**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

THE BANK OF NEW YORK MELLON
LONDON BRANCH, as Indenture Trustee
under the Indenture dated as of April 30,
2007,

          Interpleader Plaintiff,


     - against -

CART 1, LTD., as Issuer; DEUTSCHE BANK
AG FRANKFURT, as Swap Counterparty; and
CRC CREDIT FUND, LTD.,

          Interpleader Defendants.

                                   18-cv-06093 (JPO)

---

DEUTSCHE BANK AG, as Swap Counterparty,

          Counterclaim and Crossclaim
          Plaintiff,


     - against -

THE BANK OF NEW YORK MELLON
LONDON BRANCH, as Indenture Trustee
under the Indenture dated as of April 30,
2007, and CRC CREDIT FUND, LTD.,

          Counterclaim and Crossclaim
          Defendants.

                                   18-cv-06093 (JPO)

---

### INTERPLEADER DEFENDANT
### DEUTSCHE BANK AG'S ANSWER, STATEMENT OF CLAIM TO THE FUNDS, COUNTERCLAIM AGAINST THE BANK OF NEW YORK MELLON LONDON BRANCH AND CROSSCLAIMS AGAINST CRC CREDIT FUND, LTD.

Interpleader Defendant Deutsche Bank AG ("Deutsche Bank"), herein named Deutsche

Bank AG Frankfurt, by its attorneys Cahill Gordon & Reindel LLP, hereby answers the

Interpleader Complaint (the "Complaint") of Interpleader Plaintiff The Bank of New York Mellon, London Branch ("BNY Mellon" or the "Trustee") in the above-captioned action.

1.      Deutsche Bank admits the allegations in the first sentence of Paragraph 1; admits that the Trustee holds more than €42 million in Disputed Funds;[1] admits that Deutsche Bank claims entitlement to €24,400,601.41 of Disputed Funds; admits that CRC Credit Fund, Ltd. ("CRC") holds CART 1, Ltd. ("CART 1" or the "Issuer") Class E Notes; avers that CRC is a noteholder in the Series 65 issuance of a special purpose vehicle ("Coriolanus") which is linked to CART 1 Class F Notes; denies having knowledge or information sufficient to form a belief as to the allegations concerning any person or entity other than Deutsche Bank contained in Paragraph 1, and otherwise denies the allegations contained in Paragraph 1.

2.      Deutsche Bank admits that the CART 1 transaction was intended to provide credit protection to Deutsche Bank; admits that as part of the CART 1 transaction, Deutsche Bank entered into Swaps[2] with the Issuer pursuant to which Deutsche Bank purchased protection against defaults in a set of underlying loans for which Deutsche Bank or its affiliates was lender and/or servicer; admits that under the Swaps, Deutsche Bank made periodic premium payments; admits that under the Swaps, if the underlying loans defaulted and the underlying lender received no recovery, or only a partial recovery, the Issuer would make protection payments to Deutsche

---

[1] Terms used but not defined herein have the meanings provided to them in the Trustee's Interpleader Complaint. (Dkt. No. 1.)

[2] Deutsche Bank generally denies any allegation in the Complaint that this dispute concerns only a single Confirmation that sets forth the terms of a single credit default swap; and avers that a Mezzanine Confirmation governs Class A+, A, B, C, D, and E Notes under one credit default swap, and a First Loss Confirmation governs Class F Notes under another credit default swap (collectively, the "Swaps"). True and correct copies of the Mezzanine and First Loss Confirmations (collectively the "Confirmations") are attached hereto as Exhibits 1 and 2, respectively.

Bank; and denies knowledge or information sufficient to form a belief as to the allegations concerning any person or entity other than Deutsche Bank contained in Paragraph 2.

3.      Deutsche Bank denies having knowledge or information sufficient to form a belief as to the allegations concerning any person or entity other than Deutsche Bank contained in Paragraph 3; and otherwise admits the allegations in Paragraph 3.

4.      Deutsche Bank admits the allegations in Paragraph 4.

5.      Deutsche Bank admits the allegations in Paragraph 5.

6.      Deutsche Bank admits the allegations in Paragraph 6.

7.      Deutsche Bank admits that CRC has asserted that Deutsche Bank breached its obligations under the Swaps, denies having knowledge or information sufficient to form a belief as to the allegations concerning any person or entity other than Deutsche Bank contained in Paragraph 7, and otherwise denies the allegations contained in Paragraph 7.

8.      Deutsche Bank admits the allegations in Paragraph 8 and avers that it has materially complied with its obligations in connection with the Swaps.

9.      Deutsche Bank admits the allegations in Paragraph 9, and avers that on June 29, 2018, CART 1 instructed the Trustee to make payments as set forth in an Information Report of Legal Maturity ("Information Report"), dated June 15, 2018.  That Information Report directed €17,983,430.97 to be paid to Class E noteholders and €8,499,895.28 on Class E Notes and €15,900,706.13 on Class F Notes to be paid to Deutsche Bank.

10.      The allegations contained in Paragraph 10 purport to state a legal conclusion to which no response is required.  To the extent that a response is required, Deutsche Bank refers the Court to the transaction documents for their complete content and context, and otherwise denies the allegations in Paragraph 10.

11.     Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 11, which speak to the Trustee's subjective motivation in filing the instant action.

12.     Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 12.

13.     Deutsche Bank admits the allegations in Paragraph 13.

14.     Deutsche Bank admits that Deutsche Bank AG is a bank organized under the laws of the Federal Republic of Germany, avers that "Deutsche Bank AG Frankfurt," as referred to in the transaction documents, is the same entity as "Deutsche Bank AG," and otherwise denies the allegations in Paragraph 14.

15.     Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 15.

16.     Paragraph 16 states a legal conclusion to which no response is required.  To the extent a response is required, Deutsche Bank admits that it is organized under the laws of the Federal Republic of Germany, denies having knowledge or information sufficient to form a belief as to the allegations concerning any person or entity other than Deutsche Bank contained in Paragraph 16, and otherwise denies the allegations contained in Paragraph 16.

17.     Paragraph 17 states a legal conclusion to which no response is required.  To the extent a response is required, Deutsche Bank refers the Court to the quoted material for their complete content and context, and otherwise denies the allegations contained in Paragraph 17.

18.     Paragraph 18 states a legal conclusion to which no response is required.  To the extent a response is required, Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 18.

19.     Deutsche Bank admits the allegations in the first sentence of Paragraph 19; denies that the Complaint included a copy of a Confirmation as an Exhibit; avers that Class F Notes are governed by a First Loss Confirmation and that all other classes of Notes are governed by a Mezzanine Confirmation; admits that pursuant to the Swaps, the Issuer sold, and Deutsche Bank purchased, credit protection to protect against defaults in certain underlying loans referred to as the "Reference Obligations"; and refers the Court to the referenced material for its complete content and context.

20.     Deutsche Bank admits the allegations in Paragraph 20 and otherwise refers the Court to the referenced material for its complete content and context.

21.     Deutsche Bank admits the allegation in Paragraph 21 of the Complaint that the Issuer, the Trustee, and others entered into an Indenture[3] concurrently with the Swaps; and denies that the Complaint included a copy of the Indenture as an Exhibit.

22.     Deutsche Bank admits the allegation in Paragraph 22 that the Issuer issued Notes pursuant to the Indenture and otherwise refers the Court to the Indenture for its complete content and context.

23.     Deutsche Bank admits the allegation in Paragraph 23 that the Swaps matured on June 15, 2018; admits that Deutsche Bank issued one or more valid Credit Event Notices, which entitled it to receive protection payments pursuant to the Swaps; avers that, as a courtesy, Deutsche Bank agreed to an extension of the maturity date from June 15, 2018 to June 29, 2018; admits that final payments to the Noteholders and final protection payments to Deutsche Bank were scheduled to occur on the maturity date; denies that the transaction documents referred to

---

[3] A true and correct copy of the Indenture is attached hereto as Exhibit 3.

June 15, 2018 as the "Final Maturity Date," but rather referred to that date as the "Legal Maturity

Date;" and otherwise refers to the referenced material for its complete content and context.

24.     Deutsche Bank admits that CRC asserted in a letter dated May 29, 2018 that

Deutsche Bank breached its obligations under a swap, claiming, *inter alia*, the allegations in

subparts (a), (b), and (c) of Paragraph 24; admits that CRC instructed the Trustee not to make

any payment to Deutsche Bank under the Swaps on the maturity date; refers the Court to CRC's

May 29, 2018 letter for its complete content and context; and otherwise denies having

knowledge or information sufficient to form a belief as to the allegations concerning any person

or entity other than Deutsche Bank contained in Paragraph 24.

25.     Deutsche Bank admits the allegation in Paragraph 25 that it responded to CRC's

May 29, 2018 letter via a letter dated June 11, 2018, and refers to the June 11, 2018 letter for its

complete content and context.

26.     Deutsche Bank admits the allegations in Paragraph 26.

27.     Deutsche Bank admits that it wrote to the Trustee on June 29, 2018; refers to the

June 29, 2018 letter for its complete content and context; and otherwise denies having

knowledge or information sufficient to form a belief as to the truth or falsity of allegations

contained in Paragraph 27.

28.     Deutsche Bank admits the allegations in Paragraph 28.

29.     Deutsche Bank denies having knowledge or information sufficient to form a

belief as to the truth or falsity of allegations contained in Paragraph 29, except avers that if the

Trustee fails to make distributions in accordance with its obligations, Deutsche Bank would

regard that as, among other things, an Event of Default under the Indenture.

30.     The allegations contained in Paragraph 30 purport to state a legal conclusion to which no response is required.

31.     The allegations contained in Paragraph 31 purport to state a legal conclusion to which no response is required.

32.     The allegations contained in Paragraph 32 purport to state a legal conclusion to which no response is required.

33.     The allegations contained in Paragraph 33 purport to state a legal conclusion to which no response is required.

34.     Deutsche Bank repeats and restates its answers set forth in the preceding Paragraphs, inclusive, as though fully set forth herein.

35.     Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 35, except avers that it is entitled to the amounts owed to it under the Swaps.

36.     Deutsche Bank admits the allegations Paragraph 36.

37.     Deutsche Bank admits the allegation in Paragraph 37 that CRC made allegations against Deutsche Bank in its May 29, 2018 letter to the Trustee, refers the Court to CRC's May 29, 2018 letter for its complete content and context, and denies any allegations asserted by CRC against Deutsche Bank in that letter.

38.     The allegations contained in Paragraph 38 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 38.

39.     The allegations contained in Paragraph 39 purport to state a legal conclusion to which no response is required.

40.     The allegations contained in Paragraph 40 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 40.

41.     The allegations contained in Paragraph 41 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Deutsche Bank admits that it is a party to the Swaps and is entitled to protection payments under the Swaps, and otherwise denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 41.

42.     The allegations contained in Paragraph 42 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 42.

43.     The allegations contained in Paragraph 43 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 43.

44.     The allegations contained in Paragraph 44 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Deutsche Bank denies the allegations contained in Paragraph 44.

45.     Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 45.

46.     Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 46.

47.     The allegations contained in Paragraph 47 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Deutsche Bank denies having knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 47 and refers the Court to the referenced material for its complete content and context.

48.     Deutsche Bank admits that the Euro is currently a negative interest currency, but denies having knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in the first sentence of Paragraph 48.   The allegations contained in the second sentence of Paragraph 48 purport to state a legal conclusion to which no response is required.

## **DEFENSES**

Without admitting any wrongful conduct on its part and without conceding that it has the burden of proof on any of the following defenses, Deutsche Bank alleges the following defenses to the Complaint:

First Defense
(Failure to State a Claim for Relief)

The allegations of the Complaint are barred, in whole or in part, because the Complaint fails to state a claim upon which relief may be granted.

<u>Second Defense</u>
(No Legitimate Dispute)

The allegations of the Complaint are barred, in whole or in part, because there is no legitimate dispute as to the funds at issue (or any portion thereof).

<u>Third Defense</u>
(Barred by Governing Agreements)

The allegations of the Complaint are barred, in whole or in part, by the terms of the Indenture and related agreements.

<u>Fourth Defense</u>
(Lack of Authority to Withhold Payment)

The allegations of the Complaint are barred, in whole or in part, because the Trustee lacked the authority under the Indenture and related agreements to withhold the payment at issue based on the objections interposed by CRC.

## DEUTSCHE BANK'S STATEMENT OF CLAIM TO THE FUNDS

Defendant and Counterclaim/Crossclaim Plaintiff Deutsche Bank by and through the undersigned counsel, for its Statement of Claim to the Funds that are the subject of the Complaint, alleges as follows:

### PARTIES

1.      Deutsche Bank AG is a bank organized under the laws of the Federal Republic of Germany.

2.      Upon information and belief, The Bank of New York Mellon, London Branch is a branch of the Bank of New York Mellon, a New York banking corporation, with its principal place of business in New York, New York.

3.      CART 1 is an exempted limited liability company organized under the laws of the Cayman Islands.

4.      Upon information and belief, CRC is an exempted limited liability company organized under the laws of the Cayman Islands.

### NATURE OF THE ACTION

5.      This interpleader action arises from the failure of BNY Mellon, as Trustee in connection with the Swaps entered into between CART 1, as Issuer, and Deutsche Bank, as Swap Counterparty, to comply with its contractual obligations by failing to make timely payments due to Deutsche Bank under the terms of the Swaps and from CRC's tortious interference with Deutsche Bank's entitlement to protection payments under the Swaps.

6.      Pursuant to the terms of the Swaps, Deutsche Bank agreed to make periodic payments to CART 1 and did, in fact, make such payments.  In exchange, CART 1 agreed to provide credit protection to Deutsche Bank on certain Reference Obligations to which it, or its affiliates, served as lender.  Specifically, CART 1 agreed to protect Deutsche Bank in the event

-11-

of a credit event of a Reference Obligation by making payments ("Floating Payments") to cover any losses suffered by Deutsche Bank, up to a certain limit.

      7.      Concurrent with its entry into the Swaps, on April 30, 2007, CART 1 issued certain Notes linked to the performance of the Reference Obligations.  CRC is a holder of Class E Notes and a noteholder in the Series 65 issuance of Coriolanus, which is linked to Class F Notes.

      8.      By its own admission, when certain Reference Obligations experienced credit events and Deutsche Bank suffered losses in connection with those Reference Obligations, the Trustee declined to distribute the €24,400,601.41 in Floating Payments due to Deutsche Bank.  It did so based on Defendant CRC's baseless claim that Deutsche Bank breached its obligations under the Swaps and therefore was not entitled to the Floating Payments.

      9.      But the relevant transaction documents are clear: the Confirmations governing the Swaps required CART 1 to make Floating Payments to Deutsche Bank in the event Deutsche Bank suffered losses as a result of a credit event on a Reference Obligation, and the Indenture unambiguously required the Trustee to distribute the Floating Payments at issue to Deutsche Bank.  The Trustee's failure to do so is a breach of the Indenture, and CRC's meritless objections to, and tortious interference with, the Trustee's obligations do not justify such a breach.

## STATEMENT OF FACTS

**The Transaction**

      10.      This dispute concerns the following primary transaction documents:

      (a)      The April 30, 2007 Confirmations, as amended and restated on June 22, 2017 which, together with an ISDA Master Agreement and Schedule (attached hereto as Exhibits 4 and 5, respectively), set forth the terms of the credit default swaps entered into by CART 1 and Deutsche Bank.

-12-

(b)     The April 30, 2007 Indenture, as amended and restated on June 22, 2017, entered into by CART 1, as Issuer, and BNY Mellon, as Trustee.  Deutsche Bank is an express third party beneficiary of the Indenture.  *See* Indenture §14.8.

11.     Under the terms of the Swaps, CART 1 agreed to sell credit protection to Deutsche Bank to cover potential losses on a portfolio of Reference Obligations (the "Reference Portfolio").  The agreed-to credit protection consists of Floating Payments by the Issuer to Deutsche Bank upon the occurrence of certain credit events ("Credit Events") and the determination of actual losses incurred by Deutsche Bank ("Loss Determination Amount").  *See* Confirmations § 3; Indenture § 11.1.

12.     Credit Events include a borrower's failure to pay amounts due in connection with a Reference Obligation or a borrower's bankruptcy.

13.     In exchange for the credit protection, Deutsche Bank agreed to make certain periodic payments ("Fixed Payments") to the Issuer.  Throughout the life of the Swaps, Deutsche Bank paid more than €100 million in Fixed Payments to CART 1 Class E and Class F noteholders.

14.     Pursuant to the Indenture, CART 1 issued seven classes of Notes to noteholders (Class A+, Class A, Class B, Class C, Class D, Class E, and Class F), which were linked to the performance of the Reference Portfolio.

15.     Deutsche Bank is an express third party beneficiary of the Indenture.

16.     In the Indenture, CART 1 granted BNY Mellon, as Trustee, the "right, title and interest" to secure CART 1's obligations to certain parties, including the noteholders and Deutsche Bank.  *See* Indenture, Granting Clause.  This grant included securing the payment of "all amounts payable by the Issuer under the Credit Default Swaps" due to Deutsche Bank.  *Id.*

Thus, the Indenture obligated the Trustee to secure CART 1's obligations to pay Deutsche Bank Floating Payments when they became due.

17.     The Indenture also dictated the order and mechanics of the various payments to be made under the Indenture and the Confirmations.  Specifically, Section 11.1 of the Indenture outlined the Trustee's periodic distribution obligations, including the order in which amounts were to be distributed among the Trustee, the Noteholders, and Deutsche Bank as Swap Counterparty.

18.     The Indenture subordinates the Trustee's and the Noteholders' rights to payments under the Indenture to those of Deutsche Bank as Swap Counterparty.  *See* Indenture § 13.1.

**The Reference Portfolio**

19.     The Reference Portfolio was comprised of loans made to certain borrowers ("Reference Entities") held by and for the benefit of Deutsche Bank.  The initial notional amount of the Reference Portfolio was €1,700,000,000 in relation to which the Issuer agreed to provide credit loss protection of up to €263,500,000.

20.     The Reference Portfolio initially consisted of Reference Obligations that met certain criteria outlined in the Confirmations ("Reference Obligation Eligibility Criteria," *see* Confirmations, Sch. C).

21.     Deutsche Bank was both lender and servicer of the Reference Obligations.

22.     During the life of the Swaps, Reference Obligations could be removed from the Reference Portfolio if, for example, a Reference Obligation was paid down.  If Reference Obligations were removed, Deutsche Bank could elect to add additional Reference Obligations to the Reference Portfolio as follows:

(a)     Under the terms of the Confirmations, if the notional amount of the Reference Portfolio decreased, Deutsche Bank was permitted to add to the Reference

Portfolio additional Reference Obligations up to the agreed-upon maximum

Reference Portfolio notional amount through a process known as

"Replenishment", provided that the applicable Reference Obligation Eligibility

Criteria and certain other criteria ("Replenishment Conditions," *see*

Confirmations, Sch. D) were met.

(b)      Further, under the terms of the Confirmations, if a Reference Obligation was

partially or fully prepaid or cancelled, Deutsche Bank could "substitute another

obligation of the applicable Reference Entity that satisfies the Reference

Obligation Eligibility Criteria other than clauses (a) and (c) thereof . . . for the

prepaid or cancelled portion of such Reference Obligation," through a process

known as "Substitution."  Confirmations, Sch. D §(x)(1).  The Replenishment

Conditions need not be satisfied for a Substitution.

(c)      Further, under the terms of the Confirmations, if a Reference Obligation was

"partially or fully paid from the proceeds of one or more other loan or credit

facilities that satisfy the Reference Obligation Eligibility Criteria other than

clauses (a) and (c) thereof" then Deutsche Bank could "elect to include any such

Replacement Reference Obligation(s) in the Reference Portfolio," through a

process known as "Replacement."  Confirmations, Sch. D §(x)(2).  The

Replenishment Conditions need not be satisfied for a Replacement.

23.      The Confirmations also afforded Deutsche Bank significant discretion in

servicing Reference Obligations, providing that Deutsche Bank "shall at all times act . . . as a

reasonable creditor in the protection of its own interests acting reasonably and in good faith in

accordance with its general business practices taking into account the interests of Seller."  In

-15-

addition, it empowered Deutsche Bank to "take all measures it deems necessary or appropriate in its professional judgment (which judgment shall, for the avoidance of doubt, be reasonable) to service the relevant part of the Reference Portfolio." It further provided that, "[i]n the case of a conflict between the interests of [Deutsche Bank] and the interests of the Noteholders, [Deutsche Bank] shall give priority to the interests of [Deutsche Bank] and then, among the Noteholders, to the interests of the Holders of the Class or Classes of Notes which then rank most senior pursuant to the Priority of Payments." (*See* Confirmations, Sch. F.)

24.    In the case of a Credit Event, the Confirmations provided that Deutsche Bank, as servicer of the defaulting Reference Obligation ("Defaulted Reference Obligation"), would conduct any "work-out processes . . . in accordance with its servicing practices prevailing from time to time and this Confirmation." (Confirmations § 5.)

25.    According to Section 5 of the Confirmations (which provides the method for calculating Actual Recoveries):

> For each Defaulted Reference Obligation….All work-out processes . . . shall be deemed to continue until the date on which [Deutsche Bank] either shall have (a) consummated the sale of such Reference Obligation *or determined in accordance with such servicing practices and this Confirmation either that such Reference Obligation is to be written off (as reflected in the relevant [Deutsche Bank] Entity's books and records)* or (b) the formal work-out process is to have been terminated (such date, as determined by the Calculation Agent, the **"Loss Determination Date"**).

Confirmations § 5 (italicized emphasis added, bolded emphasis in original).

26.    Deutsche Bank's internal policies provided that Reference Obligations could be written off when the uncollectability of the loan, or a portion thereof, was determined to be probable (*i.e.*, when a greater than 50% chance existed that collectability would not occur).

-16-

27.     On or promptly after the Loss Determination Date, the Confirmations provided that Deutsche Bank would determine the Loss Determination Amount and, subject to the terms of the Confirmations, that amount would be paid to Deutsche Bank as a Floating Payment (*i.e.* a protection payment).

28.     The Confirmations also provided that, if the work-out process for any Defaulted Reference Obligation had not concluded by the Legal Maturity Date such that no Loss Determination Amount had been determined for the Defaulted Reference Obligation, then the Loss Determination Amount for that Defaulted Reference Obligation would be zero.

29.     During the course of the Swaps, Deutsche Bank's work-out team completed work-outs of a number of defaulted Reference Obligations pursuant to Deutsche Bank's policies.

30.     After a completed write-off, the Confirmations provided that Deutsche Bank would be entitled to credit protection (Floating Payments) upon the satisfaction of two conditions: (1) Deutsche Bank was to distribute a Credit Event Notice notifying CART 1 and the Trustee of the Credit Event, and (2) Deutsche Bank was to procure from the independent accounting firm KPMG a Notice of Accountant Certification certifying the following:

(a)     "that such Defaulted Reference Obligation satisfied the Reference Obligation Eligibility Criteria to the extent applicable thereto and, if added to the Reference Portfolio pursuant to a Replenishment, did not (taken together with any other Reference Obligation added to the Reference Portfolio on the same Replenishment Date) contravene the Replenishment Conditions, in each case on the related Relevant Date,"

(b)     "that the Credit Event identified in the Credit Event Notice occurred and"

(c)     "the computation of the relevant Loss Determination Amount."

*See* Confirmations § 3 at 12-13.

**Conergy**

31.     A Reference Obligation of €14.3 million tied to Conergy AG ("Conergy"), a German solar panel manufacturer, was included in the Reference Portfolio of CART 1 at the Reference Portfolio's inception on April 30, 2007.  That Reference Obligation was removed from the Reference Portfolio on June 27, 2007.

32.     On July 31, 2007, Conergy entered into a €600 million syndicated multicurrency revolving credit and amortizing term loan facilities agreement.  As part of this agreement, Deutsche Bank Luxembourg, S.A. ("DB Luxembourg")[4] agreed to loan a total of €45 million to Conergy:  €11.25 million as an amortizing term loan and €33.75 million as a revolving credit and letter of guarantee facility.  DB Luxembourg is the only Deutsche Bank entity that acted as an original lender of the July 31, 2007 agreement.

33.     On September 13, 2007, Deutsche Bank added €20.25 million of the Conergy revolving credit and letter of guarantee facility to CART 1's Reference Portfolio via Replenishment.  This Replenishment satisfied the Confirmations' Reference Obligation Eligibility Criteria and the Replenishment Conditions.

34.     On November 30, 2007, Deutsche Bank added €4.05 million of the Conergy amortizing term loan to CART 1's Reference Portfolio via Replenishment.  This Replenishment satisfied the Confirmations' Reference Obligation Eligibility Criteria and the Replenishment Conditions.

---

[4] DB Luxembourg is a wholly-owned subsidiary of Deutsche Bank AG.

**Conergy Restructuring**

35.     In November of 2009, Conergy informed its lenders, including DB Luxembourg, that based on its liquidity forecast, the Company would require a postponement of its obligations to pay repayment installments due in December.

36.     Sometime after the original issuance, Deutsche Bank AG's distressed debt desk based out of London ("DB London), which is separate and distinct from DB Luxembourg, purchased Conergy debt issued under the syndicated loan agreement.

37.     The Confirmations expressly contemplated and permitted Deutsche Bank and its affiliates to conduct business with a Reference Entity:

> "each party and its Affiliates may, where permitted, accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking or other business with, a Reference Entity . . . and may act with respect to such business in the same manner as each of them would if the relevant Transaction did not exist, regardless of whether any such action might have an adverse effect on a Reference Entity, or the position of any other party or otherwise (including, without limitation, any action which might constitute or give rise to a Credit Event)[.]"

Confirmations § 8(b)(ii).

38.     A subsequent independent business review provided by PricewaterhouseCoopers ("PWC") determined that Conergy's capacity for long-term senior cash debt had declined.

39.     As a result, Conergy and its lenders agreed to restructure Conergy's debt to account for its reduced debt capacity and to increase the recovery outlook for its lenders.

40.     On or about December 13, 2010, PWC presented to Conergy's lenders two options under its restructuring plan: (i) a debt-for-equity swap, in which lenders could exchange their debt holdings for equity shares in Conergy, or (ii) a debt refinancing, which included a

haircut.  PWC estimated that the debt-for-equity swap would result in a 72% recovery, and that debt refinancing would result in an 84% average recovery.

41.     On December 17, 2010, Conergy agreed to a restructuring term sheet with its lenders, refinancing its remaining debt under the syndicated loan agreement.  As part of the term sheet, certain lenders ("Swapping Lenders") participated in the debt-for-equity swap, including DB London.  Many lenders, including DB Luxembourg, decided not to participate in the debt-for-equity swap; DB Luxembourg was not a Swapping Lender and did not receive any equity in Conergy.  DB Luxembourg instead opted for the debt refinancing and, as part of the debt refinancing, accepted a €6.6 million haircut which it wrote off in the third quarter of 2011 for a loss.  The haircut occurred prior to any relevant credit event and had no impact on CART 1.

42.     As part of the restructuring, on July 8, 2011, Conergy and its lenders entered into a €273,184,146 multicurrency senior term loan and revolving credit and guarantee facilities agreement.

43.     As part of the July 8, 2011 restructuring on the syndicate level, and in line with conditions for other syndicate lenders, the debt was restructured into three tranches, with each tranche entitled to a pro rata payment in the event of a default.

**Conergy Default and Deutsche Bank's Write Off**

44.     On July 5, 2013, Conergy filed for insolvency.  Thus, the Conergy Reference Obligations defaulted, and a Credit Event occurred with respect to the Conergy Reference Obligations under the terms of the Confirmations.

45.     On July 10, 2013, facility agent Commerzbank International S.A. issued a Notice of Termination and Acceleration declaring the Conergy debt, together with accrued interest, immediately due and repayable.

46.     On July 23, 2013, Deutsche Bank issued a Credit Event Notice in connection with the defaulted Conergy Reference Obligations.

47.     Thereafter, Deutsche Bank's recovery team – as the work-out team had done ahead of the insolvency filing via the active restructuring negotiation – began the process of seeking to recover what it could on the defaulted debt, which continued for the next several years.

48.     In March 2018, nearly nine years after the work-out process began, nearly five years after Conergy filed for insolvency and Deutsche Bank's recovery team began its recovery process, and based on information from the insolvency administrator, Deutsche Bank's recovery team determined that €25.2 million of its Conergy debt was expected to be unrecoverable and recommended that it be written-off.

49.     The determination was made consistent with Deutsche Bank's internal policies.

50.     On March 23, 2018, Deutsche Bank wrote off €25.2 million of Conergy debt, thus concluding the Conergy Reference Obligation work-out process.

51.     On June 7, 2018, Deutsche Bank issued a Cash Settlement Notice for the Conergy Reference Obligation.

**Legal Maturity Date**

52.     The Confirmations originally provided for a Legal Maturity Date of June 15, 2018, at which time the transaction was to terminate.  At that point, any remaining credit protection that Deutsche Bank had not yet drawn upon (*i.e.*, the credit protection fund less the last scheduled Floating Payments) was to be distributed to the noteholders.  Thus, it was in the noteholders' financial interests for Deutsche Bank to draw upon as little of the credit protection fund as possible.

53.      By letter on June 14, 2018, Deutsche Bank agreed to extend the Legal Maturity Date from June 15, 2018 to June 29, 2018, as a courtesy in order to address allegations raised by CRC, which are discussed in detail below.

54.      On June 29, 2018, the transaction terminated.  By this time, all conditions necessary to entitle Deutsche Bank to the Floating Payments had been satisfied.  Deutsche Bank provided a Credit Event Notice on July 23, 2013 and a Notice of Accountant Certification on June 6, 2018.  *See* Confirmations § 3.  And under the Indenture, the Trustee was in receipt of (i) an Information Report, pursuant to Section 10.5; (ii) an Issuer Order directing it to pay Deutsche Bank consistent with the Information Report, pursuant to Section 11.1(a); and (iii) payment instructions, pursuant to Section 10.5(b)(i).

55.      As set forth in the Information Report and the Issuer Order, the Trustee was obligated on June 29, 2018 to pay (i) €8,499,895.28 to Deutsche Bank in connection with Class E Notes and (ii) €15,900,706.13 to Deutsche Bank in connection with Class F Notes (for a total aggregate amount of €24,400,601.41).

**CRC's Baseless Objections Aimed at Causing the Trustee's Breach**

56.      Only the CART 1 Class E and F Notes have not yet been redeemed.

57.      CRC purports to hold 82.56% of the Class E Notes and 100% of the Class F Notes issued by CART 1 pursuant to the Indenture.

58.      CRC is not a Class F Noteholder.  CRC is a noteholder in the Series 65 issuance of Coriolanus, which is linked to Class F Notes.

59.      Given its interest in a significant majority of the unredeemed Notes, CRC's payouts will be reduced should credit protection payments be paid to Deutsche Bank.  CRC therefore has a direct financial incentive to prevent Deutsche Bank from drawing upon the credit protection.

60.     Understanding that Deutsche Bank's entitlement to credit protection cuts against its financial interests, CRC set out to invent false allegations that Deutsche Bank breached the Confirmations in an effort to cause the Trustee to withhold credit protection payments from Deutsche Bank.

61.     In implementing this plan, CRC wrote a letter to the Trustee dated May 29, 2018, in which it demanded that the Trustee "ensure that no Floating Rate Payments are made to [Deutsche Bank]" and advanced categorically incorrect and baseless allegations that accuse Deutsche Bank of somehow breaching the Confirmations, including:

(a)     Allegations that Deutsche Bank engaged in a "last-minute fire sale" or otherwise improperly accelerated its workout of the Conergy debt and another "six defaulted reference obligations with five reference entities" in order to collect credit protection by the Legal Maturity Date.  In fact, Deutsche Bank did not sell the Conergy debt or any of the other six Reference Obligations CRC's letter lists; much less engage in a fire sale.  Moreover, debt associated with three of the Reference Entities was not written off at all, *i.e.* Deutsche Bank never even sought credit protection in connection with them, and the Conergy debt was written off after a nearly nine years-long workout process that proved consistent with Deutsche Bank's internal policies.

(b)     Allegations that DB Luxembourg participated in the debt-for-equity swap and failed to give CART 1 its pro rata share of equity.  In fact, DB Luxembourg did not participate in the debt-for-equity swap at all and, naturally, could not give CART 1 a pro rata share of equity that it never received.  And DB London, which participated in the debt-for-equity swap prior to any relevant Credit Event, was entirely free to do so under the express terms of the Confirmations.  Confirmations § 8(b)(ii).

(c)     Allegations that during the July 2011 syndicated loan restructuring, DB Luxembourg replaced senior debt with subordinated debt.  In fact, the debt was structured into three tranches, each of which would be paid pro rata in the event of a default, thus qualifying as a senior obligation under the terms of the Confirmations.

(d)     Allegations that the July 2011 syndicated loan restructuring failed to satisfy the Replenishment Criteria and Reference Obligation Eligibility Criteria (a).  In fact, this restructuring was not a Replenishment at all, but a Replacement or Substitution.  Under the terms of the Confirmations, Replacements and Substitutions are subject to neither the Replenishment

-23-

Criteria nor Reference Obligation Eligibility Criteria (a). The restructuring met all required criteria under the Confirmations. *See* Confirmations Sch. D.

(e)     Allegations that the Transaction Documents obligated Deutsche Bank to subordinate its interests to those of CRC and the Noteholders. In fact, the Confirmations state the opposite: that "[i]n the case of a conflict between the interests of [Deutsche Bank] and the interests of the Noteholders, [Deutsche Bank] shall give priority to the interests of [Deutsche Bank] and then, among the Noteholders, to the interests of the Holders of the Class or Classes of Notes which then rank most senior pursuant to the Priority of Payments." Confirmations, Sch. F.

62.     With the hope that CRC's letter reflected confusion rather than a self-serving motive, Deutsche Bank reviewed and investigated CRC's concerns and corresponded and conferred with CRC in good faith.

63.     Further communication with CRC only revealed the absence of any justification for its scattershot allegations and the transparent motive behind them: to cause the Trustee to breach the Indenture in the hopes of prompting Deutsche Bank to offer CRC a settlement.

**The Trustee Withholds Funds Due to Deutsche Bank in Contravention of the Indenture**

64.     As noted above, all conditions necessary to entitle Deutsche Bank to the Floating Payments were satisfied in advance of the Legal Maturity Date.

65.     Article 11 of the Indenture required the Trustee to distribute to Deutsche Bank on the Legal Maturity Date the Floating Payments to which it is entitled.

66.     On the Legal Maturity Date, the Trustee withheld the Floating Payments from Deutsche Bank.

67.     On July 5, 2018, six days after the Legal Maturity Date, the Trustee filed the instant Complaint.

68.     To date, Deutsche Bank has not been paid the Floating Payments that it is owed.

69.     The Trustee's failure to provide the Floating Payments to Deutsche Bank is a breach of Article 11 of the Indenture, to which Deutsche Bank is an intended third party beneficiary.

70.     The Trustee's failure to provide the Floating Payments to Deutsche Bank is an Event of Default under Section 5.1 of the Indenture.  *See* July 12, 2018 CART 1 Notice of Default (attached hereto as Exhibit 6).

71.     Neither CART 1 nor the Trustee has ever on its own disputed Deutsche Bank's right to be paid the Floating Payments.  The only justification the Trustee has offered for withholding payment from Deutsche Bank at this time are the baseless allegations CRC advanced in its May 29, 2018 letter.  CRC's objections, however, in addition to being meritless, provide no basis for the Trustee to withhold the payment, because the Trustee lacks the authority under the Indenture to withhold the Floating Payments.

72.     There is no provision in the Indenture (or any other related agreement) that authorizes the Trustee, or empowers CRC to instruct the Trustee, to withhold any Floating Payment the Issuer (CART 1) directs the Trustee to pay pursuant to a Credit Event.

73.     Contrary to the Interpleader Complaint's allegations, making the Floating Payments would not have exposed the Trustee to claims.  The Trustee would have been protected against such claims because it would have relied on the Information Report and the Issuer Order in good faith.  *See, e.g.*, Indenture at §6.1(c)(v) ("the Trustee shall not be liable to the other Secured Parties for any action taken or omitted by it at the direction of the Issuer or any such Secured Parties under circumstances in which such direction is required or permitted by the terms of this Indenture."); *id.* at §6.3(A) ("the Trustee may conclusively rely and shall be fully

protected in acting . . . upon any . . . report . . . order . . . or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.").

74.     Upon information and belief, the Trustee intends to continue withholding the payment due to Deutsche Bank until directed to pay such by the Court.

## COUNTERCLAIM AGAINST BNY MELLON AND CROSSCLAIMS AGAINST CART 1 AND CRC

Counterclaim and Crossclaim Plaintiff Deutsche Bank, by and through the undersigned counsel, for its Counterclaim against Counterclaim Defendant BNY Mellon, as Trustee, and its Crossclaims against Crossclaim Defendants CART 1 and CRC hereby alleges and states as follows:

## JURISDICTION AND VENUE

75.     Jurisdiction is proper under 28 U.S.C. §1335 and Federal Rule of Civil Procedure 13 because the counterclaim and crossclaims pleaded below arise out of the same transactions and occurrences that are the subject matter of this interpleader action, and venue is proper pursuant to 28 U.S.C. §1391 and 28 U.S.C. §1397.

76.     Jurisdiction and venue are also proper pursuant to the forum selection and consent to jurisdiction clauses contained in Section 14.10 of the Indenture.  Deutsche Bank is an express third party beneficiary of the Indenture.  *See* Indenture §14.8.

## STATEMENT OF FACTS

77.     Deutsche Bank repeats and realleges all other paragraphs set forth herein and in its Answer and Statement of Claim to the Funds as if set forth here in full.

## COUNT I

### (Declaratory Judgment Against All Counterclaim and Crossclaim Defendants)

78.     Deutsche Bank repeats and realleges all other paragraphs herein as if set forth here in full.

79.     The parties entered into valid, binding contracts as described above.

80.     Deutsche Bank is an intended third party beneficiary of, and entitled to enforce, the Indenture, including in connection with the distribution of Transaction-related monies under Section 11.1 thereof.

81.     Deutsche Bank has fulfilled its obligations under the Transaction Documents in all material respects.

82.     As described above, Deutsche Bank is entitled to certain Floating Payments pursuant to the Transaction Documents, including under Section 3 of the Confirmations and Section 11.1 of the Indenture.

83.     Deutsche Bank is entitled to €24,400,601.41 in Floating Payments, consistent with the June 29, 2018 Issuer Order.

84.     Section 11.1 of the Indenture required that amount to be distributed to Deutsche Bank on June 29, 2018.

85.     To date, Deutsche Bank has not received any such distribution.

86.     An actual controversy exists between the parties regarding Deutsche Bank's entitlement to the Floating Payments.

87.     Deutsche Bank seeks a declaratory judgment that it is entitled to €24,400,601.41 in Floating Payments.

## COUNT II

### (Crossclaim Against CRC for Tortious Interference with Contract)

88.     Deutsche Bank repeats and realleges all other paragraphs herein as if set forth here in full.

89.     Deutsche Bank is an intended third party beneficiary of, and entitled to enforce, the Indenture, including in connection with the distribution of Transaction-related monies under Section 11.1 thereof.

90.     Deutsche Bank has fulfilled its obligations under the Transaction Documents in all material respects.

91.     CRC has knowledge of Deutsche Bank's status as a third party beneficiary under the Indenture and a party to the Confirmations.

92.     CRC has no right under the Transaction Documents to claim an entitlement to the Floating Payments or to instruct the Trustee to withhold the Floating Payments from Deutsche Bank.

93.     CRC has and continues to unjustifiably interfere with Deutsche Bank's rights to receive its purchased credit protection by making baseless allegations against Deutsche Bank, thereby causing the Trustee to withhold payment from Deutsche Bank and thereby breach the contracts.

94.     CRC was motivated and did induce the Trustee to breach its contractual obligation to pay Deutsche Bank the credit protection under the agreement, and instead file this Interpleader Complaint.

95.     Deutsche Bank has been harmed by CRC's interference in that Deutsche Bank remains without the credit protection payment to which it is entitled, and has been forced to incur unnecessary attorneys' fees and costs litigating this matter.

## **PRAYER FOR RELIEF**

WHEREFORE, Deutsche Bank respectfully requests that the Court enter Judgment in its favor as follows:

96.     That Deutsche Bank is entitled to €24,400,601.41 in Floating Payments under the Transaction Documents;

97.     That the Trustee's request for indemnification or reimbursement be dismissed to the extent it seeks such relief from Deutsche Bank.

98.     That Deutsche Bank be granted compensatory damages in an amount to be determined at trial plus interest, prejudgment interest, costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees, and such other and further relief as the Court deems just and proper.

August 9, 2018
New York, New York

CAHILL GORDON & REINDEL LLP

By:   _David G. Januszewski_

David G. Januszewski
Sheila C. Ramesh
Stephen C. Behymer

Eighty Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Interpleader Defendant and Counterclaim/Crossclaim Plaintiff Deutsche Bank AG*