Exhibit 1

EXECUTION COPY

**Deutsche Bank** ☒

| | |
|---|---|
| Date: | June 22, 2007 |
| To: | CART 1 Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093 GT<br>Queensgate House<br>South Church Street<br>George Town, Grand Cayman<br>Cayman Islands |
| Attention: | The Directors |
| Telephone:<br>Fax No.: | +1 (345) 945-7099<br>+1 (345) 945-7100 |
| cc: | Deutsche Bank AG Frankfurt<br>Taunusanlage 12<br>60325 Frankfurt am Main<br>Germany |
| Attention: | Christian Kuenzle/Karin Lehnert |
| Telephone:<br>Fax No.: | +49(69)910-34819/-42298<br>+49(69)910-34796 |
| Re: | Credit Derivative Transaction – Mezzanine Credit Default Swap |

The purpose of this letter (this "**Confirmation**") is to confirm the terms and conditions of the Credit Derivative Transaction entered into between Deutsche Bank AG Frankfurt ("**Party A**") and CART 1 Ltd. ("**Party B**") on the Trade Date specified below (the "**Transaction**"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions, each as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**"), and as modified as set forth herein (collectively, the "**Definitions**"), are incorporated into this Confirmation. In the event of any inconsistency between the provisions of this Confirmation and the Definitions or the Agreement, this Confirmation shall prevail for the purpose of the Transaction.

Capitalized terms used herein and not expressly defined in the body of this Confirmation shall have the meanings assigned to such terms in the amended and restated indenture, dated as of June 22, 2007, among CART 1 Ltd. (the "**Issuer**"), The Bank of New York, London Branch, as trustee and The Bank of New York (Luxembourg) S.A., as note registrar and BNY Fund Services (Ireland) Limited, as Irish Paying Agent (as the same may be amended, modified or supplemented from time to time, the "**Indenture**"). In

the event of any inconsistency between the provisions of this Confirmation and the Indenture, the Indenture shall prevail for the purpose of the Transaction.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement (1992 version, Multicurrency-Cross Border) dated as of April 30, 2007 (as the same may be amended, modified or supplemented from time to time, the "**Agreement**"), between Party A and Party B. All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The parties agree and acknowledge that the Transaction to which this Confirmation relates contemplates that there may be more than one Credit Event and accordingly more than one Cash Settlement Amount and more than one Cash Settlement Date and that the Definitions shall, for the purposes of this Confirmation, be interpreted accordingly.

The terms of the Transaction to which this Confirmation relates are as follows:

1.      **General Terms:**

Initial Portfolio
Notional Amount:                EUR 1,700,000,000

Initial Credit Default Swap
Notional Amount:                EUR 180,200,000

Mezzanine Threshold Amount:     EUR 83,300,000

Senior Threshold Amount:        EUR 263,500,000

Credit Default Swap Notional    On any date of determination:
Amount:
                                (a) the Initial Credit Default Swap Notional Amount

                                *minus*

                                (b) the aggregate amount of

                                    (x) all Floating Payments paid by Seller to Buyer

                                    *plus*

                                    (y) all Adjustment Payments paid by Seller to Buyer

                                    *minus*

                                    (z) all Adjustment Payments paid by Buyer to Seller,

                                in each case paid pursuant to the Transaction evidenced
                                hereby on or prior to such date

Cut-off Date:                   March 30, 2007

2

Trade Date:                      June 22, 2007

Relevant Date:                   (a)     With respect to any Reference Obligation comprising
                                 the Reference Portfolio on the Effective Date, the Effective
                                 Date; or

                                 (b)     with respect to any Reference Obligation added to
                                 the Reference Portfolio (or whose Reference Obligation
                                 Notional Amount was increased) thereafter, either
                                 (i) pursuant to Clause 6 below, the relevant Replenishment
                                 Date or Reset Date or (ii) pursuant to clause (x) of the
                                 provisions set forth in Schedule D hereto under which the
                                 Replenishment Conditions are made inapplicable, the date
                                 specified pursuant to such clause (x).

Effective Date:                  June 22, 2007

Scheduled Termination Date:      The "Payment Date" (as defined in the Indenture) falling in
                                 June 2015.

Final Redemption Date:           The earliest of (i) the Scheduled Termination Date, (ii) with
                                 respect to any one or more Classes of Notes, the relevant
                                 Optional Termination Date and (iii) with respect to any one
                                 or more Classes of Notes, the first date on which the
                                 Outstanding Principal Amount of each such Class of Notes
                                 (excluding the portion thereof corresponding to the Deferred
                                 Funding Amount, if any, for such Class of Notes) shall
                                 become due and payable upon acceleration of the principal of
                                 the Notes in accordance with Section 5.1 of the Indenture or
                                 redemption of such Class of Notes in accordance with Article
                                 9 of the Indenture.

Termination Date:                Notwithstanding anything to the contrary in the Definitions,
                                 the last Final Redemption Date; *provided, however*, that in
                                 the event that, on such Final Redemption Date, the Deferred
                                 Funding Amount for any Class of Notes is greater than zero,
                                 the Termination Date shall be the earliest of (a) the Payment
                                 Date on which the Deferred Funding Amount for each Class
                                 of Notes has been reduced to zero (after giving effect on such
                                 Payment Date to the applicable provisions of the Indenture in
                                 relation to such Payment Date); (b) the Payment Date
                                 immediately following the Loss Certification Date on which
                                 the Calculation Agent determines that the Cumulative Loss
                                 Amount will exceed the Senior Threshold Amount; (c) the
                                 Payment Date immediately following the Loss Certification
                                 Date on which the Calculation Agent determines the final
                                 Loss Determination Amount with respect to any of such
                                 Defaulted Reference Obligations and Impaired Reference
                                 Obligations (and no such Reference Obligation with respect
                                 to which the Conditions to Settlement have been satisfied has
                                 not had a Loss Determination Amount determined with

3

respect thereto); and (d) the Legal Maturity Date.

| | |
|---|---|
| Optional Termination Date: | If a Regulatory Event or a Clean-Up Event occurs, then Party A will on any date have the right, by written notice to Party B, to designate a succeeding Payment Date occurring not less than 10 Business Days (or such longer notice period as shall be required pursuant to the Agreement and the Indenture in connection with the redemption of more than one Class, but fewer than all Classes, of Notes and the related amendment of the Agreement) after the date such notice is effective as the Optional Termination Date hereunder, and any such designation shall be binding upon Party A and Party B and result in the termination of the Transaction in whole on such succeeding Payment Date. |
| Legal Maturity Date: | The Payment Date falling in June 2018. |
| Floating Rate Payer: | Party B (the "**Seller**") |
| Fixed Rate Payer: | Party A (the "**Buyer**") |
| Originator: | Deutsche Bank AG ("**DBAG**") and/or any of its Affiliates (collectively, "**DBAG Group**") |
| DBAG Group Entity: | Any entity within the DBAG Group |
| Servicer: | The person responsible for the administration, collection and enforcement of each Reference Obligation (in the case of any DBAG Group Entity or appointed at the initiative of any such entity, a "**DB Servicer**"; in the case of any third party agent bank not so appointed, an "**Agent Bank**") |
| Calculation Agent: | Deutsche Bank AG Frankfurt |
| Credit Event Monitoring Agent: | Deutsche Bank AG Frankfurt |
| Calculation Agent City: | Frankfurt |
| Business Days: | New York, Frankfurt, TARGET and London (and, if different, the city in which the corporate trust office of the Trustee is located, being, at the date hereof, London). |
| Business Day Convention: | Following, which shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day. |
| Reference Entity: | On any date, in respect of any Reference Obligation comprising the Reference Portfolio on that date, any obligor in respect thereof (each, a "**Reference Obligor**") or, in respect of any Reference Obligation that is subject to a guarantee, any guarantor in respect thereof (each, a "**Reference Obligation Guarantor**"), in each case as shown |

4

NY1 6227748v.3

in the books and records of the Originator, and listed with a "Reference Entity Identifier" in the .xls file attached as Schedule A hereto, as such Schedule A may be amended by the Calculation Agent from time to time in accordance with the terms set forth herein, including the terms set forth in Schedule B hereto (such list, the "**Reference Obligation List**").

If a Replenishment Date occurs during the Replenishment Period, then on the tenth day of the following month (each such day, a "**Reference Obligation List Delivery Date**"), the Calculation Agent will deliver to each of the Buyer, the Credit Event Monitoring Agent and the Seller a copy of the Reference Obligation List containing information regarding the Reference Portfolio as at the latest Replenishment Date (or, in the case of the first Reference Obligation List Delivery Date, since the Effective Date).

Requirements for Individual Reference Obligations and Reference Entities:

Each Reference Obligation and the related Reference Entity must satisfy the applicable criteria (collectively, the "**Reference Obligation Eligibility Criteria**") set forth in Schedule C hereto, on the Relevant Date for each such Reference Obligation.

Successor:

Section 2.1 of the Definitions is hereby modified by deleting the words "or a New Credit Derivative Transaction as determined pursuant to such Section 2.2" at the end thereof. Section 2.2 of the Definitions is hereby modified to read as follows:

"**Section 2.2. Successor.** "Successor" means in relation to a Reference Entity a direct or indirect successor to such Reference Entity that assumes liability in respect of any relevant Reference Obligation by way of merger, consolidation, amalgamation, transfer or otherwise, whether by operation of law or pursuant to any agreement, as determined by the Calculation Agent (after consultation with Buyer and Seller)."

Reference Entity Group:

In respect of any Reference Entity, such Reference Entity and any other debtor forming a unit with such Reference Entity (as determined in good faith by Buyer), meaning that one has (directly or indirectly) controlling influence on the other, can exert such controlling influence, or in the absence of such influence may be seen as one unit in terms of risk, or if one of such debtors experiences financial difficulties, such condition may lead the Reference Entity also to experience financial difficulties. Each Reference Entity Group will be identified by a Reference Entity Group Identifier in the Reference Obligation List.

5

Reference Portfolio: The Reference Portfolio will consist of the obligations listed as such in the Reference Obligation List in relation to Reference Entities (such obligations, the "**Reference Obligations**"), which are held by or for the benefit of any DBAG Group Entity, representing certain claims, including partial claims and contingent claims in respect of principal, interest and fees (if any) arising from certain loans (including syndicated loans), overdraft facilities, certain loan facilities that may be held on trading books, or revolving credit facilities (including reimbursement obligations arising from the acceptance of bills of exchange or drawings under letters of credit) and other payment claims arising from certain guarantees (including letters of credit) to or for the account of corporate entities, including financial institutions, and certain other entities and to or for the account of individuals, whose repayment is primarily dependent upon the creditworthiness of small or medium-sized enterprises, as determined by the relevant DBAG Group Entity in accordance with the Credit and Collection Policies.

"**Credit and Collection Policies**" means the standard credit and collection policies of Deutsche Bank AG as amended or supplemented from time to time in accordance with the Servicing Standards, consistently applied by Deutsche Bank AG and each other DBAG Group Entity and including modifications applicable to any DBAG Group Entity other than Deutsche Bank AG; *provided* that any such modification does not and will not adversely affect the quality and standards of servicing.

"**Servicing Standards**" means the servicing principles set forth in Schedule F hereto, as amended, modified or supplemented from time to time by Deutsche Bank AG or any other relevant DBAG Group Entity.

A Reference Obligation will, unless earlier removed (or subject to the reduction of its Reference Obligation Notional Amount) pursuant to a Reduction as set forth in Clause 6, remain in the Reference Portfolio until the related Reference Obligation Due Date. For any Reference Obligation, the earlier of (x) the Scheduled Termination Date and (y) (i) unless its maturity date shall have been extended pursuant to a restructuring, consensual extension or refinancing, its original maturity date or (ii) if its maturity date shall have been so extended, its maturity date as so extended or otherwise agreed pursuant to such restructuring, consensual extension or refinancing shall be the "**Reference Obligation Due Date**" for such Reference Obligation; *provided* that for a Reference Obligation consisting of a portion of an underlying claim, the Reference Obligation Due Date of such Reference Obligation shall be the remaining

6

term to maturity of such portion; and *provided further* that subject to clause (y)(ii) above, the Reference Obligation Due Date for any Reference Obligation comprising an overdraft facility or other loan payable on demand shall be construed to be either the date that is 14 months after the Relevant Date thereof or such later date as shall be specified by Buyer for such Reference Obligation as of the Relevant Date thereof. A Reference Obligation in respect of which the maturity date has been extended pursuant to the exercise of an option given to the borrower to extend the maturity of the credit facility at the initial maturity for an additional period of time established at the initial loan closing date (such later date, the "**Term-Out Maturity Date**") will remain in the Reference Portfolio until the Term-Out Maturity Date even if such Reference Obligation is governed by new loan documents, and such Term-Out Maturity Date shall become the Reference Obligation Due Date for the relevant Reference Obligation; *provided, however*, that if the original maturity date of any Reference Obligation is extended (pursuant to clause (y)(ii) above or pursuant to the exercise of an option to extend the maturity date of such Reference Obligation to its Term-Out Maturity Date) to a date later than the Scheduled Termination Date, then the Reference Obligation Due Date shall be deemed to be the Scheduled Termination Date. The Reference Portfolio will not include any Liquidated Reference Obligation.

## 2.    **Fixed Payments:**

| | |
|---|---|
| Fixed Payment Obligations: | By 10:00 a.m. London time on each Fixed Rate Payer Payment Date, the Fixed Rate Payer shall pay the Fixed Amount to the Floating Rate Payer. |
| Fixed Rate Payer Calculation Period: | Each period from and including one Fixed Rate Payer Payment Date to but excluding the immediately following Fixed Rate Payer Payment Date; *provided* that: |
| | (a) the initial Fixed Rate Payer Calculation Period will commence on and include the Effective Date and |
| | (b) the final Fixed Rate Payer Calculation Period will end on and include the Termination Date. |
| Fixed Rate Payer Payment Dates: | Each Payment Date. |
| Fixed Amount: | Issuer Spread Amount |
| Issuer Spread Amount: | For any Fixed Rate Payer Payment Date until and including the last Final Redemption Date, the Base Spread Amount |

7

plus the Eligible Investment Spread Shortfall Amount; after such Final Redemption Date, no further payments in respect of the Base Spread Amount will be due and the Issuer Spread Amount will equal the Eligible Investment Spread Shortfall Amount.

Base Spread Amount:

For any Fixed Rate Payer Payment Date until and including the Final Redemption Date, the sum of the products, for each Class of the Offered Notes, of (i) the Outstanding Principal Amount of such Class of Notes on the immediately preceding Fixed Rate Payer Payment Date (or, for the first Fixed Rate Payer Payment Date, on the Effective Date), (ii) the applicable Class Spread and (iii) the Day Count Fraction; and thereafter, zero.

Class Spread:

In respect of any Class of the Offered Notes, the rate per annum set forth or described opposite such Class of Notes below:

Class A+ Notes: 0.25%;

Class A Notes: 0.30%;

Class B Notes: 0.50%;

Class C Notes: 0.70%;

Class D Notes: 1.30%; and

Class E Notes: 4.50%;

Day Count Fraction:

For any Fixed Rate Payer Payment Date, the number of days in the related Fixed Rate Payer Calculation Period divided by 360.

Eligible Investment Spread Shortfall Amount:

For any Fixed Rate Payer Payment Date the greater of (a)(i) the product of (x) the Credit Default Swap Notional Amount on the immediately preceding Payment Date (after all payments required to be made pursuant to the Indenture on such date have been made), (y) the Base Rate and (z) the Day Count Fraction minus (ii) the Offered Note Custodial Account Investment Earnings Amount for such Fixed Rate Payer Payment Date and (b) zero.

8

NYI 6227748v.3

Offered Note Custodial Account
Investment Earnings Amount:

With respect to any Payment Date, the product of (x) a fraction, the numerator of which is the Credit Default Swap Notional Amount and the denominator of which is the sum of the "Credit Default Swap Notional Amounts" of both "Credit Default Swaps" (as such quoted terms are defined in the Indenture) and (y) the amount of the investment earnings collected during the related Due Period and credited to the Custodial Account.

Base Rate:

For any Fixed Rate Payer Payment Date, the rate at which euro interbank term deposits within the Euro zone are offered by one prime bank to another prime bank during the related Due Period, calculated as:

(a)   the percentage rate per annum determined by the Banking Federation of the European Union for deposits in euro for three months, commencing on the first day of the related Due Period, as that rate is displayed on the appropriate page of the Reuters screen designated EURIBOR01 as of 11:00 a.m., Brussels time, two TARGET Business Days preceding such first day, or

(b)   if the rate for deposits in euros cannot be determined by the Calculation Agent in accordance with clause (a) above, the rate calculated by the Calculation Agent as the arithmetic mean of at least two quotations obtained by the Calculation Agent after requesting the principal Euro-zone offices of four major banks in the Euro-zone interbank market, in the European interbank market, to provide the Calculation Agent with its offered quotation for deposits in euros for three months, commencing on the first day of the related Due Period, to prime banks in the Euro-zone interbank market at approximately 11:00 a.m., Brussels time, on the second TARGET Business Day preceding such first day and in a principal amount not less than the equivalent of U.S. $1,000,000 in euros that is representative for a single transaction in euros in such market at such time, or

(c)   if fewer than two quotations referred to in clause (b) above are so provided, the rate will be calculated by the Calculation Agent as the arithmetic mean of the rates quoted at approximately 11:00 a.m., Brussels time, on the second TARGET Business Day preceding the first day of the related Due Period by four major banks in the Euro-zone for loans in euros to leading European banks, having a maturity of three months, commencing on such first day and in a principal amount not less than the equivalent of U.S. $1,000,000 in euros that is representative for a single transaction in euros in such

9

market at such time, or

(d) if the banks so selected by the Calculation Agent are not quoting as mentioned in clause (c) above, the Base Rate applicable to the immediately preceding Payment Date;

*provided, however*, that the Base Rate for the first Fixed Rate Payer Payment Date will be determined by the Calculation Agent by straight line linear interpolation of the rates which appear in respect of 2-month and 3-month Euro interbank deposits.

## 3. Floating Payments:

Floating Payments from Seller to Buyer: Subject to Section 2(c) of the Agreement, on any Cash Settlement Date, Seller will pay Buyer an amount equal to the sum of

(a) the least of:

(i) the Credit Default Swap Notional Amount,

(ii) subject to the limitation set forth in "Cumulative Deferred Interest Loss Amount" below, the greater of (x) the Cumulative Loss Amount minus the Mezzanine Threshold Amount and (y) zero

and

(iii) subject to the limitation set forth in "Cumulative Deferred Interest Loss Amount" below, the aggregate of all Loss Determination Amounts determined since the immediately preceding Cash Settlement Date (or, in the case of the first Cash Settlement Date, since the Effective Date)

and

(b) to the extent so provided pursuant to "Cumulative Deferred Interest Loss Amount" below, the portion of the Cumulative Deferred Interest Loss Amount that is no longer in excess of the Periodic Interest Loss Limitation Amount (to the extent that such portion has not been or is not contemporaneously being paid by Party B to Part A pursuant to the comparable provisions of the First Loss Credit Default Swap Confirmation);

10

*provided* that the aggregate amount of Floating Payments by Seller (together with the aggregate amount of Adjustment Payments paid by Seller, net of the aggregate amount of any Adjustment Payments received by Seller), in each case pursuant to the Transaction evidenced hereby, shall not exceed the Senior Threshold Amount *minus* the Mezzanine Threshold Amount.

Cumulative Deferred Interest Loss Amount:

With respect to any Cash Settlement Date, the payment by Seller in respect of a Floating Payment to the extent that the amount thereof has been derived from Defaulted Notional Interest Amounts from and including the Effective Date to and including such Cash Settlement Date (the aggregate amount of the interest-related portions of Loss Determination Amounts comprising all such Floating Payments being the "**Cumulative Interest Loss Amount**") will additionally be subject to limitation to an amount (the "**Periodic Interest Loss Limitation Amount**") equal to 9.30% of the aggregate of the Defaulted Notional Principal Amounts of all the Liquidated Reference Obligations determined from and including the Effective Date to and including such Cash Settlement Date (and determined, with respect to each such Liquidated Reference Obligation, on the relevant Loss Determination Date).

On any Cash Settlement Date, an amount equal to the excess, if any, of (i) the Cumulative Interest Loss Amount determined on such Cash Settlement Date over (ii) the Periodic Interest Loss Limitation Amount determined on such Cash Settlement Date (subject to the next succeeding sentence, any such excess amount, the "**Cumulative Deferred Interest Loss Amount**" for such date), shall be deferred until the first succeeding Fixed Rate Payer Payment Date on which (and to the extent that) the Cumulative Interest Loss Amount determined on such succeeding Fixed Rate Payer Payment Date is not greater than the Periodic Interest Loss Limitation Amount determined on such succeeding Fixed Rate Payer Payment Date.

On such succeeding Fixed Rate Payer Payment Date (and on Fixed Rate Payer Payment Dates thereafter if all or part of the Cumulative Deferred Interest Loss Amount remains unpaid), the portion of the Cumulative Deferred Interest Loss Amount that is no longer in excess of the Periodic Interest Loss Limitation Amount will, to the extent that such portion was derived from a Loss Determination Amount in respect of which a Floating Payment would have been payable by Seller hereunder in the absence of the limitation imposed on Floating Payments set forth hereinabove, and to the extent that such portion has not been or is not contemporaneously being paid by Party B to Party A pursuant to the comparable

11

provisions of the First Loss Credit Default Swap Confirmation, form part of a Floating Payment due on such succeeding Fixed Rate Payer Payment Date or on such subsequent Fixed Rate Payer Payment Dates, as applicable (each of which Fixed Rate Payer Payment Dates shall constitute a Cash Settlement Date in relation to the applicable portion of the Cumulative Deferred Interest Loss Amount), and the Cumulative Deferred Interest Loss Amount will be reduced on each such date to the extent of the portion thereof so paid; *provided* that the Cumulative Deferred Interest Loss Amount shall also be reduced on each "Cash Settlement Date" to the extent to which a "Floating Payment" is paid by Party B to Party A pursuant to the comparable provisions of the First Loss Credit Default Swap Confirmation (each of the foregoing quoted terms having the meaning ascribed to it in such Confirmation).

Loss Determination Amount:    For any Reference Obligation, as determined as of the Loss Determination Date, the greater of (a) the product of (i) the Defaulted Notional Amount and (ii) 100% *minus* the Final Price and (b) zero.

Conditions to Settlement:    Credit Event Notice.

Notifying Party: Buyer

Credit Event Notice:    Section 3.3 of the Definitions is hereby modified to read as follows:

"Section 3.3. Credit Event Notice. "Credit Event Notice" means an irrevocable notice by the Credit Event Monitoring Agent to Seller and the Trustee that a Credit Event has occurred and has not been remedied or waived at or prior to 11:59 p.m. Greenwich Mean Time, on the later of:

(a) the Final Redemption Date; and

(b) the Grace Period Extension Date or Optional Termination Grace Period Extension Date, as applicable if:

(i) Grace Period Extension is specified as applicable in the related Confirmation;

(ii) the Credit Event that is the subject of the Credit Event Notice is a Failure to Pay that occurs after the Final Redemption Date; and

(iii) the Potential Failure to Pay with respect to such Failure to Pay occurs at or prior to 11:59 p.m., Greenwich Mean Time, on the Final Redemption Date.

A Credit Event Notice must be given by the Credit Event

12

Monitoring Agent as soon as practicable, but no later than 90 calendar days after the Credit Event occurred. All Defaulted Reference Obligations of any Reference Entity may be identified in a single Credit Event Notice relating to such Reference Entity.

A Credit Event Notice must (i) contain a description in reasonable detail of the facts relevant to the determination that a Credit Event has occurred and (ii) specify the date on which the Credit Event occurred and the Reference Obligation in respect of which such Credit Event occurred. A Credit Event Notice may be delivered between 9:00 a.m. and 4:00 p.m. (Greenwich Mean Time) on any Business Day. If a Credit Event Notice is delivered to the Trustee after 4:00 p.m. (Greenwich Mean Time) on a Business Day or on a day which is not a Business Day, such Credit Event Notice shall be deemed delivered on the immediately following Business Day."

Section 1.8 of the Definitions is hereby modified to read as follows:

"**Section 1.8. Event Determination Date.** "Event Determination Date" means (in relation to a Credit Event) the date on which the Credit Event Notice is delivered (or deemed delivered) to the Trustee.

For the avoidance of doubt (but without prejudice to the provisions for deferral and payment of the Cumulative Deferred Interest Loss Amount), the parties agree that the Conditions to Settlement may be satisfied more than once under this Transaction, but only once with respect to any Reference Obligation.

Impairment Notice:

An irrevocable notice by the Credit Event Monitoring Agent to Seller and the Trustee on or prior to the Business Day immediately preceding any Final Redemption Date that a Potential Failure to Pay has occurred and has neither been Cured nor become a Failure to Pay Credit Event nor is capable of becoming a Failure to Pay Credit Event on or prior to such Final Redemption Date. An Impairment Notice must (i) contain a description in reasonable detail of the facts relevant to the determination that a Potential Failure to Pay has occurred that cannot become a Failure to Pay Credit Event on or prior to such Final Redemption Date and (ii) specify the date on which the Potential Failure to Pay occurred and the Reference Obligation in respect of which such Potential Failure to Pay occurred. An Impairment Notice may be delivered between 9:00 a.m. and 4:00 p.m. (Frankfurt time) on any Business Day occurring less than 90 calendar days prior to any Final Redemption Date. If an

13

Impairment Notice is delivered to the Trustee after 4:00 p.m. (Frankfurt time) on a Business Day or on a day which is not a Business Day, such Impairment Notice shall be deemed delivered on the immediately following Business Day. Delivery of an Impairment Notice shall not be construed to be a Condition to Settlement.

Additional Condition to Settlement:

Notwithstanding anything to the contrary in Section 3.2 of the Definitions:

In respect of each Defaulted Reference Obligation, the Credit Event Monitoring Agent shall cause the Accountant to deliver to the Calculation Agent, Buyer and Seller an irrevocable notice (the "**Notice of Accountant Certification**") containing a certification (a) that such Defaulted Reference Obligation satisfied the Reference Obligation Eligibility Criteria to the extent applicable thereto and, if added to the Reference Portfolio pursuant to a Replenishment, did not (taken together with any other Reference Obligation added to the Reference Portfolio on the same Replenishment Date) contravene the Replenishment Conditions, in each case on the related Relevant Date, (b) verifying that the Credit Event identified in the Credit Event Notice occurred and (c) verifying the computation of the relevant Loss Determination Amount. The Notice of Accountant Certification Condition to Settlement is satisfied by receipt of such Notice of Accountant Certification by Seller. All Defaulted Reference Obligations of any Reference Entity may be identified (and computational verification for all such Defaulted Reference Obligations set forth) in a single Notice of Accountant Certification relating to such Reference Entity.

The Notice of Accountant Certification delivered to the Calculation Agent, Buyer and Seller shall be conclusive and binding for all purposes, absent manifest error.

Accountant:

KPMG Deutsche Treuhand Gesellschaft Aktiengesellschaft Wirtschaftsprüfungsgesellschaft, or any other firm of independent accountants of internationally recognized standing as may be appointed by the Calculation Agent from time to time with the consent of Seller (such consent not to be unreasonably withheld).

Credit Events:

The following Credit Events shall apply to this Transaction:

Bankruptcy

Failure to Pay

14

NY1 6227748v.3

Grace Period Extension: Applicable.

Payment Requirement: The lesser of EUR 1,000 and the Defaulted Notional Amount on the date of the relevant Failure to Pay (or in respect of a Reference Obligation denominated in a currency other than EUR, such amount converted into the currency of denomination of the relevant Reference Obligation at the Relevant FX Rate as of the immediately preceding Reset Date in respect of such Reference Obligation (or, if no such Reset Date has occurred prior to the date of the relevant Failure to Pay, as of the immediately preceding Relevant Date for such Reference Obligation)).

Section 1.9 of the Definitions is hereby modified by replacing the word "fourteen" in the second line thereof with the figure "90".

Section 1.12(a) of the Definitions is hereby modified (a) by replacing, in clause (ii) thereof, (x) the word "lesser" with the word "greater" and (y) the word "thirty" with the figure "90"; (b) by adding, in clause (iii) thereof, after the words "Trade Date" in the first line thereof, the words "(in relation to any Reference Obligation comprising the original Reference Portfolio), the relevant Replenishment Date (in relation to any Reference Obligation added to the Reference Portfolio pursuant to a Replenishment) or the Relevant Date (in relation to any Reference Obligation added to the Reference Portfolio pursuant to clause (x) of the provisions set forth in Schedule D hereto under which the Replenishment Conditions are made inapplicable), as applicable," and (c) by replacing, in clause (iii) thereof, the words "three Grace Period Business Days", in each instance where such words appear, with "90 calendar days".".

Section 4.5 of the Definitions is hereby modified to read as follows:

"Section 4.5. Failure to Pay. "Failure to Pay" means the failure by a Reference Entity (after the expiration of the longer of (x) any applicable Grace Period (after the satisfaction of any conditions precedent to the commencement of such Grace Period) and (y) 90 calendar days) to make, when and where due, any payments in respect of interest, fees (in respect of commitments to make advances, issue letters·of credit or otherwise to provide credit services, however described, under revolving credit facilities or other similar credit agreements, but excluding arrangement

15

|  | fees or other similar fees not directly related to the availability or extension of credit or credit-related services) or principal under a Reference Obligation in accordance with the terms of such Reference Obligation at the time of such failure in an aggregate amount of not less than the Payment Requirement." |
|---|---|
| Obligation(s): | Reference Obligations Only. |
| Reference Obligation Notional Amount: | With respect to each Reference Obligation, the EUR amount set forth as such in the Reference Obligation List. |
|  | The Reference Obligation Notional Amount of a Reference Obligation may be reduced as a result of a Reduction or increased as the result of a Replenishment or a Reset as described herein. |
| Portfolio Notional Amount: | On any date of determination: |
|  | (a) the aggregate of the Reference Obligation Notional Amounts of all Reference Obligations (including Impaired Reference Obligations and Defaulted Reference Obligations) comprising the Reference Portfolio on such date |
|  | *minus* |
|  | (b) the aggregate of the Impaired Notional Amounts of all Impaired Reference Obligations *plus* the aggregate of the Defaulted Notional Amounts of all Defaulted Reference Obligations, in each case comprising the Reference Portfolio on such date, |
|  | *plus* |
|  | (c) the aggregate of the Guarantee Undrawn Amounts on such date. |
| Impaired Reference Obligation: | A Reference Obligation with respect to which an Impairment Notice has been duly delivered by Buyer but which has not become a Defaulted Reference Obligation. |
| Defaulted Reference Obligation: | A Reference Obligation with respect to which an Event Determination Date has occurred but which has not become a Liquidated Reference Obligation. |
| Liquidated Reference Obligation: | A Reference Obligation with respect to which a Loss Determination Amount has been determined. |
|  | Upon the determination of the Loss Determination Amount for any Reference Obligation, the Calculation Agent will amend the Reference Obligation List accordingly, removing |

16

the relevant Liquidated Reference Obligation from the Reference Obligation List in evidence of such Liquidated Reference Obligation no longer comprising part of the Reference Portfolio.

·Maximum Portfolio Notional Amount:

On any date of determination:

(a) the Initial Portfolio Notional Amount,

*minus*

(b) the aggregate of the Impaired Notional Amounts of all Impaired Reference Obligations *plus* the aggregate of the Defaulted Notional Amounts of all Defaulted Reference Obligations, in each case comprising the Reference Portfolio on such date,

*minus*

(c) the Cumulative Loss Amount on such date.

Guarantee Undrawn Amount:

With respect to each Impaired Reference Obligation or Defaulted Reference Obligation, on any date of determination, the lesser of (a) the aggregate amount remaining undrawn under Guarantees that remains capable of being drawn (and of giving rise to a Guarantee Reimbursement Obligation comprising such Impaired Reference Obligation or Defaulted Reference Obligation) on or after such date of determination notwithstanding the occurrence of a Potential Failure to Pay or a Credit Event, as applicable, in relation to such Reference Obligation, in accordance with the terms of such Guarantees and (b) the greater of (i) (x) the Reference Obligation Notional Amount thereof on the date on which the relevant Potential Failure to Pay arose (in the case of an Impaired Reference Obligation) or on the Event Determination Date (in the case of a Defaulted Reference Obligation) *minus* (y) the Impaired Notional Amount or Defaulted Notional Amount thereof, as applicable, and (ii) zero.

Guarantee:

With respect to any Reference Entity, a letter of credit, bank guarantee, contingent guarantee or other instrument providing for credit enhancement in favor of (or capable of being drawn by) a party other than such Reference Entity. For the avoidance of doubt, a letter of credit, guarantee or similar sublimit under a loan facility will be considered a Guarantee for purposes of this definition.

Guarantee Reimbursement Obligation:

An obligation owed by a Reference Entity to reimburse or indemnify the relevant DBAG Group Entity arising out of a

17

drawing under a Guarantee.

Effect of Cure of Potential
Failure to Pay:

If an Impairment Notice is delivered and the related Potential
Failure to Pay is Cured, then the Impairment Notice delivered
in relation thereto shall, with effect from the Payment Date
immediately following the day on which Buyer determines
that such Potential Failure to Pay was Cured, be deemed to be
rescinded and shall have no effect, and each Impaired
Reference Obligation that was the subject of such Impairment
Notice shall remain in the Reference Portfolio. Buyer shall
provide notice to Seller and the Trustee in writing promptly
after it knows of any such Cure.

Cured:

With respect to a Potential Failure to Pay, the indefeasible
payment in full by any Reference Obligor, any Reference
Obligation Guarantor or otherwise (but, for the avoidance of
doubt, excluding any payment made by any "Seller" (as
defined in any Relevant Definitions) under a "Credit
Derivative Transaction" (as so defined) other than the
transaction evidenced by this Confirmation) of the amount of
the obligation that was the subject of such Potential Failure to
Pay (together with any contractual interest on past-due
amounts), prior to the end of the Notice Delivery Period.
None of (a) a reduction in the rate or amount of interest
payable or the amount of scheduled interest accruals; (b) a
reduction in the amount of principal or premium payable at
maturity or at scheduled redemption dates; and (c) a
postponement or other deferral of a date or dates for either
(i) the payment or accrual of interest or (ii) the payment of
principal or premium shall in any event result, in and of
itself, in a Potential Failure to Pay being Cured.

Impaired Notional Amount:

With respect to an Impaired Reference Obligation on any
date of determination, the lesser of (a) the Reference
Obligation Notional Amount thereof on the date the relevant
Potential Failure to Pay occurred and (b) the aggregate drawn
amount of the Reference Obligation to which all relevant
DBAG Group Entities are exposed on the date the relevant
Potential Failure to Pay occurred *plus*, in the case of a
Reference Obligation or any portion thereof comprising one
or more Guarantee Reimbursement Obligations, the
aggregate amount of Guarantee Reimbursement Obligations
arising out of drawings made under Guarantees after the date
the relevant Potential Failure to Pay arose and on or prior to
such date of determination, in each case determined from
DBAG's books and records for financial and regulatory
reporting purposes and in each case converted by the
Calculation Agent, if applicable, from the denomination
currency into EUR at the Relevant FX Rate on the date the
relevant Potential Failure to Pay occurred, as stated in or

18

pursuant to the applicable Impairment Notice. With respect to an Impaired Reference Obligation for which the related payment claim is not denominated in EUR, the Impaired Notional Amount, once determined, will not be subject to change based on subsequent changes in the Relevant FX Rate.

Maximum Impaired Notional Amount:

With respect to an Impaired Reference Obligation on any date of determination, the sum of (a) the lesser of (i) the Reference Obligation Notional Amount thereof and (ii) the sum of (x) the Impaired Notional Amount on such date and (y) the Guarantee Undrawn Amount thereof on such date *plus* (b) the greatest aggregate amount thereof in respect of interest and fees (in respect of commitments to make advances, issue letters of credit or otherwise to provide credit services, however described, under revolving credit facilities or other similar credit agreements comprising the Impaired Reference Obligation, but excluding arrangement fees or other similar fees not directly related to the availability or extension of credit or credit-related services) capable of becoming owed thereunder to all relevant DBAG Group Entities in respect of such Impaired Reference Obligation for the period from and including the date on which the relevant Potential Failure to Pay occurred, to but excluding the Legal Maturity Date.

Defaulted Notional Amount:

With respect to a Defaulted Reference Obligation on any date of determination, the sum of

(a) the "**Maximum Defaulted Notional Principal Amount**," which is an amount equal to the lesser of:

(i) the Reference Obligation Notional Amount thereof on the Event Determination Date;

and

(ii) an amount (the "**Defaulted Notional Principal Amount**") equal to the aggregate drawn amount of the Reference Obligation to which all relevant DBAG Group Entities are exposed on the relevant Event Determination Date *plus*, in the case of a Reference Obligation or any portion thereof comprising one or more Guarantee Reimbursement Obligations, the aggregate amount of Guarantee Reimbursement Obligations arising out of drawings made under Guarantees after the Event Determination Date and on or prior to such date of determination.

19

and

(b) the aggregate amount accrued and unpaid in respect of interest and fees (in respect of commitments to make advances, issue letters of credit or otherwise to provide credit services, however described, under revolving credit facilities or other similar credit agreements comprising the Reference Obligation, but excluding arrangement fees or other similar fees not directly related to the availability or extension of credit or credit-related services) owed to all relevant DBAG Group Entities on such date of determination (such amount, the "**Defaulted Notional Interest Amount**");

in each case determined from DBAG's books and records for financial and regulatory reporting purposes and in each case converted by the Calculation Agent, if applicable, from the denomination currency into EUR at the Relevant FX Rate, as stated in or pursuant to the applicable Credit Event Notice. With respect to a Defaulted Reference Obligation for which all or part of the related payment claim is not denominated in EUR, the Defaulted Notional Amount, once determined, will not be subject to change based on subsequent changes in the Relevant FX Rate.

Maximum Defaulted Notional Amount

With respect to a Defaulted Reference Obligation on any date of determination, the sum of

(a) the lesser of

(i) the Reference Obligation Notional Amount

and

(ii) the sum of

(x) the Defaulted Notional Principal Amount on such date

and

(y) the Guarantee Undrawn Amount on such date

and

(b) the greatest aggregate amount accrued and unpaid in respect of interest and fees (in respect of commitments to make advances, issue letters of credit or otherwise to provide credit services, however described, under revolving credit facilities or other similar credit agreements comprising the Defaulted Reference Obligation, but excluding arrangement fees or other similar fees not directly related to the

20

availability or extension of credit or credit-related services) capable of becoming owed to all relevant DBAG Group Entities in respect of such Defaulted Reference Obligation for the period from and including the date on which the aggregate unpaid amount of such interest and fees first equaled or exceeded to Payment Amount, to but excluding the Legal Maturity Date.

4. **Settlement Terms:**

Settlement Method:

Cash Settlement, as set forth in Clause 3 and this Clause 4, but subject to the terms set forth in Clause 5 below.

Terms relating to Cash Settlement:

Final Price:

The percentage obtained by dividing Actual Recoveries by the Defaulted Notional Amount.

For the avoidance of doubt, the Final Price shall in each case be determined in accordance with the terms set forth in this Confirmation.

Cash Settlement Date:

With respect to any one or more Reference Obligations, the Fixed Rate Payer Payment Date immediately following the day on which the Additional Condition to Settlement has been satisfied or, with respect to all or any part of the Cumulative Deferred Interest Loss Amount, if any, each applicable succeeding Fixed Rate Payer Payment Date.

Settlement Currency:

EUR

5. **Actual Recoveries and Settlement with Respect to Impaired Reference Obligations and Defaulted Reference Obligations Remaining on Final Redemption Date:**

Actual Recoveries:

For each Defaulted Reference Obligation or Liquidated Reference Obligation, the amount recovered and applied to extinguish claims in respect of principal or interest upon a work-out of such Reference Obligation (including, where the relevant DB Servicer determines to effect a sale of such Reference Obligation in a commercially reasonable manner, pursuant to a sale of the interest of the relevant DBAG Group Entity in such Reference Obligation in accordance with the Credit and Collection Policies and applicable law), it being understood that any amount due in respect of principal or

21

interest that is forgone as part of the work-out process by or on behalf of the relevant DB Servicer in relation to a restructured Defaulted Reference Obligation or Liquidated Reference Obligation does not constitute a recovery. All work-out processes will be conducted by the relevant Servicer and, with respect to any DB Servicer, in accordance with its servicing practices prevailing from time to time and this Confirmation and shall be deemed to continue until the date on which DBAG either shall have (a) consummated the sale of such Reference Obligation or determined in accordance with such servicing practices and this Confirmation either that such Reference Obligation shall be written-off (as reflected in the relevant DBAG Entity's books and records) or (b) the formal work-out process shall have been terminated (such date, as determined by the Calculation Agent, the "**Loss Determination Date**"); it being understood that, except as otherwise described herein with respect to Adjustment Payments, Seller shall have no liability to Buyer in connection with any losses arising out of any Defaulted Reference Obligation or Liquidated Reference Obligation that are determined after the Loss Determination Date. Upon or promptly after the Loss Determination Date, the Calculation Agent shall determine the Loss Determination Amount, using all information available as of the Loss Determination Date. The Calculation Agent will furnish its determination of the Loss Determination Amount for each relevant Reference Obligation, promptly after making such determination, to the Accountant, together with information and documentation evidencing each of the calculations necessary to make such determination.

Buyer agrees to procure that Seller and each Rating Agency receive a copy of the Notice of Accountant Certification verifying the computation of each Loss Determination Amount by the Calculation Agent and to use commercially reasonable efforts to procure the delivery of such copy to Seller and each Rating Agency as soon as practicable after determination by the Calculation Agent of the Loss Determination Amount. With respect to any Loss Determination Amount, the day on which Seller receives such copy is the "**Loss Certification Date**". With respect to any Reference Obligation (including any Defaulted Reference Obligation or Liquidated Reference Obligation), until the Cash Settlement Date in respect of any Loss Certification Date, Seller will not owe any non-zero Floating Payment to Buyer.

Further, Actual Recoveries:

(i) shall be calculated as of the Loss Determination Date by reference to the percentage of the sum of the face amount of principal recovered plus the amount of interest recovered in comparison with the Defaulted Notional Amount,

(ii) shall take into account as a component of loss the *pro rata* share attributable to the Defaulted Notional Amount of any fees or expenses duly incurred and paid to third parties in respect of the recovery of the related Reference Obligation,

(iii) shall not take into account any internal costs or fees of DBAG or any Affiliate,

(iv) shall not take into account any internal costs or fees of any Agent Bank, unless duly and actually deducted from the distribution of amounts by such Agent Bank,

(v) shall take into account in determining any loss the market value (as determined by the relevant Servicer) of any securities or other consideration (which may include interest and principal) received after the occurrence of the relevant Credit Event, whether pursuant to any restructuring, settlement or proceeding affecting such Reference Obligation or otherwise with respect to such Reference Obligation,

(vi) shall take into account the exercise of any rights of set-off, netting or combination of accounts in respect of the relevant Reference Entity only if the set-off, netting or combination of accounts forms part of the enforcement of collateral in respect of the related Reference Obligation,

(vii) shall take into account in determining any loss of principal or interest the "Collateral Allocation Principles" set forth in Schedule E hereto,

(viii) to the extent that any amount recovered in respect of the principal amount of the related Reference Obligation or in respect of the interest accrued thereon is not denominated in EUR, shall be calculated after converting any such amount recovered between the Event Determination Date and the Loss Determination Date into EUR on the basis of the mid-market foreign exchange rate prevailing on the Relevant FX Date for conversion of the relevant currency into EUR fixed by DBAG for its own foreign exchange transactions pursuant to its standard internal procedures, and

(ix) for the avoidance of doubt, need not take account of (a) any determination made in respect of any "Cash Settlement Amount" (as defined in the Definitions or in the 1999 Credit

23

Derivatives Definitions as published by ISDA in 1999 (as supplemented from time to time thereafter); any of such publications, as applicable, the "**Relevant Definitions**") received by any DBAG Group Entity as a "Buyer" (as so defined) in relation to a "Credit Derivative Transaction" (as so defined) other than the Transaction evidenced by this Confirmation relating to any "Obligation" (as so defined) that is also a Reference Obligation hereunder or (b) the existence of any such Credit Derivative Transaction.

Settlement with Respect to Impaired Reference Obligations and Defaulted Reference Obligations Remaining on Final Redemption Date:

If, on any Final Redemption Date, there shall remain any Impaired Reference Obligations or Defaulted Reference Obligations, then the provisions set forth herein with respect to the determination (including in respect of Actual Recoveries) and payment of Floating Payments will continue in effect in relation to such obligations and, if no Loss Determination Amount has been determined for such obligations by the Legal Maturity Date then the Final Price for any such obligation shall be 100% and such Final Price shall be deemed to have been determined on the Business Day immediately preceding the Legal Maturity Date.

## 6.    **Replenishments and Resets:**

Replenishment Period:

The period from and including the "Closing Date" (as defined in the Indenture) to but excluding the earlier to occur of (a) the Payment Date occurring in June, 2014 and (b) the last Final Redemption Date.

Replenishment:

On any date during the Replenishment Period on which the Maximum Portfolio Notional Amount exceeds the Portfolio Notional Amount, Buyer may add Reference Obligations to the Reference Portfolio or increase the Reference Obligation Notional Amount of any Reference Obligation then comprising the Reference Portfolio, provided that each Reference Obligation so added (or whose Reference Obligation Notional Amount was so increased) meets the Reference Obligation Eligibility Criteria and, following such addition, the Reference Portfolio or, in the case of Replenishment Condition (D), the Reference Obligations to be so added (or to have their Reference Obligation Notional Amounts so increased) meet the Replenishment Conditions. Each such addition of Reference Obligations (or increase in Reference Obligation Notional Amounts) shall constitute a "**Replenishment**" and the day on which any Replenishment is to take effect shall constitute a "**Replenishment Date**" with respect to each Reference Obligation so added (or whose Reference Obligation Notional Amount was so increased).

24

Within five Business Days after each Replenishment Date, Buyer shall provide written notice to the Calculation Agent, the Credit Event Monitoring Agent, Seller and the Rating Agencies stating that each such addition or increase has occurred and identifying the Reference Obligation so added (and the associated Reference Obligation Notional Amount) or the amount of each such increase and the related Replenishment Date.

For the avoidance of doubt, if the Reference Portfolio does not comply with any Replenishment Condition prior to the proposed Replenishment(s), the proposed Replenishment(s) shall be permitted (and the Reference Portfolio deemed to comply with the Replenishment Conditions) if the inclusion of the relevant Reference Obligation(s) (in each case taken at the associated Reference Obligation Notional Amount or relevant increase therein) would not cause the degree of non-compliance with any Replenishment Condition to worsen; and the Reference Obligations subject to such Replenishment(s) (taken at the associated Reference Obligation Notional Amount(s) or increases therein) collectively meet the WARF Test (as defined in Schedule D hereto). Following any Replenishment, the Portfolio Notional Amount may not exceed the Maximum Portfolio Notional Amount.

Reduction:

(a)    Except as otherwise provided under clause (x) of the terms of Schedule D hereto, under which the Replenishment Conditions are not applicable, the Reference Obligation Notional Amount of any Reference Obligation may be reduced as a result of the irrevocable cancellation or expiry of any undrawn commitment or any amortization, repayment of principal or prepayment of principal or as a result of the full and irrevocable assignment or other transfer of ownership interest by the relevant DBAG Group Entity, without recourse, of an interest therein to a third party not affiliated with DBAG (it being understood that (x) any pledge, any grant of a security interest or any assignment for security purposes of any interest in any Reference Obligation will not, of itself, give rise to a Reduction; and (y) upon any such full and irrevocable assignment or transfer, to the extent of the principal amount of the Reference Obligation will be reduced and the potential liability of Seller in respect of Floating Payments derived from Credit Events occurring after the effective date of such assignment or transfer will be diminished accordingly).

25

(b)     The Reference Obligation Notional Amount of any Reference Obligation may be reduced by the Calculation Agent as a result of increases in the Relevant FX Rate, pursuant to "Non-EUR Reference Obligations and Resets" below.  Upon the occurrence of a Reduction with respect to the Reference Obligation Notional Amount of Reference Obligations that have experienced, in the past, one or more increases in the Reference Obligation Notional Amount representing a permitted Replenishment as described below under "Non-EUR Reference Obligations and Resets" due to decreases in the Relevant FX Rate, such Reduction shall be allocated pro rata to the original Reference Obligation Notional Amount and each such prior increase based upon the relative amounts thereof.

(c)     The Reference Obligation Notional Amount of any Defaulted Reference Obligation will be reduced by an amount equal to the difference between (i) the Reference Obligation Notional Amount of such Defaulted Reference Obligation and (ii) the sum of (A) the Defaulted Notional Amount of such Defaulted Reference Obligation *plus* (B) the Guarantee Undrawn Amount with respect to such Defaulted Reference Obligation.

(d)     The Reference Obligation Notional Amount of any Reference Obligation will be reduced if, pursuant to the provisions described in clause (y) following the list of Replenishment Conditions in Schedule D hereto, the inclusion of such Reference Obligation, or any portion of the Reference Obligation Notional Amount associated therewith, in the Reference Portfolio is not valid as a result of such Reference Obligation not complying with any of the Reference Obligation Eligibility Criteria or causing any contravention (or worsening of any existing contravention) of the Replenishment Conditions on the Relevant Date, but only to the extent of the Reference Obligation Notional Amount associated with the non-compliance, contravention or worsening of contravention.

For the avoidance of doubt, the Reference Obligation Notional Amount of any Reference Obligation in relation to which a Reduction has occurred as described above will be reduced (in the case of clause (b) above, to the extent so determined by Buyer) on the first Business Day following the day on which such Reduction occurred.

26

Relevant FX Date:

In respect of each Reference Obligation comprising the Reference Portfolio, (a) in connection with the calculation of the Reference Obligation Notional Amount thereof, the Relevant Date or the Reset Date, as applicable and (b) in connection with any of (x) the determination of the Payment Requirement as applied to any Non-EUR Reference Obligation, (y) the determination of the Impaired Notional Amount with respect to an Impaired Reference Obligation or the Defaulted Notional Amount with respect to a Defaulted Reference Obligation or (z) the determination of Actual Recoveries, the Relevant Date or the Reset Date, as the case may be, occurring on or immediately prior to the date of first determination of the Defaulted Notional Amount, as applicable.

Relevant FX Rate:

On any date of determination, the rate at which the currency in which a Reference Obligation is denominated could be converted into EUR (expressed as a decimal number of EUR per unit of such currency), as determined by the Calculation Agent on the basis of the mid-market foreign exchange rate prevailing on such date for the conversion from the relevant currency into EUR fixed by DBAG for its own foreign exchange transactions pursuant to its standard internal procedures. In respect of any Reference Obligation that becomes an Impaired Reference Obligation or a Defaulted Reference Obligation, the Relevant FX Rate will be the rate determined on the Relevant FX Date set forth in clause (b)(y) of the definition of "Relevant FX Date".

Non-EUR Reference Obligations and Resets:

On any day, Buyer may increase (by way of Replenishment only) or reduce the Reference Obligation Notional Amount of any Reference Obligation for which the related payment claim is not denominated in EUR (each, a "**Non-EUR Reference Obligation**") (excluding Impaired Reference Obligations and Defaulted Reference Obligations) based on decreases or increases in the applicable Relevant FX Rate. In such event, the Calculation Agent will revise each relevant entry on the Reference Obligation List, and such revisions will take effect (together with any other revisions resulting from any Replenishment or from clause (x) of the provisions set forth in Schedule D hereto under which the Replenishment Conditions are made inapplicable) on such date (each such increase or decrease, a "**Reset**"; and the day on which any Reset is to take effect, a "**Reset Date**" for each relevant Reference Obligation and, for the avoidance of doubt, in the case of any such increase, such Reset Date is also a Relevant Date for each relevant Reference Obligation). However, increases in the Reference Obligation Notional Amount of any Non-EUR Reference Obligation attributable to decreases in the Relevant FX Rate will only be permitted on a Relevant Date and only to the extent that such increase

27

is set forth in the Reference Obligation List delivered following the occurrence of the applicable Relevant Date and, taken together with any other Replenishments occurring concurrently therewith, satisfies the Replenishment Conditions.

Within five Business Days after each Reset Date, Buyer shall provide written notice to the Calculation Agent, the Credit Event Monitoring Agent and Seller stating that each such Reset has occurred and identifying each relevant Reference Obligation, the amount of the related increase or reduction in the Reference Obligation Notional Amount thereof and the related Reset Date.

7.     **Additional Definitions:**

Cumulative Loss Amount:

For any day, the sum of: (a) the aggregate of all Loss Determination Amounts certified; (b) the aggregate of all Adjustment Payments paid by Seller to Buyer *minus* the aggregate of all Adjustment Payments paid by Buyer to Seller, in each case pursuant to the Transaction evidenced hereby; and (c) the aggregate of all amounts that would have been paid by Seller to Buyer as Adjustment Payments pursuant to the Transaction evidenced hereby *minus* the aggregate of all amounts that would have been paid by Buyer to Seller as Adjustment Payments pursuant to the Transaction evidenced hereby (in either case but for the fact that the aggregate of the Loss Determination Amounts and all such other amounts is greater than the Senior Threshold Amount), in each case certified, determined or paid, as applicable, on or prior to such day.

Regulatory Event:

An event which will occur if (a) as a result of any enactment of or supplement or amendment to, or change in any applicable laws or regulations, or (b) as a result of (x) an official communication of previously not existing or not publicly available official interpretation of such laws and regulations, or (y) a change in the official interpretation, implementation or application of such laws and regulations that (in the case of (a) or (b)) becomes effective on or after the Effective Date,

either

(a) the DBAG Group would, for reasons outside its control, and after taking reasonable measures (such measures not involving any material additional payment by, or capital or other expenses for Party A), be subject to less favorable capital adequacy treatment with respect to (A) the risk weighting of the Seller and/or (B) the amount of the regulatory capital required to be maintained by the DBAG Group as a result of Party A entering into the Transaction or

28

> retaining any portion of risk under the Reference Portfolio (assuming, for such purposes, that a DBAG Group Entity is the owner of each Reference Obligation comprising the Reference Portfolio) by comparison to the regulatory capital, if any, applicable on the Effective Date,

or

> (b) in respect of any bank that is subject to the supervision of the competent bank supervisory authority of the Federal Republic of Germany, assuming that such bank is the lender in respect of all of the Reference Obligations, the DBAG Group determines that the costs, as at the Effective Date, of buying protection in respect of the Reference Portfolio on the terms set out in the Transaction (but as if the Initial Portfolio Notional Amount was the initial Credit Default Swap Notional Amount, the "**Deemed Transaction**") and maintaining the regulatory capital required to be maintained by any such bank in respect of the Reference Portfolio taking account of the protection afforded by the Deemed Transaction is greater than the regulatory capital costs for any such bank in respect of the Reference Portfolio without the benefit of the Deemed Transaction.

> For the avoidance of doubt, the occurrence of any event referred to above shall not be precluded by the fact that, prior to the Effective Date, (1) such event was announced or contained in any proposal for a change in the official interpretation, implementation or application of any applicable laws and regulations or any accord, standard or recommendation of the Basel Committee on Banking Supervision (including any document or any meetings or other discussions in connection with such change) or (2) the competent authority has taken any decision or expressed any view with respect to any individual transaction other than the Transaction. Accordingly, such proposals, decisions or views shall not be taken into account when assessing the capital adequacy treatment to which the DBAG Group (or such other bank) is (or would be) subject on the Effective Date immediately after entering into the Transaction (or the Deemed Transaction, as the case may be).

Clean-Up Event: The reduction of the Portfolio Notional Amount to 10% or less of the Initial Portfolio Notional Amount.

## 8. Additional Representations and Agreements of the Parties:

(a) Each party represents to each other party that it is entering into the Transaction solely in the course of carrying on, and for the purposes of, its business, if any and with no intention to carry on insurance business, and that it is entering into the Transaction for investment, financial intermediation, hedging or other commercial purposes.

29

(b)     The parties agree that, so long as any of them has or may have any obligation under the Transaction:

   (i)     the Transaction does not create, on the part of any of them, either a direct or indirect obligation of a Reference Entity or a direct or indirect participation in any obligation of a Reference Entity owing to such party;

   (ii)    each party and its Affiliates may, where permitted, accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking or other business with, a Reference Entity, any Affiliate of Reference Entity, any other person or entity having obligations relating to Reference Entity, and may act with respect to such business in the same manner as each of them would if the relevant Transaction did not exist, regardless of whether any such action might have an adverse effect on Reference Entity, or the position of any other party or otherwise (including, without limitation, any action which might constitute or give rise to a Credit Event); and

   (iii)   without prejudice to the Reference Obligation Eligibility Criteria, the Replenishment Conditions and any other agreement or provision to the contrary in relation to the Transaction, each party and its Affiliates may, whether by virtue of the types of relationships described herein or otherwise, on the Trade Date or at any time thereafter, be in possession of information in relation to a Reference Entity that is or may be material in the context of the Transaction and that may or may not be publicly available or known to the other party and such Transaction does not create any obligation on the part of such party or any of its Affiliates to disclose to any other party any such relationship or information (whether or not confidential).

(c)     Reporting; No Disclosure.

   (i)     Party A agrees to provide each Information Report to Party B, the Trustee and the Deposit Bank, at least two Business Days in advance of the relevant Payment Date.

   (ii)    Party B agrees that, without the prior written consent of Party A, it will not disclose any information received from Party A in connection with any Reference Obligation or Reference Entity to any other person; provided, however, that Party B shall be entitled to disclose such information, if, but only to the extent, it is legally required to be disclosed or is otherwise subject to legal, judicial, regulatory or self-regulatory proceedings requiring the production of information or documents, in which event Party B shall give Party A notice in writing as soon as practicable (which shall be prior notice if possible) of any such disclosure, and Party B shall use its reasonable efforts to obtain assurance that confidential treatment will be accorded to the disclosed information; provided further, for the avoidance of doubt, that the Trustee may deliver periodic reports to the Noteholders from time to time in substantially the form specified in the Indenture.

(d)     Party A agrees to pay or cause to be paid, on each Payment Date (but without double-counting in relation to like amounts determined and payable pursuant to the First Loss Credit Default Swap Confirmation), upon receipt of invoices and supporting documentation in reasonable detail at least 10 Business Days prior to such date, all Administrative Expenses and Trustee Administrative Expenses incurred by or for the benefit of Party B or for which Party B is liable for the related Due Period.

"**Administrative Expenses**" means, for any Due Period, all expenses incurred by Party B (excluding Trustee Administrative Expenses), and duly invoiced to Party B and documented during such Due Period, which may include:

(a)     the cost of preparing tax returns and reports;

(b)     fees, expenses and other costs relating to the acquisition, maintenance, custody and administration of the Trust Estate, including the fees (which fees shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), expenses and other amounts payable to the Trustee in connection herewith or in connection with the administration of the Trust Estate, except any such expense or other amount as may be attributable to its negligence, willful misconduct or bad faith;

(c)     expenses incurred in employing outside lawyers, accountants and consultants;

(d)     fees and expenses for any administrators of Party B, including annual return fees, or for any paying agent of Party B appointed in accordance with the provisions of the Indenture; and

(e)     all other expenses of Party B relating to the Notes and the Trust Estate, including any supplemental indenture or any other modification of the Indenture or any related documentation, any structuring fees or accountants' fees and any indemnities arising out of agreements entered into by Party B (excluding any Indemnification Amounts (as defined below)).

"**Trustee Administrative Expenses**" means, for any Due Period, a fee to the Trustee in an amount agreed upon in a fee letter dated April 30, 2007, between Party A and the Trustee plus reasonable fees, expenses and disbursements of the Trustee, the Note Registrar, any Paying Agent, and any of their agents and counsel duly invoiced to Party B and documented during such Due Period.

(e)     Party A agrees to indemnify the Trustee and its directors, officers, employees and agents for, and to hold them harmless against, any loss, liability or expense (including reasonable attorneys' fees and expenses) incurred without negligence, willful misconduct or bad faith on their part arising out of or in connection with the acceptance or administration of the trusts of the Indenture, the Bank Account Charge and the Account Pledge Agreement, including the costs and expenses of defense against any claim or liability in connection with the exercise or performance of any of its powers or duties under the Indenture, the Bank Account Charge or the Account Pledge Agreement; and any loss, liability or expense (including reasonable attorneys' fees and expenses) arising out of any claim or assertion of any right by any Secured Party that is not a Noteholder that the Trustee owes any fiduciary duty to such Secured Party (but without double-counting in relation to like amounts determined and payable pursuant to the First Loss Credit Default Swap Confirmation) (all amounts payable pursuant to this Clause 8(e), "**Indemnification Amounts**"). This provision shall survive the termination of the Agreement or the Indenture.

(f)     Section 2.30 of the Definitions shall not apply.

(g)     Party A, Party B and the Calculation Agent agree that if (A) any Loss Determination Amount in respect of which a Floating Payment was made by Party B proves, after the date of determination thereof, to have been determined in error or (B) after the relevant Loss Determination Date, additional amounts are recovered in respect of principal by a Servicer or other relevant DBAG Group Entity from any Reference Collateral or otherwise in respect of any Liquidated Reference

31

Obligation (in each case as reasonably determined by the Calculation Agent, including based upon any pertinent information furnished by the Servicer or other relevant DBAG Group Entity or the Accountant), then the following shall occur during the Term of this Transaction:

(1)    the Calculation Agent shall calculate (a) the amount equal to (i) the Loss Determination Amount that should rightfully have been determined, *minus* (ii) the Loss Determination Amount that was actually determined (the result of (i) *minus* (ii), the "**Adjustment Amount**"); and (b) the Cumulative Loss Amount; and

(2)    (a) if the Adjustment Amount is greater than zero and the final Extension Maturity Date has not yet occurred, then on the Payment Date next succeeding the day that is five Business Days after the Calculation Agent so notifies Party B, Party B will pay Party A an amount equal to the least of (i) the Adjustment Amount, (ii) the Credit Default Swap Notional Amount and (iii) the greater of (x) the Senior Threshold Amount *minus* the current Cumulative Loss Amount and (y) zero; and (b) if the Adjustment Amount is less than zero (and, for the avoidance of doubt, without regard to whether the Final Redemption Date for any Class of Notes has occurred), then, on the Payment Date next succeeding the day that is five Business Days after the Calculation Agent so notifies Party A, Party A will pay Party B an amount equal to the least of (i) the absolute value of the Adjustment Amount, (ii) (A) if, on the immediately preceding Payment Date, the Cumulative Loss Amount was less than the Mezzanine Threshold Amount, zero; (B) if, on the immediately preceding Payment Date, the Cumulative Loss Amount was greater than or equal to the Mezzanine Threshold Amount and less than or equal to the Senior Threshold Amount, the current Cumulative Loss Amount *minus* the Mezzanine Threshold Amount; or (C) if, on the immediately preceding Payment Date, the Cumulative Loss Amount was greater than the Senior Threshold Amount, the greater of (X) (I) the Senior Threshold Amount *minus* (II) the current Cumulative Loss Amount *minus* the absolute value of the Adjustment Amount and (Y) zero and (iii) the Initial Credit Default Swap Notional Amount (any such payment described in this clause (2), an "**Adjustment Payment**").

For the avoidance of doubt, the provisions set forth in sub-clause (2) above for the payment of Adjustment Payments shall only apply to Loss Determination Amounts in respect of which a Floating Payment was made pursuant to Clause 3. Adjustment Payments owed by Party B to Party A shall not be subject to the limitations set forth in clause 3 under the term "Cumulative Deferred Interest Loss Amount".

(h)    Party A agrees that it shall procure the performance by (or on behalf of) each relevant other DBAG Group Entity of the obligations set forth herein for which performance is expressed herein to be incumbent upon such other entity.

(i)    The Calculation Agent shall, and Party A shall procure that the Accountant shall, make all determinations and calculations required to be made by it hereunder as soon as reasonably practicable and Party A shall, and shall procure that each of its Affiliates (including, where relevant, each DB Servicer in respect of a Reference Obligation comprising the Reference Portfolio) shall, promptly provide to the Calculation Agent and the Accountant all information required in order for each of the Calculation Agent and the Accountant to fulfill its respective duties hereunder. The Calculation Agent shall, and Party A shall procure that the Accountant shall, notify Party A and Party B of the results of the determinations and calculations carried out pursuant to this Confirmation, in each case as soon as reasonably practicable after such determinations and calculations are made.

NY1 6227748v.3

(j)     [RESERVED]

(k)     [RESERVED]

(l)     Party A shall have the right but not the obligation hereunder, either with knowledge of or after receiving notice from the Trustee of any Tax Redemption Condition, to pay to Party B on each relevant Payment Date such additional amount (for any such Payment Date, the "**Additional Payment**") as may be required to ensure (without limitation in respect of the amount (or equivalent) of liability incurred in respect of taxes) that the net amount actually received by the Noteholders in respect of such Payment Date (free and clear of any taxes that constitute Indenture Indemnifiable Taxes) will equal the full amount the Noteholders would have received on such Payment Date had the applicable condition(s) described in clause (1)(a) or clause (2) of the definition of "Tax Redemption Condition" not subsisted.

"**Tax Redemption Condition**" means that either (1) (a) Party B (i) becomes subject to any requirement to withhold or deduct any amount in respect of Indenture Indemnifiable Taxes in relation to amounts payable on each Class of Notes or (ii) whether as a result of a Change in Tax Law or otherwise, is required (A) to pay any income, corporate or capital gains tax to the government or other taxing authority in the Cayman Islands or (B) to pay any other tax imposed by any other government or taxing authority, and (b) Party B has been duly directed by a person or persons other than Party A to redeem each Class of Notes in accordance with Article 9 of the Indenture as a result of any of the conditions described in the foregoing clause (a); or (2) Party A is required to withhold or deduct any amount for or on account of any Tax, or to pay any Tax, in respect of the Agreement.

"**Indenture Indemnifiable Taxes**" has the meaning given to the term "Indemnifiable Taxes" in the Indenture.

(m)     **Amendment upon Partial Optional Termination or Note Redemption**

If Party A designates an Optional Termination Date pursuant to (1) the First Loss Credit Default Swap or (2) this Confirmation in the event that any one or more (but not all) Classes of Notes, as applicable, are to be redeemed as a result of the application of any requirement to withhold or deduct amounts in respect of Taxes, then, in each case (subject to the Rating Agency Condition, if applicable), this Confirmation will be amended by Party A and Party B, without the consent of the Trustee or any one or more Noteholders or any other person being required, if necessary, in order to preserve the loss-transferring characteristics of the Transaction after the relevant redemption date.

(n)     Nothing herein shall restrict Party A from pledging, granting a security interest in or assigning for security purposes any interest it may have in respect of a Reference Obligation, including but not limited to a pledge of claims against any Reference Entity under any Reference Obligation as collateral for any obligations of Party A to the Deutsche Bundesbank and/or the European Central Bank.

9.     **Notice and Account Details:**

Telephone, Telex and/or Fax     **Party A:**
Numbers and Contact Details
for Notices:

                                Deutsche Bank AG Frankfurt

Taunusanlage 12
60325 Frankfurt am Main
Germany

| Attn: | Loan Exposure Management Group |
| | Christian Kuenzle/Karin Lehnert |
| Telephone: | +49(69) 910-34819/-42298 |
| Telefax: | +49(69) 910-34796 |

All notices to the Calculation Agent, and copies of all notices to
Party A in relation to payments, shall be sent to:

Deutsche Bank AG Frankfurt
Taunusanlage 12
LSS 1, B 34-02
60325 Frankfurt am Main
Germany

| Attn: | Christian Kuenzle/Karin Lehnert |
| Telephone: | +49(69) 910-34819/-42298 |
| Telefax: | +49(69) 910-34796 |

**Party B:**

CART 1 Ltd.
c/o Maples Finance Limited
P.O. Box 1093 GT
Queensgate House
South Church Street
George Town, Grand Cayman
Cayman Islands

| Attn: | The Directors |
| Telephone: | +1 (345) 945-7099 |
| Telefax: | +1 (345) 945-7100 |

With a mandatory copy of each notice to each of:

The Bank of New York, London Branch
One Canada Square
London, E14 5AL
United Kingdom

| Attn: | Corporate Trust Administration |
| Telephone: | 44-207-964-7073 |
| Telefax: | 44-207-964-6399 |

and

Maples and Calder

34

P.O. Box 309GT, Ugland House
South Church Street,
George Town, Grand Cayman
Cayman Islands

Attn:  Alasdair Robertson–CART 1
Telephone:      +1 (345) 949-8066
Telefax:           +1 (345) 949-8080

Account Details of Party A:      Correspondent Bank: Deutsche Bank AG Frankfurt
                                                 Account No:  004818006
                                                 Reference: CART 1
                                                 Attn: Christian Ries/Karin Lehnert

Account Details of Party B:      For Fixed Amounts, amounts payable pursuant to clauses 8(d),

                                                 (e) and (k) and Additional Payments:

                                                 Correspondent Bank: Barclays Bank plc
                                                 SWIFT Code: BARCGB22
                                                 Beneficiary: The Bank of New York, London Branch
                                                 Account Number: 57474322
                                                 Reference: CART 1 – Collection Account
                                                 For Further Credit: 3001819780

                                                 For Adjustment Payments:

                                                 Correspondent Bank: Barclays Bank plc
                                                 SWIFT Code: BARCGB22
                                                 Beneficiary: The Bank of New York, London Branch
                                                 Account Number: 57474322
                                                 Reference: CART 1 – Custodial Account
                                                 For Further Credit: 5000899780

**10.    Offices:**

Party A:                               Deutsche Bank AG Frankfurt
                                                 Taunusanlage 12
                                                 60325 Frankfurt am Main
                                                 Germany

35

Party B:                         CART 1 Ltd.
                                 c/o Maples Finance Limited
                                 P.O. Box 1093 GT
                                 Queensgate House
                                 South Church Street
                                 George Town, Grand Cayman
                                 Cayman Islands

36

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours faithfully,

**DEUTSCHE BANK AG FRANKFURT**

By:_____

Name: **Christian Künzle**
Title: **Director**

By:_____

Name: Karin Lehnert
Title: Vice President

Confirmed as of the date first written above:

**CART 1 LTD.**

By:_____
Name:
Title:

Accepted and agreed with respect to the obligations of the Calculation Agent:

**DEUTSCHE BANK AG FRANKFURT**

By:_____

Name: **Christian Künzle**
Title: **Director**

By:_____

Name: Karin Lehnert
Title: Vice President

Accepted and agreed with respect to the obligations of the Credit Event Monitoring Agent:

**DEUTSCHE BANK AG FRANKFURT**

By:_____

Name: **Christian Künzle**
Title: **Director**

By:_____

Name: Karin Lehnert
Title: Vice President

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours faithfully,

**DEUTSCHE BANK AG FRANKFURT**

By:_____

Name:

Title:

By:_____

Name:

Title:

Confirmed as of the date first written above:

**CART 1 LTD.**

By:_____

Name:   Chris Marett

Title:   DIRECTOR

Accepted and agreed with respect to the obligations of the Calculation Agent:

**DEUTSCHE BANK AG FRANKFURT**

By:_____

Name:

Title:

By:_____

Name:

Title:

Accepted and agreed with respect to the obligations of the Credit Event Monitoring Agent:

**DEUTSCHE BANK AG FRANKFURT**

By:_____

Name:

Title:

By:_____

Name:

Title:

## Schedule A

**Initial Reference Portfolio**

[.xls file to be provided]

## Schedule B

### Components of the Reference Obligation List

The Reference Obligation List will contain the following items, each expressed (except as set forth below) for each Reference Obligation as of the Effective Date (for the initial Reference Obligation List) or each applicable Relevant Date (for each Reference Obligation List delivered on a Reference Obligation List Delivery Date):

(a)    The DBAG identification number (the "**Reference Obligation Identifier**") corresponding to such Reference Obligation which on that date is part of the Reference Portfolio;

(b)    the DBAG identification number (the "**Reference Entity Identifier**") for each Reference Entity corresponding to such Reference Obligation;

(c)    the DBAG identification number (the "**Reference Entity Group Identifier**") for the Reference Entity Group corresponding to such Reference Obligation;

in each case as set forth in the books and records of the relevant DBAG Group Entity;

(d)    the Reference Obligation Notional Amount of such Reference Obligation, both (i) before taking into account any Reductions, Replenishments or Resets and (ii) giving effect to all Reductions, Replenishments and Resets;

(e)    the Relevant Date(s) for such Reference Obligation, including, in the case of any Reference Obligation whose Reference Obligation Notional Amount was increased after it first comprised part of the Reference Portfolio, the Relevant Date of each such increase;

(f)    the Relevant FX Date for each Reference Obligation;

(g)    the currency of denomination of each Reference Obligation;

(h)    if a Reference Obligation is denominated in a currency other than EUR, the Relevant FX Rate for that Reference Obligation;

(i)    the Reference Obligation Due Date of such Reference Obligation; *provided* that if, after the Relevant Date, a Term-Out Maturity Date or other date later than the original Reference Obligation Due Date for such Reference Obligation becomes its Reference Obligation Due Date, then the Reference Obligation List will be amended accordingly;

(j)    the DBAG Internal Rating for the Reference Entity related to such Reference Obligation (determined as of the Effective Date, the relevant Replenishment Date or the Reset Date, as applicable, and not, for the avoidance of doubt, as of the Relevant Date(s) for such Reference Obligation);

(k)    the country in which the Reference Entity is organized (or, if different, has its principal place of business) and (based on such country) the relevant percentage specified for use in the calculation of the Assumed S&P Recovery Level;

(l)    the S&P Equivalent Rating and Fitch Equivalent Rating; and

(m)     the S&P Industry Group and the Fitch Industry Group (and related Industry Codes) (as indicated in Annex 2 to this Schedule B) of the Reference Entity relating to such Reference Obligation.

For the foregoing purposes (and, if applicable, for the purposes of Schedule C and Schedule D below), the following terms shall have the respective meanings set forth below:

"**DBAG Internal Rating**" as of any date of determination, means the credit rating assigned by DBAG to such Reference Entity for purposes of DBAG's generally applicable internal credit evaluation and monitoring processes.

"**S&P Equivalent Rating**" in relation to any Reference Entity, as of any date of determination, will be (a) if S&P has assigned an issuer credit rating to such Reference Entity, such issuer credit rating; (b) if S&P has not assigned an issuer credit rating to such Reference Entity, the respective S&P Mapped Rating associated with its DBAG Internal Rating (as per Annex 1 to this Schedule B).

"**Fitch Equivalent Rating**" in relation to any Reference Entity, as of any date of determination, will be (a) if Fitch has assigned an issuer credit rating to such Reference Entity, such issuer credit rating; (b) if Fitch has not assigned an issuer credit rating to such Reference Entity, the respective Fitch Mapped Rating associated with its DBAG Internal Rating (as per Annex 1 to this Schedule B).

## Annex 1

## Mapping from DBAG Internal Ratings[1]

| DBAG Internal Rating | S&P Mapped Rating | Fitch Mapped Rating |
|---|---|---|
| "iAAA" | "AA+" | "AA" |
| "iAA+" | "AA" | "AA" |
| "iAA" | "AA-" | "AA" |
| "iAA-" | "A+" | "AA-" |
| "iA+" | "A+" | "A" |
| "iA" | "A" | "BBB+" |
| "iA-" | "A-" | "BBB+" |
| "iBBB+" | "BBB+" | "BBB" |
| "iBBB" | "BBB" | "BBB" |
| "iBBB-" | "BBB-" | "BBB-" |
| "iBB+" | "BB+" | "BB+" |
| "iBB" | "BB" | "BB" |
| "iBB-" | "BB-" | "BB-" |
| "iB+" | "B+" | "B+" |
| "iB" | "B" | "B" |
| "iB-" | "B-" | "B-" |
| "iCCC+" | "CCC+" | "CCC+" |
| "iCCC" | "CCC" | "CCC" |
| "iCCC-" | "CC" | "CCC-" |
| "iCC+" and below | "D" | "D" |

---

[1] Subject, in each case, to revision by the relevant Rating Agency from time to time.

**Annex 2**

**S&P Industry Codes**

| Industry Code | S&P Industry |
|---|---|
| 1 | Aerospace & Defense |
| 2 | Air transport |
| 3 | Automotive |
| 4 | Beverage & Tobacco |
| 5 | Radio & Television |
| 6 | Brokers, Dealers & Investment houses |
| 7 | Building & Development |
| 8 | Business equipment & services |
| 9 | Cable & satellite television |
| 10 | Chemicals & plastics |
| 11 | Clothing/textiles |
| 12 | Conglomerates |
| 13 | Containers & glass products |
| 14 | Cosmetics/toiletries |
| 15 | Drugs |
| 16 | Ecological services & equipment |
| 17 | Electronics/electrical |
| 18 | Equipment leasing |
| 19 | Farming/agriculture |
| 20 | Financial intermediaries |
| 21 | Food/drug retailers |
| 22 | Food products |
| 23 | Food service |
| 24 | Forest products |
| 25 | Health care |
| 26 | Home furnishings |
| 27 | Lodging & casinos |
| 28 | Industrial equipment |
| 29 | Insurance |
| 30 | Leisure goods/activities/movies |
| 31 | Nonferrous metals/minerals |
| 32 | Oil & gas |
| 33 | Publishing |
| 34 | Rail industries |
| 35 | Retailers (except food & drug) |
| 36 | Steel |
| 37 | Surface transport |
| 38 | Telecommunications |
| 39 | Utilities |

**Fitch Industry Codes**

| Industry Code | Fitch Industry |
|---|---|
| 1 | Aerospace & Defense |
| 2 | Automobiles |
| 3 | Banking & Finance |
| 4 | Broadcasting/Media/Cable |
| 5 | Building & Materials |
| 6 | Business Services |
| 7 | Chemicals |
| 8 | Computers & Electronics |
| 9 | Consumer Products |
| 10 | Energy |
| 11 | Food, Beverage & Tobacco |
| 12 | Gaming, Leisure & Entertainment |
| 13 | Health Care & Pharmaceuticals |
| 14 | Industrial/Manufacturing |
| 15 | Lodging & Restaurants |
| 16 | Metals & Mining |
| 17 | Packaging & Containers |
| 18 | Paper & Forest Products |
| 19 | Real Estate |
| 20 | Retail (General) |
| 21 | Sovereign |
| 22 | Supermarkets & Drugstores |
| 23 | Telecommunications |
| 24 | Textiles & Furniture |
| 25 | Transportation |
| 26 | Utilities |

## Schedule C

### Reference Obligation Eligibility Criteria

Each Reference Obligation, and the related Reference Entity, must satisfy the following conditions (i) as of the Effective Date, in respect of each Reference Obligation comprising the original Reference Portfolio and (ii) as of each Replenishment Date, in respect of each Reference Obligation that is (or is proposed to be) added to the Reference Portfolio (or whose Reference Obligation Notional Amount is (or is proposed to be) increased) on such date:

(a)     Such Reference Entity has a DBAG Internal Rating of "iB-" or better;

(b)     Such Reference Obligation relates to a senior obligation of the relevant Reference Entity that has been originated by the Originator in accordance with its standard credit policies and guidelines;

(c)     A Credit Event or other event which, with the giving of notice or the lapse of time (or both) would become a Credit Event shall not have occurred in relation to such Reference Obligation;

(d)     Such Reference Obligation shall be, to the knowledge of the Originator, legally valid and enforceable in accordance with its terms and applicable provisions of law; and

(e)     Such Reference Obligation shall not be a bond but shall be a loan (including a syndicated loan), overdraft facility, revolving credit facility, guarantee or letter of credit (or combination of the foregoing) to or for the account of a corporate entity, including a financial institution and certain other entities or to or for the account of an individual, whose repayment is primarily dependent upon the creditworthiness of a small or medium-sized enterprise, as determined by the relevant DBAG Group Entity in accordance with the Credit and Collection Policies.

NY1 6227748v.3

## Schedule D

### Replenishment Conditions

(A)    the Reference Portfolio shall comply with the S&P SROC Condition;

(B)    the Reference Portfolio shall comply with the Fitch Default VECTOR Model Test;

(C)    no Reference Entity Group has an aggregate Reference Obligation Notional Amount that exceeds the percentage shown in the table below (based on its DBAG Internal Rating):

| **DBAG Internal Rating** | **Percentage of Initial Portfolio Notional Amount** |
|---|---|
| "iA-" and above (for each Reference Entity Group whose aggregate Reference Obligation Notional Amount is one of the five largest comprising the Reference Portfolio) | 7.00% |
| "iBBB-" and above (for each Reference Entity Group not included in the category immediately above) | 5.00% |
| "iBB+" to "iBB-" | 3.00% |
| "iB+" and below | 1.50% |

*provided that* if the DBAG Internal Rating(s) of any one or more Reference Entities are lower than the DBAG Internal Rating of any Reference Entity within the same Reference Entity Group, then:

(i)     each such lower-rated Reference Entity may not have an aggregate Reference Obligation Notional Amount that exceeds the product of the Initial Portfolio Notional Amount and the percentage shown in the preceding table (based on its own DBAG Internal Rating); and

(ii)    each such higher-rated Reference Entity may not have an aggregate Reference Obligation Notional Amount that exceeds the greater of (x) (A) the product of the Initial Portfolio Notional Amount and the percentage shown in the preceding table (based on its own DBAG Internal Rating) minus (B) the sum, for all such lower-rated Reference Entities, of the aggregate of the Reference Obligation Notional Amount of the lower-rated Reference Entities within the same Reference Entity Group and (y) zero;

it being understood that the foregoing sub-paragraphs (i) and (ii) shall apply independently in relation to each Reference Entity within the same Reference Entity Group;

(D)    the WARF Test is satisfied;

(E)    the Weighted Average Life of the Reference Portfolio is less than or equal to 3.5 years;

(F)    the aggregate of the Reference Obligation Notional Amounts of all Reference Obligations for which the Reference Entity is organized (or, if applicable, has its principal place of business) in a country other than the Federal Republic of Germany is less than or equal to 40% of the Initial Portfolio Notional Amount; *provided*, for the avoidance of doubt, that the aggregate of the Reference Obligation Notional Amounts for which the Reference Entity is organized (or has its

principal place of business) in the Federal Republic of Germany shall not be subject to any percentage limitation with respect to the Initial Portfolio Notional Amount;

(G)     the Portfolio Notional Amount does not exceed the Maximum Portfolio Notional Amount;

(H)     the aggregate of the Reference Obligation Notional Amounts of Reference Obligations for which the Reference Entity is organized (or, if applicable, has its principal place of business) in any jurisdiction (other than Japan, Hong Kong, Singapore and any member state of the European Union) with a long-term sovereign debt rating lower than "AA-" by S&P and "AA-" by Fitch shall not exceed 10% of the Initial Portfolio Notional Amount in the aggregate;

(I)     the aggregate of the Reference Obligation Notional Amounts of Reference Obligations owed by Reference Entities whose Reference Entity Groups belong to (1) the largest S&P Industry Group shall not exceed 30% of the Initial Portfolio Notional Amount; (2) the largest, second and third largest S&P Industry Groups shall not in the aggregate exceed 55% of the Initial Portfolio Notional Amount; (3) any S&P Industry Group other than the three largest S&P Industry Groups shall not exceed 15% of the Initial Portfolio Notional Amount; (4) the largest Fitch Industry Group shall not exceed 30% of the Initial Portfolio Notional Amount; (5) the largest, second and third largest Fitch Industry Groups shall not in the aggregate exceed 55% of the Initial Portfolio Notional Amount; and (6) any Fitch Industry Group other than the three largest Fitch Industry Groups shall not exceed 15% of the Initial Portfolio Notional Amount;

(J)     the Concentration Test is satisfied; and

(K)     the aggregate of the Reference Obligation Notional Amounts of all Reference Obligations for which the Reference Entity has annual gross revenue on the Relevant Date greater than the Reference Entity Concentration Threshold Amount (as determined by the Calculation Agent utilizing information available to it from within the DBAG Group) shall not exceed 80% of the Initial Portfolio Notional Amount.

During the Replenishment Period, the conditions specified above will not be applicable as follows:

(x)     (1) If a Reference Obligation (the "**Original Reference Obligation**") is partially or fully prepaid or cancelled (as such terms are commonly used), then Buyer may elect to maintain the unpaid or uncancelled portion of such Reference Obligation in the Reference Portfolio and substitute another obligation of the applicable Reference Entity that satisfies the Reference Obligation Eligibility Criteria other than clauses (a) and (c) thereof (the "**Substitute Reference Obligation**") for the prepaid or cancelled portion of such Reference Obligation; *provided* that (a) the sum of the remaining Reference Obligation Notional Amount of the Original Reference Obligation and the Reference Obligation Notional Amount of the Substitute Reference Obligation is less than or equal to the Reference Obligation Notional Amount of the Original Reference Obligation, calculated immediately prior to giving effect to such prepayment or cancellation; *provided further*, for the avoidance of doubt, that the date of such election shall be the Relevant Date for such Substitute Reference Obligation;

(2)     if the principal amount of a Reference Obligation (the "**Paid-out Reference Obligation**") is partially or fully paid (whether prior to, on or after the date on which the same becomes due and payable) from the proceeds of one or more other loan or credit facilities that satisfy the Reference Obligation Eligibility Criteria other than clauses (a) and (c) thereof (any such facility, a "**Replacement Reference Obligation**"), then Buyer may elect to include any such Replacement Reference Obligation(s) in the Reference Portfolio at an aggregate Reference Obligation Notional Amount up to an amount equal to the portion of the principal amount of the Paid-out Reference Obligation so paid and the Reference

Obligation Notional Amount of such Paid-out Reference Obligation shall be reduced accordingly and, for the avoidance of doubt, the date of such election shall be the Relevant Date for such Replacement Reference Obligation; and

(3)  if a Reference Obligation (other than any credit line or revolving credit facility (including reimbursement obligations arising from the acceptance of bills of exchange or drawings under letters of credit)) is renewed or extended (as such terms are commonly used), then, if such Reference Obligation continues to satisfy the Reference Obligation Eligibility Criteria other than clauses (a) and (c) thereof, Buyer may elect to maintain such Reference Obligation in the Reference Portfolio;

and in each case any Substitute Reference Obligation, Replacement Reference Obligation or Reference Obligation that is so renewed or extended may remain in the Reference Portfolio until the related Reference Obligation Due Date.

(y)  If, subsequent to its inclusion in the Reference Portfolio, any purported Reference Obligation is determined not to comply with the Reference Obligation Eligibility Criteria or the Replenishment Conditions (determined as of the Relevant Date), the inclusion of the purported Reference Obligation in the Reference Portfolio on that Relevant Date (and any Credit Event Notice given in relation to that purported Reference Obligation) will be treated as not having been a valid inclusion (or a valid Credit Event Notice) and be of no effect for any purpose, but in each case only to the extent of the Reference Obligation Notional Amount associated with such non-compliance. Following the discovery of any such non-compliance, Buyer will remove the relevant Reference Obligation (or part of the Reference Obligation Notional Amount thereof) from the Reference Portfolio and such removal shall be treated as a Reduction, as provided for above. Notwithstanding the foregoing provisions of this clause (y), if a Reference Obligation is removed from the Reference Portfolio pursuant to this clause (y) and such removal results in retroactive non-compliance with the Replenishment Conditions by another Reference Obligation in the Reference Portfolio, Buyer may substitute other obligations for the Reference Obligation removed pursuant to this clause, subject to the Replenishment Conditions and Reference Obligation Eligibility Criteria being satisfied; *provided* that this clause (y) will not require the removal of such other Reference Obligation from the Reference Portfolio.

(z)  If the Guarantee Undrawn Amount with respect to any Defaulted Reference Obligation is drawn upon, the amount of any related Guarantee Reimbursement Obligation (or increase therein) arising in connection therewith after the Event Determination Date shall be deemed a part of the Defaulted Reference Obligation without any approval of Seller, whether or not the Reference Obligation Eligibility Criteria or the Replenishment Conditions were satisfied at the time of drawing (so long as the Reference Obligation Eligibility Criteria and the Replenishment Conditions, if applicable, were satisfied on the Relevant Date).

For the foregoing purposes, the following terms shall have the respective meanings set forth below:

*With respect to Replenishment Condition (A):*

"**S&P SROC Condition**" means, on any date of determination, a condition that is satisfied if SROC for each Class of Notes that is rated by S&P on such date (as determined by the Calculation Agent using the S&P CDO Evaluator, applying the formula set forth below) is greater than or equal to:

*for all Classes of Notes rated "BB+" or below by S&P on the date of determination*

(x) if SROC for Class E Notes as determined immediately prior to taking into account any Reduction that has occurred since the most recent Replenishment Date occurring not more than 60 days prior to such

date was greater than or equal to 0.99517, 0.99517 or (y) if SROC for Class E Notes as determined immediately prior to taking into account any such Reduction was less than 0.99517, not less than such lesser determined figure

*for all Classes of Notes rated "BBB-" or above by S&P on the date of determination*

(x) if SROC for such Class of Notes as determined immediately prior to taking into account any Reduction that has occurred since the most recent Replenishment Date occurring not more than 60 days prior to such date was greater than or equal to 1.00, 1.00 or (y) if SROC for such Class of Notes as determined immediately prior to taking into account any such Reduction was less than 1.00, not less than such lesser determined figure.

"SROC" =     $(1 - SLR)/(1 - \text{Remaining Threshold})$

Where, for each such Class of Notes:

"**Available Subordination Amount**" has the meaning specified in the Indenture (or in the case of the Class F Notes, means zero).

"**Remaining Threshold**" means, on any date of determination, a fraction, the numerator of which is the Available Subordination Amount of such Class of Notes on the Payment Date immediately preceding such date of determination and the denominator of which is the Portfolio Notional Amount on such date.

"**S&P CDO Evaluator**" means Version 3.2 of the dynamic, analytical computer program developed by S&P and used to determine the credit risk of the Reference Portfolio (and each Class of Notes rated by S&P) and provided to Buyer by S&P on or before the Closing Date. For the avoidance of doubt, such provided program includes transaction-specific S&P Correlation Assumptions.

"**S&P Correlation Assumption**" means 0.05 between S&P Industry Groups and 0.12 within an S&P Industry Group.

"**SLR**" means, on any date of determination, an estimate of the current cumulative loss rate based upon the S&P Scenario Default Rate and the Assumed S&P Recovery Level for each Reference Obligation, given the rating scenario assigned on such date, for the Reference Obligations comprising the Reference Portfolio on such date, determined by the Calculation Agent using the S&P CDO Evaluator on such date.

"**S&P Scenario Default Rate**" means, on any date of determination, an estimate of the current cumulative default rate, given the rating scenario assigned on such date, for the Reference Obligations comprising the Reference Portfolio on such date, determined by the Calculation Agent using the S&P CDO Evaluator on such date.

"**Assumed S&P Recovery Level**" means, on any date of determination and for each Reference Obligation, the recovery percentage agreed between Buyer and S&P from time to time with respect to the country in which the Reference Entity is organized (or, if different, the country in which the Reference Entity has its principal place of business) and whether such Reference Obligation is secured or unsecured. On the Effective Date, the respective countries and associated recovery percentages so agreed are as follows:

| Country | Recovery Rate (base case)[1] | |
| | Senior Secured[2] | Senior Unsecured |
| --- | --- | --- |
| Argentina | 15.0% | 7.5% |
| Bahamas | 15.0% | 7.5% |
| Belgium | 45.0% | 25.0% |
| Canada | 50.0% | 38.0% |
| Germany | 60.0% | 35.0% |
| Iceland | 35% | 15.0% |
| Italy | 45.0% | 25.0% |
| Japan | 35.0% | 15.0% |
| Luxembourg | 45.0% | 25.0% |
| Mexico | 15.0% | 7.5% |
| Netherlands | 55.0% | 25.0% |
| Spain | 45.0% | 25.0% |
| Switzerland | 55.0% | 25.0% |
| Taiwan | 15.0% | 7.5% |
| United States | 50.0% | 38.0% |

With respect to any country for which no percentages are specified above, the Buyer may reach agreement with S&P on a case-by-case basis in relation to any one or more Reference Obligations.

*With Respect to Replenishment Conditions (B) and (D):*

"**Fitch Default VECTOR Model Test**" will be satisfied following a Replenishment if, for each Class of Notes, the Fitch Risk Tranche Rating Loss Rate is less than or equal to the Risk Tranche Current Credit Enhancement Level. For the avoidance of doubt, the compliance or otherwise of the Reference Portfolio with the Fitch Default VECTOR Model Test on any Replenishment Date does not imply any affirmation, upgrade or downgrade of the initial ratings assigned by Fitch to each Class of Notes. In order to determine whether the degree of non-compliance with the Fitch Default VECTOR Model Test is not worsened by a Replenishment, the Risk Tranche Current Credit Enhancement Level before Replenishment is determined immediately prior to taking into account any Reduction that has occurred since the most recent Replenishment Date occurring not more than 60 days prior to such date.

For these purposes:

"**Fitch Default VECTOR Model**" is Version 3.0 of the Fitch proprietary computer program used to calculate portfolio default and loss levels as provided to Buyer by Fitch on or before the Closing Date. For the avoidance of doubt, such provided program includes transaction specific recovery and correlation assumptions in the form of a "Model for CART I Ltd. Guidelines".

---

[1]     Subject to revision by S&P from time to time.

[2]     Subject to collateral adjustment factor.

Schedule D – Page 5

"**Fitch Risk Tranche Rating Loss Rate**" means, at any time, the number equal to the level of rating loss rate expressed as a percentage and derived from the Fitch Default VECTOR Model based on the proposed portfolio and consistent with the initial ratings assigned by Fitch to each Class of Notes.

"**Risk Tranche Current Credit Enhancement Level**" means, in relation to any Class of Notes, the number, expressed as a percentage equal to a fraction, (i) the numerator of which is (x) the aggregate Initial Principal Amount of all Classes of Notes subordinate to such Class of Notes minus (y) the Cumulative Loss Amount and (ii) the denominator of which is the current Portfolio Notional Amount (excluding, for the avoidance of doubt, any Defaulted Reference Obligations in respect of which a Loss Determination Amount has not yet been calculated).

*With Respect to Replenishment Condition (D):*

"**WARF Test**" means, with respect to the Reference Obligations to be added (or whose Reference Obligation Notional Amounts are to be increased) pursuant to a Replenishment, (a) the Weighted Average S&P Equivalent Rating thereof is not lower than "BBB-" and (b) the Weighted Average Fitch Equivalent Rating (expressed as "Weighted Average Rating", as reported by the Fitch Default VECTOR Model) thereof is not lower than "BBB-"/"BB+".

The "**Weighted Average S&P Equivalent Rating**" (with respect to all Reference Obligations to be added or whose Reference Obligation Notional Amounts are to be increased pursuant to any Replenishment) is the nearest S&P Equivalent Rating implied from the S&P Default Probability Table shown below, based on the Weighted Average Life of the portion of the Reference Portfolio comprising such Replenishment (determined using linear interpolation if the Weighted Average Life of such portion of the Reference Portfolio is not an integral number of years) and the Weighted Average S&P Default Probability of the portion of the Reference Portfolio comprising such Replenishment.

The "**Weighted Average S&P Default Probability**" (with respect to all Reference Obligations to be added or whose Reference Obligation Notional Amounts are to be increased pursuant to any Replenishment) is obtained by multiplying the S&P Default Probability, for each Reference Obligation to be so added or whose Reference Obligation Notional Amount is to be so increased, by the Reference Obligation Notional Amount of each such Reference Obligation (or by the respective amount of the relevant increase) and dividing such sum by the sum of the aggregate of the Reference Obligation Notional Amounts of the Reference Obligations to be so added and the aggregate of the amounts of such increases.

The "**S&P Default Probability**" of any Reference Obligation is the default probability set forth for such Reference Obligation in the S&P Default Probability Table shown below based on the Weighted Average Life of such Reference Obligation (determined using linear interpolation if the Weighted Average Life of such Reference Obligation is not an integral number of years) and the S&P Equivalent Rating of such Reference Obligation; provided that if the Weighted Average Life of any Reference Obligation is less than one year it shall be deemed to be one year for the purpose of such determination.

- **S&P Default Probability Table, Part 1**

| Wtd. Avg. Life (yrs) | S&P Equivalent Rating[1] | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | "AAA" | "AA+" | "AA" | "AA-" | "A+" | "A" | "A-" | "BBB+" | "BBB" | "BBB-" | "BB+" |
| 1. | 0.000% | 0.001% | 0.008% | 0.014% | 0.018% | 0.022% | 0.033% | 0.195% | 0.294% | 0.806% | 1.484% |
| 2. | 0.005% | 0.009% | 0.039% | 0.048% | 0.064% | 0.080% | 0.121% | 0.427% | 0.684% | 1.805% | 2.915% |
| 3. | 0.016% | 0.027% | 0.085% | 0.102% | 0.138% | 0.172% | 0.262% | 0.701% | 1.162% | 2.899% | 4.312% |
| 4. | 0.034% | 0.056% | 0.144% | 0.178% | 0.240% | 0.298% | 0.451% | 1.023% | 1.713% | 4.034% | 5.681% |
| 5. | 0.061% | 0.098% | 0.219% | 0.276% | 0.371% | 0.459% | 0.686% | 1.391% | 2.323% | 5.179% | 7.020% |
| 6. | 0.097% | 0.153% | 0.310% | 0.397% | 0.531% | 0.655% | 0.966% | 1.805% | 2.980% | 6.316% | 8.327% |
| 7. | 0.144% | 0.224% | 0.420% | 0.543% | 0.719% | 0.887% | 1.287% | 2.261% | 3.672% | 7.434% | 9.598% |
| 8. | 0.204% | 0.311% | 0.549% | 0.713% | 0.937% | 1.152% | 1.648% | 2.756% | 4.390% | 8.529% | 10.831% |
| 9. | 0.276% | 0.414% | 0.700% | 0.909% | 1.184% | 1.451% | 2.047% | 3.284% | 5.127% | 9.598% | 12.025% |
| 10. | 0.362% | 0.536% | 0.872% | 1.130% | 1.458% | 1.782% | 2.479% | 3.842% | 5.876% | 10.637% | 13.179% |
| 11. | 0.463% | 0.678% | 1.066% | 1.377% | 1.761% | 2.143% | 2.943% | 4.425% | 6.634% | 11.649% | 14.295% |
| 12. | 0.581% | 0.839% | 1.284% | 1.650% | 2.092% | 2.534% | 3.434% | 5.029% | 7.396% | 12.631% | 15.371% |
| 13. | 0.715% | 1.020% | 1.525% | 1.947% | 2.448% | 2.952% | 3.952% | 5.651% | 8.160% | 13.587% | 16.410% |
| 14. | 0.867% | 1.223% | 1.790% | 2.270% | 2.830% | 3.396% | 4.491% | 6.287% | 8.923% | 14.515% | 17.414% |
| 15. | 1.037% | 1.447% | 2.078% | 2.617% | 3.237% | 3.864% | 5.051% | 6.936% | 9.684% | 15.418% | 18.383% |
| 16. | 1.225% | 1.693% | 2.389% | 2.988% | 3.666% | 4.353% | 5.628% | 7.593% | 10.441% | 16.296% | 19.320% |
| 17. | 1.433% | 1.961% | 2.724% | 3.382% | 4.117% | 4.862% | 6.221% | 8.258% | 11.193% | 17.152% | 20.226% |
| 18. | 1.661% | 2.250% | 3.080% | 3.798% | 4.588% | 5.390% | 6.826% | 8.928% | 11.940% | 17.985% | 21.103% |
| 19. | 1.908% | 2.561% | 3.458% | 4.234% | 5.078% | 5.934% | 7.442% | 9.602% | 12.680% | 18.798% | 21.952% |
| 20. | 2.175% | 2.893% | 3.858% | 4.690% | 5.586% | 6.493% | 8.068% | 10.279% | 13.414% | 19.591% | 22.777% |
| 21. | 2.462% | 3.246% | 4.277% | 5.165% | 6.110% | 7.065% | 8.701% | 10.957% | 14.142% | 20.365% | 23.577% |
| 22. | 2.769% | 3.619% | 4.715% | 5.657% | 6.648% | 7.648% | 9.340% | 11.636% | 14.862% | 21.123% | 24.355% |
| 23. | 3.095% | 4.012% | 5.171% | 6.164% | 7.200% | 8.241% | 9.985% | 12.314% | 15.575% | 21.863% | 25.112% |

Schedule D – Page 7

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 24. | 3.440 % | 4.423 % | 5.644 % | 6.687 % | 7.763 % | 8.844 % | 10.633 % | 12.991 % | 16.281 % | 22.589 % | 25.850 % |
| 25. | 3.804 % | 4.853 % | 6.133 % | 7.223 % | 8.337 % | 9.454 % | 11.284 % | 13.667 % | 16.980 % | 23.300 % | 26.570 % |
| 26. | 4.187 % | 5.300 % | 6.638 % | 7.772 % | 8.921 % | 10.070 % | 11.937 % | 14.340 % | 17.671 % | 23.997 % | 27.272 % |
| 27. | 4.586 % | 5.763 % | 7.156 % | 8.331 % | 9.513 % | 10.692 % | 12.591 % | 15.010 % | 18.356 % | 24.682 % | 27.959 % |
| 28. | 5.003 % | 6.241 % | 7.686 % | 8.901 % | 10.112 % | 11.318 % | 13.245 % | 15.678 % | 19.033 % | 25.354 % | 28.630 % |
| 29. | 5.436 % | 6.735 % | 8.229 % | 9.480 % | 10.718 % | 11.947 % | 13.900 % | 16.342 % | 19.704 % | 26.015 % | 29.288 % |
| 30. | 5.885 % | 7.241 % | 8.781 % | 10.066 % | 11.329 % | 12.580 % | 14.553 % | 17.003 % | 20.367 % | 26.665 % | 29.933 % |

(1)    Subject to revision by S&P from time to time.

NY1 6227748v.3

- **S&P Default Probability Table, Part 2**

| Wtd. Avg. Life (yrs) | S&P Equivalent Rating[1] | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | "BB" | "BB-" | "B+" | "B" | "B-" | "CCC+" | "CCC" | "CCC-" | "CC" | "SD" | "D" |
| 1. | 2.296% | 3.457% | 4.100% | 5.295% | 8.138% | 23.582% | 45.560% | 66.413% | 100.000% | 100.000% | 100.000% |
| 2. | 4.506% | 6.624% | 8.124% | 10.833% | 16.559% | 38.046% | 59.087% | 79.205% | 100.000% | 100.000% | 100.000% |
| 3. | 6.597% | 9.516% | 11.903% | 15.940% | 23.729% | 46.605% | 64.704% | 82.840% | 100.000% | 100.000% | 100.000% |
| 4. | 8.567% | 12.164% | 15.388% | 20.479% | 29.578% | 52.040% | 67.875% | 84.478% | 100.000% | 100.000% | 100.000% |
| 5. | 10.424% | 14.595% | 18.571% | 24.463% | 34.333% | 55.809% | 70.042% | 85.513% | 100.000% | 100.000% | 100.000% |
| 6. | 12.175% | 16.832% | 21.462% | 27.947% | 38.234% | 58.626% | 71.685% | 86.285% | 100.000% | 100.000% | 100.000% |
| 7. | 13.826% | 18.895% | 24.083% | 30.999% | 41.476% | 60.850% | 73.005% | 86.907% | 100.000% | 100.000% | 100.000% |
| 8. | 15.387% | 20.800% | 26.457% | 33.680% | 44.209% | 62.672% | 74.105% | 87.429% | 100.000% | 100.000% | 100.000% |
| 9. | 16.862% | 22.563% | 28.610% | 36.046% | 46.543% | 64.204% | 75.041% | 87.877% | 100.000% | 100.000% | 100.000% |
| 10. | 18.258% | 24.197% | 30.565% | 38.145% | 48.559% | 65.517% | 75.853% | 88.268% | 100.000% | 100.000% | 100.000% |
| 11. | 19.580% | 25.717% | 32.346% | 40.016% | 50.320% | 66.657% | 76.565% | 88.614% | 100.000% | 100.000% | 100.000% |
| 12. | 20.834% | 27.132% | 33.973% | 41.694% | 51.871% | 67.659% | 77.197% | 88.921% | 100.000% | 100.000% | 100.000% |
| 13. | 22.025% | 28.453% | 35.463% | 43.206% | 53.248% | 68.548% | 77.762% | 89.197% | 100.000% | 100.000% | 100.000% |
| 14. | 23.157% | 29.689% | 36.832% | 44.575% | 54.481% | 69.343% | 78.271% | 89.447% | 100.000% | 100.000% | 100.000% |
| 15. | 24.234% | 30.849% | 38.096% | 45.822% | 55.592% | 70.060% | 78.732% | 89.674% | 100.000% | 100.000% | 100.000% |
| 16. | 25.262% | 31.940% | 39.265% | 46.962% | 56.599% | 70.710% | 79.154% | 89.882% | 100.000% | 100.000% | 100.000% |
| 17. | 26.243% | 32.969% | 40.351% | 48.009% | 57.517% | 71.304% | 79.541% | 90.074% | 100.000% | 100.000% | 100.000% |
| 18. | 27.181% | 33.941% | 41.363% | 48.976% | 58.359% | 71.848% | 79.898% | 90.250% | 100.000% | 100.000% | 100.000% |
| 19. | 28.081% | 34.862% | 42.310% | 49.872% | 59.134% | 72.350% | 80.229% | 90.414% | 100.000% | 100.000% | 100.000% |
| 20. | 28.944% | 35.737% | 43.198% | 50.706% | 59.851% | 72.816% | 80.538% | 90.568% | 100.000% | 100.000% | 100.000% |
| 21. | 29.773% | 36.570% | 44.034% | 51.486% | 60.517% | 73.249% | 80.827% | 90.711% | 100.000% | 100.000% | 100.000% |
| 22. | 30.572% | 37.365% | 44.824% | 52.216% | 61.140% | 73.654% | 81.099% | 90.845% | 100.000% | 100.000% | 100.000% |
| 23. | 31.343% | 38.126% | 45.571% | 52.904% | 61.723% | 74.035% | 81.355% | 90.973% | 100.000% | 100.000% | 100.000% |

| Wtd. Avg. Life (yrs) | S&P Equivalent Rating[1] | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | "BB" | "BB-" | "B+" | "B" | "B-" | "CCC+" | "CCC" | "CCC-" | "CC" | "SD" | "D" |
| 24. | 32.087% | 38.855% | 46.281% | 53.554% | 62.271% | 74.394% | 81.598% | 91.093% | 100.000% | 100.000% | 100.000% |
| 25. | 32.808% | 39.556% | 46.958% | 54.169% | 62.789% | 74.733% | 81.828% | 91.207% | 100.000% | 100.000% | 100.000% |
| 26. | 33.506% | 40.230% | 47.604% | 54.754% | 63.280% | 75.055% | 82.048% | 91.316% | 100.000% | 100.000% | 100.000% |
| 27. | 34.184% | 40.881% | 48.222% | 55.311% | 63.746% | 75.362% | 82.258% | 91.419% | 100.000% | 100.000% | 100.000% |
| 28. | 34.842% | 41.510% | 48.815% | 55.844% | 64.190% | 75.655% | 82.459% | 91.519% | 100.000% | 100.000% | 100.000% |
| 29. | 35.483% | 42.118% | 49.386% | 56.355% | 64.615% | 75.935% | 82.653% | 91.614% | 100.000% | 100.000% | 100.000% |
| 30. | 36.108% | 42.709% | 49.936% | 56.845% | 65.022% | 76.205% | 82.839% | 91.706% | 100.000% | 100.000% | 100.000% |

(1)   Subject to revision by S&P from time to time.

NY1 6227748v.3

*With Respect to Replenishment Condition (E)*:

"**Weighted Average Life**" of the Reference Portfolio (or any relevant portion of the Reference Portfolio, including any single Reference Obligation) means, on any date of determination (the "**Weighted Average Life Determination Date**") means the number which equals (a) the number obtained by summing the products obtained by multiplying each portion of the Reference Obligation Notional Amount of each Reference Obligation in the Reference Portfolio (excluding Defaulted Reference Obligations) or in the relevant portion of the Reference Portfolio as of the Weighted Average Life Determination Date by the shorter of (i) the period from the Weighted Average Life Determination Date to the date when such portion of the Reference Obligation Notional Amount of each Reference Obligation in the Reference Portfolio (excluding Defaulted Reference Obligations) or in the relevant portion of the Reference Portfolio falls due and (ii) the period from the Weighted Average Life Determination Date to the Scheduled Termination Date, in each case measured in years and rounded to the second decimal place, divided by (b) the aggregate of the Reference Obligation Notional Amounts of such Reference Obligations (excluding Defaulted Reference Obligations).

*With Respect to Replenishment Condition (J)*:

"**Concentration Test**" is a test that is satisfied if, on the relevant date of determination, the aggregate of the Loss Determination Amounts for Reference Obligations (such Loss Determination Amount to be calculated by the Calculation Agent assuming that (a) such Reference Obligations have become Liquidated Reference Obligations and in each case the Defaulted Notional Amount thereof is equal to the Reference Obligation Notional Amount thereof, (b) the Event Determination Date is such date of determination (and, consequently, the Defaulted Notional Interest Amount is zero) and (c) the Final Price is the Assumed S&P Recovery Level associated with such Reference Obligation)

(i)     with respect to the ten largest Reference Entities (measured by aggregate Reference Obligation Notional Amount) having S&P Equivalent Ratings of "BB+" or below on such date is equal to or less than the Available Subordination Amount for the Class A Notes on such date;

(ii)    with respect to the eight largest Reference Entities (measured by aggregate Reference Obligation Notional Amount) having S&P Equivalent Ratings of "BB+" or below on such date is equal to or less than the Available Subordination Amount for the Class B Notes on such date;

(iii)   with respect to the six largest Reference Entities (measured by aggregate Reference Obligation Notional Amount) having S&P Equivalent Ratings of "BB+" or below on such date is equal to or less than the Available Subordination Amount for the Class C Notes on such date;

(iv)    with respect to the four largest Reference Entities (measured by aggregate Reference Obligation Notional Amount) having S&P Equivalent Ratings of "BB+" or below on such date is equal to or less than the Available Subordination Amount for the Class D Notes on such date; and

(v)     with respect to the two largest Reference Entities (measured by aggregate Reference Obligation Notional Amount) having S&P Equivalent Ratings of "BB+" or below on such date is equal to or less than the Available Subordination Amount for the Class E Notes on such date.

*With Respect to Replenishment Condition (K)*:

"**Reference Entity Concentration Threshold Amount**", for any date of determination, means an amount, in Euro, equal to the product of (a) 500,000,000 and (b) the sum of (i) 1, *plus* (ii) the product of (x) 3.0%, (y) 1/4 and (z) the number of Payment Dates occurring on or prior to such date.

## Schedule E

### Collateral Allocation Principles

A Defaulted Reference Obligation may be secured by collateral (or a portion thereof) which may from time to time be held or acquired by the relevant DBAG Group Entity for its own benefit or by a third party for the benefit of such entity and in each case, if applicable, for the benefit of third parties, generally on a pro rata basis (the "**Reference Collateral**"). The Reference Collateral shall not include collateral (or any portion thereof) held solely for the benefit of third parties (and not for the benefit of any DBAG Group Entity). In addition to securing such Defaulted Reference Obligation, such Reference Collateral may from time to time also secure (i) any other payment claims of such entity (including other Reference Obligations) and/or (ii) payment claims transferred from time to time by such entity together with a pro rata benefit from such Reference Collateral (in each case, a "**Reference Collateral Pool**").

For the purpose of the determination of Actual Recoveries any proceeds of a Reference Collateral Pool securing one or more Defaulted Reference Obligations, or the relevant portion thereof held for the benefit of DBAG Group Entities, as applicable, shall (except as specified below) be allocated to reduce the outstanding amount of such Defaulted Reference Obligations as follows:

(i)     if, pursuant to the records of the relevant DBAG Group Entity, any Reference Collateral is allocated to any particular claim or claims and such Reference Collateral, at any time after the Relevant Date, is relevant for the calculation of regulatory capital and reserves of DBAG Group Entity or other regulatory purposes with respect to such claim or claims under the applicable capital adequacy laws and regulations in effect on the Event Determination Date, including pursuant to Principle I (*Grundsatz I*) of the Principles on Own Capital and Liquidity of Banking Institutions (*Grundsätze über das Eigenkapital und die Liquidität der Kreditinstitute*) of January 20, 1969, as amended, modified or supplemented from time to time, the proceeds of such Reference Collateral shall be allocated in accordance with such collateral allocation in the records of the relevant DBAG Group Entity; and

(ii)    with respect to any Reference Collateral forming part of a Reference Collateral Pool not allocated pursuant to the immediately preceding clause (i), a portion of the proceeds from such Reference Collateral shall be allocated to the relevant Defaulted Reference Obligation(s) (in each such case, the "**Reference Collateral Share**") in proportion to the ratio between:

(A)     the Defaulted Notional Amount(s) of the relevant Defaulted Reference Obligation(s) secured by such Reference Collateral on the date of determination; and

(B)     the outstanding principal amount, on such date, of all payment claims (including contingent claims) secured by such Reference Collateral, in each case converted to EUR, if necessary, at the exchange rate applicable at the time the relevant proceeds are received by the relevant DBAG Group Entity.

The Reference Collateral Share may change from time to time, as the claims of the relevant entity DBAG Group Entity secured by the Reference Collateral Pool may be redeemed and new claims secured by such Reference Collateral Pool created.

NYI 6227748v.3

With respect to any Reference Obligation that is a syndicated loan or in respect of which claims on a Reference Collateral Pool must be shared with other creditors, the principles set forth above will not apply and instead the principles applicable to all such creditors alike will apply.

*Allocation of Payments with respect to non-syndicated Reference Obligations*

(a)      *General:* Subject to any binding allocation of a payment to a particular obligation by the relevant payer or pursuant to applicable law and subject to the provisions herein, in the event that the relevant DBAG Group Entity receives a payment on a Reference Obligation which is not a syndicated Reference Obligation, or a payment on any other payment obligation of the Reference Entity in relation to such Reference Obligation that is not subordinate in right of payment to the Reference Obligation, and such payment is less than the total amount then due under such Reference Obligation, and such other obligations, the payment received shall be allocated for the purposes of determining Actual Recoveries in the proportion that the Reference Obligation Notional Amount of the related Reference Obligation bears to the actual outstanding principal amounts of such other obligations.

(b)      *Allocation of Payment prior to the Credit Event:* Prior to the occurrence of a Credit Event in respect of a Reference Obligation, the Calculation Agent may allocate the payments received and allocated to such Reference Obligation to the interest due on, the principal of, the costs and expenses in respect of and/or any other obligations under such Reference Obligation in accordance with the Credit and Collection Policies.

(c)      *Allocation of Payment after the Credit Event:* Subject to any binding allocation of a payment to a particular obligation by the relevant payer or pursuant to applicable law, any payments allocated to a Reference Obligation pursuant to (a) above after the occurrence of a Credit Event with respect to such Reference Obligation shall be allocated *first* to reduce the outstanding principal amount of such Reference Obligation, *second*, only after the outstanding principal amount has been repaid in full, to pay accrued and unpaid interest with respect to such Reference Obligation and *third*, to costs and expenses with respect to such Reference Obligation.

*Allocation of Payments with respect to syndicated Reference Obligations*

With respect to syndicated Reference Obligations, any payments received by the Agent Bank with respect to a Reference Obligation shall be allocated by such Agent Bank to the related Reference Obligation pursuant to the related Reference Obligation Documentation, and, for the avoidance of doubt, to the extent not superseded by any contractual arrangements, applicable provisions of law. Such allocation by the Agent Bank of any payment to a Reference Obligation will be binding on the Calculation Agent for the purposes of determining Actual Recoveries. If a Credit Event has occurred with respect to the Reference Obligation, such amounts received by the relevant DBAG Group Entity shall be allocated *first* to reduce the outstanding principal amount of such Reference Obligation, *second*, only after the outstanding principal amount has been repaid in full, to pay accrued and unpaid interest with respect to such Reference Obligation and *third*, to costs and expenses with respect to such Reference Obligation.

*Allocation of Foreclosure Proceeds with respect to non-syndicated Reference Obligations*

(a) For the purposes of determining Actual Recoveries any proceeds of any Reference Collateral securing one or more Reference Obligations which do not arise from syndicated Reference Obligations, after deduction of reasonable fees, disbursements, costs and expenses (excluding internal costs and expenses of the relevant Servicer) payable or incurred in connection with foreclosure on such Reference Collateral, shall be allocated to reduce the outstanding principal amount of such Reference Obligations as follows:

(i)     if, pursuant to the records of the DBAG Group or any contractual or legal obligations of the relevant DBAG Group Entity, any Reference Collateral is allocated to any particular obligation or obligations or such Reference Collateral, at any time after the Effective Date, is relevant for the calculation of regulatory capital and reserves of the DBAG Group or other regulatory purposes with respect to such obligation or obligations under the applicable capital adequacy laws and regulations, in particular, pursuant to Principle I (*Grundsatz I*) of the German Principles concerning Own Funds and Liquidity of Institutions (*Grundsätze über die Eigenmittel und die Liquidität der Kreditinstitute*) of January 20, 1969, as amended or replaced from time to time, the net proceeds of such Reference Collateral shall be allocated in accordance with such records of the DBAG Group, contractual or legal obligations of the relevant DBAG Group Entity or regulatory requirements, as applicable, and

(ii)    with respect to any Reference Collateral also securing obligations other than Reference Obligations and not allocated pursuant to (i) above, a portion of the net proceeds from such Reference Collateral shall be allocated to the relevant Reference Obligation(s); such portion shall represent the ratio between:

      (A)     the Reference Obligation Notional Amount (or the aggregate thereof) at such time of the relevant Reference Obligation(s) secured by such Reference Collateral and

      (B)     the actual outstanding principal amount, at such time of all payment obligations (including contingent obligations) secured by such Reference Collateral.

(b)  Payments to DBAG Group Entities which are made to redeem the Reference Collateral which does not relate to a Reference Obligation arising from a syndicated Reference Obligation shall be deemed to be proceeds from foreclosure on such Reference Collateral. After the occurrence of a Credit Event in respect of a Reference Obligation which does not arise from a syndicated Reference Obligation, payments received on an obligation secured by the same Reference Collateral as such Reference Obligation shall be allocated to such Reference Obligation regardless of the due date of such obligations, subject only to any binding allocation of a payment to a particular obligation by the relevant payer or pursuant to applicable law.   Otherwise, payments received shall be allocated as described in "*Allocation of Payments with respect to non-syndicated Reference Obligations*" above.

Subject to any binding allocation of a payment to a particular obligation by the relevant payer or pursuant to applicable law after the occurrence of a Credit Event with respect to a particular Reference Obligation other than a syndicated Reference Obligation any proceeds from the foreclosure of the Reference Collateral allocated to such Reference Obligation as described in this provision ("*Allocation of Foreclosure Proceeds with respect to non-syndicated Reference Obligations*"), shall be allocated *first* to reduce the outstanding principal amount of such Reference Obligation, *second*, only after the outstanding principal amount has been repaid in full, to pay accrued and unpaid interest with respect to such Reference Obligation and *third*, to costs and expenses with respect to such Reference Obligation.

### *Allocation of Foreclosure Proceeds with respect to syndicated Reference Obligations*

Any proceeds received with respect to any Reference Collateral securing a syndicated Reference Obligation shall be allocated by the Calculation Agent to the Reference Obligation in accordance with the allocation of the relevant Agent Bank pursuant to the underlying Reference Obligation Documentation, and, for the avoidance of doubt, to the extent not superseded by any contractual arrangements, pursuant to applicable law.  Such allocation by the Agent Bank of any proceeds to a Reference Obligation will be binding on the Calculation Agent for the purposes of determining Actual Recoveries.  If a Credit Event has occurred with respect to such Reference Obligation relating to, such proceeds received by the relevant entity within the DBAG Group, after deduction of reasonable fees, disbursements, costs and expenses

(excluding internal costs and expenses of the relevant DBAG Servicer) payable or incurred in connection with foreclosure on such Reference Collateral, shall be allocated by the Calculation Agent *first* to reduce the outstanding principal amount of such Reference Obligation, *second*, only after the outstanding principal amount has been repaid in full, to pay accrued and unpaid interest with respect to such Reference Obligation and *third*, to costs and expenses with respect to such Reference Obligation.

*Set-off*

The relevant DBAG Group Entity may, at its sole discretion, set off any amounts due under a Reference Obligation against any amount due by such entity to the Reference Entity of such Reference Obligation in accordance with the terms of the underlying Reference Obligation Documentation, the Credit and Collection Policies and applicable law.

*Non compliance with Allocation Rules*

In the event that the provisions described hereinabove, are not complied with, the allocation of the relevant payments or foreclosure proceeds for the purposes of determining Actual Recoveries shall be effected by the Calculation Agent as if such provisions were complied with.

## Schedule F

## REFERENCE PORTFOLIO SERVICING STANDARDS

The DBAG Group Entities will, to the extent that they act as Servicers, service the Reference Obligations in accordance with the following servicing principles (such principles, collectively, the "**Servicing Standards**").

- **Common Principles**

- **General**

In administering, collecting and enforcing the Reference Obligations or foreclosing on any Reference Collateral (collectively the "servicing" and to "service") each DB Servicer shall at all times act (in the case of a syndicated loan, to the extent permissible under the relevant loan agreement) as a reasonable creditor in the protection of its own interests acting reasonably and in good faith in accordance with its general business practices taking into account the interests of Seller. In the case of a conflict of interest between the interests of Seller and the interests of any DBAG Group party or a third party with regard to servicing of the Reference Obligations, the DB Servicers shall not place the interests of Seller in a less favorable position than the interests of any such DBAG Group Entity or third party. In the case of a conflict between the interests of Buyer and the interests of the Noteholders, the DB Servicers shall give priority to the interests of Buyer and then, among the Noteholders, to the interests of the Holders of the Class or Classes of Notes which then rank most senior pursuant to the Priority of Payments.

Each DB Servicer shall take all measures it deems necessary or appropriate in its professional judgment (which judgment shall, for the avoidance of doubt, be reasonable) to service the relevant part of the Reference Portfolio which are necessary to comply with supervisory requirements and shall refrain from acting when so required by applicable law, regulations or a competent regulator.

Except as otherwise described herein, each DB Servicer shall perform its duties in the course of servicing the Reference Obligations in compliance with the Credit and Collection Policies.

- **Amendments**

Seller and Buyer may agree at any time to amend or supplement the servicing principles, provided that any such amendment or supplement does not adversely affect (except in an immaterial manner) the interests of any Class of Notes, unless otherwise required by mandatory provisions of law, and each Rating Agency receives notice thereof from Buyer. Buyer may amend or supplement the Credit and Collection Policies in its sole discretion from time to time, provided that (A) if any such amendment or supplement is inconsistent with the Servicing Standards, it shall not be applied with respect to the Reference Portfolio, (B) if such amendment or supplement may, in the professional judgment of Buyer (which judgment shall, for the avoidance of doubt, be reasonable), adversely affect the determination of the losses, Credit Events, or appraised values from the perspective of Seller, it shall not be applied to the Reference Obligations without prior consent of Seller, unless in the case of each of (A) or (B) otherwise required by mandatory provisions of law and (C) to the extent such amendment or supplement, in the professional judgment of Buyer (which judgment shall, for the avoidance of doubt, be reasonable), affects or may affect the interests of the Noteholders, each Rating Agency receive notice thereof from Buyer.

NYI 6227748v.3

- **Payments in Arrears from Reference Obligors**

If a Reference Obligor is in arrears with a payment due, the relevant DB Servicer shall proceed in accordance with the Credit and Collection Policies. If these do not generally provide for the specific case at hand, the relevant DB Servicer shall handle the case as would a reasonable creditor in the protection of its own interests acting in good faith.

The Servicers shall be allowed to exercise reasonable discretion in handling such cases of a Reference Obligor's default within the scope of the Credit and Collection Policies. Each Servicer shall exercise this discretion as would a reasonable creditor in maximizing recovery on its claims against debtors and in the protection of its own interests.

In accordance with the Credit and Collection Policies and subject to the following three paragraphs, each DB Servicer is authorized to agree on payment rescheduling or debt restructuring with a Reference Obligor. In doing so, the relevant DB Servicer may in particular (i) forgo the repayment of a portion of the relevant Reference Obligation or (ii) subordinate all or a portion of a Reference Obligation.

If any Reference Obligor falls more than six months in arrears on a payment due and no payment rescheduling or debt restructuring agreement has been entered into, the relevant DB Servicer shall commence enforcement against the Reference Obligor or, if different, the Reference Entity for the Reference Obligation, or foreclose on any related Reference Collateral, unless the relevant DB Servicer concludes, in its professional judgment (which judgment shall, for the avoidance of doubt, be reasonable), that such enforcement or foreclosure would not be justified in view of the expenses and expected proceeds thereof.

In all cases of a payment rescheduling or debt restructuring, each of the DB Servicers shall adequately safeguard the interests of Seller in the fullest performance of the Reference Obligations at all times and shall not place such interests in a less favorable position than its own interests or the interests of any other DBAG Group Entity in relation to their respective other claims against the same Reference Obligor.

Each DB Servicer shall only agree to payment rescheduling or debt restructuring of a Reference Obligation except for any amount of principal of such Reference Obligation which qualifies as principal foregone for the purposes of the determination of losses (whether the relevant Reference Obligor is in arrears or not), if the Reference Obligation, under the altered repayment schedule or as restructured, is due to be repaid in full before the Scheduled Termination Date.

- **Other Changes in Reference Obligation Conditions**

Each DBAG Group Entity shall be authorized to take action in the context of servicing the Reference Obligations (in particular to amend contractual provisions of the underlying loan), which in the relevant DB Servicer's professional judgment (which judgment shall, for the avoidance of doubt, be reasonable) may affect the Reference Obligations, only if, on the assumption that the relevant Reference Obligation were eligible to be added to the Reference Portfolio through a Replenishment immediately prior to the relevant action, such action would not result in such Reference Obligation not complying with the Replenishment Conditions, if it were added to the Reference Portfolio at the time of such action.

- **Accounting**

Each DB Servicer shall keep separate accounting records regarding the Reference Obligations serviced by it, which shall show, inter alia:

6

(i)     the identification number and any other identifiers assigned to the relevant Reference Obligation,

(ii)    the Reference Obligation Notional Amount of the Reference Obligation as of the Cut-off Date or the Relevant Date, as applicable, and with respect to a Non-EUR Reference Obligation, also the outstanding principal amount expressed in the currency drawn, together with the applicable exchange rate, and

(iii)   the remaining term to maturity of the Reference Obligation as of the Cut-off Date or the Replenishment Date, as applicable.

Accounting records, journals, daily accounts and portfolio inventories for the annual financial statements shall be kept in safekeeping for a period of seven years after the relevant accounting period, or for such longer or shorter period as is required from time to time by applicable law. The accounting records shall be kept current and shall not fall behind for more than 30 calendar days.

Each DB Servicer may maintain records and documentation relating to the Reference Obligations in paper or electronic form or any other commercially reasonable manner.

- **Vicarious Agents; Consultants**

Each DB Servicer may delegate the performance of its duties in the context of enforcing the Reference Obligations and foreclosing on any Reference Collateral, in whole or in part, to vicarious agents (*Erfüllungsgehilfen*) pursuant to Section 278 of the German Civil Code. A more extensive delegation of duties by the DB Servicers in the context of servicing the Reference Obligations is not permitted.

In connection with servicing the Reference Obligations, each of the DB Servicers may retain outside consultants and experts to the extent it deems necessary in its professional judgment (which judgment shall, for the avoidance of doubt, be reasonable). Each DB Servicer shall select and monitor such consultants and experts with the care expected of a prudent bank.

- **Change in Servicers**

A DB Servicer may be substituted in its function as Servicer of a Reference Obligation by another DBAG Group Entity, provided that:

(i)     the standard of the servicing and the loss determination and allocation of losses remains unchanged,

(ii)    the obligations under the transaction documents remain to be complied with, and

(iii)   in the professional judgment of Buyer (which judgment shall, for the avoidance of doubt, be reasonable) such change shall not adversely affect the interests of Seller.

NY1 6227748v.3