Exhibit 3

**EXECUTION COPY**

AMENDED AND RESTATED INDENTURE

DATED AS OF JUNE 22, 2007

AMONG

CART 1 LTD.,
AS ISSUER

AND

THE BANK OF NEW YORK, LONDON BRANCH,
AS TRUSTEE

AND

THE BANK OF NEW YORK (LUXEMBOURG) S.A.,
AS NOTE REGISTRAR

AND

BNY FUND SERVICES (IRELAND) LIMITED,
AS IRISH PAYING AGENT

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT.................................................................................................... 1

GRANTING CLAUSES .............................................................................................................. 1

ARTICLE 1 DEFINITIONS, INTERPRETATION ................................................................ 4

Section 1.1      Definitions, Interpretation. ............................................................................. 4

ARTICLE 2 THE NOTES .......................................................................................................... 5

Section 2.1      Forms Generally. ............................................................................................. 5
Section 2.2      Forms of Notes and Certificate of Authentication. ......................................... 6
Section 2.3      Authorized Amount, Certain Economic Terms and Other Terms. ................... 7
Section 2.4      Denominations. ................................................................................................ 9
Section 2.5      Execution, Authentication, Delivery and Dating. ........................................... 9
Section 2.6      Registration, Transfer and Exchange of Notes. ............................................ 10
Section 2.7      Mutilated, Defaced, Destroyed, Lost or Stolen Notes. ................................. 13
Section 2.8      Payments on the Notes. ................................................................................. 14
Section 2.9      Persons Deemed Owners. .............................................................................. 15
Section 2.10     Cancellation. ................................................................................................. 15
Section 2.11     Global Notes; Certificated Notes. ................................................................ 15
Section 2.12     Certain Tax-Related Matters. ....................................................................... 16
Section 2.13     Appointment of Paying Agents; Payments by Paying Agents. ...................... 16

ARTICLE 3 AUTHENTICATION AND DELIVERY OF NOTES; PROCEDURES RELATING
              TO COLLATERAL ......................................................................................... 17

Section 3.1      General Provisions for the Benchmark Date.................................................. 17
Section 3.2      General Provisions for the Closing Date....................................................... 18
Section 3.3      Additional Conditions for the Benchmark Date and the Closing Date........... 18
Section 3.4      Procedures Relating to Collateral. ............................................................... 19

ARTICLE 4 SATISFACTION AND DISCHARGE ................................................................. 20

Section 4.1      Satisfaction and Discharge of Indenture....................................................... 20
Section 4.2      Application of Trust Money............................................................................ 21

ARTICLE 5 EVENT OF DEFAULT; REMEDIES .................................................................. 22

Section 5.1      Events of Default............................................................................................ 22
Section 5.2      Acceleration of Maturity; Rescission and Annulment.................................... 23
Section 5.3      Suits for Enforcement by Trustee. ................................................................. 25
Section 5.4      Remedies. ....................................................................................................... 25
Section 5.5      Retention of Trust Estate................................................................................ 27

i

**TABLE OF CONTENTS**
(continued)

Section 5.6     *Trustee May File Proofs of Claim*..................................................................... 28
Section 5.7     *Trustee May Enforce Claims Without Possession* .............................................. 29
Section 5.8     *Application of Money Collected*......................................................................... 29
Section 5.9     *Limitation on Suits* ............................................................................................ 29
Section 5.10    *Unconditional Rights of Noteholders to Receive Payment* ............................. 30
Section 5.11    *Restoration of Rights and Remedies* ................................................................ 30
Section 5.12    *Rights and Remedies Cumulative*...................................................................... 30
Section 5.13    *Delay or Omission Not Waiver.* ....................................................................... 31
Section 5.14    *Control by Secured Parties* .............................................................................. 31
Section 5.15    *Waiver of Past Defaults* ................................................................................... 31
Section 5.16    *Undertaking for Costs* ...................................................................................... 32
Section 5.17    *Sale of Trust Estate.* ......................................................................................... 32
Section 5.18    *Action on Notes* ................................................................................................ 33
Section 5.19    *Role of Trustee upon an Event of Default* ........................................................ 33

ARTICLE 6 THE TRUSTEE; CERTAIN LIENS ............................................................... 33

Section 6.1     *Certain Duties and Responsibilities*.................................................................. 33
Section 6.2     *Notice of Default* .............................................................................................. 35
Section 6.3     *Certain Rights of Trustee* ................................................................................ 35
Section 6.4     *Not Responsible for Recitals or Issuance of Notes* ......................................... 37
Section 6.5     *May Hold Notes* ................................................................................................ 37
Section 6.6     *Money Held in Trust; Investment in Certain Eligible Investments* .................. 37
Section 6.7     *Compensation, Reimbursement and Indemnity*................................................ 37
Section 6.8     *Corporate Trustee Required; Eligibility* .......................................................... 38
Section 6.9     *Resignation and Removal; Appointment of Successor.*..................................... 38
Section 6.10    *Acceptance of Appointment by Successor* ........................................................ 39
Section 6.11    *Merger, Conversion, Consolidation or Succession to Business of Trustee* ..................... 40
Section 6.12    *[Reserved].*........................................................................................................ 40
Section 6.13    *Co-Trustees.* ...................................................................................................... 40
Section 6.14    *Roles of Trustee with Regard to Various Parties*............................................. 41
Section 6.15    *Confidential Treatment of Documents* ............................................................. 42

ARTICLE 7 COVENANTS................................................................................................... 42

Section 7.1     *Payment of Principal and Interest* ................................................................... 42
Section 7.2     *Maintenance of Office or Agency for Presentation; Paying Agents.* ................ 42
Section 7.3     *Money for Note Payments to Be Held in Trust* ................................................ 43
Section 7.4     *Existence of Issuer* ........................................................................................... 43
Section 7.5     *Protection of Trust Estate.* ............................................................................... 43
Section 7.6     *Required Limited Recourse and Non-Petition Provisions in Agreements* ....................... 44
Section 7.7     *Performance of Obligations; Separate Existence.* ........................................... 44
Section 7.8     *Negative Covenants*........................................................................................... 45
Section 7.9     *Statement as to Compliance; Statement as to Withholding*.............................. 46
Section 7.10    *Issuer May Not Consolidate or Merge.*............................................................ 46
Section 7.11    *Limited Activities.*............................................................................................. 46
Section 7.12    *Indebtedness*...................................................................................................... 47
Section 7.13    *Compliance with Law*........................................................................................ 47

ii

## TABLE OF CONTENTS
### (continued)

**Page**

Section 7.14    Waiver of Stay or Execution Laws ............................................................... 47
Section 7.15    Appointment of an Auditor ......................................................................... 47
Section 7.16    Notice of Rating Changes ........................................................................... 47

ARTICLE 8 SUPPLEMENTAL INDENTURES ................................................................... 47

Section 8.1    Supplemental Indentures Without Consent of Secured Parties ...................... 47
Section 8.2    Supplemental Indentures with Consent of Swap Counterparty and Noteholders ............ 49
Section 8.3    Execution of Supplemental Indentures ......................................................... 51
Section 8.4    Effect of Supplemental Indentures ............................................................... 51
Section 8.5    Reference in Notes to Supplemental Indentures ............................................ 51

ARTICLE 9 REDEMPTION ................................................................................................. 51

Section 9.1    Redemption. ............................................................................................... 51
Section 9.2    Notice to Trustee, Rating Agency and Swap Counterparty ............................ 53
Section 9.3    Notice of Redemption .................................................................................. 54
Section 9.4    Deposit of Aggregate Redemption Amount ................................................... 54
Section 9.5    Payments on Early Redemption Date. ........................................................... 54

ARTICLE 10 ACCOUNTS, ACCOUNTINGS AND RELEASES ....................................... 54

Section 10.1    Collection of Money ................................................................................... 54
Section 10.2    Segregated Accounts. ................................................................................. 55
Section 10.3    Release of Collateral................................................................................... 57
Section 10.4    Reports by Trustee and Related Matters ..................................................... 57
Section 10.5    Information Reports. ................................................................................... 58

ARTICLE 11 APPLICATION OF MONIES ........................................................................ 63

Section 11.1    Disbursements of Monies. ........................................................................... 63

ARTICLE 12 THE CREDIT DEFAULT SWAPS ................................................................ 68

Section 12.1    The Credit Default Swaps. ........................................................................... 68

ARTICLE 13 RELATIONSHIP AMONG NOTEHOLDERS ............................................... 68

Section 13.1    Subordination............................................................................................. 68
Section 13.2    Standard of Conduct ................................................................................... 72

ARTICLE 14 MISCELLANEOUS........................................................................................ 72

Section 14.1    Form of Documents Delivered to Trustee ..................................................... 72
Section 14.2    Acts of Secured Parties. ............................................................................. 73
Section 14.3    Notices, Etc., to Various Participants........................................................... 73
Section 14.4    Notices to Noteholders; Waiver. ................................................................. 74
Section 14.5    Effect of Headings and Table of Contents..................................................... 75

NY1 6216749v.6

**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| *Section 14.6* | *Successors and Assigns* | *75* |
| *Section 14.7* | *Separability* | *75* |
| *Section 14.8* | *Benefits of Indenture* | *76* |
| *Section 14.9* | *Payments on Non-Business Days* | *76* |
| *Section 14.10* | *Governing Law* | *76* |
| *Section 14.11* | *Counterparts* | *76* |
| *Section 14.12* | *Inspection Rights* | *76* |
| *Section 14.13* | *Submission to Jurisdiction* | *77* |
| *Section 14.14* | *Non-Petition Covenants* | *77* |

Annexes

Annex A:        Glossary of Definitions

Exhibits

| | |
|---|---|
| Exhibit A | Form of Note |
| Exhibit B | Form of Transferee Certificate |
| Exhibit C | Form of Transferor Certificate |
| Exhibit D-1 | Forms of Benchmark Date Opinions of Counsel of Sidley Austin LLP and affiliated partnerships |
| Exhibit D-2 | Form of Benchmark Date Opinion of Counsel of Maples and Calder |
| Exhibit D-3 | Forms of Closing Date Opinions of Counsel of Sidley Austin LLP and affiliated partnerships |
| Exhibit D-4 | Form of Closing Date Opinion of Counsel of Maples and Calder |
| Exhibit E-1 | Form of Benchmark Date Opinion of Counsel of Gardere Wynne Sewell LLP |
| Exhibit E-2 | Form of Closing Date Opinion of Counsel of Gardere Wynne Sewell LLP |
| Exhibit F | [Reserved] |
| Exhibit G | [Reserved] |
| Exhibit H-1 | Form of Credit Default Swap Master Agreement |
| Exhibit H-2-a | Form of First Loss Credit Default Swap Confirmation |
| Exhibit H-2-b | Form of Mezzanine Credit Default Swap Confirmation |
| Exhibit I | Form of Information Report |

NY1 6216749v.6

AMENDED AND RESTATED INDENTURE dated as of June 22, 2007, between CART 1 LTD., an exempted Cayman Islands limited liability company, as Issuer (the "Issuer"), The Bank of New York, London Branch, a New York banking corporation, as trustee (the "Trustee"), The Bank of New York (Luxembourg) S.A., a société anonyme licensed and registered under the laws of the Grand Duchy of Luxembourg, as note registrar (the "Note Registrar") and BNY Fund Services (Ireland) Limited, as Irish paying agent (the "Irish Paying Agent").

### PRELIMINARY STATEMENT

On the Benchmark Date, the Issuer, the Trustee, the Note Registrar and the Irish Paying Agent entered into an Indenture (the "Original Indenture") providing for the issuance of the Class F Notes on the Benchmark Date. The Issuer and the Trustee have agreed, pursuant to a First Supplemental Indenture, dated as of June 22, 2007, to amend and restate the Original Indenture in its entirety in the form of this Amended and Restated Indenture in order to (i) obtain the Requisite Ratings in connection with the occurrence of the Closing Date and the issuance of the Offered Notes on the date hereof, (ii) correct certain inconsistencies, defects and ambiguities arising under the Original Indenture and (iii) conform certain provisions of the Original Indenture to the description thereof set forth in the Prospectus.

The Issuer is duly authorized to execute and deliver this Indenture to provide for the Notes issuable as provided in this Indenture. All covenants and agreements made by the Issuer herein are for the benefit and security of the Trustee in trust for the Secured Parties. The Issuer is entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Issuer in accordance with its terms have been done.

Capitalized terms used in this Preliminary Statement and in the following Granting Clauses have the meanings specified in Annex A to this Indenture.

### GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties as set forth in this Indenture, a first priority security interest in, and all of its estate, right, title and interest (but not the obligations), whether now owned or hereafter acquired or arising, in, to and under all of the following property (other than (w) the Segregated Accounts, (x) the account opened pursuant to the Bank Account Agreement, (y) all sums and other property from time to time standing to the credit of any of the Segregated Accounts and the account opened pursuant to the Bank Account Agreement and (z) the Excepted Property):

> (a)  (i) all rights of the Issuer under the Credit Default Swaps, including payments made or to be made by the Swap Counterparty thereunder and (ii) all revenues, issues, products,

accessions, substitutions, replacements, profits and UCC Proceeds of and from any of the property described in the preceding clause (i);

(b)     all rights of the Issuer under the Subscription Agreement, the Placement Agency Agreement, the Administration Agreement and the Bank Account Agreement;

(c)     all accounts, deposit accounts, securities accounts, security entitlements, subaccounts, chattel paper, supporting obligations, general intangibles, investment property, documents, instruments, including all debt obligations and debt or other securities, including any part thereof that consists of general intangibles (as defined in the UCC) which the Issuer has caused to be delivered or otherwise pledged to the Trustee herewith, all payments made thereon and any other property delivered with respect thereto, all rights of the Issuer to receive debt obligations or debt or other securities and obligations (including any Eligible Investments) from any Person whether created pursuant to purchase orders or otherwise and all debt obligations or debt or other securities and obligations (including any Eligible Investments) which may be delivered to the Trustee in the future pursuant to the terms hereof and thereof;

(d)     except to the extent otherwise provided in this Indenture, all present and continuing right, power and authority of the Issuer, in the name and on behalf of the Issuer, as agent and attorney-in-fact or otherwise, to make claim for and demand performance on, under or pursuant to any of the Collateral held by or for the Trustee for the benefit and security of the Secured Parties, to bring actions and proceedings thereunder or for the specific or other enforcement thereof, or with respect thereto, to make all waivers and agreements, to grant or refuse requests, to give or withhold notices and to exercise all rights, remedies, powers, privileges and options, to grant or withhold consents and approvals and to do any and all things and exercise all other discretionary rights, options, privileges or benefits which the Issuer is or may become entitled to do with respect to the Collateral held for the benefit of the Secured Parties without notice to, consent or approval by or joinder of the Issuer; and

(e)     all revenues, issues, products, accessions, substitutions, replacements, profits and UCC Proceeds of and from all the property described in clauses (b) through (d) above

(the collateral described in clauses (a) through (e) (other than (w) the Segregated Accounts, (x) the account opened pursuant to the Bank Account Agreement, (y) all sums and other property from time to time standing to the credit of any of the Segregated Accounts and the account opened pursuant to the Bank Account Agreement and (z) the Excepted Property) being referred to as the "Collateral"). Such Grants are made in trust, to secure the payment of all amounts payable by the Issuer under the Notes equally and ratably without prejudice, priority or distinction, subject to the provisions of Article 13, and all amounts payable by the Issuer under the Credit Default Swaps, in each case subject to the provisions of Article 11; *provided, however,* that the Swap Counterparty shall not be secured by the Issuer's rights under the Credit Default Swaps. The priority in which the Secured Obligations are payable from proceeds of the Collateral shall be as expressly set forth in this Indenture (including Article 11).

2

NY1 6216749v.6

Except to the extent otherwise provided in this Indenture, the Issuer hereby irrevocably constitutes and appoints the Trustee the true and lawful attorney of the Issuer, with full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer with respect to the Collateral held by the Trustee in trust for the benefit and security of the Secured Parties and to ask, require, demand, receive, settle, compromise, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of any of the Collateral held for the benefit and security of the Secured Parties, to endorse any checks or other instruments or orders in connection therewith and to file any claims or.take any action or institute any proceedings which the Trustee may deem to be necessary or advisable in the premises.  The power of attorney granted pursuant to this Indenture and all authority hereby conferred are granted and conferred solely to protect the Trustee's interest in the Collateral held for the purposes provided for herein and shall not impose any duty upon the Trustee to exercise any power.  This power of attorney shall be irrevocable as one coupled with an interest prior to the payment in full of all the Secured Obligations.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein.  Upon the occurrence of any Event of Default hereunder, and in addition to any other rights available under this Indenture or any other instruments or other property included in the Collateral held, subject to Section 6.14, by the Trustee in trust for the benefit and security of the Secured Parties or otherwise available at law or in equity, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right (subject to compliance with any mandatory requirements of applicable law, to any restrictions applicable to the Collateral as set forth in the terms thereof and to any applicable provisions of this Indenture), to sell or apply any rights and other interest assigned or pledged hereby in accordance with the terms hereof at public or private sale.

It is expressly agreed that, anything herein contained to the contrary notwithstanding, the Issuer shall remain liable under any instruments and other property included in the Collateral to perform all the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and, except as otherwise expressly provided herein, the Trustee shall not have any obligations or liabilities under such instruments and other property by reason of or arising out of this Indenture, nor shall the Trustee be required or obligated in any manner to perform or fulfill any obligation of the Issuer under or pursuant to such instruments or other property or to make any payment, to make any inquiry as to the nature or sufficiency of any payment received by it, to present or file any claim or to take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof and agrees to perform the duties provided herein pursuant to and in accordance with the terms of this Indenture such that, subject to Section 6.14, the interests of the Secured Parties may be adequately and effectively protected.

3

ARTICLE 1
DEFINITIONS, INTERPRETATION

Section 1.1    *Definitions, Interpretation.*  Except as otherwise specified herein or as the context may otherwise require, capitalized terms used in this Indenture have the respective meanings assigned them in Annex A hereto for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms.  Capitalized terms used in this Indenture that are not defined in this Indenture (including Annex A hereto) shall have the respective meanings specified in the First Loss Credit Default Swap Confirmation, the Mezzanine Credit Default Swap Confirmation, and the Credit Default Swap Master Agreement.

Except as otherwise specified herein or as the context may otherwise require:

(i) all references in this Indenture to designated "Articles", "Sections", "subsections" and other subdivisions are to the designated Articles, Sections, subsections and other subdivisions of this Indenture;

(ii) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole (including Annex A hereto) and not to any particular Article, Section, subsection or other subdivision;

(iii) the word "including" and correlative words shall be deemed to be followed by the phrase "without limitation" unless actually followed by such phrase or a phrase of like import;

(iv) the word "or" is used inclusively herein (for example, the phrase "A or B" means "A or B or both", not "either A or B but not both");

(v) references to a Person are references to such Person and such Person's successors and assigns;

(vi) references to an agreement or other document are to it as amended, supplemented, restated and otherwise modified from time to time and to any successor document;

(vii) references to a statute, regulation or other government rule are to it as amended from time to time and, as applicable, are to corresponding provisions of successor governmental rules;

(viii) references to "EUR", "euro", "Euro" and "€" are to the currency introduced at the start of the third stage of the European Economic and Monetary Union pursuant to the Treaty establishing the European Community, as amended, and references to "$" shall be to the lawful currency of the United States of America; and

(ix) the words "allocated to", when used in conjunction with a Class of Notes and any Floating Payment or any Adjustment Payment, shall refer to the reduction (in the case of any Floating Payment, any Adjustment Payment from the Issuer or any part of either thereof) or increase (in the case of any Adjustment Payment from the Swap Counterparty or any part thereof) in the Outstanding Principal Amount of such Class of Notes in the following sequences:

4

(A) in the case of any such reduction, first (unless the Available Subordination Amount for the Class E Notes has been reduced to €1), to the Class F Notes; second (unless the Available Subordination Amount for the Class D Notes has been reduced to €2), to the Class E Notes; third (unless the Available Subordination Amount for the Class C Notes has been reduced to €3), to the Class D Notes; fourth (unless the Available Subordination Amount for the Class B Notes has been reduced to €4), to the Class C Notes; fifth (unless the Available Subordination Amount for the Class A Notes has been reduced to €5), to the Class B Notes, sixth (unless the Available Subordination Amount for the Class A+ Notes has been reduced to €6), to the Class A Notes, and seventh (if the Available Subordination Amount for the Class A+ Notes has been reduced to €7), to the Class A+ Notes, in each case to an amount not less than €1; and

(B) in the case of any such increase, first (if the Outstanding Principal Amount of the Class A+ Notes was reduced pursuant to the foregoing clause (A) and has not subsequently been increased to an amount equal to the Initial Principal Amount of such Class of Notes), to the Class A+ Notes; second (if the Outstanding Principal Amount of the Class A Notes was so reduced and has not subsequently been increased to an amount equal to the Initial Principal Amount of such Class of Notes), to the Class A Notes; third (if the Outstanding Principal Amount of the Class B Notes was so reduced and has not subsequently been increased to an amount equal to the Initial Principal Amount of such Class of Notes), to the Class B Notes; fourth (if the Outstanding Principal Amount of the Class C Notes was so reduced and has not subsequently been increased to an amount equal to the Initial Principal Amount of such Class of Notes), to the Class C Notes; fifth (if the Outstanding Principal Amount of the Class D Notes was so reduced and has not subsequently been increased to an amount equal to the Initial Principal Amount of such Class of Notes), to the Class D Notes; sixth (if the Outstanding Principal Amount of the Class E Notes was so reduced and has not subsequently been increased to an amount equal to the Initial Principal Amount of such Class of Notes), to the Class E Notes; and seventh (if the Outstanding Principal Amount of the Class F Notes was so reduced), to the Class F Notes, in each case to an amount not greater than the Initial Principal Amount of such Class of Notes (any such reductions or increases to take place on a net basis as to each relevant Class of Notes on the Payment Dates in respect of which the relevant amounts fall due under the Credit Default Swaps).

## ARTICLE 2
## THE NOTES

Section 2.1      *Forms Generally*.

(a)      The Notes and the Trustee's certificate of authentication thereon shall be as specified in Section 2.2, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may, consistently herewith, be determined by an Authorized Officer of the Issuer executing such Notes, as evidenced by the execution by such Authorized Officer of such Notes. Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

(b)      The Notes shall be typed, printed, lithographed or engraved or produced by any combination of these methods on steel engraved borders or may be produced in any other manner, all as

determined by an Authorized Officer of the Issuer executing such Notes, as evidenced by the execution by such Authorized Officer of such Notes.

(c)     The Notes shall be issued in registered form (as a Global Note or as Certificated Notes) without interest coupons.

(d)     The Issuer in issuing the Notes may use "private placement" numbers, "ISIN" numbers and/or similar designations (if then generally in use), and, if so, the Trustee shall indicate any such number and designation of the Notes in notices of redemption and related materials as a convenience to Holders; *provided, however*, that any such notice may state that no representation is made as to the correctness of any such number or designation either as printed on the Notes or as contained in any notice of redemption and related materials.

Section 2.2     *Forms of Notes and Certificate of Authentication.*

(a)     The Notes shall initially be issued in the form of a Global Note in substantially the form of Exhibit A.

(b)     This Section 2.2(b) shall apply only to Global Notes deposited with or on behalf of the Common Depositary.

The Issuer shall execute and the Trustee shall, in accordance with this Section 2.2(b), authenticate and deliver initially one Global Note, which (i) shall be registered in the name of the Common Depositary for such Global Note or the nominee of such Common Depositary for the respective accounts of Euroclear and Clearstream and (ii) shall be delivered by the Trustee to such Common Depositary or pursuant to such Common Depositary's instructions, held by the Trustee, as custodian for the Common Depositary.

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Common Depositary or under any Global Note, and the Common Depositary may be treated by the Issuer, the Trustee, and any agent of the Issuer or the Trustee as the absolute owner of such Global Note for all purposes whatsoever (except to the extent otherwise provided herein). Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee, or any agent of the Issuer or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by the Common Depositary or impair, as between the Common Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Noteholder.

(c)     Except as provided in Section 2.11, owners of beneficial interests in a Global Note shall not be entitled to receive physical delivery of Certificated Notes.

(d)     The form of the Trustee's certificate of authentication shall be as follows:

This is one of the Notes referred to in the within-mentioned Indenture.

[Date]                                         The Bank of New York, London Branch,

NY1 6216749v.6

as Trustee


By_____
　　　Authorized Signatory


Section 2.3　　*Authorized Amount, Certain Economic Terms and Other Terms.*

(a)　　The aggregate Initial Principal Amount of the Notes that may be authenticated and delivered under this Indenture is limited to the following, except in each case for Notes of the applicable Class authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes of such Class pursuant to Section 2.6 or Section 2.7:

(i)　　in the case of the Class A+ Notes, €17,000,000;

(ii)　　in the case of the Class A Notes, €8,500,000;

(iii)　　in the case of the Class B Notes, €51,000,000;

(iv)　　in the case of the Class C Notes, €17,000,000;

(v)　　in the case of the Class D Notes, €38,250,000;

(vi)　　in the case of the Class E Notes, €48,450,000; and

(vii)　　in the case of the Class F Notes, €83,300,000.

(b)　　Each Class of Notes shall, to the extent applicable to such Class as so set forth, have the following terms, in addition to the other terms applicable thereto set forth herein or pursuant hereto or in the form thereof:

(i)　　On the applicable Final Redemption Date, the Outstanding Principal Amount shall be due and payable; *provided* that an amount in respect of each Note equal to the product of the Applicable Percentage and the Deferred Funding Amount for the relevant Class of Notes on the applicable Final Redemption Date shall not be due on such Final Redemption Date. The portion of the Outstanding Principal Amount corresponding to the portion of the Deferred Funding Amount for such Class of Notes not paid to the Swap Counterparty in satisfaction of the Issuer's obligations to pay Floating Payments and Adjustment Payments under the Credit Default Swaps shall become due and payable in respect of the Notes thereafter to the extent provided in clauses (iii) and (iv) of this Section 2.3(b).

(ii)　　Interest or investment return, as applicable, on the Notes shall accrue quarterly in arrears in an amount equal to the Note Interest Amount (in the case of the Offered Notes) or the Class F Note Accrual Amount (in the case of the Class F Notes). Such interest or investment return shall be payable, subject to the availability of funds therefor pursuant to Article 11, on each

7

Payment Date as provided in Section 11.1.  With respect to the Class F Notes, if the amount available for such payment with respect to any Payment Date shall be insufficient to pay all or any portion of the Class F Note Accrual Amount on such Payment Date, the Class F Note Accrual Amount (to the extent of such insufficiency) not paid on such Payment Date shall not then be due and payable, and such non-payment shall not be a Default or an Event of Default pursuant to Article 5.  Any such amount will not be added to the Outstanding Principal Amount of the Class F Notes, and no interest or investment return on such unpaid amount shall be payable in respect of such Notes.

(iii)     On each Payment Date after the applicable Final Redemption Date, (x) an amount in respect of interest or investment return, as applicable, shall be due and payable on each Note and (y) an amount in respect of principal shall be due and payable on each Note, and the sum of such amounts with respect to each Class of Notes shall equal the product of the Applicable Percentage and the amount of funds that are available for payment on such Class of the Notes on such Payment Date in accordance with Section 11.1(d)(i) (as to interest or investment return, as applicable) or Section 11.1(d)(ii) (as to principal).

(iv)     On (x) if the Deferred Funding Amount on the Scheduled Maturity Date is equal to zero, the Scheduled Maturity Date or (y) otherwise, the Extension Maturity Date for the relevant Class of Notes, the Outstanding Principal Amount of the Notes, together with all other amounts payable on each such Note, shall be due and payable.

(v)     The portion of the Initial Principal Amount of each Class of Notes equal to the lesser of (A) the entire Initial Principal Amount of such Class of Notes and (B) the amount, if any, by which the Cumulative Loss Amount (determined on the Final Payment Date) exceeds either (x) in the case of the Offered Notes, the Available Subordination Amount for such Class of Notes (determined on the Closing Date) or (y) in the case of the Class F Notes, zero shall in each case not be due and payable on the Final Payment Date and such non-payment shall not be a Default or an Event of Default pursuant to Article 5 and the rights of the holders of Notes of the relevant Class to receive such amounts shall be extinguished and shall not thereafter revive.

(vi)     Notwithstanding any other provisions of this Indenture or of any Note, all references to any Class of Notes being redeemed in full or at their Outstanding Principal Amount, together with any other amounts, and each other applicable provision of this Indenture or of any Note, shall be construed so as to ensure that, at all times prior to (x) if the Deferred Funding Amount for such Class of Notes on the applicable Final Redemption Date is equal to zero, such Final Redemption Date or (y) otherwise, the Extension Maturity Date for such Class of Notes, the Outstanding Principal Amount of such Class of Notes is not less than €1, that the Notes of such Class remain Outstanding at all such times and any amounts which are to be applied in or toward redemption of such Class of Notes pursuant to this Indenture which are in excess of the Outstanding Principal Amount of such Class of Notes minus €1, shall first be applied in payment of residual interest in respect of such Class of Notes and shall not be applied in redemption of the Outstanding Principal Amount of such Class of Notes; *provided* that on the Final Payment Date (whether such date is the applicable Final Redemption Date pursuant to clause (x) above or the

NY1 6216749v.6

final Extension Maturity Date pursuant to clause (y) above), such minimum requirement of €1 shall not apply and such Class of Notes shall, if not previously redeemed in full, be redeemed in full on the date on which all of the Trust Estate has been realized and is to be finally distributed to the Noteholders.

Section 2.4    *Denominations.*  Each Note shall be issuable in registered form in minimum denominations of €100,000 or integral multiples of €1,000 in excess thereof (expressed in terms of the Initial Principal Amount of such Note); *provided, however,* that on the Benchmark Date (in respect of the Class F Notes) and the Closing Date (in respect of the Offered Notes), as applicable, one Note of each Class may be issued in such denomination as may be necessary to represent the remainder of the Initial Principal Amount of such Class of Notes.

Section 2.5    *Execution, Authentication, Delivery and Dating.*

(a)    The Notes shall be executed on behalf of the Issuer by an Authorized Officer of the Issuer.  The signature of an Authorized Officer on the Notes may be manual or by facsimile.

(b)    Notes bearing the manual or facsimile signature of an individual that was at any time the Authorized Officer of the Issuer and which have been authenticated shall bind the Issuer, notwithstanding the fact that such individual has ceased to hold such office prior to the authentication and delivery of such Notes or did not hold such office at the date of issuance of such Notes.

(c)    At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Notes executed by the Issuer to the Trustee for authentication, and the Trustee, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

(d)    The Global Note authenticated and delivered by the Trustee upon Issuer Order on the Benchmark Date (in respect of the Class F Notes) or the Closing Date (in respect of the Offered Notes), as applicable, shall be dated as of the Benchmark Date or the Closing Date, as applicable.  Each other Note that is authenticated on a date other than the Benchmark Date (in respect of the Class F Notes) or the Closing Date (in respect of the Offered Notes) for any other purpose under this Indenture shall be dated the date of its authentication.

(e)    Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the Initial Principal Amount of the Notes so transferred, exchanged or replaced, but shall represent only the Outstanding Principal Amount  of the Notes so transferred, exchanged or replaced.  If any Note is divided into more than one Note in accordance with this Article 2, the Initial Principal Amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the sum of the Initial Principal Amounts of such subsequently issued Notes.

(f)    No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication, substantially in the form provided for in Section 2.2(d), executed by the Trustee by the manual signature of one of its Authorized

9

Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

(g)    Upon the request of the Issuer, the Trustee shall and, at the election of the Trustee, the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with transfers and exchanges thereof hereunder as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by this Indenture to authenticate the Notes; *provided* that any such appointment shall be upon terms and conditions reasonably acceptable to the Trustee (with respect to which the Trustee may require, among other things, appropriate indemnification for any damages, losses or reasonable costs arising from acts or omissions of such Authenticating Agent).  For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section shall be deemed to be an authentication of such Notes "by the Trustee."

(h)    The Transfer Agent is hereby appointed as an Authenticating Agent for purposes of authenticating Notes.

(i)    Any entity into which any Paying Agent, Transfer Agent or Authenticating Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, consolidation or conversion to which any Paying Agent, Transfer Agent or Authenticating Agent shall be a party, or any entity succeeding to the corporate trust business of any Paying Agent, Transfer Agent or Authenticating Agent, or any entity to which any Paying Agent, Transfer Agent or Authenticating Agent shall sell or otherwise transfer all or substantially all of its corporate trust business, shall have all of the rights and obligations of its respective predecessor hereunder, without the execution or filing of any further act on the part of the parties hereto or such Paying Agent, Transfer Agent or Authenticating Agent or such successor corporation.

(j)    The Trustee shall pay to any Paying Agent, Transfer Agent or Authenticating Agent reasonable compensation and shall reimburse each Paying Agent, Transfer Agent or Authenticating Agent for expenses reasonably incurred by such Paying Agent, Transfer Agent or Authenticating Agent in the performance of its duties as a Paying Agent, Transfer Agent or Authenticating Agent, in each case as and to the extent agreed upon between the Trustee and such Paying Agent, Transfer Agent or Authenticating Agent; *provided* that if the appointment of such Paying Agent, Transfer Agent or Authenticating Agent is at the election or request of the Issuer, the Trustee's obligation to make such payments shall be limited to amounts for which it is entitled to be reimbursed pursuant to Section 6.7(B) or (C).  The provisions of Section 6.3 shall be applicable to any Paying Agent, Transfer Agent or Authenticating Agent.

Section 2.6    *Registration, Transfer and Exchange of Notes.*

(a)    The Issuer shall cause to be kept a register (the "Note Register") in which, subject to such reasonable procedures as it may prescribe, the Issuer shall provide for the registration of the Notes and the registration of transfers of the Notes.  The Bank of New York (Luxembourg) S.A. is hereby appointed "Note Registrar" for the purpose of registering the Notes and transfers of the Notes as herein

10

provided.  The Issuer shall notify the Trustee of any Notes owned by or pledged to the Issuer promptly upon the acquisition thereof or the creation of such pledge. Upon the written request of the Issuer or, after the occurrence of a Default, any Noteholder, the Note Registrar shall promptly, but in no event later than two Business Days (five Business Days in the case of a Noteholder) following such request, furnish such requesting Person with a list of all Noteholders and the addresses thereof; *provided, however*, that the Note Registrar shall have no liability to any Person for furnishing or failing to furnish the Note Register to any Noteholder.

The Issuer may at any time vary or terminate the appointment of the Note Registrar.  If a Person other than the Trustee is appointed as Note Registrar, the Issuer shall provide the Trustee prompt written notice of the appointment of such Note Registrar and of the location, and any change in the location, of the Note Register, and the Trustee shall have the right to inspect the Note Register at all reasonable times and to obtain copies thereof at the expense of the Issuer.

The transfer and exchange of Notes shall be effected through the Note Registrar in accordance with this Indenture, including the restrictions on transfer set forth herein and the procedures of the Note Registrar therefor.

Subject to this Section 2.6, at the option of the Holder, in connection with a transfer thereof or otherwise, any Note may be exchanged for a new Note or Notes, in any authorized denominations and of like Initial Principal Amount, upon surrender of the Note to be exchanged at the office or agency of the Issuer to be maintained as provided herein.  Whenever any Note is surrendered for exchange, the Issuer shall execute and the Trustee shall authenticate and deliver the Notes that the Noteholder making the exchange is entitled to receive.

Subject to this Section 2.6, upon surrender for registration of transfer of any Notes at the office or agency of the Issuer to be maintained as provided herein, the Issuer shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like Initial Principal Amount.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Issuer evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Any Note presented or surrendered for registration of transfer or exchange shall be duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Issuer and the Trustee duly executed by, the Holder thereof or its attorney, duly authorized in writing, and, unless transferred to the Issuer, shall be accompanied by all documents required by this Section 2.6 and such other certificates and information as may be reasonably required to confirm that the proposed transfer complies with the restrictions in the legends on the Notes and in this Indenture.

(b)     No Note or beneficial interest in a Note may be sold or transferred (including by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act and is exempt under other applicable securities laws.  None of the Issuer, the Trustee, the

Note Registrar or any other Person shall be required to register the Notes under the Securities Act or any other jurisdiction's securities laws.

(c)     The Trustee shall be entitled to rely conclusively on any certificates provided and deemed representations made by transferees of interests in Notes, and shall be entitled to presume conclusively the continuing accuracy thereof from time to time, in each case without further inquiry or investigation.

(d)     Notwithstanding any provision to the contrary herein (but subject to Section 8.5), resales, pledges, exchanges or other transfers of Notes (as used in this Section 2.6, "transfers") shall only be made in accordance with this Section 2.6(d).

(i)     *Transfers of Global Note Generally.*  Transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of the Common Depositary or to a successor of the Common Depositary or such successor's nominee.

(ii)     *Other Exchanges.*  If a Global Note is exchanged for Certificated Notes, pursuant to Section 2.11, such Certificated Notes may be exchanged for one another only in accordance with such procedures and restrictions as are substantially consistent with the provisions above (including certification requirements intended to ensure that such transfers are to non-U.S. Persons (or otherwise comply with Regulation S) that are neither U.S. Residents nor United States persons) and as may be from time to time adopted by the Issuer. Prior to any registration, each prospective transferee of a Certificated Note shall deliver to the Trustee and the Issuer a Transferee Certificate, and each prospective transferor of a Certificated Note shall deliver to the Trustee and the Issuer a Transferor Certificate.  The Trustee shall be entitled to rely conclusively on any Transferor Certificate or Transferee Certificate and shall be entitled to presume the accuracy thereof without further inquiry or investigation. In addition to the requirements set forth above, each prospective transferee of a Certificated Note shall be deemed by its acceptance of a Certificated Note to have made the representations, warranties and covenants set forth with respect to a "Transferee" in items 1 through 17 (inclusive) of the Transferee Certificate.

(iii)     *Transfer of Interests in the Global Note.*  Notwithstanding anything herein to the contrary, transfers of interests in a Global Note may be made by book-entry transfer of beneficial interests within the relevant Clearing Agency, subject to Section 2.6(b).  Beneficial interests in a Global Note may only be held through Euroclear and Clearstream.  Any transfer of an interest in a Global Note to a U.S. Person, U.S. Resident or United States person, shall in each case be null and void *ab initio* and shall in each case not be given effect for any purpose hereunder, and the Trustee shall hold any funds conveyed by the intended transferee of such interest in such Global Note in trust for the transferor and shall promptly reconvey such funds to such Person in accordance with the written instructions thereof delivered to the Trustee at its address listed in Section 14.3.

(iv)     *Deemed Representations, Warranties and Agreements by Beneficial Owners of Global Note.*  In addition to any certificates delivered by the beneficial owners of Notes represented by beneficial interests in a Global Note, each Person that purchases or otherwise

12

acquires any beneficial interest therein shall be deemed, by its purchase or other acquisition thereof, to have represented, warranted and agreed as provided in the legends of such Note and shall be deemed to have made the representations, warranties and covenants set forth with respect to a Transferee in items 1 through 17 (inclusive) of the Transferee Certificate.

(e)     Upon transfer or exchange of a Note pursuant to this Section 2.6, such Note shall be issuable in minimum denominations equal to €100,000 or an integral multiple of €1,000 in excess thereof (in Initial Principal Amount).

(f)     Any Note issued upon the transfer, exchange or replacement of Notes shall bear the applicable legend set forth in Exhibit A unless there is delivered to the Issuer such satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required by the Issuer to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of the relevant provisions of law to which such legend relates. Upon provision of such satisfactory evidence, the Trustee, upon Issuer Order, shall authenticate and deliver Notes that do not bear such applicable legend.

(g)     Transfer, registration and exchange shall be permitted as provided in this Section 2.6 without any charge to the Noteholder except for any tax or other governmental charge payable in connection therewith and expenses of delivery (if any). Registration of the transfer of a Note by the Note Registrar shall be deemed to be the acknowledgment of such transfer on behalf of the Issuer.

(h)     Upon final payment due on a Note, the Holder thereof shall present and surrender such Note at the office of the Transfer Agent.

(i)     The Issuer shall not purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the Outstanding Notes or any interest therein. Any Note so acquired shall be immediately delivered to the Trustee for cancellation and shall be canceled and any interest therein shall be void, and no Note may be issued in substitution or exchange for any such Note or interest so acquired.

(j)     Any purported transfer of a Note or a beneficial interest therein not in compliance with the provisions of this Indenture applicable thereto shall be void *ab initio* and of no force and effect.

Section 2.7     *Mutilated, Defaced, Destroyed, Lost or Stolen Notes.*

If (i) any mutilated Note is surrendered to the Trustee, or the Issuer and the Trustee receive evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Issuer or the Trustee that such Note has been acquired by a bona fide purchaser, the Issuer shall execute and, upon a written request therefor by the Issuer, the Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a new Note of the same Class and Initial Principal Amount, bearing a number not contemporaneously outstanding. If, after the delivery of such new Note, a bona fide purchaser of the original Note in lieu of which such new Note was issued presents such original Note for

13

payment, the Issuer and the Trustee shall be entitled to recover such new Note from the Person to which it was delivered or any Person taking title therefrom, except a bona fide purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer or the Trustee in connection therewith.  If any such mutilated, destroyed, lost or stolen Note shall have become or shall be about to become due and payable in full, or shall have been called for redemption in full, instead of issuing a new Note, the Issuer, may pay such Note without surrender thereof, except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.7, the Issuer or the Trustee may require the payment by the registered Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed or any other reasonable expense in relation thereto.

Every new Note issued pursuant to this Section 2.7 in lieu of any mutilated, defaced, destroyed, lost or stolen Note, shall constitute an original additional contractual obligation of the Issuer and such new Note shall be entitled, subject to the second paragraph of this Section 2.7, to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section 2.7 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.8    *Payments on the Notes.*

(a)    Payments on each Note shall be made as provided in Section 2.3, Article 11, the other applicable provisions hereof and the applicable form of Note.

(b)    Payments of any amount payable on or in respect of any Note shall be payable by wire transfer to an account (in euro) maintained by such Holder (or the payee designated by such Holder) at a Depository Institution as reflected on the Note Register (and pursuant to wiring instructions provided by such Holder reasonably in advance of the related Record Date (as determined in the sole discretion of the Issuer)) or, if a wire transfer cannot be effected as aforesaid (as determined in the sole discretion of the Issuer), by check (in euro) mailed to such Holder at its address as shown on the Note Register.

(c)    The Holders of the Notes of each Class on the Record Date in respect of a Payment Date shall be entitled to the amount payable on such Payment Date.

(d)    All amounts payable on or in respect of the Notes and this Indenture shall constitute limited recourse obligations of the Issuer payable solely from the Trust Estate.  All the Issuer's obligations shall be extinguished under the Notes and this Indenture after the Trust Estate has been reduced to zero.  None of (i) the Issuer's agents, partners, beneficiaries, shareholders, members, officers, directors, employees, administrator or any Affiliate of the Issuer or any of them, (ii) any agent, partner, beneficiary, shareholder, member, officer, director or employee of any Person referred to in clause (i) above or (iii) any of their respective successors or assigns shall be personally liable for any amounts payable, or performance due, under the Notes or this Indenture.  It is understood that the

14

foregoing provisions of this paragraph shall not (A) prevent recourse to the Trust Estate for the sums due or to become due under any security, instrument or agreement which is part of the Trust Estate, (B) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture (and the same shall continue until paid or discharged) or (C) limit the right of any Person to name the Issuer as a party defendant in any action, suit or in the exercise of any other remedy under the Notes or in this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking any other liability shall be asked for or (if obtained) enforced against the Issuer. This Section 2.8(d) shall survive the termination of this Indenture for any reason.

(e)     Payments to each Holder of the Notes of each Class shall be made ratably among the Holders of the Notes of such Class in proportion to the Initial Principal Amount of the Notes of such Class held by each such Holder.

Section 2.9     *Persons Deemed Owners*.  Prior to due presentment for registration of transfer of any Note, the Issuer, the Trustee and any agent of the Issuer or the Trustee shall treat the Person in the name of which any Note is registered as it appears on the Note Register as the owner of such Note for the purpose of receiving payments on such Note and for all other purposes whatsoever (whether or not such Note is overdue), and none of the Issuer, the Trustee and any agent of either of them shall be affected by notice to the contrary; *provided, however*, that the Common Depositary, or its nominee, shall be deemed the owner of the Global Notes, and owners of beneficial interests in Global Notes shall not be considered the owners of any Notes for the purpose of receiving notices.

Section 2.10     *Cancellation*.  All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed destroyed, lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, shall promptly be canceled by it and may not be reissued or resold.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10, except as expressly permitted by this Indenture.  All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuer shall direct by Issuer Order that they be returned to the Issuer.  Any Notes purchased by the Issuer shall be immediately delivered to the Trustee for cancellation.

Section 2.11     *Global Notes; Certificated Notes*.

(a)     A Global Note deposited with the Common Depositary pursuant to Section 2.2 shall be exchangeable for Certificated Notes and transferred to the beneficial holders thereof only if such transfer complies with Section 2.6 and either (i) the Common Depositary notifies the Trustee, who in turn informs the Issuer, that it is unwilling or unable to continue as Common Depositary for such Global Note or if at any time Euroclear or Clearstream ceases to be a clearing agency and a successor depositary is not appointed by the Issuer within 90 days after such notice, (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Benchmark Date (in respect of the Class F Notes) or the Closing Date (in respect of the Offered Notes), the Issuer becomes aware that it is or will be required to make any

15

deduction or withholding from any payment in respect of the Notes which would not be required if the Notes were in definitive form or (iii) an Event of Default has occurred and is continuing.

(b)     Any Global Note that is transferable in the form of a Certificated Note to the beneficial holders thereof pursuant to this Section 2.11 shall be surrendered by the Common Depositary to the Transfer Agent, to be so transferred, in whole or from time to time in part, without charge, and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal Initial Principal Amount of Certificated Notes with the applicable legends and of authorized denominations.  Certificated Notes of each Class shall be sent to the holders within seven Business Days after surrender by the Common Depositary of the Global Note representing the Notes of such Class by registered mail.

Section 2.12     *Certain Tax-Related Matters.*

(a)     The Issuer shall treat the Notes as equity of the Issuer for purposes of United States federal, state and local income taxation.

(b)     The Issuer shall not elect to be treated as a partnership or disregarded entity for United States federal income tax purposes and shall not file any forms inconsistent with the Issuer being treated as a corporation for United States federal income tax purposes.

Section 2.13     *Appointment of Paying Agents; Payments by Paying Agents.*

(a)     The Issuer hereby initially appoints as Paying Agents the offices or entities specified in Section 7.2.

(b)     The Issuer may, with the prior approval of the Trustee, vary or terminate the appointment of any Paying Agent and/or appoint additional Paying Agents.  The Issuer shall maintain a Paying Agent in an EU Member State that has opted for exchange of information rather than withholding and will not be obligated to withhold or deduct tax pursuant to EU Council Directive 2003/48/EC or any law implementing or complying with, or introduced in order to conform to, such Directive.  Any Paying Agent appointed hereunder shall be required to have a short-term credit rating of at least "A-2" by S&P and at least "F-2" by Fitch; *provided* that such requirement shall not apply to the Irish Paying Agent unless it has short-term debt rated by S&P and Fitch.  Notice of any such variation, termination or appointment, and of any changes in the specified offices, shall be given by the Issuer to the Trustee and the Noteholders in the manner described in Sections 13.3 and 13.4, as applicable.

(c)     To the extent that funds are available therefor in the Collection Account, the Trustee shall on or prior to each Payment Date transfer to any Paying Agent an amount in immediately available funds sufficient to pay the amounts due and payable on the Notes on such Payment Date.

The Issuer shall cause each Paying Agent to execute and deliver to the Trustee (and, in the case of a Paying Agent other than the initial Paying Agent, to the Issuer) an instrument in which each such Paying Agent shall agree with the Issuer and the Trustee, among other terms, that such Paying Agent will:

NY1 6216749v.6

     (i)     allocate all sums received for payment to the Noteholders on each related Payment Date among such Holders;

     (ii)    distribute all sums necessary for payment to the Noteholders of all amounts due and payable on such Payment Date to the extent sufficient funds are available therefor in the Collection Account;

     (iii)    hold all sums by it for the payment of amounts due with respect to the Notes in a segregated account for the exclusive benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

     (iv)    maintain such records as may reasonably be requested by the Trustee, and furnish such copies thereof as the Trustee may require;

     (v)    abide or be governed by such other reasonable terms and conditions not inconsistent with or contrary to the terms of this Indenture as may be agreed upon between the Trustee and such Paying Agent; and

     (vi)    abide by all provisions of this Indenture relating to the duties and responsibilities of the Paying Agent.

## ARTICLE 3
## AUTHENTICATION AND DELIVERY OF NOTES; PROCEDURES RELATING TO COLLATERAL

Section 3.1     *General Provisions for the Benchmark Date.*  On the Benchmark Date, the Class F Notes shall be executed by the Issuer and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon receipt of an Issuer Request and upon compliance with the conditions of Section 3.3, and upon receipt by the Trustee of the following:

     (i)    Opinions of Counsel of Sidley Austin LLP and affiliated partnerships, Maples and Calder and Gardere Wynne Sewell LLP in substantially the forms of Exhibits D-1, D-2 and E-1, respectively, dated the Closing Date, with such assumptions, limitations and qualifications as may be reasonably acceptable to the Trustee;

     (ii)    executed copies of the First Loss Credit Default Swap Confirmation, the Credit Default Swap Master Agreement, the Placement Agency Agreement, the Bank Account Agreement, the Bank Account Charge, the Account Pledge Agreement and the Administration Agreement;

     (iii)    evidence of preparation for filing at the appropriate filing office in the District of Columbia of appropriate documentation relating to the perfection of the lien of this Indenture;

     (iv)    an Issuer Order directing the Trustee to authenticate the Class F Notes in the amounts set forth therein, registered in the names set forth therein or as otherwise provided to the

Trustee by the Issuer or at its direction, and to make delivery thereof to the Issuer or as it may otherwise direct therein;

   (v)  an Officer's Certificate of the Issuer identifying the amounts to be deposited by the Issuer on the Benchmark Date into the Custodial Account, as indicated in such Officer's Certificate; and

   (vi)  such other documents as the Swap Counterparty or the Trustee may reasonably request.

  Section 3.2  *General Provisions for the Closing Date.*  On the Closing Date, the Offered Notes shall be executed by the Issuer and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon receipt of an Issuer Request and upon compliance with the conditions of Section 3.3, and upon receipt by the Trustee of the following:

   (i)  Opinions of Counsel of Sidley Austin LLP and affiliated partnerships, Maples and Calder and Gardere Wynne Sewell LLP in substantially the forms of Exhibits D-3, D-4 and E-2, respectively, dated the Closing Date, with such assumptions, limitations and qualifications as may be reasonably acceptable to the Trustee and each Rating Agency (which acceptability to each Rating Agency shall be evidenced by the issuance of the required Ratings);

   (ii)  executed copies of the Mezzanine Credit Default Swap Confirmation and the Subscription Agreement,

   (iii)  an Issuer Order directing the Trustee to authenticate the Offered Notes in the amounts set forth therein, registered in the names set forth therein or as otherwise provided to the Trustee by the Issuer or at its direction, and to make delivery thereof to the Issuer or as it may otherwise direct therein;

   (iv)  an Officer's Certificate of the Issuer identifying the amounts to be deposited by the Issuer on the Closing Date into the Custodial Account, as indicated in such Officer's Certificate; and

   (v)  such other documents as the Swap Counterparty or the Trustee may reasonably request.

  Section 3.3  *Additional Conditions for the Benchmark Date and the Closing Date.*  On the Benchmark Date and the Closing Date, the following conditions, as applicable, shall have been satisfied:

  (a)  *Segregated Accounts.*  On the Benchmark Date, the Segregated Accounts shall have been established in the name and under the "control" (as defined in the UCC) of the Trustee, all as contemplated by Section 10.2.

      (b)    *Rating Letters*.  On the Closing Date, a true and correct copy of a letter dated on or about the Closing Date and signed by each Rating Agency shall have been delivered to the Trustee on or prior to the Closing Date  to the effect that the Offered Notes have been rated by each Rating Agency:

        (i)    in the case of the Class A+ Notes, "AAA" by S&P and "AAA" by Fitch;

        (ii)    in the case of the Class A Notes, "AAA" by S&P and not lower than "AA+" by Fitch;

        (iii)    in the case of the Class B Notes, not lower than "AA" by S&P and "AA-" by Fitch;

        (iv)    in the case of the Class C Notes, not lower than "A" by S&P and "A+" by Fitch;

        (v)    in the case of the Class D Notes, not lower than "BBB" by S&P and "BBB+" by Fitch; and

        (vi)    in the case of the Class E Notes, not lower than "BB" by S&P and "BB" by Fitch;

        in each case as to timely payment of interest and ultimate payment of principal.

Section 3.4    *Procedures Relating to Collateral.*

      On the Benchmark Date and Closing Date, the Issuer represents and warrants to the Trustee, and on each other date on which any Eligible Investment is to be acquired by the Issuer, the Issuer shall be deemed to have represented and warranted to the Trustee, with respect to any Collateral as of such date (after giving effect to all purchases to be made on such date), as follows (and each such actual or deemed representation and warranty shall survive the execution of this Indenture and shall not be waived by the Trustee unless the Majority of the Controlling Class and the Swap Counterparty shall have consented with respect to such waiver):

      (a)    with respect to the Collateral, this Indenture creates a valid and continuing security interest (as defined in the UCC) in such Collateral in favor of the Trustee for the benefit of the Secured Parties, which security interest is prior to all other liens, claims and encumbrances and is enforceable as such against creditors of and purchasers from the Issuer;

      (b)    the Issuer owns and has good and marketable title to such Collateral and all other portions of the Trust Estate free and clear of any lien, claim or encumbrance of any Person;

      (c)    the Issuer has acquired its interest in the Collateral in good faith without notice of any adverse claim as defined in the UCC as in effect on the date hereof, except as described in paragraph (i) above;

      (d)    other than the security interest Granted to the Trustee pursuant to this Indenture, the Issuer has not, pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Collateral;

(e)     the Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Collateral other than any financing statements relating to the security interest Granted to the Trustee hereunder or that has been terminated; the Issuer is not aware of any judgment lien, Pension Benefit Guaranty Corporation lien or tax lien filings against the Issuer;

(f)     the Issuer has received all consents and approvals required by the terms of each item included in the Collateral to the Grant to the Trustee of all its interest and rights in the Collateral hereunder;

(g)     the Issuer has caused or, in the case of the Benchmark Date, will have caused, within ten (10) days after the Benchmark Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Collateral Granted to the Trustee hereunder;

(h)     other than "general intangibles" within the meaning of the UCC, all Collateral has been credited to one of the Segregated Accounts;

(i)     the Segregated Accounts are not in the name of any Person other than the Issuer or the Trustee; and

(j)     (A) all original executed copies of each writing that constitutes or evidences any portion of the Collateral that constitutes "instruments" within the meaning of the UCC have been delivered to the Trustee and (B) none of the writings that constitute or evidence such Collateral has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee.

ARTICLE 4

SATISFACTION AND DISCHARGE

Section 4.1     *Satisfaction and Discharge of Indenture*.  Provided that no Event of Default has occurred and is continuing hereunder, this Indenture shall cease to be of further effect with respect to the Notes and any other claims of a Secured Party upon the Issuer, and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture when:

(a)     either:

(i)     all Notes theretofore authenticated and delivered (other than (A) Notes which have been destroyed, lost or stolen and which have been paid or replaced as provided in Section 2.7 and (B) Notes for the payment of which money has theretofore been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 4.2) have been delivered to the Trustee for cancellation; or

20

(ii)     all Notes not theretofore delivered to the Trustee for cancellation have become due and payable;

and the Issuer, in the case of clause (ii), has irrevocably deposited or caused to be deposited with the Trustee in trust for such purpose, cash or Eligible Investments, representing the proceeds of the Sale of or other realization on any part of the Trust Estate not constituting cash or an Eligible Investment (including the Credit Default Swaps), the aggregate amount of which is in an amount sufficient to pay and discharge (x) the entire indebtedness on such Notes not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of such deposit (in the case of Notes which have become due and payable) or to the Scheduled Maturity Date (but without giving effect to the possible application of the provisions of Section 2.3(b)(iv)), as the case may be and (y) any other amounts, including Administrative Expenses to become payable under this Indenture on or before such Scheduled Maturity Date (but without giving effect to the possible application of the provisions of Section 2.3(b)(iv));

(b)     the Issuer has paid or caused to be paid all other sums payable hereunder and under each Credit Default Swap by the Issuer; and

(c)     the Issuer has delivered to the Trustee an Officer's Certificate of the Issuer and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture with respect to the Notes have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Issuer, the Paying Agents, the Note Registrar, the Common Depositary, the Trustee and the other Secured Parties with respect to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments in respect thereof, (iv) the rights, obligations and immunities of the Trustee hereunder and (v) the rights of the Secured Parties as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them (including pursuant to Sections 4.2, 5.17, 6.7 and 7.3) shall survive.

Section 4.2     *Application of Trust Money*.  All monies deposited with the Trustee pursuant to Section 4.1 shall be held in trust by the Trustee and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment to the Person entitled thereto of the amounts in accordance with Section 11.1 for the payment of which such money has been deposited with the Trustee, and such money shall be held in a segregated trust account for the benefit of the Secured Parties and, if applicable and so identified, each other Person entitled thereto and so identified.  Except as specifically provided herein, the Trustee shall not be responsible for payment of interest upon any monies deposited with it.

Subject to the applicable requirements of abandoned property laws, any money held by the Trustee (whether or not pursuant to this Article 4) in trust for the payment of any amount due with respect to any Note or any other Person and remaining unclaimed for two years after such amount has become due and payable shall be discharged from such trust and be paid to the Issuer on Issuer Request; and the Holder of such Note and any such other Person shall thereafter, as an unsecured general creditor, look only to the Issuer for payment thereof (but only to the extent of the amounts so paid to the Issuer), and all liability of the Issuer or the Trustee with respect to such trust money shall thereupon cease; *provided,*

21

*however*, that the Issuer or the Trustee shall, at the expense of the Issuer, cause to be published once, in a newspaper published in the English language, customarily published on each Business Day and of general circulation in the Cayman Islands and in the city in which the Corporate Trust Office is then located, notice that such money remains unclaimed and that, after a date specified therein, which shall not be later than 30 days from the date of such publication, any unclaimed balance of such money then remaining shall be paid to the Issuer.

ARTICLE 5
EVENT OF DEFAULT; REMEDIES

Section 5.1      *Events of Default.* "Event of Default", wherever used herein, means any one of the following events (whatever the reason for such event and whether it shall be voluntary or involuntary and whether or not it shall be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)      either (i) a default in the payment of any interest (A) on any Class A+ Note or Class A Notes when the same becomes due and payable, which default continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent or the Note Registrar, such default continues for a period of five days); or (B) if there are no Class A+ Notes or Class A Notes outstanding, on any Class B Note, when the same becomes due and payable, which default continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent or the Note Registrar, such default continues for a period of five days); or (C) if there are no Class B Notes outstanding, on any Class C Note, when the same becomes due and payable, which default continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent or the Note Registrar, such default continues for a period of five days); or (ii) default in the payment of any amount payable in respect of any Note on the applicable Final Redemption Date;

(b)      a failure to make any payment, from funds paid to the Issuer by the Swap Counterparty under the Credit Default Swaps or from funds received under Eligible Investments, in accordance with the Priority of Payments, within five Business Days after the relevant Payment Date;

(c)      a default in the performance, or breach, of any covenant or other agreement of the Issuer in this Indenture, the Bank Account Charge or the Account Pledge Agreement (other than a covenant or other agreement a default in the performance of which or breach of which is specifically dealt with elsewhere in this Section 5.1), which default or breach materially and adversely affects the Secured Parties, and continuance of such default or breach for a period of 30 days after written notice is duly given to the Issuer;

(d)      the Issuer (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights,

22

or a petition is presented for its winding-up or liquidation, and such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (iii) becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (iv) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; or (v) is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (i) to (iv) (inclusive); *provided, however*, that the appointment of a trustee or other secured party by the Issuer or the Secured Parties for the purpose of holding all or substantial portion of the Trust Estate for the benefit of the Secured Parties shall not constitute an Event of Default hereunder;

(e)     the Issuer (i) institutes a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (ii) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); or (iii) causes any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (i) and (ii) (inclusive) and paragraph (d) above;

(f)     the Issuer or the Trust Estate becomes an investment company required to be registered under the Investment Company Act; or

(g)     an "Early Termination Date" is designated under (and as defined in) the Credit Default Swaps (other than as a result of another Event of Default hereunder).

Upon the occurrence of an Event of Default, the Issuer shall promptly notify the Swap Counterparty, the Trustee, the Noteholders and each Rating Agency thereof in writing.

Section 5.2     *Acceleration of Maturity; Rescission and Annulment.*

(a)     If an Event of Default (other than an Event of Default specified in Section 5.1(d), (e), (f) or (g)) occurs and is continuing:

(i)     the Trustee shall, at the direction of the Majority of the Controlling Class, by notice to the Issuer; or

(ii)      the Majority of the Controlling Class may, by notice to the Issuer and the Trustee,

declare the Outstanding Principal Amount of the Notes and all other amounts payable thereon to be due and payable on the 10th Business Day following such declaration (the "Acceleration Payment Date"); and upon any such declaration the Outstanding Principal Amount of the Notes and all other amounts payable hereunder with respect to the Notes (except for any amount in respect of the Deferred Funding Amounts), shall be due and payable on such 10th Business Day; *provided* that (x) in the case of an Event of Default specified in Section 5.1(g), such amount shall be due and payable on the Business Day immediately succeeding the Early Termination Date occurring under the Credit Default Swaps and (y) in the case of an Event of Default specified in Section 5.1(d), (e) or (f), such amount shall be due and payable on the 10th Business Day immediately following such Event of Default (any amounts that become due and payable pursuant to this clause (a) shall be referred to herein as "Accelerated Amounts"), in each case of (x) and (y) above, without any action or notice by the Trustee or any other person (but without prejudice to any other term of this Indenture providing for notice to be given to the Trustee).

(b)      At any time after such a declaration of acceleration of maturity has been made and before (i) the occurrence of an Early Termination Date under the Credit Default Swaps resulting from an Event of Default described in Sections 5.1(a) through (f) or (ii) a judgment or decree for payment of the money due has been obtained by the Trustee as provided in this Article 5, the Majority of the Controlling Class, by written notice to the Issuer and the Trustee, may rescind and annul such declaration and its consequences if:

(i)      the Issuer has paid or deposited with the Trustee a sum sufficient to pay the aggregate of:

(A)      all amounts then due and payable other than by reason solely of the inclusion thereof in Accelerated Amounts;

(B)      all amounts then due and payable under the Credit Default Swaps; and

(C)      all Trustee Administrative Expenses and Administrative Expenses;

and

(ii)      the Trustee, relying on such opinions of counsel or experts as may be necessary shall have determined that all Events of Default, other than the nonpayment of any Accelerated Amounts, have been (A) cured, and the Majority of the Controlling Class, by written notice to the Trustee shall have consented to such determination (which consent shall not be unreasonably withheld) or (B) waived as provided in Section 5.15.

No such rescission shall affect any subsequent Event of Default or impair any right consequent thereon. Any notices received or given by the Trustee pursuant to this Section 5.2 will also be given to each Rating Agency.

NY1 6216749v.6

Section 5.3      *Suits for Enforcement by Trustee.*

If an Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Secured Parties by such appropriate Proceedings as the Trustee:

(i)      may be directed to institute in writing by the Majority of the Controlling Class; or

(ii)      if no direction by the Majority of the Controlling Class is received by the Trustee, shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein or hereby, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture, by the Bank Account Charge, by the Account Pledge Agreement or by law.

Nothing herein contained shall be deemed to authorize the Trustee to authorize, consent to, vote for or accept or adopt, on behalf of any Secured Party, any plan of reorganization, arrangement, adjustment or composition affecting the rights of the Swap Counterparty, the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of the Swap Counterparty or any Noteholder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

In any Proceedings brought by the Trustee on behalf of the Secured Parties (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all such Secured Parties, subject to the provisions of this Indenture, and it shall not be necessary to make any other Secured Party party to any such Proceedings.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Trust Estate or institute Proceedings in furtherance thereof pursuant to this Section 5.3 except in accordance with Section 5.4(a).

Section 5.4      *Remedies.*

(a)      If the Notes have been declared due and payable pursuant to Section 5.2 and such declaration and its consequences have not been rescinded and annulled, the Issuer agrees that the Trustee may after written notice to the Secured Parties and shall, upon direction by the Majority of the Controlling Class, subject to the payment in full of all amounts due to the Swap Counterparty under the Credit Default Swaps and to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies (subject to compliance with any mandatory requirements of applicable law, to any restrictions applicable to the Trust Estate as set forth in the terms thereof and to any applicable provisions of this Indenture, the Bank Account Charge and the Account Pledge Agreement):

25

(i)      institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture with respect to the Notes, whether by declaration or otherwise, enforce any judgment obtained and collect from the Trust Estate monies adjudged due;

(ii)      institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Trust Estate;

(iii)      sell all or a portion of the Trust Estate or rights or interests therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Sections 5.5 and 5.17;

(iv)      exercise any applicable remedies available to the Issuer pursuant to the Credit Default Swaps or any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Trustee and the Holders of the Notes hereunder; and

(v)      to the extent not inconsistent with clauses (i) through (iv) above, exercise any other rights and remedies that may be available at law or in equity with respect to the Notes;

*provided, however*, that the Trustee shall not sell or liquidate the Trust Estate, or any portion thereof, or any rights or interest therein, pursuant to this Section 5.4 unless (x) such sale or liquidation shall be in accordance with Section 5.5, and (y) the Majority of the Controlling Class consents in writing to such sale or liquidation and, with respect to the Credit Default Swaps, direct the Trustee regarding the method of such liquidation.  For the avoidance of doubt, "liquidation" of the Credit Default Swaps means only that the Trustee shall follow the directions of the Majority of the Controlling Class to enforce the rights of the Issuer under the Credit Default Swaps.  The Trustee shall send notice to each of the Noteholders of any proposed sale or liquidation of the Trust Estate together with a brief description thereof.  The Trustee may, but need not, obtain and rely upon an opinion of an independent investment banking firm of national reputation as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 or Section 5.5(a) and as to the sufficiency of the proceeds and other amounts receivable with respect to the Eligible Investments and other portions of the Trust Estate to make the required payments with respect to the Notes, which opinion shall be conclusive evidence as to such feasibility or sufficiency.  The cost of such opinion shall be paid by the Issuer.  If the Majority of the Controlling Class consents in writing to any sale or liquidation of the Trust Estate, or any portion thereof, the Trustee shall sell or liquidate the Trust Estate, or portion thereof, in accordance with Section 5.17 at one or more public or private sales conducted in any manner permitted by law and, with respect to the Credit Default Swaps, as directed by the Majority of the Controlling Class.

(b)      If an Event of Default as described in Section 5.1(c) has occurred and is continuing, the Trustee may, after written notice to the Secured Parties, and shall upon direction of the Majority of the Controlling Class, institute a proceeding to compel performance of the covenant or to cure the representation or warranty, the breach of which gave rise to the Event of Default under Section 5.1(c), and enforce any decree or order arising from such proceeding.

26

(c)     Upon any sale, whether made under the power of Sale hereby given or by virtue of Proceedings, any Secured Party may bid for and purchase the Trust Estate or any part thereof and, upon compliance with the terms of such Sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability.

Upon any Sale, whether made under the power of Sale hereby given or by virtue of Proceedings, the receipt of the Trustee or of the officer making a Sale under judicial proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase money, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such Sale, whether under any power of Sale hereby given or by virtue of Proceedings, shall bind the Issuer, the Trustee and the other Secured Parties, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)     Notwithstanding any other provision of this Indenture, the Trustee may not, before the date which is one year and one day (or, if longer, the applicable preference period then in effect plus one day) after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Federal or State bankruptcy or similar laws of any jurisdiction. Nothing in this Section 5.4(d) shall preclude, or prevent, the Trustee, with respect to the Issuer, (i) from taking any action before the expiration of such one year and one day period, or if longer the applicable preference period then in effect, in (A) any case or Proceeding voluntarily filed or commenced by such Issuer or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Trustee, or (ii) from commencing against such Issuer or any of its properties any legal action that is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar Proceeding.

Section 5.5     *Retention of Trust Estate.*

(a)     If an Event of Default has occurred and is continuing or if the applicable Final Redemption Date has occurred and subject to Section 5.4, the Trustee shall retain the Trust Estate securing the claims of the Secured Parties intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of such claims in accordance with the applicable provisions of Article 10 and Section 11.1 (unless and until such claims have been declared or have otherwise, subject to the provisions hereof in relation to Deferred Funding Amounts, become immediately due and payable and the Majority of the Controlling Class has directed the Trustee pursuant to Section 5.4(a) to sell or liquidate the Trust Estate or any portion thereof). The Trustee shall give written notice of the retention of the Trust Estate to the Issuer. If such claims have been declared or have otherwise, subject to the provisions hereof in relation to Deferred Funding Amounts, become immediately due and payable pursuant to Section 5.2 or if the applicable Final Redemption Date has occurred, any such retention pursuant to this Section 5.5(a) may be rescinded at any time by written notice to the Trustee and the Issuer from the Majority of the Controlling Class directing the Trustee to sell or liquidate the Trust Estate or any portion thereof and, with respect to the

NY1 6216749v 6

Credit Default Swaps, instructing the Trustee regarding the manner of such liquidation. Without the prior written consent of the Majority of the Controlling Class, no Sale of any portion of the Trust Estate shall be effected unless, in connection with such Sale, the Trustee shall have obtained bids on the items subject to such Sale from at least three dealers identified on a list which has been provided by the Majority of the Controlling Class and the Trustee shall have accepted the bid that appears to the Trustee, in its sole discretion, to be the most favorable.

(b)    Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Trust Estate if prohibited by applicable law.

Section 5.6    *Trustee May File Proofs of Claim.*  If there shall be pending Proceedings relative to the Issuer or to any other obligor upon the claims of the Secured Parties under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or if a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer's property or such other obligor or its property, or if there shall be pending any other comparable Proceedings relative to the Issuer or such other obligor, or any voluntary dissolution, liquidation or winding-up of the Issuer, regardless of whether any amount owing to a Secured Party shall then be due and payable at maturity or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of Section 5.3, the Trustee shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(i)    (A) to file and prove a claim or claims for the whole amount owing and unpaid in respect of the Notes and (B) to file such other papers or documents and take such other action, including participating as a member, voting or otherwise, of any committee of creditors, as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee or any Secured Party, except as a result of negligence or bad faith) and the Secured Parties allowed in any Proceedings relative to the Issuer or other obligor upon the Notes or to the creditors or property of the Issuer or such other obligor;

(ii)    unless prohibited by applicable law and regulations, to vote on behalf of the Secured Parties in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or Person performing similar functions in comparable Proceedings; and

(iii)    to collect and receive any monies or other property payable to or deliverable on any such claims, and distribute in accordance with Section 5.8 all amounts received with respect to the claims of the Secured Parties and of the Trustee on their behalf; and any trustee, receiver, liquidator, custodian or other similar official is hereby authorized by each of the Secured Parties to make payments to the Trustee, and, if the Trustee shall consent to the making of payments directly to the Secured Parties, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents,

28

attorneys and counsel, and, subject to the terms of Article 6, all other expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee or any Secured Party except such expenses, liabilities and advances incurred as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Secured Party thereunder, or to authorize the Trustee to vote in respect of the claim of any Secured Party in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person or to participate as a member of any committee of creditors.

In any Proceedings brought by the Trustee on behalf of the Secured Parties (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all such Secured Parties, as subrogee (if applicable) subject to the provisions of this Indenture, and it shall not be necessary to make any other Secured Party party to any such Proceedings.

Notwithstanding anything in this Section 5.6 to the contrary, the Trustee may not sell or liquidate the Trust Estate or institute Proceedings in furtherance thereof pursuant to this Section 5.6 except in accordance with Section 5.4(a).

Section 5.7    *Trustee May Enforce Claims Without Possession.*  All rights of action and claims under this Indenture, the Notes or the Credit Default Swaps may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the Credit Default Swaps or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.8.

Section 5.8    *Application of Money Collected.*  Any money collected by the Trustee with respect to the Notes pursuant to this Article 5 (including all collections from, and proceeds of the sale or liquidation of, the Trust Estate) shall be applied at the date or dates fixed by the Trustee and in the same order as specified in Sections 11.1(c), 11.1(d) and 11.1(e), as applicable.

Section 5.9    *Limitation on Suits.*  Except as otherwise provided in Section 5.10, no Secured Party (other than the Trustee) shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(i)      such Secured Party has previously given written notice to the Trustee of a continuing Event of Default which notice shall not be required if such Secured Party is the Trustee itself;

(ii)     the Majority of the Controlling Class shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(iii)    such Secured Party or Secured Parties as shall be satisfactory to the Trustee have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(iv)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceedings; and

(v)     no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Majority of the Controlling Class, it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class.

Section 5.10     *Unconditional Rights of Noteholders to Receive Payment.*  Notwithstanding any other provision in this Indenture, but subject to the provisions of Sections 2.8 and 11.1, the Holders of the Notes of each Class shall have the right, which is absolute and unconditional, to receive the amount of each payment with respect to such Class provided for herein, as each such amount becomes due and payable.  Furthermore, subject to Sections 5.9 and 11.1 and to any rights reserved to the Controlling Class, the Holder of any Note shall have the right, which is absolute and unconditional, to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

Section 5.11     *Restoration of Rights and Remedies.*  If the Trustee or any other Secured Party has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or such Secured Party, then and in every such case the Issuer, the Trustee or such Secured Party shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Secured Parties shall continue as though no such Proceeding had been instituted.

Section 5.12     *Rights and Remedies Cumulative.*  No right or remedy herein conferred upon or reserved to the Trustee or the other Secured Parties is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

NYI 6216749v.6

Section 5.13    *Delay or Omission Not Waiver*.  No delay or omission of the Trustee or any other Secured Party to exercise any right or remedy occurring upon any Event of Default or otherwise shall impair any such right or remedy or constitute a waiver of any such Event of Default or other event or an acquiescence therein.  Every right and remedy given by this Article 5 or by law to the Trustee or the other Secured Parties may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or the other Secured Parties, as the case may be.

Section 5.14    *Control by Secured Parties*.  Notwithstanding any other provision of this Indenture, the Majority of the Controlling Class shall have the right (a) to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee or (b) subject to Section 6.3(E), to direct the Trustee with respect to its exercise of any right, remedy, trust or power conferred on the Trustee; *provided, however*, that:

(i)    such direction shall not be in conflict with any rule of law or with any express provision of this Indenture (including any provision hereof which expressly provides for a greater percentage interest in, or an additional or different Class of, the Notes to effect an action hereunder and any provision providing express personal protection to the Trustee or a limitation on the liability of the Issuer as set forth in Section 2.8(d)), and

(ii)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; *provided, however*, that, subject to Sections 6.1 and 6.3(E), the Trustee need not take any action that it reasonably determines might involve it in liability.

During the continuance of an Event of Default that has not been cured, the Trustee shall, before the receipt of directions, if any, from the Majority of the Controlling Class, exercise such of the rights and powers expressly vested in it by this Indenture and use the same degree of care and skill in their exercise, with respect to such Event of Default, as is required by Section 6.1(b) and subject to 6.1(c)(iv).

Section 5.15    *Waiver of Past Defaults*.  Before a judgment or decree for payment of the money due has been obtained by the Trustee, either (x) in so far as the obligations of the Issuer under the Credit Default Swaps are concerned, the Swap Counterparty; or (y) in so far as the Notes are concerned, the Majority of the Controlling Class, may in each case on behalf of all of the respective Secured Parties waive any past Default and its consequences, except a Default:

(A)    described in Section 5.1(a), (d), (e), (f) or (g); or

(B)    in respect of a covenant or provision hereof that under Section 8.2 cannot be modified or amended without the consent of each Secured Party affected.

In the case of any such waiver, the Issuer, the Trustee and the other Secured Parties shall be restored to their former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.  Upon such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or

31

impair any right consequent thereon.  The Issuer shall give notice of any such waiver to each Rating Agency.

Section 5.16     *Undertaking for Costs*.  All parties to this Indenture agree, and each Holder of any Note by such Holder's acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

Section 5.17     *Sale of Trust Estate*.

(a)     The power to effect any sale or liquidation of any portion of the Trust Estate pursuant to Sections 5.4 and 5.5 (a "Sale" or "Sales") shall not be exhausted by any one or more Sales as to any portion of such Trust Estate remaining unsold but shall continue unimpaired until all of the Trust Estate shall have been sold or all amounts secured thereby shall have been paid.  The Trustee may, upon written notice to the Secured Parties and each Rating Agency and shall, upon written direction of the Majority of the Controlling Class and upon written notice to each Rating Agency, from time to time postpone any Sale by public announcement made at the time of and place of such Sale.  The Trustee hereby expressly waives its right to any amount fixed by law as compensation for any Sale.

(b)     The Trustee shall have the right to bid for and acquire any portion of the Trust Estate in connection with a Sale thereof to the extent not prohibited by applicable laws, and may pay all, or part of, the purchase price by crediting against amounts owing on the Notes or other amounts secured by this Indenture, all or part of the net proceeds of such Sale after deducting the costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7.  The Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)     If, in connection with any Sale, any portion of the Trust Estate consists of securities issued without registration under the Securities Act ("Unregistered Items"), the Trustee shall have the right to seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the consent of the Majority of the Controlling Class, seek a no-action position from the staff of the Securities and Exchange Commission or from any other relevant Federal or State regulatory authorities, regarding the legality of a public or private sale of such Unregistered Items.

(d)     The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Trust Estate in connection with a Sale thereof.  In addition, but (in the absence of any direction by the Majority of the Controlling Class) without imposing upon the Trustee any obligation so to act, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Trust Estate in connection with

32

a Sale thereof and to take all action necessary to effect such Sale.  No purchaser or transferee at such a Sale shall be bound to ascertain the Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

Section 5.18    *Action on Notes.*  The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Trustee.

Section 5.19    *Role of Trustee upon an Event of Default.*  Notwithstanding anything herein to the contrary, with respect to the actions to be taken by the Trustee upon an Event of Default, the Trustee will act as representative of the Noteholders, but only as an agent for the Swap Counterparty in its capacity as another Secured Party.  In furtherance of the foregoing, any actions taken by the Trustee in enforcing its security interest in the Collateral on behalf of the Secured Parties are undertaken by the Trustee in its capacity as representative of the Noteholders but only as an agent for the other Secured Parties.

<h3 style="text-align:center">ARTICLE 6<br/>THE TRUSTEE; CERTAIN LIENS</h3>

Section 6.1    *Certain Duties and Responsibilities.*

(a)    Except during the continuance of an Event of Default (other than a Trustee Payment-Related Event of Default):

(i)    the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, opinions or reports furnished to the Trustee and conforming to the requirements of this Indenture, whether or not the liability of the auditors or any other person in respect thereof is limited by a monetary cap or otherwise; *provided, however*, that in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not it conforms on its face to the requirements of this Indenture and shall promptly notify the party delivering the same if such certificate, opinion or report does not so conform, and, if a corrected certificate, opinion or report shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall so notify the other Secured Parties.

(b)    If an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, before the receipt of directions, if any, from the Majority of the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, using, for the benefit of the Noteholders, the

NY1 6216749v.6

same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs and, after the receipt of any such directions, the Trustee shall act in accordance with such directions.

(c)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)     this Section 6.1(c) shall not be construed to limit the effect of Section 6.1(a);

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Majority of the Controlling Class (or Holders with such larger percentage as may be required by the terms hereof) relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any extraordinary financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it (*provided, however*, that the unsecured agreement of any Secured Party that is an Institutional Investor shall constitute adequate assurance with respect to repayment and indemnity provided that the aggregate net worth of the Institutional Investors providing such unsecured agreements shall not be less than $50,000,000); *provided, however*, that the reasonable costs of performing its ordinary services under this Indenture shall not be deemed an "extraordinary financial liability" for purposes hereof; and

(v)     the Trustee shall not be liable to the other Secured Parties for any action taken or omitted by it at the direction of the Issuer or any such Secured Parties under circumstances in which such direction is required or permitted by the terms of this Indenture.

(d)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 6.1 and Section 6.3.

(e)     Subject to the applicable provisions of Section 10.5, the Trustee, promptly after receipt by a Responsible Officer, shall transmit in accordance with Section 14.4 to all Holders of Notes, all written communications that are required under this Indenture to be delivered to the Trustee and are received from or on behalf of the Issuer and any notification or other communication received from either Rating Agency stating that the Rating of the Notes has been, or will be, changed or withdrawn.

NY1 6216749v.6

Section 6.2     *Notice of Default.*  Promptly (and in no event later than three Business Days) after the occurrence of any Default known to a Responsible Officer of the Trustee or after any declaration of acceleration has been made by or delivered to the Trustee pursuant to Section 5.2, the Trustee shall deliver to each Rating Agency (so long as the Notes are Outstanding and have a Rating by such Rating Agency) and to all Holders of Notes, notice of all Defaults hereunder known to such Responsible Officer, unless such Default shall have been cured or waived, in which case each Rating Agency shall receive notice of such waiver pursuant to Section 5.15.

Section 6.3     *Certain Rights of Trustee.*  Except as otherwise provided in Section 6.1:

(A)     the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(B)     any request or direction of the Issuer mentioned herein shall be sufficiently evidenced by an Issuer Order or Issuer Request, as applicable, as the context may require;

(C)     whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established before taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate of the Issuer or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accounting firms, investment banks or other Persons qualified to provide the information required to make such determination including nationally recognized dealers in securities of the type being valued and securities quotation services;

(D)     as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(E)     the Trustee shall be under no obligation to honor the request or direction of any of the other Secured Parties pursuant to this Indenture unless such Secured Parties shall have offered to the Trustee security or indemnity satisfactory to it against all costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(F)     the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice,

35

request, direction, consent, order, bond, note or other paper or document, but the Trustee, upon written direction of the Majority of the Controlling Class or either Rating Agency, shall make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed; *provided, however*, that, if payment within a reasonable time of the expenses and liabilities of such inquiry or investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Indenture, the Trustee may, as a condition to proceeding with such inquiry or investigation, require indemnity satisfactory to it against such expenses and liabilities;

(G)     the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent appointed and supervised, or attorney appointed, with due care by it hereunder;

(H)     to the extent permitted by applicable law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise;

(I)     the Trustee shall not be deemed to have notice or knowledge of any matter (other than a Trustee Payment-Related Event of Default) unless a Responsible Officer within the Corporate Trust Office has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the Notes generally, the Issuer or this Indenture; whenever reference is made in this Indenture to a Default or an Event of Default such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to a Default or an Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph (i); *provided, however*, that the Trustee shall be deemed to have knowledge in accordance with this paragraph (i) of any Trustee Payment-Related Event of Default;

(J)     the Trustee may appoint and pay any person to act as custodian or nominee on any terms in relation to such assets of the trust as the Trustee may determine, including for the purpose of depositing with the custodian this Indenture or any document relating to the trust created hereunder and the Trustee shall not be responsible for any liability incurred by reason of the misconduct, omission or default on the part of any person appointed by it hereunder or be bound to supervise the proceedings or acts of such person; the Trustee is not obliged to appoint a custodian if the Trustee invests in securities payable to bearer;

(K)     the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty; and

(L)     the rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable

36

by, the Trustee in each of its capacities hereunder, and to and by each Paying Agent, Irish Paying Agent, Transfer Agent, Authenticating Agent and Note Registrar.

Section 6.4     *Not Responsible for Recitals or Issuance of Notes.*  The recitals contained herein and in the Notes, other than the certificate of authentication thereon, shall be taken as the statements of the Issuer and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture, of the Trust Estate or of the Notes (except that its certificate of authentication on any Note shall have the effect specified herein).  The Trustee shall not be accountable for the use or application by the Issuer of the Notes or the proceeds thereof.

Section 6.5     *May Hold Notes.*  The Trustee, in its individual capacity as the Bank or any other capacity, may become the owner or pledgee of Notes, and may otherwise deal with the Issuer or any Affiliate thereof with the same rights it would have if it were not Trustee.  Notwithstanding the foregoing sentence, if the Trustee or Bank is a Noteholder for its own account, any Note owned by the Trustee or the Bank in such capacity shall not be included in the determination of the Majority of the Controlling Class.

Section 6.6     *Money Held in Trust; Investment in Certain Eligible Investments.*  Money held by the Trustee in trust hereunder shall be segregated from other funds held by the Trustee in trust hereunder to the extent required herein or required by law.  The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.

Section 6.7     *Compensation, Reimbursement and Indemnity.*  The Issuer and the Trustee acknowledge that:

(A)     compensation for all services rendered by the Trustee, the Note Registrar and the Paying Agents hereunder and reasonable expenses, disbursements and advances incurred or made by the Trustee, the Note Registrar and the Paying Agents in accordance with any provision of this Indenture (including securities transaction charges) are to be paid as set forth in the fee letter agreement between the Swap Counterparty and the Trustee;

(B)     except as provided in such fee letter agreement, the Trustee, the Note Registrar and the Paying Agents shall be reimbursed in a timely manner upon its request for its expenses, including payment of the fees of any agents, legal counsel and accounting firm or investment banking firm employed by the Trustee, the Note Registrar and the Paying Agent pursuant to Section 5.3, 5.4, 5.5 or 5.17, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith but, with respect to securities transaction charges, only to the extent that any such securities transaction charges have not been waived during a Due Period due to the

37

Trustee's receipt of payments from any financial institutions with respect to certain Eligible Investments;

(C)     the Trustee, the Note Registrar and the Paying Agents and their directors, officers, employees and agents shall be indemnified for, and held harmless against, any loss, liability or expense (including reasonable attorneys' fees and expenses) incurred without negligence, willful misconduct or bad faith on their part, and not as a result of the breach of any of the express covenants of the Trustee, the Note Registrar and the Paying Agent set forth in this Indenture, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defense against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder; and

(D)     the Trustee shall be paid reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken with respect to any Eligible Investment;

in each case pursuant to the Credit Default Swaps.  The Trustee and the Issuer further agree that the Trustee has no recourse to any security, instrument or agreement which is part of the Collateral for payment of any right it may have to receive compensation, reimbursement and indemnity in respect of the exercise of its rights or the discharge of its duties hereunder.

Section 6.8      *Corporate Trustee Required; Eligibility.*  There shall at all times be a Trustee hereunder which shall be a national banking association or a corporation organized and doing business under the laws of the United States of America or of any State, authorized under such law to exercise corporate trust powers, having a combined capital and surplus of at least $250,000,000, an issuer credit rating or senior unsecured debt rating of at least "BBB-" by S&P and of at least "BBB-" by Fitch, a short-term credit rating of at least "A-2" by S&P and of at least "F-2" by Fitch and subject to supervision or examination by Federal or State authority.  If such entity publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such entity shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.8, it shall resign immediately in the manner and with the effect hereinafter specified in this Article 6.

Section 6.9      *Resignation and Removal; Appointment of Successor.*

(a)     No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article 6 shall become effective until the acceptance of appointment by the successor Trustee under Section 6.10.  The indemnification in favor of the Trustee, the Note Registrar and the Paying Agents referred to in Section 6.7 shall survive any resignation or removal (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred before, or arising out of actions or omissions occurring before, such resignation or removal).

38

(b)     The Trustee may resign at any time by giving written notice thereof to the Issuer, the Swap Counterparty and the Noteholders.  Upon receiving such notice of resignation, the Issuer shall promptly appoint a successor Trustee by written instrument, in duplicate, executed by an Authorized Officer of the Issuer on behalf of the Issuer, one original copy of which shall be delivered to the Trustee so resigning and one original copy to the successor Trustee, together with a copy to each Rating Agency and each Noteholder; *provided, however*, that such successor Trustee shall be appointed only upon the written consent of the Swap Counterparty and the Majority of the Controlling Class.  If no successor trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee, or any Noteholder, on behalf of such Noteholder and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)     If at any time:

(i)      the Trustee shall cease to be eligible under Section 6.8 and shall fail to resign after written request therefor by the Issuer or any Noteholder, or

(ii)     the Trustee shall become incapable of acting or shall be adjudged bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, (i) the Issuer, by Issuer Order, may remove the Trustee, (ii) the Swap Counterparty may remove the Trustee or (iii) any Noteholder on behalf of such Noteholder and all others similarly situated, may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(d)     If the Trustee shall be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any cause, other than in accordance with Section 6.9(b), (i) the Issuer, by Issuer Order, shall promptly appoint a successor Trustee with the consent of the Swap Counterparty and the Majority of the Controlling Class and (ii) if no successor Trustee shall have been so appointed by the Issuer and shall have accepted appointment in the manner hereinafter provided within 30 days after the retiring Trustee resigns or is removed, the Swap Counterparty, any Noteholder on behalf of such Noteholder and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(e)     The Issuer shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by written notice of such event to each Rating Agency and to the Holders of the Notes in accordance with Section 14.4.  Each notice of appointment shall include the name of the successor Trustee and the address of its Corporate Trust Office.

Section 6.10     *Acceptance of Appointment by Successor.* Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Issuer and the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall

39

become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Issuer, the successor Trustee or the Majority of the Controlling Class, such retiring Trustee shall, upon payment of its fees, charges, indemnities and expenses then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder.  Upon reasonable request of any such successor Trustee, the Issuer shall execute any and all instruments reasonably necessary for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

Upon acceptance of appointment by a successor Trustee as provided in this Section 6.10, the Issuer shall so notify each Rating Agency and the Holders of the Notes at their last addresses appearing upon the Note Register in accordance with Section 14.4.  If the Issuer fails so to notify such Holders within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Issuer.

No successor Trustee shall accept its appointment unless (i) at the time of such acceptance such successor Trustee shall be qualified and eligible under Section 6.8 and (ii) the Rating Agency Condition with respect to each Rating Agency shall have been satisfied with respect to such appointment.

Section 6.11    *Merger, Conversion, Consolidation or Succession to Business of Trustee*.  Any entity into which the Trustee may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trustee, or any entity to which the Trustee shall sell or otherwise transfer all or substantially all of its corporate trust business, shall be the successor of the Trustee hereunder, provided that such entity shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  If any Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.12    [Reserved].

Section 6.13    *Co-Trustees*.

(a)    At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Trust Estate may at the time be located, the Issuer and the Trustee shall have the power to appoint one or more Persons to act as co-trustee (a "Co-Trustee") with respect to any part of the Trust Estate, with the power to file such proofs of claim and take such other actions pursuant to Section 5.6 and to make such claims and enforce such rights of action on behalf of the Holders of the Notes with respect thereto as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.13.

40

(b)     Every Co-Trustee shall, to the extent permitted by law, but to such extent, only be appointed subject to the following terms:

(i)     The Notes shall be authenticated and delivered and all rights, powers, duties and obligations hereunder in respect of the custody of securities, cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by the Trustee.

(ii)     The rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a Co-Trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and a Co-Trustee jointly, as shall be provided in the instrument appointing such Co-Trustee, except to the extent that, under any law of any jurisdiction in which any particular act is to be performed, the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by a Co-Trustee.

(iii)     The Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Issuer evidenced by an Issuer Order, may accept the resignation of or remove any Co-Trustee appointed under this Section 6.13, and, if an Event of Default has occurred and is continuing, the Trustee shall have power to accept the resignation of, or remove, any such Co-Trustee without the concurrence of the Issuer.

(iv)     A successor to any Co-Trustee so resigned or removed may be appointed in the manner provided in this Section 6.13.

(v)     No Co-Trustee shall be personally liable by reason of any act or omission of the Trustee.

(vi)     The Trustee shall not be liable by reason of any act or omission of any Co-Trustee.

(vii)     Any Act of the Secured Parties delivered to the Trustee shall be deemed to have been delivered to each Co-Trustee.

(c)     Upon acceptance of appointment by a Co-Trustee, the Issuer shall so notify each Rating Agency and the Holders of the Notes in accordance with Section 14.4.  If the Issuer fails so to notify such Holders within 10 days after acceptance of appointment by the Co-Trustee, the Co-Trustee shall cause such notice to be given at the expense of the Issuer.

Section 6.14     *Roles of Trustee with Regard to Various Parties.*  Notwithstanding anything herein to the contrary, with respect to the security interests created hereunder, the pledge of any Collateral to the Trustee is to the Trustee as representative of the Noteholders and agent for other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any item of Collateral and the endorsement to or registration in the name of the Trustee of any item of Collateral (including as customer with respect to the applicable Segregated Account) are all undertaken by the Trustee in its capacity as

41

representative of the Noteholders and agent for other Secured Parties.  Without limiting the generality of the foregoing, the Trustee is not a trustee or fiduciary for any Person other than the Noteholders.

Section 6.15   *Confidential Treatment of Documents.*  Except as otherwise provided in this Indenture, all agreements, reports or other documents related to the transactions contemplated by this Indenture shall be treated by the Trustee as confidential.

ARTICLE 7
COVENANTS

Section 7.1   *Payment of Principal and Interest.*  The Issuer shall duly and punctually pay the Outstanding Principal Amount of any interest on and other amounts payable on or in respect of each Class of Notes in accordance with the terms of such Class of Notes and this Indenture.  Amounts properly withheld under the Code and under any laws of any State or other jurisdiction by any Person from a payment to any Noteholder of interest, principal or such other amount shall be deemed to have been paid by the Issuer to such Noteholder for all purposes of this Indenture.

The Issuer hereby irrevocably and unconditionally undertakes to pay to the Trustee an amount equal to the aggregate of (x) the Outstanding Principal Amount of, any interest on and any other amounts payable on or in respect of each Class of Notes in accordance with the terms of the Notes of such Class and this Indenture and (y) any and all amounts payable by the Issuer under or in respect of the Credit Default Swaps, in accordance with the terms thereof, in each case as and when the same become due and payable (such obligation of the Issuer, the "Trustee Claim").  The Trustee shall be entitled to enforce the Trustee Claim in its own name and not only as agent or trustee acting on behalf of the other Secured Parties.  The Issuer and the Trustee acknowledge that, for this purpose, such monetary obligations of the Issuer to the Trustee are several and are separate and independent from, and are without prejudice to, the identical payment obligations which the Issuer has to the Noteholders or the Swap Counterparty, as applicable.  Without prejudice to the foregoing, it is agreed that the amounts due and payable by the Issuer to the Trustee under the Trustee Claim shall be reduced and discharged to the extent that the Issuer satisfies, whether by payment or other appropriation of the Issuer's assets against that debt, any amounts owing by the Issuer to the Noteholders in relation to the Notes or to the Swap Counterparty in relation to the Credit Default Swaps and that the amounts owed by the Issuer in relation to the Notes or the Credit Default Swaps, as applicable, shall be reduced and discharged to the extent that the Issuer satisfies, whether by payment or other appropriation of the Issuer's assets against those debts, the Trustee Claim.  Nothing in this provision shall in any way negate, affect or increase the obligations which the Issuer has either to the Noteholders under the Notes or to the Swap Counterparty under the Credit Default Swaps.  For the purpose of this provision only, the Trustee acts in its own name and on behalf of itself and not as agent, representative or trustee of any other party.  Any security granted to the Trustee to secure the Trustee Claim is granted to the Trustee in its capacity as creditor of the Trustee Claim.  The Trustee shall apply any and all enforcement proceeds received by it in respect of any security granted to the Trustee to secure the Trustee Claim in accordance with this Indenture.

Section 7.2   *Maintenance of Office or Agency for Presentation; Paying Agents.*  The Trustee shall maintain an office or agency in the Borough of Manhattan, the City of New York, the State of

New York, at 101 Barclay Street, New York, New York 10286, Attention: Worldwide Securities Services, London, CART 1 Ltd., at which Notes may be presented or surrendered for payment (any such office or agency, a "Paying Agent"). The Trustee shall maintain an office or agency in London, at which Notes may be presented or surrendered for payment. Pursuant to the Original Indenture, the Issuer initially appointed the office of the Trustee, at The Bank of New York, London Branch, One Canada Square, London E14 5AL, United Kingdom, as such office or agency (in such capacity, a "Paying Agent" and the "Transfer Agent"). The Trustee shall maintain an office or agency in Ireland, at which Offered Notes may be presented or surrendered for payment. The Issuer hereby appoints BNY Fund Services (Ireland) Limited, Guild House, Guild Street, I.F.S.C., Dublin 1, Ireland, as such office or agency (in such capacity, a "Paying Agent" and the "Irish Paying Agent"). The Issuer shall give prompt written notice to the Trustee, each Rating Agency and the Noteholders of the appointment or termination of any such agent and of the location and of any change in the location of any such office or agency. If at any time the Trustee shall fail to maintain any such office or agency, presentations and surrenders may be made or served at the Corporate Trust Office. The Issuer is required by the Prospectus Directive to maintain, and for so long as so required pursuant to the Prospectus Directive (including pursuant to the rules and regulations of any "Competent Authority" within the meaning of the Prospectus Directive) the Issuer will maintain, a listing agent, paying agent and transfer agent in Ireland for the life of the Offered Notes.

The Issuer may at any time and from time to time vary or terminate the appointment of any such paying agent or appoint any additional paying agents for any or all of such purposes; *provided* that the Issuer will maintain in the city of the Corporate Trust Office an office or agency where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served; *provided further* that no Paying Agent shall be appointed in a jurisdiction which subjects payments on the Notes to withholding tax. The Trustee may perform its duties as Paying Agent hereunder either directly or through affiliates, agents or attorneys.

Section 7.3     *Money for Note Payments to Be Held in Trust.*  All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Segregated Accounts shall be made on behalf of the Issuer by the Trustee.

Section 7.4     *Existence of Issuer.*  The Issuer shall maintain in full force and effect its existence, rights and franchises as a company or corporation organized or incorporated under the laws of the jurisdiction of its organization or incorporation and will preserve its qualification to do business as a foreign company or corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes or any of the Collateral or other property included in the Trust Estate. The Issuer shall, at all times while any Class of Notes is Outstanding, comply with its memorandum and articles of association. The Issuer shall provide each Rating Agency with a copy of any amendment, supplement, restatement or other modification of its memorandum and articles of association.

Section 7.5     *Protection of Trust Estate.*

(a)     The Issuer shall from time to time execute and deliver all such supplements and amendments hereto and the Issuer shall from time to time execute and deliver all such financing

statements, continuation statements, instruments of further assurance and other instruments and shall take such other action as may be necessary or advisable to:

(i)       Grant more effectively all or any portion of the Trust Estate;

(ii)       maintain or preserve the lien (and the priority thereof) of this Indenture or the charge of the Bank Account Charge or the pledge under the Account Pledge Agreement to carry out more effectively the purposes hereof or thereof;

(iii)       perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture, the Bank Account Charge or the Account Pledge Agreement;

(iv)       enforce any of the Eligible Investments or other instruments or property included in the Trust Estate;

(v)       preserve and defend title to the Trust Estate and the rights therein of the Trustee and the Secured Parties in the Trust Estate against the claims of all Persons and parties; or

(vi)       pay any and all taxes levied or assessed upon all or any part of the Trust Estate.

The Issuer hereby designates the Trustee its agent and attorney-in-fact to execute any instrument required pursuant to this Section 7.5; *provided, however*, that such appointment shall not impose upon the Trustee the Issuer's obligations under this Section 7.5.

(b)       The Trustee shall not, except in accordance with the provisions of this Indenture, release any portion of the Collateral from the Grant of the lien hereunder or any other portion of the Trust Estate from the charge created by the Bank Account Charge or the pledge under the Account Pledge Agreement, as applicable.

(c)       The Issuer shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any of the Trust Estate.

Section 7.6      *Required Limited Recourse and Non-Petition Provisions in Agreements*.  The Issuer shall not enter into any agreement with any Person unless such agreement contains limited recourse provisions comparable to Section 2.8(d) and a non-petition covenant comparable to Section 14.14.

Section 7.7      *Performance of Obligations; Separate Existence.*

(a)       Without the prior written consent of the Majority of the Controlling Class, the Issuer shall not take any action or, using its best efforts, permit any action to be taken by others, that would release any Person from any of such Person's covenants or obligations under any instrument included in the Trust Estate.

(b)       The Issuer shall ensure that all corporate or other formalities regarding its existence (including holding required meetings) are followed.  The Issuer shall not take any action, or conduct its

44

affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in any bankruptcy, reorganization or other insolvency proceeding.  Without limiting the foregoing, the Issuer (i) shall correct any misunderstanding known to it regarding its separate identity, (ii) shall maintain its accounts separate from those of any other Person, (iii) shall maintain separate financial statements, (iv) shall pay its own liabilities out of its own funds, (v) shall maintain an arms'-length relationship with any Affiliate, (vi) shall maintain adequate capital in light of its contemplated business operations pursuant to the Transaction Documents, (vii) shall have and maintain an Independent Director, (viii) shall not have any subsidiaries and (ix) shall not (A) have any employees (other than any directors and officers), (B) engage in any transaction in contravention of this Indenture, (C) pay any dividends or distributions other than in accordance with the terms of this Indenture, (D) commingle the Trust Estate or any other part of its assets with the assets of any other Person or (E) acquire obligations or securities of the holders of any of its shares.

Section 7.8     *Negative Covenants.*

(a)     The Issuer shall not:

(i)     sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Trust Estate or the Excepted Property, except as expressly permitted by this Indenture, the Bank Account Charge or the Account Pledge Agreement, as applicable;

(ii)     claim any credit on, or make any deduction from, the amount payable with respect to the Notes other than amounts withheld pursuant to Section 7.1 or any other express provision of this Indenture, or assert any claim against any present or former Noteholder, by reason of the payment of any taxes levied or assessed upon any part of the Trust Estate;

(iii)     (A) permit the validity or effectiveness of this Indenture, the Bank Account Charge or the Account Pledge Agreement or any Grant hereunder or thereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture, the Notes or under any of the other Transaction Documents, except, in each case, as may be expressly permitted hereby or thereby, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture, the charge under the Bank Account Charge and the pledge under the Account Pledge Agreement) to be created on or extend to or otherwise arise upon or burden the Trust Estate or any part thereof, any interest therein or the proceeds thereof or (C) take any action that would (i) permit the lien of this Indenture not to constitute a valid first priority perfected security interest in the Collateral, (ii) permit the charge under the Bank Account Charge not to constitute a valid first fixed charge over the portion of the Trust Estate identified in Clause 3 of the Bank Account Charge or (iii) permit the pledge under the Account Pledge Agreement not to constitute a valid first-priority pledge over the portion of the Trust Estate identified therein;

45

(iv)    except as otherwise permitted elsewhere in this Indenture, increase the Outstanding Principal Amount of any Class of Notes;

(v)    permit any Person capable of acting on its behalf to acquire any asset, enter into any transaction, conduct any activity or take any action if the acquisition or ownership of such asset, the entering into of such transaction, the conduct of such activity or the taking of such action, as the case may be, would cause the Issuer to be engaged or deemed to be engaged in a trade or business within the United States for United States federal income tax purposes or otherwise cause the Issuer to be subject to United States federal income tax on a net basis; or

(vi)    conduct business under an assumed name.

(b)    The Issuer and Trustee shall not sell, transfer, exchange or otherwise dispose of, or enter into or engage in any business with respect to, any part of the Trust Estate or the Excepted Property, except as expressly permitted by this Indenture, the Bank Account Charge, the Account Pledge Agreement and the Credit Default Swaps.

Section 7.9    *Statement as to Compliance; Statement as to Withholding.*  On or before the anniversary of the Closing Date in each calendar year, commencing with such anniversary in 2008, or immediately if there has been a Default, the Issuer shall deliver to the Trustee and each Rating Agency an Officer's Certificate of the Issuer stating, with respect to each signer thereof, that:

(i)    a review has been made under such signer's supervision of the activities of the Issuer during such year and of the Issuer's performance under this Indenture; and

(ii)    to the best of such signer's knowledge, based on such review, there has been no Default during such year, or, if there has been a Default during such year, specifying each Default known to such signer and the nature and status thereof.

Promptly after becoming aware that any amounts may or must be properly withheld under the Code, or under any laws of any State or other jurisdiction by any Person from a payment to any Noteholder of interest, principal and/or any other amount hereunder, the Issuer shall cause written notice thereof to be given to the Trustee, each Rating Agency and each Noteholder.

Section 7.10    *Issuer May Not Consolidate or Merge.*  The Issuer shall not consolidate or merge with or into any other Person or convey or transfer all or substantially all of its assets to any Person.

Section 7.11    *Limited Activities.*  The Issuer shall not engage in any business or activity other than the issuance, sale and redemption of the Notes and the performance of its obligations under this Indenture, the Credit Default Swaps, its memorandum and articles of association, acquiring, owning, managing, holding, pledging and disposing of the Eligible Investments and any other instrument or property included in the Trust Estate in connection therewith and engaging in any other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith, in each case to the extent permitted by its memorandum and articles of association.

46

Section 7.12    *Indebtedness*.  The Issuer shall not incur or have outstanding, assume, guarantee or otherwise become liable, directly or indirectly, for any indebtedness, or assume or guarantee any indebtedness of any Person, or hold out its credit as being available to satisfy the obligations of any other Person, other than pursuant to or as contemplated by this Indenture.

Section 7.13    *Compliance with Law*.  The Issuer shall comply in all material respects with all laws, rules, regulations, writs, judgments, injunctions, decrees, awards and orders applicable to it and to its activities and properties.

Section 7.14    *Waiver of Stay or Execution Laws*.  The Issuer covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or execution law, including filing a voluntary petition under Chapter 11 of the Bankruptcy Code, wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of or the exercise of any remedies under this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Trustee or any Noteholder, but shall suffer and permit the execution of every such power as though no such law had been enacted.

Section 7.15    *Appointment of an Auditor*.  If the Issuer ever appoints an auditor, the Issuer agrees that it shall seek the consent of the Majority of the Controlling Class as to any appointment of auditors.

Section 7.16    *Notice of Rating Changes*.  The Issuer shall promptly notify the Trustee (which shall promptly notify the Noteholders) if at any time the Rating of any Class of Notes has been, or it is known will be, changed or withdrawn.

## ARTICLE 8
## SUPPLEMENTAL INDENTURES

Section 8.1    *Supplemental Indentures Without Consent of Secured Parties*.  Without the consent of any Secured Parties, the Issuer and the Trustee, at any time and from time to time may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee and subject to, except for (f) below, the satisfaction of the Rating Agency Condition with respect to each Rating Agency with respect to each such supplemental indenture, for any of the following purposes:

(a)    to add to the covenants of the Issuer or the Trustee for the benefit of the Secured Parties;

(b)    to convey, transfer, assign, mortgage or pledge any property to or with the Trustee for the benefit of the Secured Parties;

(c)    to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be

47

necessary to facilitate the administration of the trusts hereunder by more than one Trustee pursuant to the requirements of Section 6.9, 6.10 or 6.13;

(d)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject to or required to be subjected to the lien of this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations) or to subject to the lien of this Indenture any additional property;

(e)    to provide procedures for the Noteholders to communicate with the Swap Counterparty and the Trustee so that Additional Amounts may be properly allocated and paid to the Noteholders based on each such Person's documented claim thereto;

(f)    to correct any inconsistency, defect or ambiguity arising under this Indenture;

(g)    to modify any provision in order to (i) prevent the Issuer or the Trust Estate from being subject to withholding or other taxes, fees or assessments, (ii) comply with the listing requirements of any securities exchange on which the Notes of any Class may be listed (or of the relevant competent authority in connection with such listing), (iii) obtain the Requisite Ratings of the Offered Notes from each Rating Agency in connection with the occurrence of the Closing Date, or, with the consent of, or at the initiative of, the Swap Counterparty, in the event that the Closing Date shall not have occurred on or prior to June 30, 2007, to ensure the efficacy of the First Loss Credit Default Swap and this Indenture in the absence of the Mezzanine Credit Default Swap or (iv) preserve, in connection with any redemption of fewer than all Classes of Notes arising out of either (x) any requirement to withhold or deduct amounts on account of any tax, (y) the imposition of any Relevant Issuer Tax or (z) the designation by the Swap Counterparty of an Optional Termination Date under either Credit Default Swap in connection with the redemption of one or more Classes of Notes, the loss-bearing characteristics of the Class or Classes of Notes to remain outstanding after such redemption; *provided* that such modification (other than pursuant to clause (iii) above) shall not, as evidenced by an Officer's Certificate of the Issuer, adversely affect in any material respect the interests of any Noteholder; and

(h)    to conform any provision to the description thereof set forth in the Prospectus.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

At the cost of the Issuer, the Trustee shall provide to each Rating Agency a copy of any proposed supplemental indenture at least 10 days prior to the execution thereof by the Trustee (except to the extent that a period shorter than such ten Business Day period shall have been consented to by the Swap Counterparty and not objected to by either Rating Agency) and, as soon as practicable after the execution

by the Trustee and the Issuer of any such supplemental indenture, provide to each Rating Agency a copy of the executed supplemental indenture. Any failure of the Trustee to mail a notice, or any defect in it, shall not in any way impair or affect the validity of the supplemental indenture.

Section 8.2    *Supplemental Indentures with Consent of Swap Counterparty and Noteholders*. Except as set forth in Section 8.1, the Issuer and the Trustee, at any time and from time to time, may enter into an indenture or indentures supplemental hereto, subject to the satisfaction of the Rating Agency Condition with respect to each Rating Agency, for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or modifying in any manner the rights of the Holders of the Notes under this Indenture with the prior written consent of the Swap Counterparty and the Majority of the Controlling Class; *provided, however*, that in connection with any such supplemental indenture, the Trustee shall have the right (but shall not be required) to solicit the consent of the Majority of any one or more relevant Classes of Notes (other than the Controlling Class), and if acting in accordance with any such consent obtained shall be fully protected in so acting; *provided, further*, that no such supplemental indenture shall, without the written consent of each Noteholder of each Class adversely affected thereby:

(i)    change the Scheduled Maturity Date or Payment Date of any Note, or reduce the Initial Principal Amount or the Outstanding Principal Amount thereof, or change the interest amount or other investment return amount payable with respect thereto, change the provisions of this Indenture relating to the application of proceeds of the Trust Estate to the payment of the Notes or the priority of the payment of the Notes or change any place where, or the coin or currency in which, any Note or any amount thereunder is payable, or impair the right to institute suit for the enforcement of any such payment on or after the maturity thereof;

(ii)    reduce the percentage of the Initial Principal Amount of the Notes, the consent of the Holders of which is required for (A) the execution of any such supplemental indenture, (B) any approval required prior to the Issuer taking any action or giving any consent or approval under either Credit Default Swap or (C) for any waiver of compliance with certain provisions of this Indenture or certain Defaults hereunder and their consequences provided for in this Indenture;

(iii)    permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or terminate the lien of this Indenture on any property at any time subject hereto (other than pursuant to the terms of this Indenture) or deprive the Holder of any Note of the security afforded by the lien of this Indenture;

(iv)    reduce the percentage of the Initial Principal Amount of the Notes the consent of the Holders of which is required before any request is made of the Trustee to preserve the Collateral or to rescind the Trustee's election to preserve the Collateral pursuant to Section 5.5, or to sell or liquidate the Collateral pursuant to Section 5.4 or 5.5;

(v)    modify any of the provisions of Section 8.1, this Section 8.2 or Section 5.15, except (i) to increase any percentage specified herein or therein or (ii) to provide that certain other

provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby, *provided, however,* that any modification pursuant to the preceding clause (i) shall require the consent of the Majority of each Class of Notes other than the Class of Notes subject to such increase, as applicable;

(vi)    modify the provisions of Article 11 or the definition of "Holder", "Noteholder" or "Outstanding";

(vii)    provide for the subsequent issuance of notes of one or more series that are prior in right of payment to the Notes pursuant to this Indenture and to which the Notes may be expressly subordinated, in each case by the terms of any such supplemental indenture; or

(viii)    modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of interest or principal or other amount due on any Note on any Payment Date (including the calculation of any of the individual components of such calculation) or to affect the rights of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained herein;

Not later than 10 days (or such shorter time as may be consented to by all Noteholders the consent of which shall be required as provided above) before the execution of any supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Issuer, shall provide to the Swap Counterparty and the Noteholders and, for so long as any Class of Notes is Outstanding and has a Rating, to the applicable Rating Agency a copy of such supplemental indenture and a notice, prepared by the Issuer, reciting in narrative form the amendments to be effected by such supplemental indenture and, if any Class of Notes Outstanding has a Rating, shall request that the applicable Rating Agency rating such Class provide evidence to the Trustee and the Issuer of the satisfaction of the Rating Agency Condition with respect to such supplemental indenture.

It shall not be necessary in connection with any consent of Noteholders under this Section 8.2 for the Noteholders to approve the specific form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

Promptly after the execution by the Trustee and the Issuer of any such supplemental indenture pursuant to this Section 8.2, at the expense of the Issuer, the Trustee or the Issuer shall provide a copy of the executed supplemental indenture to the Swap Counterparty, each Rating Agency, the Holders of the Notes and, for so long as the Offered Notes of any Class are listed on the Irish Stock Exchange and the rules of such exchange so require, the Irish Stock Exchange. Any failure of the Trustee to mail a notice, or any defect in it, shall not in any way impair or affect the validity of the supplemental indenture.

If a supplemental indenture is executed with the consent of the Holders of the Offered Notes and such supplemental indenture amends the terms and conditions of the Offered Notes, the Issuer will deliver, or cause to be delivered, a supplement to the Prospectus to the Irish Stock Exchange.

NY1 6216749v.6

Section 8.3      *Execution of Supplemental Indentures.*  In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article 8 or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled upon request to receive, and (subject to Sections 6.1 and 6.3) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent applicable thereto under this Indenture have been satisfied.  Any such Opinion of Counsel may be supported as to factual (including financial and capital markets) matters by such relevant certificates and other documents as may be necessary or advisable in the judgment of counsel delivering such Opinion of Counsel.  The Trustee shall further be entitled to rely upon an Officer's Certificate from the Issuer regarding the effect of any supplemental indenture on any particular Person or whether such Person's interests are adversely affected (as referred to in the text of the provisos to Section 8.1(g) and to the first sentence of Section 8.2).  The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise except to the extent required by law.

Section 8.4      *Effect of Supplemental Indentures.*  Upon the execution of any supplemental indenture under this Article, this Indenture shall be modified in accordance therewith and such supplemental indenture shall form a part of this Indenture for all purposes; and the Swap Counterparty and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder and the Trustee shall be bound thereby.

Section 8.5      *Reference in Notes to Supplemental Indentures.*  Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Issuer shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Issuer to any such supplemental indenture, may be prepared and executed by the Issuer and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

ARTICLE 9<br>REDEMPTION

Section 9.1      *Redemption.*

(a)      The Notes shall be redeemed, in whole but not in part, by the Issuer on a Payment Date, in each case subject to the applicable provisions of this Article 9, including either the requirements of clause (d) of this Section 9.1 regarding Taxes or Relevant Issuer Taxes or the requirements of clause (e) of this Section 9.1 regarding Regulatory Events or Clean Up Events, as the case may be, and in each case the notification requirements of Section 9.2 and Section 14.3 or Section 14.4, as applicable.

(b)      [Reserved].

51

(c)     Payments due on or before an Early Redemption Date shall continue to be payable to the Holders of Notes to be redeemed pursuant to Section 9.1(a) in accordance with the terms and provisions of such Notes and this Indenture.

(d)     If the Issuer (i) becomes subject to any requirement to withhold or deduct any amount in respect of Taxes in relation to amounts payable on the Notes or (ii) is required to pay (A) any income, corporate or capital gains tax to the government or other taxing authority in the Cayman Islands or (B) any tax to any other government or taxing authority (any tax or payment in respect of a tax liability described in this clause (ii), a "Relevant Issuer Tax"), then the Issuer shall use reasonable efforts to change its place of residence for taxation purposes if such change would avoid the condition described in clause (i) or (ii) above, as applicable (subject to satisfaction of the Rating Agency Condition with respect to each Rating Agency) and, if such condition continues notwithstanding such efforts or cannot be so avoided, the Issuer shall so notify the Trustee within two Business Days after obtaining knowledge or being notified of such requirement.  The Trustee shall in turn so notify the Noteholders and the Swap Counterparty in accordance with Sections 13.3 and 13.4.

If Issuer is unable to take the remedial action referred to in the preceding paragraph, then the Majority of each Class affected thereby shall have the right, by written notice to the Issuer and the Trustee, pursuant to an Act of the Holders of the Notes of such Class, to direct the Issuer to redeem such Class of Notes with respect to which the Issuer is unable to take the remedial action at their Outstanding Principal Amount and without premium and subject to the provisions applicable to Deferred Funding Amounts.

If the Issuer is required to pay any such Relevant Issuer Tax, then the Swap Counterparty shall have the right, by written notice to the Issuer and the Trustee, to direct the Issuer to redeem all of the Notes and the Majority of the Controlling Class shall have the right, by written notice to the Issuer and the Trustee, pursuant to an Act of the Holders of the Notes of such Class, to direct the Issuer to redeem all of the Notes, in each case at their respective Outstanding Principal Amounts subject to the provisions applicable to Deferred Funding Amounts.  The Trustee shall notify the Issuer, each Rating Agency and the Swap Counterparty of the outcome of any such Act within two Business Days after receipt of notice thereof.

If the outcome of any such Act of the Holders of the Notes of such Class is not to direct the Issuer to redeem the Notes, then the Trustee, upon receipt of notice of such Act, shall so notify the Issuer, the Noteholders, each Rating Agency and the Swap Counterparty.

The election by vote of the Majority of the Controlling Class to have the Issuer redeem the Notes pursuant to this Section 9.1 shall be set forth in an Act thereof, given to the Trustee in accordance with Section 9.3.  The election by the Swap Counterparty to have the Issuer redeem the Notes pursuant to this Section 9.1 shall be set forth in writing and delivered to the Trustee in accordance with Section 14.3.  Any such election of redemption shall be irrevocable.

If the Issuer is directed to redeem the Notes as set forth above, then the Issuer shall so notify the Trustee and the Swap Counterparty that the conditions to such direction have been met.  Unless such

direction shall have been given by the Swap Counterparty, where the Issuer has been directed to redeem the Notes on the basis that condition (i) or (ii) in the first paragraph of this clause (d) has been satisfied, the Swap Counterparty shall have the right, in its sole discretion, to make additional payments to the Issuer under the Credit Default Swaps (each, an "Additional Payment") in order to provide the Issuer with funds to pay either any Relevant Issuer Taxes or such additional amounts to the Noteholders as are necessary to ensure that the net amount received by the Noteholders (free and clear of the relevant Indemnifiable Taxes; each such amount payable to the Noteholders, an "Additional Amount") shall equal the full amount that would have been received had no withholding or deduction in respect of Indemnifiable Taxes been required or had the Issuer not been required to pay any such Relevant Issuer Tax.

As a condition to its right to prevent the redemption of the Notes as aforesaid, the Swap Counterparty shall notify the Trustee of its intention whether or not to pay such Additional Payments (and, if such intention is to pay such Additional Payments, of any subsequent change in such intention, not less than 10 Business Days in advance of the relevant Payment Date) and, for so long as the Swap Counterparty continues to pay such Additional Payments, no such redemption of the Notes shall occur. If (x) the Swap Counterparty notifies the Trustee that it no longer intends to pay such Additional Payments or (y) any such Additional Payment is not paid in full when due, then the Trustee shall so notify the Noteholders and the Issuer shall redeem the Notes of each relevant Class at their respective Outstanding Principal Amounts, subject to the provisions applicable to Deferred Funding Amounts, on the Payment Date following such notice or following the date on which such Additional Payment was due and was not paid in full. No premium shall be due and payable in respect of any Class of Notes in connection with a redemption of any Class of Notes under this Section 9.1(d).

(e)     On the occurrence of a Regulatory Event or a Clean-Up Event, the Swap Counterparty will have the right to designate an Optional Termination Date pursuant to the applicable Credit Default Swap. Such designation will result, in the case of a Regulatory Event, in the redemption of one or more Classes of the Notes (as determined by the Swap Counterparty) or, in the case of a Clean-Up Event, in the redemption of all of the Notes, in each case on the Payment Date so designated, at the Outstanding Principal Amount, in each case together with accrued interest or investment return for the related Due Period, without premium (except in the case of the Class F Principal Only Notes, for which an aggregate premium equal to the Class F Note Accrual Amount will be payable) and subject in each case to the provisions applicable to Deferred Funding Amounts. The Payment Date with respect to which the Issuer so redeems the Notes of any Class will constitute the Final Redemption Date for such Class of Notes. If the Issuer is so directed to redeem a Class of Notes, then the Issuer will so notify the Trustee and the Swap Counterparty that the conditions to such direction have been met.

(f)     Subject to the foregoing clause (d) or (e), the Issuer shall set the Early Redemption Date (which shall be a Payment Date) and the Redemption Record Date for any redemption pursuant to this Section 9.1 and shall give notice thereof to the Trustee pursuant to Section 9.2.

Section 9.2     *Notice to Trustee, Rating Agency and Swap Counterparty.*  In the event of any redemption pursuant to Section 9.1, the Issuer shall, not later than the fifteenth Business Day immediately preceding the proposed Early Redemption Date, notify in writing the Trustee (which shall in turn notify

53

the Noteholders), each Rating Agency and the Swap Counterparty of such proposed Early Redemption Date and the proposed Redemption Record Date.

Section 9.3    *Notice of Redemption.*   Notice of a redemption pursuant to Section 9.1 shall be given by the Trustee by first-class mail, postage prepaid, mailed not fewer than five Business Days before the proposed Redemption Record Date, to (a) each Holder of Notes to be redeemed, (b) the Swap Counterparty at its respective address for notices set forth in or pursuant to Section 14.3 and (c) each Rating Agency at its address for notices set forth in or pursuant to Section 14.3.                    .

All notices of redemption shall state (i) the proposed Early Redemption Date, (ii) the proposed Redemption Record Date, (iii) that on such proposed Early Redemption Date, the Notes are to be redeemed and, subject to Section 2.3(b), the Outstanding Principal Amount thereof paid and (iv) the places where such Notes may be presented for payment of the redemption price, which shall include the Irish Paying Agent and an agency of the Trustee to be maintained as provided in Section 7.2.

Notice of redemption of any Notes shall be given by the Trustee in the name of the Issuer and the cost of such notice shall constitute an Administrative Expense for purposes of the Credit Default Swaps. Failure to give notice of redemption, or any defect therein, to any Holder of any Note shall not impair or affect the validity of the redemption thereof or give rise to any claim based upon such failure or defect.

Section 9.4    *Deposit of Aggregate Redemption Amount.*   In the case of a redemption pursuant to Section 9.1, on the proposed Early Redemption Date (which shall be a Payment Date) contained in the notice of redemption as provided in Section 9.3, the Issuer shall cause cash to be deposited with the Trustee in an amount sufficient to provide for payment of an amount (the "Aggregate Redemption Amount") equal to all amounts required to be paid, after giving effect to Section 2.3(b) and Section 11.1(c), with respect to the Early Redemption Date.

Section 9.5    *Payments on Early Redemption Date.*   If notice of any redemption pursuant to Section 9.1 shall have been given as provided in Section 9.3, the Outstanding Principal Amount shall, in each case subject to the provisions applicable to Deferred Funding Amounts, on the Early Redemption Date become due and payable, together with accrued and unpaid interest or investment return thereon, as applicable; *provided, however*, that payments due on a Payment Date before the Early Redemption Date shall be payable to the Holders of such Notes registered as such on the relevant Record Dates according to their terms and the provisions of Section 2.8.

If the Outstanding Principal Amount of any Note called for redemption shall not be paid in full upon presentment thereof for optional redemption, then interest or investment return, as applicable, shall continue to accrue on the unpaid portion thereof, until paid, as provided herein and in such Note.

## ARTICLE 10
### ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1    *Collection of Money.*   Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or

assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due under each Credit Default Swap and on the Eligible Investments included in the Trust Estate, in each case in accordance with the terms and conditions of such Credit Default Swap and such Eligible Investments, as the case may be. The Trustee shall segregate and hold all such money and property received by it in trust for the benefit of the Secured Parties and shall apply it as provided in this Indenture.

Section 10.2    *Segregated Accounts.*

(a)    Prior to the Benchmark Date, the Trustee established and designated the accounts provided for in the balance of this Section 10.2(a) (collectively, the "Segregated Accounts"), which such accounts the Trustee shall maintain hereunder. The Trustee may establish, maintain and designate within each Segregated Account such accounts (not inconsistent with this Indenture) as the Trustee may think necessary or advisable for convenience in administering such Segregated Account. Each Segregated Account shall be non-interest bearing but shall be invested as provided in this Article 10.

The Segregated Accounts shall be established, maintained and designated as follows:

(i)    The "Collection Account" which shall be a securities account established and maintained with the Trustee (account number 57474322, for further credit to 3001819780), which shall be in the name of the Issuer for the benefit of the Secured Parties and as to which the Trustee shall be the entitlement holder and over which the Trustee shall have exclusive control. The Trustee agrees to give the Issuer and the Swap Counterparty prompt notice if the Collection Account or any assets or securities on deposit therein, or otherwise to the credit of the Collection Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.

(ii)    The "Custodial Account", which shall be a securities account established and maintained with the Trustee (account number 57474322, for further credit to 5000899780), which shall be in the name of the Issuer for the benefit of the Secured Parties and as to which the Trustee shall be the entitlement holder and over which the Trustee shall have exclusive control. The Trustee agrees to give the Issuer and the Swap Counterparty prompt notice if the Custodial Account or any assets or securities on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.

(b)    The Trustee shall allocate funds to the Segregated Accounts as follows:

(i)    the Trustee shall deposit into the Custodial Account the following amounts:

(1)    on the Benchmark Date, all amounts received on the Benchmark Date representing proceeds from the issuance and sale of the Class F Notes;

(2)    on the Closing Date, all amounts received on the Closing Date representing proceeds from the issuance and sale of the Offered Notes; and

(3)     on each Payment Date, any Adjustment Payment paid by the Swap Counterparty with respect to such date; and

(ii)     the Trustee shall deposit into the Collection Account the following amounts:

(1)     on each Payment Date, the aggregate of the Issuer Spread Amounts paid by the Swap Counterparty with respect to such date; and

(2)     on each Payment Date, from the balance standing to the credit of the Custodial Account, the aggregate of the Custodial Account Investment Earnings Amounts.

In addition, (i) the Issuer shall have the right, but shall not be required, to deposit with the Trustee from time to time such monies, securities and other instruments in any Segregated Account or Segregated Accounts as it deems, in its sole discretion, to be advisable or desirable and (ii) the Trustee shall deposit such monies, securities and other instruments into the Segregated Account or Segregated Accounts designated therefor by the Issuer by Issuer Order or Issuer Request.

(c)     All payments and disbursements to be made by the Trustee in accordance with this Indenture shall be made out of the funds in the applicable Segregated Account pursuant to the terms of this Indenture.

(d)     Any portion of the monies in the Custodial Account after giving effect to the application of funds pursuant to Section 11.1 of this Indenture shall be invested and reinvested by the Trustee in Eligible Investments. All income or other gain from such investments shall be credited to the applicable Segregated Account (for which the related investment was made), and any loss resulting from such investments shall be charged to the applicable Segregated Account (for which the related investment was made). The Trustee shall not, by virtue of its acting as Trustee, in any way be held liable by reason of any insufficiency in any Segregated Account resulting from any loss on any Eligible Investment, shall not be obligated to give investment advice regarding the investment of such funds and shall have no liability for any loss incurred on any Eligible Investment required by application of the terms of this Indenture to be liquidated prior to maturity.

(e)     In addition to the foregoing specific provisions of this Section 10.2 for the deposit, release and disbursement of funds into and from Segregated Accounts, if any provision of this Indenture in effect requires or permits the deposit, release or disbursement of funds into or from a Segregated Account but is not authorized by a specific provision of this Section 10.2, such deposit, release or disbursement is hereby authorized for purposes of this Section 10.2.

(f)     All monies deposited from time to time in any Segregated Account pursuant to this Indenture shall be held by the Trustee as part of the Trust Estate and shall be applied to the purposes provided herein.

(g)     All monies held by, or deposited with, the Trustee in a Segregated Account pursuant to the provisions of this Indenture shall be invested in Eligible Investments.

56

Section 10.3     *Release of Collateral.*

(a)     If no Event of Default has occurred and is continuing, the Issuer may, by Issuer Order, delivered to the Trustee on or before the settlement date for any sale of any portion of the Trust Estate, direct the Trustee to release from the lien of this Indenture the Collateral specified in such Issuer Order. In such Issuer Order, the Issuer shall certify that it has determined that the sale of such Collateral is in compliance with this Indenture.  Upon receipt of such Issuer Order, the Trustee shall release such Collateral from such lien in accordance with the Issuer Order, in each case against receipt of sale proceeds therefor.

(b)     If no Event of Default has occurred and is continuing and subject to the provisions of Article 12, the Issuer may, by Issuer Order, delivered to the Trustee on or before the date set for redemption or payment in full of any Collateral, certifying that such Collateral to be released is being redeemed or paid in full, direct the Trustee to release from the lien of this Indenture such Collateral in accordance with such Issuer Order, in each case against receipt of the proceeds of the redemption price therefor or payment in full thereof.

(c)     The Trustee shall, upon receipt of an Issuer Order at such time as there are no Notes Outstanding and all of the Secured Obligations of the Issuer have been satisfied (such Issuer Order to so state), release the Collateral from the lien of this Indenture.

Section 10.4     *Reports by Trustee and Related Matters.*  Upon request, the Trustee shall supply to the Issuer and each Rating Agency at least two Business Days prior to the date required hereunder for delivery of each Information Report, all information relating to the preparation of the Information Report that is in the possession of the Trustee by reason of its acting as Trustee hereunder with respect to the Credit Default Swaps, the Segregated Accounts and the other Collateral.  The Trustee shall supply in a timely fashion to the Issuer, to each Rating Agency, to the Swap Counterparty and to any Noteholder any other information that the Issuer, each Rating Agency, the Swap Counterparty or such Noteholder, as the case may be, may reasonably request from time to time that is in the possession of the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 10.5.  The Trustee shall promptly forward to the Issuer, each Rating Agency and the Swap Counterparty and any Noteholder copies of notices and other writings received by it from the Swap Counterparty or from the issuer of any Eligible Investment or from any clearing agency with respect to any Eligible Investment advising the holders of such security of any rights that the holders might have with respect thereto (including notices of calls and redemptions) as well as all periodic financial reports received from such issuers and clearing agencies with respect to such issuers (it being understood that the Trustee need not forward any such writing from the Swap Counterparty to the Swap Counterparty).  Nothing in this Section 10.4 shall be construed to impose upon the Trustee any duty to prepare any report or statement which the Issuer is required to prepare or provide under Section 10.5 or to calculate or recalculate any information required to be set forth in any such report or statement (other than information regularly maintained by the Trustee by reason of its acting as Trustee hereunder) prepared or required to be prepared by the Issuer.  Nothing herein shall be construed to obligate the Trustee to disclose any information concerning its business or its operations that it reasonably considers confidential in nature.

Section 10.5    *Information Reports.*

(a)    With respect to each Calculation Date, the Issuer shall cause the Swap Counterparty to render an accounting and to prepare a report, substantially in the form attached hereto as Exhibit I, with such changes as may be agreed to from time to time by the Swap Counterparty and the Majority of the Controlling Class (the "Information Report"), to be delivered to the Trustee and the Deposit Bank not later than the second Business Day before the related Payment Date.  The Information Report shall contain the following information and instructions:

(i)    the Outstanding Principal Amount of each Class of Notes on such Payment Date;

(ii)    each Note Interest Amount for such Payment Date (including (a) the portion of each such Note Interest Amount for such Payment Date representing the unpaid portion of the relevant Note Interest Amount from the immediately preceding Payment Date, (b) the amount, if any, by which the Note Interest Amount exceeds the funds available on such Payment Date to pay the Note Interest Amount on such Payment Date, (c) the Base Rate for the related Due Period and (d) the Day Count Fraction for the related Due Period);

(iii)    any other amount to be paid on the Offered Notes on such Payment Date;

(iv)    the balance standing to the credit of the Custodial Account;

(v)    the Deferred Funding Amount (if any) for each Class of Offered Notes on such Payment Date;

(vi)    on the Final Payment Date, the fact that such day is the Final Payment Date;

(vii)    the aggregate of the Reference Obligation Notional Amounts of Reference Obligations: (a) added to the Reference Portfolio as at each Replenishment Date  occurring during the related Due Period and (b) removed from the Reference Portfolio pursuant to any Reduction occurring during the related Due Period as at the date such Reduction occurred;

(viii)    the allocation of Loss Determination Amounts and Adjustment Amounts to the Offered Notes of each Class, and the Outstanding Principal Amount of each Class of Offered Notes, following such allocation;

(ix)    the aggregate of all Adjustment Payments to be made by the Swap Counterparty to the Issuer in respect of such Payment Date;

(x)    the aggregate of all Adjustment Payments to be made by the Issuer to the Swap Counterparty in respect of (a) such Payment Date and (ii) for all Payment Dates to and including such date;

(xi)    whether an Event of Default has occurred or not;

58

(xii)    the aggregate of the Defaulted Notional Amounts, the Maximum Defaulted Notional Principal Amounts, the Defaulted Notional Principal Amounts and the Defaulted Notional Interest Amounts of all Defaulted Reference Obligations on such Payment Date and previous Payment Dates;

(xiii)    the aggregate of the Impaired Notional Amounts of all Impaired Reference Obligations on such Payment Date and previous Payment Dates;

(xiv)    the Floating Payment and the portion thereof derived from Defaulted Notional Interest Amounts for such Payment Date and the aggregate of the Floating Payments and the aggregate of the portions thereof derived from Defaulted Notional Interest Amounts for all Payment Dates to and including such date;

(xv)    stratification tables profiling the Reference Portfolio in respect of: (a) the aggregate of the Reference Obligation Notional Amounts for each Reference Entity Group, (b) applicable DBAG Internal Rating, (c) S&P Industries and Fitch Industries of all Reference Entity Groups, (d) country of each Reference Entity and (e) the Weighted Average Life of the Reference Portfolio;

(xvi)    the Cumulative Deferred Interest Loss Amount, if any, determined on such Payment Date; and

(xvii)    for each date on which Reference Obligations were added to the portfolio pursuant to a Replenishment, confirmation that each of the Replenishment Conditions were met in connection therewith.

(b)    The Information Report delivered to the Trustee pursuant to Section 10.5(a) shall be accompanied by:

(i)    instructions to the Trustee to withdraw on the Payment Date relating to such Information Report the available funds from the Collection Account and the Custodial Account, as applicable, and make the payments set forth in the Information Report or in any supplemental information furnished pursuant to clause (iii) below in the manner specified, and in accordance with the priorities established, in Article 11;

(ii)    a copy of each notice, financial statement and other written communication received by the Issuer with respect any Eligible Investment and not previously accompanying an Information Report; and

(iii)    such supplemental information as is delivered by the Swap Counterparty pursuant to the First Loss Credit Default Swap Confirmation, but solely for delivery to the Holders of the Class F Notes.

(c)    After receiving an Information Report, the Trustee shall deliver a copy thereof no later than one Business Day before the related Payment Date to each Noteholder, each Rating Agency and

the Irish Paying Agent if and for so long as any Notes are listed on the Irish Stock Exchange and the rules of such exchange so require.

(d)     Each Information Report distributed to Noteholders shall also contain a notice substantially to the following effect:

60

Reminder to Owner of Notes:

In order to rely on the "exclusion" to the definition of "investment company" provided by Section 3(c)(7) of the United States Investment Company Act of 1940 (the "Investment Company Act"), and in order for holders of Notes to resell such Notes in reliance on the exemption from registration provided by Regulation S under the United States Securities Act of 1933 (the "Securities Act"), resales, pledges and other transfers of Notes or a beneficial interest in a Note may be made only in a principal amount of not less than €100,000 and only:

- to a person that is not a "U.S. person" within the meaning of Regulation S under the Securities Act and also not a "U.S. resident" within the meaning of the Investment Company Act; and

- in an "offshore transaction" within the meaning of Regulation S under the Securities Act in accordance with Rule 903 or 904 (as applicable) of Regulation S under the Securities Act.

Accordingly, each owner of a Note or a beneficial interest in a Note shall be deemed to represent and agree as follows:

(i)        it is not a "U.S. person" as defined in Regulation S under the Securities Act nor is it a "U.S. resident" within the meaning of the Investment Company Act,

(ii)       it was not formed for the purpose of investing in the Notes,

(iii)      it is aware that the sale of a Note or beneficial interest in a Note to it (other than the initial sale by the Issuer) is being made in reliance on the exemption from registration provided by Regulation S under the Securities Act and understands that the Notes offered in reliance on Regulation S will bear the appropriate legend (set forth in the Original Indenture),

(iv)      it is acquiring such Note or beneficial interest in a Note for its own account or for one or more accounts, each of which is a non-"U.S. person" that is also not a "U.S. resident" and as to which the beneficial owner exercises sole investment discretion, and in a principal amount of not less than €100,000 for the beneficial owner and each such account,

(v)       such owner acknowledges that the Issuer is not registered as an investment company under the Investment Company Act and that the Notes have not been registered under the Securities Act, and agrees that it will not resell, pledge or otherwise transfer beneficial interests in the Notes except to a person that is not a "U.S. resident" within the meaning of the Investment Company Act or a "U.S. person" as defined in Regulation S under the Securities Act,

(vi)      it is not (i) an "employee benefit plan" as defined in and subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) a "plan" as defined in and subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), (iii) a governmental plan, church plan or non-U.S. plan that is subject to any federal, state or local law that is substantially similar to Section 406 of ERISA, Section 4975 of the Code or the provisions of ERISA under which the assets of an issuer may be deemed to include plan assets, or (iv) an entity whose underlying assets include

NY1 6216749v.6

the assets of any such employee benefit plan or plan by reason of U.S. Department of Labor regulation Section 2510.3-101, as modified by Section 3(42) of ERISA.

(vii)     it is not, and it agrees not to offer or sell any interest in a Note to, a "United States person" for U.S. federal income tax purposes; for such purposes, "United States person" means (i) an individual who is a citizen or resident of the United States (for purposes of this definition "United States" means any state thereof and the District of Columbia), (ii) a corporation or partnership organized or created under the laws of the United States or any state thereof (including the District of Columbia) (other than a partnership that is not treated as a "United States person", such term being used herein with the meaning given it in the United States Internal Revenue Code of 1986 and applicable Treasury regulations), (iii) an estate, the income of which is subject to United States federal income taxation regardless of its source and (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have authority to control all substantial decisions of the trust,

(viii)    any purported transfer of a Note or a beneficial interest in a Note to a Person that does not comply with the requirements set forth above shall be null and void ab initio.  If at any time the Issuer or the Trustee has actual knowledge that such Noteholder or beneficial owner was in breach, at the time given, of any of the representations or agreements set forth above, the Trustee shall consider the acquisition of the related interest in such Note void and require that the related interest in such Note be transferred to a Person designated by the Issuer, and

(ix)      it will provide notice of these transfer restrictions to any transferee from it.

NY1 6216749v.6

ARTICLE 11
APPLICATION OF MONIES

Section 11.1     Disbursements of Monies.

(a)     Except as otherwise set forth in Article 10, disbursements of monies from each Segregated Account (in each case to the extent applicable as set forth in this Section 11.1) shall be made at the times set forth in this Section 11.1. In connection with any such disbursement, the Issuer shall deliver to the Trustee an Issuer Order supplementing the information contained in the most recent Information Report, which Issuer Order shall not be inconsistent with this Indenture, shall contain such information as shall be necessary in order for the Trustee to apply the amounts on deposit in the applicable Segregated Account with respect to the relevant Payment Date and to determine any repayment of principal in connection therewith. All amounts to be distributed by the Trustee shall, if necessary, be rounded to the nearest €0.01.

(b)     *Priority of Payments Before Final Redemption Dates*

(i)     Collection Account

The Trustee will apply the amount on deposit in the Collection Account in the following order of priority:

(1)     first, to the payment of Trustee Administrative Expenses, Administrative Expenses and Indemnification Amounts for the related Due Period, an amount equal to the least of (a) the balance standing to the credit of the Collection Account, (b) the sum of the Trustee Administrative Expenses, Administrative Expenses and Indemnification Amounts for such Due Period and (c) the product of the Day Count Fraction and €100,000;

(2)     second, to the holders of the Class A+ Notes, an amount equal to the lesser of (a) the remaining balance standing to the credit of the Collection Account and (b) the Note Interest Amount with respect to the Class A+ Notes;

(3)     third, to the holders of the Class A Notes, an amount equal to the lesser of (a) the remaining balance standing to the credit of the Collection Account and (b) the Note Interest Amount with respect to the Class A Notes;

(4)     fourth, to the holders of the Class B Notes, an amount equal to the lesser of (a) the remaining balance standing to the credit of the Collection Account and (b) the Note Interest Amount with respect to the Class B Notes;

(5)     fifth, to the holders of the Class C Notes, an amount equal to the lesser of (a) the remaining balance standing to the credit of the Collection Account and (b) the Note Interest Amount with respect to the Class C Notes;

(6)     sixth, to the holders of the Class D Notes, an amount equal to the lesser of (a) the remaining balance standing to the credit of the Collection Account and (b) the Note Interest Amount with respect to the Class D Notes;

(7)     seventh, to the holders of the Class E Notes, an amount equal to the lesser of (a) the remaining balance standing to the credit of the Collection Account and (b) the Note Interest Amount with respect to the Class E Notes;

(8)     eighth, to the holders of the Class F Notes, an amount equal to the lesser of (a) the remaining balance standing to the credit of the Collection Account and (b) the Class F Note Accrual Amount with respect to the Class F Notes;

(9)     ninth, to the extent the same were not paid in full pursuant to "first" above, to the payment of Trustee Administrative Expenses, Administrative Expenses and Indemnification Amounts for the related Due Period, an amount equal to the lesser of (a) the remaining balance standing to the credit of the Collection Account and (b) the portion of the sum of the Trustee Administrative Expenses, Administrative Expenses and Indemnification Amounts for such Due Period remaining unpaid; and

(10)     tenth, to the Custodial Account, the remaining balance standing to the credit of the Collection Account.

(ii)     Custodial Account

On each Payment Date before the applicable Final Redemption Date, the Trustee will pay to the Swap Counterparty an amount equal to the lesser of (a) the balance standing to the credit of the Custodial Account and (b) the sum of (x) the Floating Payments (or portions thereof), if any, payable by the Issuer to the Swap Counterparty on such Payment Date and (y) the Adjustment Payments (or portions thereof), if any, payable by the Issuer to the Swap Counterparty on such Payment Date.

The remaining portion of the amount on deposit in the Custodial Account will be retained and reinvested in Eligible Investments.

(c)     *Priority of Payments on Final Redemption Dates*

(i)     <u>Collection Account</u>

On the Final Redemption Date with respect to any Class of Notes, the Trustee will apply the amount on deposit in the Collection Account in the same order of priority as on Payment Dates before such Final Redemption Date.

(ii)     Custodial Account

On the applicable Final Redemption Date, the Trustee will apply the amount on deposit in the Custodial Account in the following order of priority:

64

(1)      first, to the Swap Counterparty, an amount equal to the lesser of (a) the balance standing to the credit of the Custodial Account and (b) the sum of (x) the Floating Payments (or portions thereof), if any, payable by the Issuer to the Swap Counterparty on such Final Redemption Date and (y) the Adjustment Payments (or portions thereof), if any, payable by the Issuer to the Swap Counterparty on such Final Redemption Date;

(2)      second, to the holders of the Class A+ Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class A+ Notes;

(3)      third, to the holders of the Class A Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class A Notes;

(4)      fourth, to the holders of the Class B Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class B Notes;

(5)      fifth, to the holders of the Class C Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class C Notes;

(6)      sixth, to the holders of the Class D Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class D Notes;

(7)      seventh, to the holders of the Class E Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class E Notes;

(8)      eighth, to the holders of the Class F Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class F Notes; and

(9)      ninth, unless the Swap Counterparty has not paid the Class F Note Premium Amount to the Issuer, to the Swap Counterparty, an amount equal

65

to the greater of (a) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (b) zero.

The remaining portion of the amount on deposit in the Custodial Account will be retained and reinvested in Eligible Investments.

    (d)    *Priority of Payments on Payment Dates Subsequent to Final Redemption Dates*

        (i)      Collection Account

On each Payment Date subsequent to the Final Redemption Date for any Class of Notes (in the event that the Deferred Funding Amount for any Class of Notes is greater than zero), the Trustee will apply the amount on deposit in the Collection Account in the same order of priority as on Payment Dates before such Final Redemption Date.

        (ii)     Custodial Account

On each Payment Date subsequent to the Final Redemption Date for any Class of Notes (in the event that the Deferred Funding Amount for any Class of Notes is greater than zero), the Trustee will apply the amount on deposit in the Custodial Account in the following order of priority:

        (1)    first, to the Swap Counterparty, an amount equal to the lesser of (a) the balance standing to the credit of the Custodial Account and (b) the sum of (x) the Floating Payments (or portions thereof), if any, payable by the Issuer to the Swap Counterparty on such Payment Date and (y) the Adjustment Payments (or portions thereof), if any, payable by the Issuer to the Swap Counterparty on such Payment Date;

        (2)    second, to the holders of the Class A+ Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class A+ Notes;

        (3)    third, to the holders of the Class A Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class A Notes;

        (4)    fourth, to the holders of the Class B Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class B Notes;

        (5)    fifth, to the holders of the Class C Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts

66

for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class C Notes;

(6)      sixth, to the holders of the Class D Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class D Notes;

(7)      seventh, to the holders of the Class E Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class E Notes;

(8)      eighth, to the holders of the Class F Notes, an amount equal to the lesser of (a) the greater of (x) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Classes of Notes and (y) zero; and (b) the Outstanding Principal Amount of the Class F Notes; and

(9)      ninth, unless the Swap Counterparty has not paid the Class F Note Premium Amount to the Issuer, to the Swap Counterparty, an amount equal to the greater of (a) the excess of the remaining balance standing to the credit of the Custodial Account over the sum of the Deferred Funding Amounts for all Class of Notes and (b) zero.

The remaining portion of the amount on deposit in the Custodial Account will be retained and reinvested in Eligible Investments

(e)      *Priority of Payments on final Extension Maturity Date*

On the final Extension Maturity Date, the Trustee will distribute all amounts then on deposit in the Collection Account and the Custodial Account in the same manner and order of priority as described in Section 11.1(d).

(f)      Payments in respect of the Notes shall only be made after provision is made for the payment of any income, corporation, excise or other similar tax or governmental charge assessed upon the Issuer and after deduction and withholding of any Taxes to the extent that such deduction or withholding is required by law.

(g)      Upon receipt of notice from the Issuer of the imposition of the Taxes referred to in condition (i) in the first paragraph of Section 9.1(d) and after giving effect to the provisions described therein allowing the Swap Counterparty to pay Additional Payments in respect thereof, the Trustee shall deduct or withhold (or cause to be deducted or withheld) the amount the Issuer directs it to withhold, from amounts otherwise payable to the Noteholders on each Payment Date for so long as such Tax continues to be imposed, all such amounts as are required to be so deducted or withheld, and promptly pay (or cause to be paid) the amount so deducted or withheld to the relevant taxing authority in accordance with the instructions of the Issuer.

(h)     Upon receipt of notice from the Issuer of the requirement to pay a Relevant Issuer Tax and after giving effect to the provisions of Section 9.1 allowing the Swap Counterparty to pay Additional Payments in respect thereof, the Trustee shall pay the relevant taxing authority the amount of such Relevant Issuer Tax which is then payable by withdrawing first, from amounts on deposit in the Collection Account representing any Additional Payments paid by the Swap Counterparty under the Credit Default Swaps in respect thereof, the amount of such unpaid Relevant Issuer Tax and second, ratably, to the extent any amount of such Relevant Issuer Tax remains unpaid, the amount of such unpaid Relevant Issuer Tax from the Custodial Account.

(i)     Upon receipt of any Additional Payments in respect of Indemnifiable Taxes, the Trustee shall distribute the related Additional Amounts to the Noteholders ratably based on the amount of each such Person's claims in respect of Indemnifiable Taxes.   Prior to the distribution of any Additional Amounts, each Noteholder shall be required to submit to the Trustee a certificate specifying the amount in respect of the Indemnifiable Taxes that such Person is owed.   Such certificate shall be duly executed by the Noteholder and shall be accompanied by all such documents, certificates and information as may be reasonably required by the Issuer or the Trustee to confirm such Person's claim in respect of the Additional Amounts.   The Trustee shall be entitled to rely conclusively on any certificate provided to it in respect of a claim to the Additional Amounts, and shall be entitled to presume conclusively the accuracy thereof, in each case without further inquiry or investigation.

## ARTICLE 12
## THE CREDIT DEFAULT SWAPS

Section 12.1     *The Credit Default Swaps.*

(a)     The Issuer shall enter into the Credit Default Swaps on the Benchmark Date or the Closing Date, as applicable, in the forms attached hereto as Exhibits H-1 (as to the Credit Default Swap Master Agreement) and H-2-a and H-2-b (as to the Credit Default Swap Confirmations) and shall Grant all of its right, title, interest and estate in, to and under the Credit Default Swaps to the Trustee pursuant to the Granting Clauses hereof.

(b)     In the event the Trustee becomes aware that the Swap Counterparty has defaulted in the payment when due of its obligations to the Issuer under either Credit Default Swap, the Trustee shall make a demand on such party demanding payment by 12:30 p.m., London time, on such date (or by such time on the next succeeding Business Day if such knowledge is obtained after 11:30 a.m., London time).   The Trustee shall give notice to the Noteholders upon the continuing failure by such party to perform its obligations during the three (3) Business Days following a demand made by the Trustee on the Swap Counterparty.

## ARTICLE 13
## RELATIONSHIP AMONG NOTEHOLDERS

Section 13.1     *Subordination.*

NY1 6216749v.6

(a)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Trustee and the Holders of the Notes of each Class agree for the benefit of the Swap Counterparty that payments on the Notes, all amounts payable to the Trustee (other than out of any sums or property deposited to the Collection Account from time to time, in relation to which the Trustee shall not be subordinate) and the Issuer's rights in and to the Trust Estate (with respect to all amounts payable to the Swap Counterparty, the "Subordinated Claims") shall be subordinate and junior to the rights of the Swap Counterparty with respect to payments to be made to the Swap Counterparty to the extent and in the manner set forth herein.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including as a result of an Event of Default specified in Section 5.1(d) or (e), all amounts payable to the Swap Counterparty shall be paid in accordance with the Priority of Payments.  The Holders of Notes evidencing Subordinated Claims agree, for the benefit of the Swap Counterparty, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinated Claims or hereunder until the payment in full of amounts due in respect of the Credit Default Swaps in accordance with the Priority of Payments and not before one year and one day have elapsed since such payment (and since the payment of all amounts due to the Swap Counterparty) or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(b)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes agree that, for the benefit of the Swap Counterparty and the Holders of the Class A+ Notes, payments on the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A+ Notes, the "Subordinated Claims") shall be subordinate and junior to payments on the Class A+ Notes, to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a) and as hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including as a result of an Event of Default specified in Section 5.1(d) or (e), payments in respect of the Class A+ Notes shall be made *pari passu* in full, in accordance with the Priority of Payments.  The Holders of Notes evidencing Subordinated Claims agree, for the benefit of the Holders of the Class A+ Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinated Claims or hereunder until the payment in full of amounts due in respect of the Class A+ Notes in accordance with the Priority of Payments and not before one year and one day have elapsed since such payment (and since the payment of all amounts due to the Swap Counterparty) or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(c)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes agree that, for the benefit of the Swap Counterparty and the Holders of the Class A+ Notes and the Class A Notes, payments on the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A Notes, the "Subordinated Claims") shall be subordinate and junior to payments on the Class A Notes,

69

to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a) and as hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including as a result of an Event of Default specified in Section 5.1(d) or (e), payments in respect of the Class A Notes shall be made *pari passu* in full, in accordance with the Priority of Payments. The Holders of Notes evidencing Subordinated Claims agree, for the benefit of the Holders of the Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinated Claims or hereunder until the payment in full of amounts due in respect of the Class A Notes in accordance with the Priority of Payments and not before one year and one day have elapsed since such payment (and since the payment of all amounts due to the Swap Counterparty) or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(d)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes agree that, for the benefit of the Swap Counterparty and the Holders of the Class A+ Notes, the Class A Notes and the Class B Notes, payments on the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class B Notes, the "Subordinated Claims") shall be subordinate and junior to payments on the Class B Notes, to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a) and as hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including as a result of an Event of Default specified in Section 5.1(d) or (e), payments in respect of the Class B Notes shall be made *pari passu* in full, in accordance with the Priority of Payments. The Holders of Notes evidencing Subordinated Claims agree, for the benefit of the Holders of the Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinated Claims or hereunder until the payment in full of amounts due in respect of the Class B Notes in accordance with the Priority of Payments and not before one year and one day have elapsed since such payment (and since the payment of all amounts due to the Swap Counterparty) or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(e)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class D Notes, the Class E Notes and the Class F Notes agree that, for the benefit of the Swap Counterparty and the Holders of the Class A+ Notes, the Class A Notes, the Class B Notes and the Class C Notes, payments on the Class D Notes, the Class E Notes and the Class F Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class C Notes, the "Subordinated Claims") shall be subordinate and junior to payments on the Class C Notes, to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a) and as hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including as a result of an Event of Default specified in Section 5.1(d) or (e), payments in respect of the Class C Notes shall be made *pari passu* in full, in accordance with the Priority of Payments. The Holders of Notes evidencing Subordinated Claims agree, for the benefit of the Holders of the Class C Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinated Claims or hereunder until the payment in

70

full of amounts due in respect of the Class C Notes in accordance with the Priority of Payments and not before one year and one day have elapsed since such payment (and since the payment of all amounts due to the Swap Counterparty) or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(f)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class E Notes and the Class F Notes agree that, for the benefit of the Swap Counterparty and the Holders of the Class A+ Notes, the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, payments on the Class E Notes and the Class F Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class D Notes, the "Subordinated Claims") shall be subordinate and junior to payments on the Class D Notes, to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a) and as hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including as a result of an Event of Default specified in Section 5.1(d) or (e), payments in respect of the Class D Notes shall be made *pari passu* in full, in accordance with the Priority of Payments.  The Holders of Notes evidencing Subordinated Claims agree, for the benefit of the Holders of the Class D Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinated Claims or hereunder until the payment in full of amounts due in respect of the Class D Notes in accordance with the Priority of Payments and not before one year and one day have elapsed since such payment (and since the payment of all amounts due to the Swap Counterparty) or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(g)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class F Notes agree that, for the benefit of the Swap Counterparty and the Holders of the Class A+ Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes, payments on the Class F Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class E Notes, the "Subordinated Claims") shall be subordinate and junior to payments on the Class E Notes, to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a) and as hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including as a result of an Event of Default specified in Section 5.1(d) or (e), payments in respect of the Class E Notes shall be made *pari passu* in full, in accordance with the Priority of Payments.  The Holders of Notes evidencing Subordinated Claims agree, for the benefit of the Holders of the Class E Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinated Claims or hereunder until the payment in full of amounts due in respect of the Class E Notes in accordance with the Priority of Payments and not before one year and one day have elapsed since such payment (and since the payment of all amounts due to the Swap Counterparty) or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(h)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer agrees that, for the benefit of the Swap Counterparty and the Holders of the Notes, the Issuer's rights in and to

71

the Trust Estate (with respect to the Class F Notes, the "Subordinated Claims") shall be subordinate and junior to payments on the Class F Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a) and as hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including as a result of an Event of Default specified in Section 5.1 (d) or (e), payments in respect of the Class F Notes shall be made *pari passu* in full, in accordance with the Priority of Payments.

(i)      In the event that, notwithstanding the provisions of this Indenture, any Person claiming or purporting to claim through any Subordinated Claim shall have received any payment or distribution in respect of such Subordinated Claim contrary to the provisions of this Indenture, then, unless and until all amounts payable to the Swap Counterparty, or on the Class A+ Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the case may be, shall have been paid in full, in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Swap Counterparty and the Holders of the Class A+ Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the case may be, in accordance with this Indenture.

(j)      Each Person claiming or purporting to claim through any Subordinated Claim agrees with the Swap Counterparty and all Holders of the Class A+ Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes, as the case may be, that such Person shall not demand, accept, or receive any payment or distribution in respect of such Subordinated Claim in violation of the provisions of this Indenture including this Section 13.1; *provided* that, after all amounts payable to the Swap Counterparty and on the Class A+ Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes, as the case may be, have been paid in full, such Person shall be fully subrogated to the rights of the Holders of the Class A+ Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes, as the case may be. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay any Person claiming or purporting to claim through any Subordinated Claim.

Section 13.2      *Standard of Conduct.*  In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Secured Party under this Indenture, subject to the terms and conditions of this Indenture, including Section 5.10, a Secured Party or Secured Parties shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Issuer, or any other Person.

ARTICLE 14
MISCELLANEOUS

Section 14.1      *Form of Documents Delivered to Trustee.*  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all

72

such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer may be based, insofar as it relates to legal matters, upon an Opinion of Counsel or a certificate of or representations by such legal counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer of the Issuer, or Opinion of Counsel or certificate of or representations by such legal counsel, may be based, insofar as it relates to factual matters, upon a certificate of, opinion of, or representations by the Issuer or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer or such other Person, unless such Authorized Officer of the Issuer or counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 14.2   *Acts of Secured Parties*.  Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by one or more of the Secured Parties may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Secured Party in person or by an agent or proxy duly appointed in writing (such instrument or instruments and the action embodied therein and evidenced thereby, an "Act" of such Secured Party); and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 14.2.

The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

The ownership of Notes shall be proved by the Note Register.

Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

Section 14.3   *Notices, Etc., to Various Participants*.  Any request, demand, authorization, direction, notice, consent, waiver or other documents provided or permitted by this Indenture to be made

NYI 6216749v.6

upon, given or furnished to, or filed with the Issuer, the Trustee, the Swap Counterparty, each Rating Agency or any Noteholder (each, a "Notice Party") shall be in writing and shall be made upon, given or furnished as follows (and shall be effective only upon receipt):

       (i)     if to or with the Trustee, by overnight courier assuring next day delivery or telecopy to or with the Trustee addressed to it at the Corporate Trust Office, or at any other address furnished in writing by the Trustee to each other Notice Party;

       (ii)     if to or with the Issuer, by overnight courier assuring next day delivery to the Issuer addressed to it at CART 1 Ltd., c/o Maples Finance Limited, P.O. Box 1093 G.T., Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention: Directors  (telecopy +1 345 945 7100; telephone +1 345 945 7099) with a copy to Maples and Calder, P.O. Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention: Alasdair Robertson (telecopy +1 345 949 8080; telephone +1 345 949 8066), or at any other address previously furnished in writing by the Issuer to each other Notice Party, and in any case other than notice given by the Swap Counterparty or any Noteholder, as the case may be, with a copy to each of the Swap Counterparty and each Noteholder; *provided* that any failure to deliver any such copy shall not affect the effectiveness of any notice duly given to the Issuer;

       (iii)     if to or with the Swap Counterparty, by overnight courier assuring next day delivery or telecopy to or with the Swap Counterparty addressed to it at Taunusanlage 12, 60325 Frankfurt am Main, Germany, Attention:  Loan Exposure Management Group, Christian Kuenzle, Karin Lehnert (telecopy +49-69-910-34796; telephone +49-69-910-42298/-34819), or at any other address previously furnished in writing by the Swap Counterparty to each other Notice Party, and in any case other than notice given by the Issuer, with a copy to the Issuer;

       (iv)     if to or with S&P, by overnight courier assuring next day delivery, telecopy or electronic mail to or with S&P addressed to it at 20 Canada Square, Canary Wharf, London E14 5LH, United Kingdom, Attention: Amit Sohal (telecopy +44-20-7176-3845; telephone +44-20-7176-3098), (email address:  europeansurveillance@standardandpoors.com) or at any other address previously furnished in writing by S&P to each other Notice Party, and in any case other than notice given by the Issuer, with a copy to the Issuer; and

       (v)     if to or with Fitch, by overnight courier assuring next day delivery, telecopy or electronic mail to or with Fitch addressed to it at 101 Finsbury Pavement, London EC2A 1RS, United Kingdom, Attention: CDO Performance Analytics, (telecopy +44-20-7417-4224; telephone +44-20-7417-4222), (email address: cdo.surveillance@fitchratings.com), or at any other address previously furnished in writing by Fitch to each other Notice Party, and in any case other than notice given by the Issuer, with a copy to the Issuer.

       Section 14.4    *Notices to Noteholders; Waiver.*  So long as a Note is represented by a Global Note and such Global Note is held on behalf of Euroclear or Clearstream, as the case may be, notices to holders of beneficial interests in such a Note may be given by delivery of the relevant notice to Euroclear

74

or Clearstream (if such Note is held on behalf of such clearing system, as applicable), for communication by it to entitled Noteholders; *provided* that such notice is also delivered to the Company Announcement Office of the Irish Stock Exchange for so long as such Note is of a Class of Offered Notes that is listed on the Irish Stock Exchange and the rules of the Irish Stock Exchange so require.  Any such notice shall be deemed to have been given on the date of delivery to such clearing system.  If the Offered Notes, while issued in the form of Certificated Notes, are listed on the Irish Stock Exchange and the rules of the Irish Stock Exchange so require, notices of amounts to be paid on the Notes, if any, on each Payment Date will be delivered to the Company Announcement Office of the Irish Stock Exchange.

Subject to the applicable provisions of Sections 10.5 and 12.1, where this Indenture provides for giving a copy of any report or notice to Noteholders (such report or notice a "notice") of any event, such notice shall be in writing, shall be given to each Noteholder affected by such event and shall be deemed to have been validly served, given or delivered (a) upon transmission, when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery as otherwise provided in this Section 14.4), (b) one Business Day after deposit with a reputable overnight courier assuring next day delivery with all charges prepaid (unless such notice is not actually delivered) or (c) when delivered, if hand-delivered by messenger, all of which shall be addressed to the Noteholder to be notified and sent to the address or facsimile number specified for such party in the Note Register, or to such other address (or facsimile number) as may be substituted by notice given as herein provided.  Notwithstanding the foregoing, with respect to any recipient of a report or a notice provided for herein, the Issuer and the Trustee shall have the right to implement such means of electronic communication as shall be consented to by such recipient.  Such means may, by way of example, include secure electronic mail, a secure extranet, a secure intranet, a secure internet website, a secure page of an internet website or a combination of any two or more of the foregoing.

In any case where notice to Noteholders is given, neither the failure to give such notice, nor any defect in any notice so given, to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice which is given in the manner herein provided shall conclusively be presumed to have been duly given whether or not received.

Where this Indenture provides for notice in any manner, any such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

Section 14.5     *Effect of Headings and Table of Contents*.  The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 14.6     *Successors and Assigns*.  All covenants and agreements in this Indenture by the Issuer and the Trustee shall bind their respective successors and assigns, whether so expressed or not.

Section 14.7     *Separability*.  If any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining

75

provisions, and the validity, legality and enforceability of such provision in any other jurisdiction, shall not in any way be affected or impaired thereby.

Section 14.8     *Benefits of Indenture*.  Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Swap Counterparty and the Noteholders (each of which shall be an express third party beneficiary of this Indenture to the extent of the rights granted thereto herein, with the power to exercise any right so granted as if a party hereto), any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 14.9     *Payments on Non-Business Days*.  If the date of any payment with respect to the Notes required or permitted hereunder shall not be a Business Day, then payment need not be made on such date, but shall be made on the next succeeding Business Day with the same force and effect as if made on such date, and no additional interest or investment return, as applicable, shall accrue for any period as a result of such payment being made on the next succeeding Business Day.

Section 14.10     *Governing Law*.  This Indenture, each indenture supplemental hereto and each Note shall be construed in accordance with and governed by the laws of the State of New York, without reference to its conflict of law provisions that would apply the law of any jurisdiction other than the State of New York, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws; *provided, however*, that the provisions of this Section 14.10 are not intended to, and will not be deemed to, determine the respective jurisdictions whose laws govern the perfection or the priority of any security interest (as defined in Section 1-201(37) of the UCC) that is created or provided for under this Indenture, under the Bank Account Charge or under the Account Pledge Agreement.

Section 14.11     *Counterparts*.  This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.12     *Inspection Rights*.  The Issuer shall permit the Trustee, each Rating Agency and, after the occurrence of a Default, any Noteholder, and their respective representatives, upon reasonable prior written notice to the Issuer:

(i)     to visit the principal office of the Issuer and the office at which the Trustee maintains any books or records pertaining to the Trust Estate;

(ii)     to discuss the Issuer's affairs, finances and accounts with its officers, employees, members and the Issuer's independent accountants (and by this provision the Issuer hereby authorizes its accountants to discuss with such representatives such affairs, finances and accounts); and

(iii)     to inspect, examine and make copies of the Issuer's books and records relating to the Trust Estate and all other information relating to the Trust Estate at any reasonable time

76

during normal business hours as often as may be reasonably requested, subject to any applicable confidentiality restrictions by which the Issuer may be bound.

Any such Noteholder shall pay its own costs and expenses in connection with such visit, inspection, examination and copies prior to an Event of Default (it being understood that the Trustee shall be reimbursed such expenses, and nothing in this Section 14.12 shall limit the Trustee's rights under Article 6) and the Issuer shall pay such costs and expenses after and during the continuance of an Event of Default.

The recipient of any such information shall, and shall cause its agents, to hold in confidence all such information, except (i) to the extent disclosure may be required by law, by any regulatory authority, by any judicial or governmental order of a court or governing body of competent jurisdiction, by the National Association of Insurance Commissioners or by the documents delivered pursuant to or in connection with this Indenture and the Notes, (ii) a Noteholder may disclose such information to any prospective transferee and to such Noteholder's and transferee's accountants, consultants, attorneys and similar agents, provided that all such Persons agree in writing to hold such information as confidential, (iii) to the extent disclosure is necessary to the defense of any claim of liability under this Indenture brought against it and (iv) except to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder (including appropriate disclosure to its own legal counsel and other advisors).

Section 14.13    *Submission to Jurisdiction.*  The Issuer hereby irrevocably (i) agrees that any judicial proceedings instituted by any Noteholder in relation to any matter arising under this Indenture or the Notes may be brought in any court having subject matter jurisdiction in the State of New York (including Federal courts located in the State of New York), (ii) accepts generally and unconditionally the jurisdiction of such courts, (iii) acknowledges their competence and (iv) agrees to be bound by any judgment rendered in such proceeding, and designates and appoints CT Corporation System, 111 Eighth Avenue, New York, New York 10011, as the agent of the Issuer to receive on its behalf service of all process brought against the Issuer with respect to any such proceeding in any such court in the State of New York, such service being hereby acknowledged by the Issuer to be effective and binding on it in every respect.  If for any reason such agent shall cease to be available to act as such, then the Issuer shall designate a new agent in the City of New York.  Nothing contained herein shall in any way inhibit the ability of any Noteholder to serve process in any other manner or bring actions or proceedings in such other jurisdictions and in such manner as may be permitted by applicable law.

Section 14.14    *Non-Petition Covenants.*  The Transfer Agent, the Irish Paying Agent, any other Paying Agent, each Noteholder and each holder of a beneficial interest in the Notes agree that before the date that is one year and one day after the termination of this Indenture or, if longer, the expiration of the then applicable preference period plus one day, such party shall not acquiesce in, petition or otherwise invoke or cause any other Person to invoke the process of any governmental authority for the purpose of commencing or sustaining a case against the Issuer under any Federal or State bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer or any substantial part of its property or ordering the winding-up or liquidation of the affairs of the Issuer.  Nothing in this Section 14.14 shall preclude, to the extent not otherwise precluded in

77

this section, the Transfer Agent, the Irish Paying Agent, any other Paying Agent, any Noteholder and any holder of a beneficial interest in the Notes from taking any action prior to the expiration of the aforementioned one year and one day period or, if longer, the applicable preference period then in effect in (i) any case or proceeding voluntarily filed or commenced by the Issuer or (ii) any involuntary insolvency proceeding filed or commenced by a person other than the Transfer Agent, the Irish Paying Agent, any other Paying Agent, any such Noteholder or any such holder of a beneficial interest in the Notes.

.

.

78

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Amended and Restated Indenture as of the date first written above.

CART 1 LTD.

By: _____
    Name:  Chris Marett
    Title:   DIRECTOR


THE BANK OF NEW YORK, LONDON BRANCH,
as Trustee


By: _____
    Name:
    Title:


THE BANK OF NEW YORK (LUXEMBOURG) S.A.,
as Note Registrar


By: _____
    Name:
    Title:


BNY FUND SERVICES (IRELAND) LIMITED,
as Irish Paying Agent


By: _____
    Name:
    Title:

*Amended and Restated Indenture Signature Page – CART 1 Ltd.*

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Amended and Restated Indenture as of the date first written above.

CART 1 LTD.


By: _____
    Name:
    Title:


THE BANK OF NEW YORK, LONDON
BRANCH,
as Trustee


By: _K M Rainbird_____
    Name:  K M RAINBIRD
    Title:  VICE PRESIDENT


THE BANK OF NEW YORK (LUXEMBOURG)
S.A.,
as Note Registrar


By: _K M Rainbird_____
    Name:  K M RAINBIRD
    Title:  AUTHORISED ATTORNEY


BNY FUND SERVICES (IRELAND) LIMITED,
as Irish Paying Agent


By: _K M Rainbird_____
    Name:  K M RAINBIRD
    Title:  AUTHORISED ATTORNEY


*Amended and Restated Indenture Signature Page – CART 1 Ltd.*

79

ANNEX A TO INDENTURE

## GLOSSARY OF DEFINITIONS

"Accelerated Amounts": The meaning specified in Section 5.2(a)(ii).

"Acceleration Payment Date": The meaning specified in Section 5.2(a)(ii).

"Account Pledge Agreement": The Bank Account Pledge Agreement made on April 30, 2007 between the Issuer and the Trustee for the benefit of the Secured Parties.

"Act" of Secured Parties: The meaning specified in Section 13.2.

"Additional Amount": The meaning specified in Section 9.1(d).

"Additional Payment": The meaning specified in Section 9.1(d).

"Adjustment Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap, confirmation, as applicable.

"Adjustment Payment":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap, confirmation, as applicable.

"Administrator": Initially, Maples Finance Limited, in the capacity as administrator of the Issuer.

"Administration Agreement": The Administration Agreement, dated April 30, 2007, between the Issuer and Maples Finance Limited, as Administrator.

"Administrative Expenses":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable or, if applicable, the aggregate of the amounts determined pursuant to such specified meaning.

"Affiliate":  With respect to a Person, (a) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (b) any other Person who is a director, officer or employee (i) of such Person, (ii) of any subsidiary or parent company of such Person or (iii) of any Person described in clause (a) above; *provided, however,* that neither Maples Finance Limited nor any Person controlled by Maples Finance Limited shall be considered an Affiliate of the Issuer.  For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (A) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person, or (B) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agent Member": Euroclear or Clearstream, as applicable.

"Aggregate Redemption Amount": The meaning specified in Section 9.4.

"Applicable Percentage": At any time with respect to each Holder of a Note of any Class, the percentage equivalent of a fraction, the numerator of which is the Initial Principal Amount of such Holder's Note and the denominator of which is the Initial Principal Amount of all of the Notes of such Class.

"Authenticating Agent":  An agent of the Trustee appointed by the Trustee pursuant to Section 2.5 to authenticate the Notes.

"Authorized Officer":  With respect to the Issuer, any director, secretary or other officer or any duly appointed attorney in fact of the Issuer who is authorized to act for the Issuer in matters relating to, and binding upon, the Issuer.  With respect to the Trustee, the Common Depositary, the Note Registrar or any other bank or trust company acting as trustee of any express trust or as custodian, a Responsible Officer.  Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"Available Subordination Amount":  With respect to a Class of Offered Notes and the Closing Date, the sum of the Initial Principal Amounts of all Classes of Notes subordinate to such Class of Offered Notes.

After the Closing Date, with respect to a Class of Offered Notes and a Payment Date, the sum of the Outstanding Principal Amounts for all Classes of Notes subordinate thereto pursuant to Section 13.1 in each case determined before giving effect to payments to be made on such Payment Date pursuant to the Indenture.

"Bank":  The Bank of New York, London Branch, in its individual capacity and not as Trustee, and, if any Person is appointed as a successor Trustee, such Person in its individual capacity and not as Trustee.

"Bank Account Agreement":  The document entitled "Opening of accounts/safe custody accounts" for the Issuer, dated as of April 30, 2007, between the Issuer and the Deposit Bank, including the "General Business Conditions" of Deutsche Bank AG and the "Special Conditions" applicable thereto as of such date.

"Bank Account Charge":  The Bank Account Charge, dated on or about 30 April, 2007, made as a deed between the Issuer and the Trustee.

"Bankruptcy Code":  Title 11 of the United States Code (11 U.S.C. §§ 101 et seq.).

"Base Rate":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Benchmark Date":  April 30, 2007.

"Business Day": Any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) and foreign exchange markets settle payments in New York, Frankfurt and London (and, if different, the city in which the corporate trust office of the Trustee is located) and a day on which TARGET (the Trans-European Automated Real-time Gross Settlement Express Transfer system) is open.

"Calculation Agent": The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Calculation Date": For any Due Period, the last day of such Due Period.

"CART Account" means the following account opened in the name of the Issuer with the Deposit Bank: account number 920009800/Ref: CART 1 pursuant to the Bank Account Agreement.

"Certificated Note": Any of the Notes executed, authenticated and delivered in definitive non-global, fully registered form without interest coupons, pursuant to this Indenture.

"Class": A class of Notes consisting of:

      (i)      the Class A+ Notes;

      (ii)     the Class A Notes;

      (iii)    the Class B Notes;

      (iv)    the Class C Notes;

      (v)     the Class D Notes;

      (vi)    the Class E Notes; or

      (vii)   the Class F Notes.

"Class A+ Notes": The Class A+ Notes due 2018 of the Issuer (if any) issued on the Closing Date hereunder and having the terms described herein.

"Class A Notes": The Class A Notes due 2018 of the Issuer (if any) issued on the Closing Date hereunder and having the terms described herein.

"Class B Notes": The Class B Notes due 2018 of the Issuer (if any) issued on the Closing Date hereunder and having the terms described herein.

"Class C Notes": The Class C Notes due 2018 of the Issuer (if any) issued on the Closing Date hereunder and having the terms described herein.

"Class D Notes": The Class D Notes due 2018 of the Issuer (if any) issued on the Closing Date hereunder and having the terms described herein.

"Class E Notes":  The Class E Notes due 2018 of the Issuer (if any) issued on the Closing Date hereunder and having the terms described herein.

"Class F Notes":  The Class F Notes Due 2018 of the Issuer issued on the Benchmark Date hereunder and having the terms described herein.

"Class F Note Accrual Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation.

"Class F Target Return Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation.

"Class Spread" means, in respect of any Class of Offered Notes, , the rate per annum set forth opposite such Class below:

Class A+ Notes:  0.25%;

Class A Notes:  0.30%;

Class B Notes:  0.50%;

Class C Notes:  0.70%;

Class D Notes:  1.30%; and

Class E Notes:  4.50%.

"Clean-Up Event":  The meaning specified in the First Loss Credit Default Swap Confirmation or Mezzanine Credit Default Swap Confirmation, as applicable.

"Clearstream":  Clearstream Banking, société anonyme, a limited liability company organized under the laws of the Grand Duchy of Luxembourg.

"Closing Date":  The date on which the Offered Notes are issued pursuant to Section 3.2.

"Code":  The United States Internal Revenue Code of 1986.

"Collateral":  The meaning specified in the Granting Clause of this Indenture.

"Collection Account":  The Segregated Account designated as the Collection Account pursuant to Section 10.2(a)(i).

"Co-managers":  Caja de Ahorros de Valencia, Castellón y Alicante, (Bancaja) and Banco Bilbao Vizcaya Argentaria, S.A. (BBVA).

"Common Depositary":  The Bank of New York, London Branch, or any successor common depositary for Euroclear Bank S.A./N.V. and Clearstream Banking, société anonyme.

"Competent Authority": The meaning specified in Section 7.2.

"Controlling Class": At any time, the Class Outstanding having the highest priority pursuant to the Priority of Payments set forth in (i) prior to the Scheduled Maturity Date, Section 11.1(b)(ii) or (ii) on or after the Scheduled Maturity Date, Section 11.1(c)(ii), as applicable.

"Corporate Trust Office": In the case of the initial Trustee, the principal corporate trust office of the Trustee currently located at The Bank of New York, London Branch, One Canada Square, London, E14 5AL, United Kingdom, Attention: Corporate Trust Administration, Telecopy: 44-207-964-6399, Telephone: 44-207-964-7073, or at such other address as the Trustee may designate from time to time by notice to the Noteholders; in the case of any successor Trustee, the principal corporate trust office of such successor Trustee.

"Co-Trustee": The meaning specified in Section 6.13(a).

"Credit Default Swaps": The credit derivative transactions entered into by the Issuer and the Swap Counterparty, dated the Benchmark Date or the Closing Date, as applicable and collectively evidenced by the Credit Default Swap Master Agreement, the First Loss Credit Default Swap Confirmation and the Mezzanine Credit Default Swap Confirmation.

"Credit Default Swap Confirmation": The First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Credit Default Swap Master Agreement":  The master agreement between the Swap Counterparty and the Issuer, including the Schedule thereto, dated as of the Benchmark Date, in the form attached as Exhibit H-1, as amended, modified or supplemented from time to time in accordance with its terms and the terms of this Indenture.

"Credit Default Swap Notional Amount": The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Cumulative Deferred Interest Loss Amount": The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Cumulative Loss Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Custodial Account":  The Segregated Account designated as the Custodial Account pursuant to Section 10.2(a)(ii).

"Custodial Account Investment Earnings Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Day Count Fraction":   A fraction, the numerator of which is the number of days from and including each Payment Date (or, for the first Payment Date, the Closing Date) to but excluding the next succeeding Payment Date and the denominator of which is 360.

"DBAG Internal Rating":   The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Default":  An Event of Default or any occurrence that is, or with the giving of notice or lapse of time or both would become, an Event of Default.

"Defaulted Notional Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Defaulted Notional Interest Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Defaulted Notional Principal Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Defaulted Reference Obligation": The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Deferred Funding Amount":   With respect to a Class of Notes on the applicable Final Redemption Date and each subsequent Payment Date, an amount equal to

(a) zero, if, on such Final Redemption Date or such subsequent Payment Date,

either:

(x) there are neither any Impaired Reference Obligations nor any Defaulted Reference Obligations in respect of which a Loss Determination Amount has not been determined in each case pursuant to the Credit Default Swaps,

or

(y) the sum of

(i) the Cumulative Loss Amount,

*plus*

(ii) the Cumulative Deferred Interest Loss Amount (if any) on such date,

*plus*

(iii) the sum of the aggregate of the Maximum Impaired Notional Amounts of all Impaired Reference Obligations,

*plus*

(iv) the aggregate of the Maximum Defaulted Notional Amounts of all Defaulted Reference Obligations in respect of which a Loss Determination Amount has not been determined on or prior to such date,

does not exceed either (A) with respect to any Class of the Offered Notes, the Available Subordination Amount for such Class of Offered Notes, or (B) with respect to the Class F Notes, zero,

or

(b) otherwise, the least of:

(i) the excess (if any) of the sum of the Credit Default Swap Notional Amounts over either (x) with respect to any Class of the Offered Notes, the Available Subordination Amount for such Class of Offered Notes or (y) with respect to the Class F Notes, zero, in each case, on such Final Redemption Date or such subsequent Payment Date, as applicable,

(ii) the excess (if any) of the sum of (x) the aggregate of the Maximum Impaired Notional Amounts of all Impaired Reference Obligations on such Final Redemption Date or such subsequent Payment Date, as applicable, (y) the aggregate of the Maximum Defaulted Notional Amounts of all Defaulted Reference Obligations in respect of which a Loss Determination Amount has not been determined on or prior to such Final Redemption Date or such subsequent Payment Date, as applicable, and (z) the Cumulative Deferred Interest Loss Amount on such Final Redemption Date or subsequent Payment Date, in each case pursuant to the Credit Default Swaps, over either (A) with respect to any Class of the Offered Notes,  the Available Subordination Amount for such Class of Offered Notes or (B) with respect to the Class F Notes, zero, and in each case, on such Final Redemption Date or such subsequent Payment Date, as applicable,

and

(iii) the Outstanding Principal Amount of such Class of Notes on such Final Redemption Date or such subsequent Payment Date, as applicable.

"Deposit Bank":  Deutsche Bank AG, Frankfurt, in its capacity as the deposit bank pursuant to the Bank Account Agreement.

"Depositary":  With respect to the Global Notes, the Bank, its nominees, and their respective successors.

"Deutsche Bank AG":  Deutsche Bank Aktiengesellschaft, Taunusanlage 12, D-60325 Frankfurt am Main, Germany.

"Depository Institution":   A "depository institution" as that term is defined at 12 U.S.C. § 461 (b) (1) (A).

"Due Period":  With respect to the first Payment Date, the period commencing on (and including) the Benchmark Date (in relation to the Class F Notes and the First Loss Credit Default Swap) or the Closing Date (in relation to the Offered Notes and the Mezzanine Credit Default Swap) and, in each case, and ending on (but excluding) such Payment Date and with respect to any subsequent Payment Date, the period commencing on (and including) the prior Payment Date and ending on (but excluding) such Payment Date.

"Early Redemption Date": The Payment Date fixed by the Issuer for a redemption of the Notes pursuant to Section 9.1.

"Early Termination Date":  The meaning specified in the Credit Default Swap Master Agreement.

"Eligible Investments":  The cash deposit account in the books of the Deposit Bank referenced in the Bank Account Agreement; *provided*, *however*, that Eligible Investments shall not include (i) obligations bearing interest at inverse floating rates or any investment the interest rate on which is variable and is established other than by reference to a single index plus a fixed spread, if any, and which interest rate moves proportionately with that index, (ii) "interest-only securities" and (iii) any investment subject to any withholding or deduction for or on account of any tax unless the Issuer is required to "gross-up" to the extent that the Issuer is made whole for such withholding or deduction on an after-tax basis; it being understood that any amendment, modification or supplement to the definition of "Eligible Investments" shall be subject to the Rating Agency Condition.

"ERISA":  The U.S. Employee Retirement Income Security Act of 1974.

"Euroclear":  Euroclear Bank S.A./N.V., as operator of the Euroclear System.

"Event of Default":  The meaning specified in Section 5.1.

"Excepted Property":  $250 representing the proceeds of the issue of the ordinary shares of the Issuer and $250 representing a profit fee of the Issuer, together with, in each case, any interest accruing thereon and the bank account in which these monies are held.

"Exchange Act":  The United States Securities Exchange Act of 1934.

"Extension Maturity Date":  For each Class of Notes, the earlier of (a) the first Payment Date on which the Deferred Funding Amount for such Class of Notes has been reduced to zero (determined, for such purposes, after giving effect to Section 11.1) and (b) the Legal Maturity Date.

"Final Payment Date":  (a) The applicable Final Redemption Date, if the Deferred Funding Amount for each Class of Notes is equal to zero or (b) otherwise, the final Extension Maturity Date.

.

"Final Redemption Date": The earliest of (a) the Scheduled Maturity Date, (b) with respect to any one or more Classes of Notes, the relevant Optional Termination Date and (c) with respect to any one or more Classes of Notes, the first date on which the Outstanding Principal Amount of such Class of Notes ( excluding the portion thereof constituting the Deferred Funding Amount, if any, for such Class of Notes) shall become due and payable upon acceleration of the principal of the Notes in accordance with Section 5.2 or redemption of the principal of the Notes in accordance with Article 9.

"First Loss Credit Default Swap Confirmation": The "Confirmation" (as defined in the Credit Default Swap Master Agreement) dated the Benchmark Date, as amended and restated as of the Closing Date, as amended and restated as of the Closing Date, in the form attached as Exhibit H-2-a, as amended, modified or supplemented from time to time in accordance with its terms, the terms of the Credit Default Swap Master Agreement and the terms of this Indenture.

"Fitch": Fitch, Inc. and its subsidiaries and any successor or successors thereto.

"Floating Payments": The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable, as reported to the Trustee by the Calculation Agent.

"Global Notes": One or more permanent global notes for the Notes offered and sold to Persons that are non-U.S. Persons pursuant to Regulation S and issued in definitive, fully registered form without interest coupons with the applicable legends added to the form of the Notes as set forth in the applicable Exhibits hereto.

"Grant": To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge and create a security interest in and right of setoff against, deposit, set over and confirm. A Grant of the Collateral shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of the Collateral and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Holder": The meaning specified in the definition of "Noteholder".

"Impaired Notional Amount": The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Impaired Reference Obligation": The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Indemnifiable Tax": Any Tax other than a Tax that would not be imposed on a payment in respect of the Notes but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a Person related to such

recipient (including, without limitation, a connection arising from such recipient or related Person being or having been a citizen or resident of such jurisdiction, or being or having been organized, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related Person having executed, delivered, performed its obligations or received a payment under, or enforced, this Indenture).  An Indemnifiable Tax shall not include (i) any Tax imposed on a payment to a Person which is required to be made pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive or (ii) any Tax imposed on a payment to a holder of an interest in a Note where the related Note was presented for payment by or on behalf of a Noteholder who would have been able to avoid such withholding or deduction by presenting the relevant Note to another Paying Agent in another jurisdiction which would not have imposed such withholding or deduction.

"Indemnification Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Indenture":  This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"Independent Director":  A duly appointed member of the board of directors of the Issuer who should not have been, at the time of such appointment, or at any time in the preceding five years, (a) a direct or indirect legal or beneficial owner of any interest in the Issuer or any Affiliate thereof (excluding *de minimus* ownership interests), (b) a creditor, supplier, employee, officer, manager or contractor of the Issuer or any Affiliate thereof or (c) a person who controls (whether directly, indirectly, or otherwise) any Affiliate of the Issuer or any creditor, supplier, employee, officer, manager or contractor of the Issuer or any Affiliate thereof.

"Information Report":  The meaning specified in Section 10.5(a).

"Initial Principal Amount":  When used with respect to the Class A+ Notes, €17,000,000; when used with respect to the Class A Notes, €8,500,000; when used with respect to the Class B Notes, €51,000,000; when used with respect to the Class C Notes, €17,000,000; when used with respect to the Class D Notes, €38,250,000; when used with respect to the Class E Notes, €48,450,000; when used with respect to the Class F Notes, €83,300,000; and when used with respect to any single Note, the amount stated on the face thereof as the Initial Principal Amount.

"Institutional Investor":  Any one of the following Persons:  (i) any bank, trust company or national banking association, acting for its own account or in a fiduciary capacity; (ii) any charitable foundation or eleemosynary institution; (iii) any insurance company; (iv) any pension or retirement trust or fund for which any bank, trust company, national banking association or investment adviser registered under the Investment Advisers Act is acting as trustee or agent, or that manages its own assets, having funds of at least $5,000,000; (v) any investment company, as defined in the Investment Company Act;

(vi) any college or university; (vii) any government or public employees' pension or retirement system or any other governmental agency supervising the investment of public funds; or (viii) any Person having total assets in excess of $5,000,000.

"Investment Advisers Act": The United States Investment Advisers Act of 1940.

"Investment Company Act":  The United States Investment Company Act of 1940.

"Irish Paying Agent":  The meaning specified in Section 7.2.

"Issuer":  The Person named as the Issuer in the first paragraph of this Indenture, until a successor Person or Persons shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person or Persons.

"Issuer Order" and "Issuer Request":  A written order or request dated and signed in the name of the Issuer by an Authorized Officer of the Issuer or a Person designated in writing by an Authorized Officer of the Issuer.

"Issuer Spread Amount":   The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable, as reported to the Trustee by the Calculation Agent.

"Legal Maturity Date": The Payment Date (if any) scheduled to occur in June 2018.

"Loss Determination Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable, as reported to the Trustee by the Calculation Agent.

"Majority of the Controlling Class":  As of any date of determination, the Persons holding more than 50% of the Initial Principal Amount of the Notes of the Controlling Class.

"Managers":  Deutsche Bank AG, London Branch as the Lead Manager, and each party, if any, named as a Co-Manager.

"Maximum Defaulted Notional Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or Mezzanine Credit Default Swap Confirmation, as applicable.

"Maximum Defaulted Notional Principal Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Maximum Impaired Notional Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Mezzanine Credit Default Swap Confirmation": The "Confirmation" (as defined in the Credit Default Swap Master Agreement) dated the Closing Date, in the form attached as Exhibit H-2-b, as

11

amended, modified or supplemented from time to time in accordance with its terms, the terms of the Credit Default Swap Master Agreement and the terms of this Indenture.

"Note Interest Amount":  With respect to each Class of the Offered Notes for each Payment Date, an amount equal to:

(a)     to and including the applicable Final Redemption Date, with respect to each such Class of Notes, the product of (i) the Outstanding Principal Amount of such Class of Notes on the immediately preceding Payment Date (after giving effect on such preceding Payment Date to the applicable provisions of the Indenture), (ii) the sum of the Base Rate for the related Due Period and the applicable Class Spread and (iii) the Day Count Fraction; and

(b)     after the applicable Final Redemption Date, the product of:

(i)     the Outstanding Principal Amount of such Class of Notes on the immediately preceding Payment Date (after giving effect on such preceding Payment Date to the applicable provisions of this Indenture);

(ii)    the Base Rate for the related Due Period;

and

(iii)   the Day Count Fraction;

plus, in each case, the portion of the Note Interest Amount for the immediately preceding Due Period that was not paid in full pursuant to the Priority of Payments.

"Note Register":  The meaning specified in Section 2.6(a).

"Note Registrar":  The meaning specified in Section 2.6(a).

"Noteholder" and "Holder":  The Person in the name of which a Note is registered in the Note Register.

"Notes":  The Class A+ Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the context requires.

"Notice Party":  The meaning specified in Section 13.3.

"Officer's Certificate":  A certificate signed on behalf of the Issuer or the Trustee by an Authorized Officer of the Issuer or the Trustee, as the case may be.

"Offered Notes":  The Class A+ Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes.

"Opinion of Counsel":  A written opinion, addressed to the Trustee and the Swap Counterparty, in form and substance reasonably satisfactory to the Trustee and the Swap Counterparty, of an attorney at

law admitted to practice before the highest court of the relevant jurisdiction or a law firm that may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer, the Swap Counterparty or the Trustee and that shall be reasonably satisfactory to the Trustee and the Swap Counterparty, as applicable. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel that are so admitted and so satisfactory, which opinions of other counsel shall accompany such Opinions of Counsel and shall either be addressed to the Trustee and the Swap Counterparty or shall state that the Trustee and the Swap Counterparty shall be entitled to rely thereon.

"Optional Redemption": The meaning specified in Section 9.1(e).

"Optional Termination Date": The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Original Indenture": The meaning specified in the Preliminary Statement.

"Outstanding": As of any determination date, all Notes theretofore authenticated and delivered under this Indenture except:

(i)     Notes theretofore canceled by the Note Registrar or delivered (or to be delivered) to the Note Registrar for cancellation;

(ii)    Notes or portions thereof for the payment or redemption of which money in the necessary amount has been theretofore irrevocably deposited with the Trustee in trust for the Holders of such Notes; *provided, however*, that, if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)   Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a holder in due course; and

(iv)    Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.7;

*provided, however*, that, in determining whether the requisite Holders have given any request, demand, authorization, direction, notice, consent or waiver hereunder, in the case of any such request, demand, authorization, direction, notice, consent or waiver hereunder, Notes that are either (x) owned by or pledged to the Issuer or (y) in the case of the Notes comprising the Controlling Class, owned by and for the benefit of the Swap Counterparty or any Affiliate thereof shall in each case be disregarded and deemed not to be Outstanding (but, in the case of the foregoing clause (y), solely as to matters as to which the interests of the Swap Counterparty are or may be adverse to the interests of the Holder of the Notes of such Class); except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that a Responsible Officer of the Trustee actually knows to be so owned or pledged shall be so disregarded.

"Outstanding Principal Amount":  With respect to each Class of Notes, on any Payment Date and subject to Section 2.3(b)(vi), an amount, rounded if necessary to the nearest €0.01, equal to (i) the Initial Principal Amount of such Class of Notes *minus* (ii) the aggregate of all Floating Payments and Adjustment Payments from the Issuer allocated to such Class of Notes on or prior to such date *plus* (iii) the aggregate of all Adjustment Payments from the Swap Counterparty allocated to such Class of Notes on or prior to such date *minus* (iv) the aggregate amount withdrawn from the Custodial Account to pay principal amounts to the holders of such Class of Notes on any preceding Payment Date.

With respect to any single Note and any date of determination, an amount rounded if necessary to the nearest €0.01 equal to the product of (i) a fraction, the numerator of which is the Initial Principal Amount of such Note and the denominator of which is the aggregate Initial Principal Amount of the Notes of the relevant Class and (ii) the Outstanding Principal Amount of such Class of Notes.

"Paying Agent":  The meaning specified in Section 7.2.

"Payment Dates":  March 15, June 15, September 15 and December 15 of each year, commencing on September 15, 2007; *provided, however*, that, if any such date is not a Business Day, such Payment Date shall be the next succeeding Business Day.  Each of the applicable Final Redemption Date and the Extension Maturity Date for any Class of Notes shall also be a Payment Date for purposes of Sections 11.1(c) and (e), and any other date on which money shall be applied as provided in Section 5.8 or Section 11.1(b) through (e) shall also be a Payment Date for such purpose; *provided, however*, that, if any such date is not a Business Day, such Payment Date shall be the next succeeding Business Day.

"Person":  Any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Placement Agency Agreement":  The Placement Agency Agreement, dated on or about 30 April, 2007, between the Issuer and Deutsche Bank AG, London Branch, as Lead Manager with respect to the Class F Notes.

"Priority of Payments":  The payment priority set forth in Section 11.

"Proceedings":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Prospectus":  The final Prospectus, expected to be dated on or about the second Business Day immediately preceding the Closing Date, relating to the Offered Notes.

"Prospectus Directive":  The Directive 2003/71/EC.

"Rating":  The rating of the Notes of any Class (if any) designated by a Rating Agency.

"Rating Agencies":  S&P and Fitch, for so long as the Notes of any Class are rated by such rating agency (including any private or confidential rating).

"Rating Agency Condition":  With respect to each Rating Agency, a condition that is satisfied with respect to an action or circumstance (actual or proposed, as the context requires) if such Rating Agency shall have confirmed to the effect that the Rating assigned to each Class of Notes then outstanding and assigned a Rating will not be reduced, suspended or withdrawn by such Rating Agency as a result of such action or circumstance.

"Record Date":  The date on which the Holders of Notes entitled to receive a payment of principal or interest on the next Payment Date are determined, such date as to any Payment Date being the date 15 calendar days prior to such applicable Payment Date (including the applicable Final Redemption Date).

"Redemption Record Date":  With respect to a redemption pursuant to Section 9.1 only, the date on which Holders of Notes entitled to receive the redemption amounts in respect of any redemption on the related Early Redemption Date are determined, such date to be the fifth Business Day preceding such Early Redemption Date.

"Reduction":  The meaning specified in the First Loss Credit Default Swap Confirmation or Mezzanine Credit Default Swap Confirmation, as applicable.

"Reference Entity":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Reference Entity Group":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Reference Obligations":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Reference Obligation Notional Amount":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Reference Portfolio":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Regulatory Event":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Regulation S":  Regulation S under the Securities Act.

"Relevant Issuer Tax":  The meaning specified in Section 9.1(d).

"Replenishment":  The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Replenishment Conditions":   The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Replenishment Date":   The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Requisite Rating":   With respect to the Class A+ Notes, "AAA" by S&P and "AAA" by Fitch; with respect to the Class A Notes, "AAA" by S&P and "AA+" by Fitch; with respect to the Class B Notes, "AA" by S&P and "AA-" by Fitch; with respect to the Class C Notes, "A" by S&P and "A+" by Fitch; with respect to the Class D Notes, "BBB" by S&P and "BBB+" by Fitch; and, with respect to the Class E Notes, "BB" by each of Fitch and S&P.

"Responsible Officer":   When used with respect to the Trustee, any officer within the Corporate Trust Office (or any successor group of the Trustee) including any vice president, assistant vice president, assistant secretary or any other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers responsible for the transactions described in this Indenture and the other Transaction Documents.

"S&P":   Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. together with its relevant Affiliates.

"Sale":   The meaning specified in Section 5.17(a).

"Scheduled Maturity Date":   The Payment Date in June 2015.

"Scheduled Termination Date":   The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Secured Obligations":   Collectively, all of the indebtedness, liabilities and obligations owed from time to time by the Issuer to any of the Secured Parties whether for principal, interest, fees, costs, expenses or otherwise (including all amounts which would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code and the operation of Sections 502(b) and 506(b) thereof or any analogous provisions of any similar laws).

"Secured Parties":   The Noteholders (being the Holders of the Class F Notes from and including the date hereof until the Closing Date and thereafter the Holders of the Notes all Classes Outstanding), the Swap Counterparty and the Trustee.

"Securities Act":   The United States Securities Act of 1933.

"Segregated Accounts":   The meaning specified in Section 10.2.

"Subscription Agreement":   The Subscription Agreement, dated 22 June, 2007, among the Issuer, Deutsche Bank AG, London Branch, as Lead Manager and Caja de Ahorros de Valencia, Castellón y

Alicante (Bancaja) and Banco Bilbao Vizcaya Argentaria, S.A. (BBVA), as co-managers, with respect to the Offered Notes.

"Swap Counterparty": Deutsche Bank AG.

"TARGET": The Trans-European Automated Real-time Gross Settlement Express Transfer payment system.

"TARGET Business Day": Any day on which TARGET is open for the settlement of payments in euros.

"Taxes": Any current or future taxes, levies or governmental charges, regardless of their nature, which are imposed, levied or collected under any applicable system of law or in any country which claims fiscal jurisdiction by, or for the account of, any political subdivision thereof or government agency therein authorized to levy Taxes.

"Transaction Documents": The Notes, the Account Pledge Agreement, the Administration Agreement, the Bank Account Agreement, the Bank Account Charge, the Credit Default Swaps, this Indenture, the Subscription Agreement, the Placement Agency Agreement and any other documents pertaining to this transaction.

"Transfer Agent": The meaning specified in Section 7.2.

"Transferee": Each person that purchases or otherwise acquires any Certificated Note or interest therein and each purchaser of an interest in a Global Note.

"Transferee Certificate": A certificate in the form of Exhibit B.

"Transferor Certificate": A certificate in the form of Exhibit C.

"Trust Estate": The Collateral, the Segregated Accounts and the CART Account and all monies on deposit therein, and all other property or assets of the Issuer (including Eligible Investments deposited in or credited to the Segregated Accounts and the CART Account) other than the Excepted Property.

"Trustee": The Bank, as trustee under this Indenture, and any corporation or other business entity resulting from or surviving any consolidation or merger to which it or its successors may be party and any successor trustee at the time serving as successor trustee hereunder.

"Trustee Administrative Expenses": The meaning specified in the First Loss Credit Default Swap Confirmation or the Mezzanine Credit Default Swap Confirmation, as applicable.

"Trustee Payment-Related Event of Default": An Event of Default pursuant to Section 5.1(b) caused solely by and based solely upon a failure to pay any amounts owing to the Trustee pursuant to Section 6.7.

17

"UCC":  The Uniform Commercial Code as in effect from time to time in the State of New York, United States of America.

"UCC Proceeds":  (i) Any property (including cash and securities) received as a distribution on the Collateral, (ii) any property (including cash and securities) received in connection with the sale, liquidation, exchange or other disposition of the Collateral and (iii) all proceeds (as such term is defined in Section 9-102(a)(64) of the UCC) of the Collateral.

"United States person":  (i) an individual who is a resident of the United States (for purposes of this definition "United States" means any state thereof and the District of Columbia), (ii) a corporation or partnership organized or created under the laws of the United States or any state thereof (including the District of Columbia) (other than a partnership that is not treated as a "United States person," such term being used herein with the meaning given it in the Code and applicable Treasury regulations), (iii) an estate, the income of which is subject to United States federal income taxation regardless of its source or (iv) a trust (1) that validly elects to be treated as a United States person for U.S. federal income tax purposes or (2) if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have authority to control all substantial decisions of the trust.

"Unregistered Items":  The meaning specified in Section 5.17(c).

"U.S. Person":  The meaning specified under Regulation S.

"U.S. Resident":  The meaning specified in the Investment Company Act and any interpretive or no-action letters issued in connection with the Investment Company Act.

"Weighted Average Life":  Weighted Average Life of the Reference Portfolio (or any relevant portion of the Reference Portfolio, including any single Reference Obligation) means, on any date of determination (the "Weighted Average Life Determination Date"), the number which equals (a) the number obtained by summing the products obtained by multiplying each portion of the Reference Obligation Notional Amount of each Reference Obligation in the Reference Portfolio (excluding Defaulted Reference Obligations) or in the relevant portion of the Reference Portfolio as of the Weighted Average Life Determination Date by the shorter of (i) the period from the Weighted Average Life Determination Date to the date when such portion of the Reference Obligation Notional Amount of each Reference Obligation in the Reference Portfolio (excluding Defaulted Reference Obligations) or in the relevant portion of the Reference Portfolio falls due and (ii) the period from the Weighted Average Life Determination Date to the Scheduled Termination Date, in each case measured in years and rounded to the second decimal place, divided by (b) the aggregate of the Reference Obligation Notional Amounts of such Reference Obligations (excluding Defaulted Reference Obligations).

EXHIBIT A

FORM OF NOTE

[THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE COMMON DEPOSITARY OR A NOMINEE OF THE COMMON DEPOSITARY.  THIS NOTE MAY NOT BE EXCHANGED OR TRANSFERRED IN WHOLE OR IN PART FOR A NOTE REGISTERED IN THE NAME OF ANY PERSON OTHER THAN THE COMMON DEPOSITARY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.] [FOR GLOBAL NOTES ONLY]

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED OR QUALIFIED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION, AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT"). ANY RESALE, PLEDGE, TRANSFER OR OTHER DISPOSITION OF THIS NOTE OR ANY INTEREST HEREIN WITHOUT SUCH REGISTRATION OR QUALIFICATION MAY BE MADE ONLY IN A TRANSACTION WHICH DOES NOT REQUIRE SUCH REGISTRATION OR QUALIFICATION.

THE HOLDER OF THIS NOTE OR OF AN INTEREST HEREIN, BY ITS ACCEPTANCE HEREOF OR OF AN INTEREST HEREIN, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY INTEREST HEREIN EXCEPT (A) TO A NON-"U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) WHO IS NOT A "U.S. RESIDENT" (WITHIN THE MEANING OF THE 1940 ACT) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT, (B) IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS, (C) IN COMPLIANCE WITH THE REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND (D) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY RELEVANT JURISDICTION.

THE HOLDER OF THIS NOTE OR OF AN INTEREST HEREIN, BY ITS ACCEPTANCE HEREOF OR OF AN INTEREST HEREIN, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY INTEREST HEREIN [WITHOUT THE PRIOR WRITTEN CONSENT OF THE SWAP COUNTERPARTY WITHIN THE MEANING OF THE INDENTURE SPECIFIED HEREIN OR] TO ANY PERSON THAT IS A "UNITED STATES PERSON" FOR UNITED STATES FEDERAL INCOME TAX PURPOSES.  FOR U.S. FEDERAL INCOME TAX PURPOSES, "UNITED STATES PERSON" MEANS (I) AN INDIVIDUAL WHO IS A CITIZEN OR RESIDENT OF THE UNITED STATES (FOR PURPOSES OF THIS DEFINITION UNITED STATES MEANS ANY STATE THEREOF AND THE DISTRICT OF. COLUMBIA), (II) A CORPORATION OR PARTNERSHIP

ORGANIZED OR CREATED UNDER THE LAWS OF THE UNITED STATES OR ANY STATE THEREOF (INCLUDING THE DISTRICT OF COLUMBIA) (OTHER THAN A PARTNERSHIP THAT IS NOT TREATED AS A "UNITED STATES PERSON", SUCH TERM BEING USED HEREIN WITH THE MEANING GIVEN IT IN THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED AND APPLICABLE TREASURY REGULATIONS), (III) AN ESTATE, THE INCOME OF WHICH IS SUBJECT TO UNITED STATES FEDERAL INCOME TAXATION REGARDLESS OF ITS SOURCE AND (IV) A TRUST IF A COURT WITHIN THE UNITED STATES IS ABLE TO EXERCISE PRIMARY SUPERVISION OVER THE ADMINISTRATION OF THE TRUST AND ONE OR MORE UNITED STATES PERSONS HAVE AUTHORITY TO CONTROL ALL SUBSTANTIAL DECISIONS OF THE TRUST.

FURTHER, NO SALE OR TRANSFER OF THIS NOTE OR ANY INTEREST HEREIN MAY BE MADE TO ANY PERSON WHO IS, OR IS INVESTING ON BEHALF OF OR WITH PLAN ASSETS OF, (I) ANY "EMPLOYEE BENEFIT PLAN" AS DEFINED IN AND SUBJECT TO TITLE I OF THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), (II) ANY "PLAN" AS DEFINED IN AND SUBJECT TO SECTION 4975 OF THE CODE, (III) A GOVERNMENTAL PLAN, CHURCH PLAN OR NON-U.S. PLAN THAT IS SUBJECT TO ANY U.S. FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA, SECTION 4975 OF THE CODE OR THE PROVISIONS OF ERISA UNDER WHICH THE ASSETS OF AN ISSUER MAY BE DEEMED TO INCLUDE PLAN ASSETS, OR (IV) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH EMPLOYEE BENEFIT PLAN OR PLAN BY REASON OF U.S. DEPARTMENT OF LABOR REGULATION SECTION 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA.

NEITHER THIS NOTE NOR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR DELIVERED, EXCEPT AS PERMITTED UNDER THE INDENTURE REFERRED TO HEREIN, AND ANY PURPORTED TRANSFER OF THIS NOTE OR ANY INTEREST HEREIN THAT IS NOT IN COMPLIANCE WITH THE PROVISIONS OF THE INDENTURE SHALL BE NULL AND VOID AB INITIO.

NO HOLDER OF THIS NOTE OR ANY INTEREST HEREIN SHALL BE ENTITLED TO RECEIVE PAYMENTS OF PRINCIPAL OR [INTEREST][INVESTMENT RETURN] HEREON UNLESS THE REQUIRED CERTIFICATIONS HAVE BEEN DELIVERED PURSUANT TO THE TERMS OF THE INDENTURE REFERRED TO HEREIN.

THIS NOTE REPRESENTS A LIMITED RECOURSE OBLIGATION OF THE ISSUER AND WILL BE PAID SOLELY FROM THE COLLATERAL SECURING THIS NOTE. NEITHER THIS NOTE NOR THE COLLATERAL THEREFOR IS INSURED OR GUARANTEED BY ANY GOVERNMENTAL AGENCY OR INSTRUMENTALITY OR BY ANY OTHER PERSON.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN AND IS SUBJECT TO REDUCTION IN THE EVENT A LOSS DETERMINATION AMOUNT IS ALLOCATED HERETO. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.  ANY PERSON

A-2

ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT OUTSTANDING PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

NO INVITATION MAY BE MADE TO ANY MEMBER OF THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THIS NOTE.

A-3

CART 1 LTD.
CLASS [A+]/[A]/[B]/[C]/[D]/[E]/[F] NOTE DUE 2018
[GLOBAL NOTE/CERTIFICATED NOTE]

No. [___]
ISIN: [XS0306449488]/[XS0295190721]/[XS0295192263]/[XS0295192420]/
      [XS0295192776]/[XS0295193311]/[XS0295193824]
Initial Principal Amount: €[17,000,000]/[8,500,000]/[51,000,000]/[17,000,000]/
      [38,250,000]/[48,450,000]/[83,300,000]
Common Code: [030644948]/[ 029519072]/[029519226]/[029519242]/
      [029519277]/[029519331]/[029519382]

CART 1 Ltd., an exempted company incorporated under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promises to pay to [_____] or registered assigns (a) upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), on the Final Redemption Date principal in an amount equal to the Outstanding Principal Amount of this Note, subject to the provisions of the Indenture regarding Deferred Funding Amounts. [Interest] / [Investment return] on this Note shall accrue and be payable on this Note on September 15, 2007, and quarterly on each March 15, June 15, September 15 and December 15 thereafter (or if such day is not a Business Day, then on the next succeeding Business Day) (each, a "Payment Date") in an amount equal to the [Note Interest Amount]/[Class F Note Accrual Amount] (subject to the availability of funds therefor in accordance with Section 11.1 of the Indenture). The amount so payable on any Payment Date shall, as provided in the Indenture, be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such Payment Date. The Record Date with respect to any Payment Date shall be 15 calendar days prior to such Payment Date (including the Legal Maturity Date).

The Outstanding Principal Amount of this Note is not necessarily the Initial Principal Amount of this Note. The Outstanding Principal Amount of this Note is determined pursuant to the Indenture, and is subject to change from time to time as provided in the Indenture. Current information relating to the Outstanding Principal Amount of this Note should be obtained by the Noteholder hereof and any prospective transferee.

Payments of any amounts due on any Payment Date on this Note shall be payable by the Trustee or a Paying Agent, subject to any laws or regulations applicable thereto, by wire transfer to an account (in euro) maintained by the Holder (or the payee designated by such Holder) at a Depository Institution as reflected on the Note Register (and pursuant to wiring instructions provided by such Holder reasonably in advance of the related Record Date) or, if a wire transfer cannot be effected as aforesaid, by check (in euro) mailed to such Holder at its address as shown on the Note Register.

Notwithstanding the foregoing, upon final payment due on a Note, the Holder hereof shall present and surrender such Note at the office of the Transfer Agent, subject to any laws or regulations applicable thereto.

NY1 6216749v.6

The Holder of this Note shall be treated as the owner hereof for all purposes.

Unless the certificate of authentication hereon has been executed by the Trustee by the manual signature of one of its authorized officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.  The authentication of this Note by the Trustee is made without any warranty by or recourse or liability to the Trustee.

This Note is one of a duly authorized issue of Credit Linked Notes due 2018 of the Issuer (the "Notes"), limited in aggregate principal amount to €[17,000,000] [FOR CLASS A+ NOTES]/ €[8,500,000] [FOR CLASS A NOTES]/ €[51,000,000] [FOR CLASS B NOTES]/ €[17,000,000] [FOR CLASS C NOTES]/ €[38,250,000] [FOR CLASS D NOTES]/ €[48,450,000] [FOR CLASS E NOTES]/ €[83,300,000] [FOR CLASS F NOTES] to be issued under an indenture dated as of April 30, 2007 (the "Indenture"), among the Issuer, The Bank of New York, London Branch, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture), The Bank of New York (Luxembourg) S.A., as Note Registrar and Transfer Agent, and BNY Fund Services (Ireland) Limited, as Irish Paying Agent, as amended and restated as of June 22, 2007.  Reference is hereby made to the Indenture and all indentures supplemental thereto (including that certain First Supplemental Indenture dated as of June 22, 2007) for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, executed, authenticated and delivered.

This Note is issued under and is subject to the terms, provisions and conditions of the Indenture, to which the Holder of this Note by virtue of its acceptance hereof assents and by which such Holder is bound.  To the extent that any provision of this Note contradicts or is inconsistent with the provisions of the Indenture, the provisions of the Indenture shall control and supersede the contradictory or inconsistent provision herein. The Notes are subject to all terms of the Indenture.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture, and the provisions of this Note shall be interpreted in accordance with Section 1.1 of the Indenture.

If an Event of Default shall occur and be continuing, the Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.  By written notice to the Issuer and the Trustee, the Majority of the Controlling Class may rescind a declaration of acceleration of the maturity of the Notes at any time prior to a judgment or decree for payment of money due, provided that certain conditions set forth in the Indenture are satisfied.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Issuer and the rights of the Holders under the Indenture at any time by the Issuer with the consent of the Majority of the Controlling Class and the Swap Counterparty.  Upon the execution of any supplemental indenture, the Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of the Indenture for all purposes; and every Holder of Notes theretofore authenticated and delivered thereunder shall be bound thereby.

NY1 6216749v.6

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligations of the Issuer, which are absolute and unconditional to the extent permitted by applicable law, to pay the amounts payable on this Note at the times, places and amounts, and in the coin or currency, prescribed in the Indenture.

The Notes are issuable only in fully registered form without interest coupons in minimum denominations of €100,000 or integral multiples of €1,000 in excess thereof.

The term "Issuer" as used in this Note includes any successor to the Issuer under the Indenture.

All amounts payable on or in respect of this Note and the Indenture shall constitute limited recourse obligations of the Issuer payable solely from the Trust Estate.  No other assets will be available to satisfy payments on the Note.  All the Issuer's obligations shall be extinguished under this Note and the Indenture after the Trust Estate has been reduced to zero.

No service charge shall be made for exchange or registration of transfer of this Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The remedies of the Trustee or the Holder hereof, as provided herein or in the Indenture, shall be cumulative and concurrent and may be pursued solely against the Trust Estate.  No failure on the part of the Holder in exercising any right or remedy hereunder shall operate as a waiver or release thereof, nor shall any single or partial exercise of any such right or remedy preclude any other further exercise thereof or the exercise of any other right or remedy hereunder.

AS PROVIDED IN THE INDENTURE, THE INDENTURE, EACH INDENTURE SUPPLEMENTAL TO THE INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS THAT WOULD APPLY THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS NOTE AND THE INDENTURE SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS; *PROVIDED, HOWEVER*, THAT SUCH PROVISIONS OF THE INDENTURE ARE NOT INTENDED TO, AND WILL NOT BE DEEMED TO, DETERMINE THE RESPECTIVE JURISDICTIONS WHOSE LAWS GOVERN THE PERFECTION OR THE PRIORITY OF ANY SECURITY INTEREST (AS DEFINED IN SECTION 1-201(37) OF THE UCC) THAT IS CREATED OR PROVIDED FOR UNDER THE INDENTURE, THE BANK ACCOUNT CHARGE OR THE ACCOUNT PLEDGE AGREEMENT.

NY1 6216749v.6

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

Date: _____, 20__                     CART 1 Ltd.,
                                                 as Issuer


                                                 By: _____
                                                       Name:
                                                       Title:



CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.


Date: _____, 20__                     The Bank of New York, London Branch,
                                                     as Trustee


                                                 By: _____
                                                       Authorized Signatory

A-7

ASSIGNMENT FORM

For value received _____

hereby sell, assign and transfer unto

      Please insert identifying number of assignee

      Please print or type name and address, including zip code, of assignee:

the within Note and does hereby irrevocably constitute and appoint _____ Attorney to transfer the Note on the books of the Issuer with full power of substitution in the premises.

Date:                           Your Signature:_____

                                             (Sign exactly as your name
                                             appears on this Note)

A-8

SCHEDULE

SCHEDULE OF PRINCIPAL AMOUNT IN GLOBAL NOTE

Initial Principal Amount of this Global Note:
€[17,000,000]/ [8,500,000]/ [51,000,000]/ [17,000,000]/[38,250,000]/[48,450,000]/[83,300,000]

| Date | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee |
|---|---|---|---|---|

A-9

EXHIBIT B

FORM OF TRANSFEREE CERTIFICATE

TO:     CART 1 LTD.
        c/o Maples Finance Limited
        P.O. Box 1093 G.T.
        Queensgate House
        South Church Street
        George Town
        Grand Cayman, Cayman Islands

        THE BANK OF NEW YORK, LONDON BRANCH, not in its individual capacity but solely as
        Trustee,
        One Canada Square
        London E14 5AL
        United Kingdom

        In connection with our proposed purchase of €_____ aggregate principal amount of
Class [A+]/[A]/[B]/[C]/[D]/[E]/[F] Notes due 2018 (the "Notes") of CART 1 Ltd. (the "Issuer"), the
undersigned (the "Transferee") acknowledges, represents, agrees and confirms as follows:

        Terms used but not defined in this certificate are used as defined in the Indenture dated as of
April 30, 2007 (the "Indenture"), among the Issuer, The Bank of New York, London Branch, as trustee
(the "Trustee"), The Bank of New York (Luxembourg) S.A., as note registrar and BNY Fund Services
(Ireland) Limited, as Irish Paying Agent, as amended and restated as of June 22, 2007.  The Transferee
understands that no transfer of any beneficial interest in the Notes apart from the transfer of legal
ownership is permitted, except as provided by the Indenture.

1.      The Transferee, and any account on behalf of which the Transferee is purchasing an interest in
        the Notes, is not a "U.S. person" as defined in Regulation S under the United States Securities
        Act of 1933, as amended and not a "U.S. resident" within the meaning of the United States
        Investment Company Act of 1940, as amended.

2.      The Transferee, and any account on behalf of which the Transferee is purchasing an interest in
        the Notes, is not a member of the public in the Cayman Islands and understands that no offer may
        be made to a member of the public in the Cayman Islands to buy any of the Notes.

3.      The Transferee, and any account on behalf of which the Transferee is purchasing an interest in
        the Notes, is not and is not investing on behalf of or with plan assets of a Plan (as defined below),
        and it agrees not to sell or otherwise transfer any interest in the Notes other than to a purchaser or
        transferee that is deemed to make these same representations, warranties and agreements with

B-1

respect to its purchase and holding of such Notes.  As used herein, a "**Plan**" means (i) any "employee benefit plan" as defined in and subject to Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), (ii) any "plan" as defined in and subject to Section 4975 of the Code, (iii) a governmental plan, church plan or non-U.S. plan that is subject to any U.S. federal, state, local or non-U.S. law that is substantially similar to Section 406 of ERISA, Section 4975 of the Code or the provisions of ERISA under which the assets of an issuer may be deemed to include plan assets, or (iv) any entity whose underlying assets include assets of any such employee benefit plan or plan by reason of the U.S. Department of Labor regulation Section 2510.3-101, as modified by Section 3(42) of ERISA.

4.      The Transferee, and any account on behalf of which the Transferee is purchasing an interest in the Notes, is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

5.      The Transferee will notify the Issuer prior to purchase of any change in such information or any change that would mean that the Transferee, or any account on behalf of which the Transferee is purchasing an interest in the Notes, could no longer make the representations contained in Paragraphs 1 through 4 above.

6.      None of the Issuer, the Swap Counterparty or any associates or Affiliates of any of them has given to the Transferee (directly or indirectly through any other Person) any assurance, guarantee or representation whatsoever as to the expected or projected success, profitability, return, performance, results, effect, consequence or benefit (including legal, regulatory, tax, financial, accounting or other advice) of its investment hereunder.

7.      None of the Issuer, the Swap Counterparty or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for the Transferee and the Transferee is not relying on any written or oral advice, counsel or representations of the Issuer, the Swap Counterparty or any of their respective Affiliates.  The Transferee, and any account on behalf of which the Transferee is purchasing an interest in the Notes, has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisers to the extent it has deemed necessary, and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuer, the Swap Counterparty or any of their respective Affiliates.  The Transferee, and any account on behalf of which the Transferee is purchasing an interest in the Notes, is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.  In connection with the purchase of Notes, the Transferee, and any account on behalf of which the Transferee is purchasing an interest in the Notes, meet all suitability standards imposed on them by applicable law.  The Transferee acknowledges that certain Persons or organizations associated with the Issuer will perform services on behalf of the Issuer and will receive fees and/or compensation for performing such services.

8.      The Transferee understands that the Notes have not been and will not be registered under the Securities Act and that the Issuer has not registered and will not register under the Investment

NY1 6216749v.6

Company Act.  The Transferee agrees, for the benefit of the Issuer, the Managers and any of their Affiliates, that, if it decides to resell, pledge or otherwise transfer such Notes (or any beneficial interest or participation therein) purchased by it, any offer, sale or transfer of such Notes (or any beneficial interest or participation therein) will be made in compliance with the Securities Act and only, or (ii) to a non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904 (as applicable) under Regulation S.

9.   The Transferee acknowledges that the Issuer, the Trustee, Deutsche Bank AG, the Managers and their affiliates, and others will rely upon the truth and accuracy of the foregoing acknowledges, representations and agreements.

10.   The Transferee understands that the Notes may not, at any time, be held by, or on behalf of, U.S. Persons or U.S. residents.

11.   The Transferee understands and agrees that any transfer of the Notes or any interest therein that does not comply with the requirements of the Indenture and the restrictions of the Note shall be null and void ab initio.

12.   The Transferee understands that the Notes are subject to substantial transfer restrictions imposed by applicable law and the terms of the Notes.  The Transferee understands that if it is purchasing the Notes for other accounts, additional representations may be required.  The Transferee acknowledges that the certificates representing the Notes shall bear a legend with substantially the following provisions:

"THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED OR QUALIFIED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION, AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT").  ANY RESALE, PLEDGE, TRANSFER OR OTHER DISPOSITION OF THIS NOTE OR ANY INTEREST HEREIN WITHOUT SUCH REGISTRATION OR QUALIFICATION MAY BE MADE ONLY IN A TRANSACTION WHICH DOES NOT REQUIRE SUCH REGISTRATION OR QUALIFICATION.

THE HOLDER OF THIS NOTE OR OF AN INTEREST HEREIN, BY ITS ACCEPTANCE HEREOF OR OF AN INTEREST HEREIN, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY INTEREST HEREIN EXCEPT (A) TO A NON-"U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) WHO IS NOT A "U.S. RESIDENT" (WITHIN THE MEANING OF THE 1940 ACT) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT, (B) IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS, (C) IN COMPLIANCE WITH THE REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND (D) IN

NY1 6216749v.6

ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY RELEVANT JURISDICTION.

THE HOLDER OF THIS NOTE OR OF AN INTEREST HEREIN, BY ITS ACCEPTANCE HEREOF OR OF AN INTEREST HEREIN, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY INTEREST HEREIN TO ANY PERSON THAT IS A "UNITED STATES PERSON" FOR U.S. FEDERAL INCOME TAX PURPOSES. FOR U.S. FEDERAL INCOME TAX PURPOSES, "UNITED STATES PERSON" MEANS (I) AN INDIVIDUAL WHO IS A CITIZEN OR RESIDENT OF THE UNITED STATES (FOR PURPOSES OF THIS DEFINITION UNITED STATES MEANS ANY STATE THEREOF AND THE DISTRICT OF COLUMBIA), (II) A CORPORATION OR PARTNERSHIP ORGANIZED OR CREATED UNDER THE LAWS OF THE UNITED STATES OR ANY STATE THEREOF (INCLUDING THE DISTRICT OF COLUMBIA) (OTHER THAN A PARTNERSHIP THAT IS NOT TREATED AS A "UNITED STATES PERSON", SUCH TERM BEING USED HEREIN WITH THE MEANING GIVEN IT IN THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED, AND APPLICABLE TREASURY REGULATIONS), (III) AN ESTATE, THE INCOME OF WHICH IS SUBJECT TO UNITED STATES FEDERAL INCOME TAXATION REGARDLESS OF ITS SOURCE AND (IV) A TRUST IF A COURT WITHIN THE UNITED STATES IS ABLE TO EXERCISE PRIMARY SUPERVISION OVER THE ADMINISTRATION OF THE TRUST AND ONE OR MORE UNITED STATES PERSONS HAVE AUTHORITY TO CONTROL ALL SUBSTANTIAL DECISIONS OF THE TRUST.

FURTHER, NO SALE OR TRANSFER OF THIS NOTE OR ANY INTEREST HEREIN MAY BE MADE TO ANY PERSON WHO IS OR IS INVESTING ON BEHALF OF OR WITH PLAN ASSETS OF (I) ANY "EMPLOYEE BENEFIT PLAN" AS DEFINED IN AND SUBJECT TO TITLE I OF THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), (II) ANY "PLAN" AS DEFINED IN AND SUBJECT TO SECTION 4975 OF THE CODE, (III) A GOVERNMENTAL PLAN, CHURCH PLAN OR NON-U.S. PLAN THAT IS SUBJECT TO ANY U.S. FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA, SECTION 4975 OF THE CODE OR THE PROVISIONS OF ERISA UNDER WHICH THE ASSETS OF AN ISSUER MAY BE DEEMED TO INCLUDE PLAN ASSETS, OR (IV) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE ASSETS OF ANY SUCH EMPLOYEE BENEFIT PLAN OR PLAN BY REASON OF U.S. DEPARTMENT OF LABOR REGULATION SECTION 2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA.

NEITHER THIS NOTE NOR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR DELIVERED, EXCEPT AS PERMITTED UNDER THE INDENTURE REFERRED TO HEREIN, AND ANY PURPORTED TRANSFER OF THIS NOTE OR ANY INTEREST HEREIN THAT IS NOT IN COMPLIANCE WITH THE PROVISIONS OF THE INDENTURE SHALL BE NULL AND VOID AB INITIO.

.

NY! 6216749v.6

NO HOLDER OF THIS NOTE OR ANY INTEREST HEREIN SHALL BE ENTITLED TO RECEIVE PAYMENTS OF PRINCIPAL OR [INTEREST][INVESTMENT RETURN] HEREON UNLESS THE REQUIRED CERTIFICATIONS HAVE BEEN DELIVERED PURSUANT TO THE TERMS OF THE INDENTURE REFERRED TO HEREIN.

THIS NOTE REPRESENTS A LIMITED RECOURSE OBLIGATION OF THE ISSUER AND WILL BE PAID SOLELY FROM THE COLLATERAL SECURING THIS NOTE. NEITHER THIS NOTE NOR THE COLLATERAL THEREFOR IS INSURED OR GUARANTEED BY ANY GOVERNMENTAL AGENCY OR INSTRUMENTALITY OR BY ANY OTHER PERSON.

NO INVITATION MAY BE MADE TO ANY MEMBER OF THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THIS NOTE.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN AND IS SUBJECT TO REDUCTION IN THE EVENT A FLOATING PAYMENT OR ADJUSTMENT PAYMENT IS ALLOCATED HERETO.  ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.  ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT OUTSTANDING PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE."

13. The Transferee has carefully read and understands the Prospectus.  The Transferee has based its decision to purchase an interest in the Notes upon the information contained therein and not upon any other information, if any, provided to it by any of the Issuer or the Swap Counterparty or any of their Affiliates (the "Relevant Entities").  The Transferee has had access to such financial and other information concerning the Issuer and the Notes, in each case as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of an interest in the Notes, including an opportunity to ask questions of and request information from the Issuer.

14. The Transferee acknowledges that the Notes or any interest therein may only be transferred to a Person that is not a "United States person" for U.S. federal income tax purposes.

15. The Transferee, and any account on behalf of which the Transferee is purchasing an interest in the Notes, understands that the minimum amount for any initial purchase or subsequent transfer of Notes is €100,000, unless otherwise approved by the Issuer.

16. The Transferee understands that prior to any proposed transfer of the Notes or any interest therein, it may be required to furnish to the Issuer or the Trustee such other information as either may reasonably require to confirm that the proposed transfer is being made in accordance with the restrictions of the Indenture and understands that each of the Issuer and the Trustee will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

B-5

17.   The Transferee is not a member of the public of the Cayman Islands.

18.   Other information relating to the Transferee:

Wire Instructions for Payments:

Bank:_____

Address:_____

Account No.:_____

FAO:_____

Attention:_____

Address (outside the United States) for Notices:

Tel:

Fax:

Attn.:

Registered Name (if Nominee): _____

B-6

IN WITNESS WHEREOF, the Transferee has executed this certificate.

Dated: _____.

    [Insert name of Transferee]

    By:_____
    Name:
    Title:

EXHIBIT C

FORM OF TRANSFEROR CERTIFICATE

TO:    CART 1 LTD.
        c/o Maples Finance Limited
        P.O. Box 1093 G.T.
        Queensgate House
        South Church Street
        George Town
        Grand Cayman, Cayman Islands

        THE BANK OF NEW YORK, LONDON BRANCH, not in its individual capacity but solely as Trustee,
        One Canada Square
        London E14 5AL
        United Kingdom

        The undersigned (the "Transferor") is the owner of €_____ aggregate principal amount of Class [A+]/[A]/[B]/[C]/[D]/[E]/[F] Notes due 2018 (the "Notes") of CART 1 Ltd. (the "Issuer").

        Terms used but not defined in this certificate are used as defined in the Indenture dated as of April 30, 2007 (the "Indenture"), among the Issuer, The Bank of New York, London Branch, as trustee (the "Trustee"), The Bank of New York (Luxembourg) S.A., as Note Registrar and BNY Fund Services (Ireland) Limited, as Irish Paying Agent, as amended and restated as of June 22, 2007.

        The Transferor proposes to transfer [the Notes / a beneficial interest in the Notes] in the aggregate principal amount of €            to:

    *Insert name*:

    (the "Transferee").

In connection with such proposed transfer, the Transferor hereby certifies as follows:

19.    Such transfer is being effected (i) in accordance with the terms of the Note and the transfer restrictions set forth in the Indenture, and (ii) in accordance with the United States Securities Act of 1933, as amended (the "Securities Act") and any other applicable securities laws of any jurisdiction.

C-1

20.      The Transferor believes that (i) the Transferee is acquiring the Notes or an interest therein for its own account or an account with respect to which the Transferee exercises sole investment discretion; (ii) the Transferee and any such account is not a (I) "U.S. person" as defined in Regulation S under the Securities Act, (II) a "U.S. resident" within the meaning of the United States Investment Company Act of 1940, as amended or (III) a "United States person" within the meaning of Section 7701(a)(30) of the United States Internal Revenue Code of 1986, as amended and the Treasury regulations and (iii) the Transferee has entered into a written agreement with the Swap Counterparty regarding the confidential treatment to be accorded to certain information that may be received in connection with its investment in the Notes.

21.      Neither the Transferor nor any Person acting on its behalf (i) has made offers or sales of any of the Notes or any interest therein by means of any form of general solicitation or general advertising within the meaning of Regulation S under the Securities Act or (ii) has engaged in any directed selling efforts with respect to the Notes or any interest therein to any "U.S. person" as defined in Regulation S under the Securities Act.

IN WITNESS WHEREOF, the Transferor has executed this certificate.

Dated: _____.


      [Insert name of Transferor]

By:_____
Name:
Title:

NYI 6216749v.6

EXHIBIT D-1

Form of Opinions of Sidley Austin LLP and its affiliated partnerships

(See Tabs 41 through 44)

.

.

NY1 6216749v.6

EXHIBIT D-2

Form of Opinion of Maples and Calder

(See Tab 45)

D-2-1

EXHIBIT E

Form of Opinion of Gardere Wynne Sewell LLP

(See Tab 47)

.

.

E-1

EXHIBIT H-1

Form of Credit Default Swap Master Agreement

(See Tab 2)

.

H-1-1

EXHIBIT H-2-a

Form of First Loss Credit Default Swap Confirmation (Amended and Restated)

(See Tab 16)

NYI 6216749v.6

EXHIBIT H-2-b

Form of Mezzanine Credit Default Swap Confirmation

(See Tab 17)

.

NY1 6216749v.6

**EXHIBIT I**

**Form of Information Report**

I-1