Exhibit 4

**(Multicurrency—Cross Border)**

# ISDA®



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ...April 30, 2007.................

among

| | | |
|---|---|---|
| **DEUTSCHE BANK AG FRANKFURT** | and | **CART 1 Ltd.** |
| *(Party A)* | | *(Party B)* |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions. Accordingly, the parties agree as follows: —

**1.      Interpretation**

(a)      *Definitions.*   The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.*   In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.   In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.*   All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

*(a)      General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)   Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b) **Change of Account**. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c) **Netting**. If on any date amounts would otherwise be payable:—

(i)   in the same currency; and

(ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d) **Deduction or Withholding for Tax**.

(i)   **Gross-Up**. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)   promptly notify the other party ("Y") of such requirement;

(2)   pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)   promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)   if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)   the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)   the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii)   *Liability*. If: —

(1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)   X does not so deduct or withhold; and

(3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest*; *Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.   **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations*.

(i)   *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)   *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)   *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)  *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)  *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)  *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)  *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)  *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.   Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)  *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

> (i)   any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;
>
> (ii)   any other documents specified in the Schedule or any Confirmation; and
>
> (iii)   upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)  *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)  *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)  *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)  *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*.

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

**ISDA® 1992**

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) **_Illegality_**. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) **_Tax Event_**. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) **_Tax Event Upon Merger_**. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) **_Credit Event Upon Merger_**. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) **_Additional Termination Event_**. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) **_Event of Default and Illegality_**. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

6.      **Early Termination**

(a)     ***Right to Terminate Following Event of Default***. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     ***Right to Terminate Following Termination Event***.

(i)     *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)     ***Transfer to Avoid Termination Event***. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)     ***Two Affected Parties***. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)     ***Right to Terminate***. If: —

(1)     a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)     an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   **Effect of Designation.**

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   **Calculations.**

(i)   **Statement**. On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   **Payment Date**. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   **Payments on Early Termination**. If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   **Events of Default**. If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation*. If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss*. If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation*. If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  ***Termination Events***. If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  ***Adjustment for Bankruptcy***. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  ***Pre-Estimate***. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

### 7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

### 8.    Contractual Currency

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**9.      Miscellaneous**

(a)      *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes  all oral communication and prior writings with respect thereto.

(b)      *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)      *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)      *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)      *Counterparts and Confirmations*.

    (i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)      *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)      *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.     Offices; Multibranch Parties**

(a)      If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)      Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)      If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.     Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.      Notices**

(a)      *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)   if in writing and delivered in person or by courier, on the date it is delivered;

(ii)   if sent by telex, on the date the recipient's answerback is received;

(iii)   if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)      *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.      Governing Law and Jurisdiction**

(a)      *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)      *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)   submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)      *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

**ISDA® 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)      *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.      Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)      in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)      in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)      in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)      in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

**ISDA® 1992**

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

**"Non-default Rate"** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

**"Non-defaulting Party"** has the meaning specified in Section 6(a).

**"Office"** means a branch or office of a party, which may be such party's head or home office.

**"Potential Event of Default"** means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

**"Reference Market-makers"** means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

**"Relevant Jurisdiction"** means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

**"Scheduled Payment Date"** means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

**"Set-off"** means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

**"Settlement Amount"** means, with respect to a party and any Early Termination Date, the sum of: —

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

**"Specified Entity"** has the meanings specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**DEUTSCHE BANK AG FRANKFURT**
*(Party A)*

**CARTU LTD.**
*(Party B)*

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

By: _____
    Name: **Chris Marett**
    Title: Director

ISDA ® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

<table>
<tr><td><b>DEUTSCHE BANK AG FRANKFURT</b><br>*(Party A)*</td><td><b>CART 1 LTD.</b><br>*(Party B)*</td></tr>
<tr><td>By: _____<br>Name:  Christian Künzle<br>Title:   Director</td><td>By: _____<br>Name:<br>Title:</td></tr>
<tr><td>By: _____<br>Name:  Karin Lehnert<br>Title:   Vice President</td><td></td></tr>
</table>

**ISDA ® 1992**

<b>EXECUTION COPY</b>

**SCHEDULE**
**to the**
**ISDA Master Agreement**

**dated as of April 30, 2007**
**between**
**Deutsche Bank AG Frankfurt ("<u>Party A</u>")**
**and**
**CART 1 Ltd. ("<u>Party B</u>")**

**Part 1.  Termination Provisions.**

(a)   "***Specified Entity***" means in relation to Party A and Party B: Not Applicable.

(b)   "***Specified Transaction***" is not applicable to Party A or Party B and accordingly Section 5(a)(v) will not apply to Party A or Party B for any purpose.

(c)   The "***Automatic Early Termination***" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(d)   ***Early Termination***.

   (i)   Section 6(a) is hereby modified to read as follows:

   "(a)   ***Right to Terminate Following Event of Default.***  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") or, if Party B is the Non-defaulting Party and the Notes are then subject to acceleration upon the occurrence of an "Event of Default" (as defined in the Indenture), the Trustee (acting pursuant to the Indenture) may, by not less than 10 Business Days notice to the Defaulting Party specifying the relevant Event of Default, and provided that the relevant Event of Default is then continuing, designate the Payment Date next succeeding the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions."

   (ii)   Section 6(b)(ii) is hereby modified to read as follows:

   "(ii)   ***Transfer to Avoid Termination Event.***  If either an Illegality or a Tax Event occurs and Party A is the sole Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is Party A, Party A will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under

19

this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates that is not a United States person (as defined in the U.S. Internal Revenue Code of 1986, as amended (the "**Code**")) or otherwise subject to tax under the Code on its income in the United States or to the application of any withholding or deduction for or on account of any Tax in respect of payments under this Agreement so that such Termination Event ceases to exist.

If Party A is not able to make such a transfer it will give notice to Party B and the Trustee to that effect within such 20 day period.

Any such transfer by Party A under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the Trustee (acting at the direction of Party B) and a Majority of the Controlling Class, which consent may not be unreasonably withheld."

(iii)    Section 6(b)(iii) is hereby modified to read as follows:

"(iii)    *Two Affected Parties.*  If either an Illegality or a Tax Event occurs and there are two Affected Parties, Party A and the Trustee (acting at the direction of Party B) will use all reasonable efforts to reach agreement within 30 days after notice thereof is given on action to avoid the effect of such Termination Event."

(iv)    Section 6(b)(iv) is hereby modified by (A) replacing the words "by not more than 20 days" therein with the words "by not less than 10 Business Days" and (B) replacing the words "a day not earlier than the day" therein with the words "the Payment Date next succeeding the day".

(v)    Section 6(c)(ii) is hereby modified by replacing the words "The amount, if any, payable in respect of an Early Termination Date" in the second sentence thereof with the words "The amounts, if any, payable on or after an Early Termination Date".

(vi)    Section 6(d)(i) is hereby modified by (A) replacing the word "occurrence" in the first sentence thereof with the word "designation"; (B) replacing the words "each party will make the calculations on its part, if any," in such sentence with the words "the Calculation Agent (or, if an Event of Default shall have occurred in relation to Party A as the Defaulting Party, the Trustee) will from time to time make the calculations of the amounts for payment"; (C) replacing the words "to the other party" in such sentence with the words "to each of Party A, the Calculation Agent (if such calculations were made by the Trustee), Party B and the Trustee (if such calculations were made by the Calculation Agent)"; (D) deleting the number "(1)" and the words "and (2) giving details of the relevant account to which any amount payable to it is to be paid" from such sentence; and (E) deleting the second sentence thereof and adding the words "To the extent that

20

the Trustee shall be responsible for making any calculation hereunder, Party B agrees to deliver to the Trustee a statement in writing making any such calculation." as a new sentence thereafter.

(vii)   Section 6(d)(ii) is hereby modified by (A) replacing the words "on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event)" in the first sentence thereof with the words "on the date or dates set forth therefor in Section 6(e)"; and (B) deleting the second and third sentences thereof; and (C) adding the words "Such amount will be paid in the Termination Currency." as a new sentence thereafter.

(viii)  Section 6(e) is hereby modified by (A) replacing all of the words therein after the words "the following provisions shall apply", through Section 6(e)(iii) with the words:

> "(i)   ***Payments in respect of Base Spread Amount to Cease.***  After the Early Termination Date, no amount shall be payable by Party A in respect of any Base Spread Amount (except, for the avoidance of doubt, any unpaid amount in respect of any Base Spread Amount accrued through the related Final Redemption Date).
>
> (ii)   ***Certain Other Payments to Continue.***  The occurrence of the Early Termination Date shall have no effect on the rights and obligations of the parties in respect of any Eligible Investment Spread Shortfall Amount, any Additional Payment, any Floating Payment or any Adjustment Payment, and each relevant amount shall be payable under the Agreement on each applicable Payment Date thereafter until the final Extension Maturity Date; it being understood, however, that Party A will not have the right to deliver any Credit Event Notice in relation to a Bankruptcy Credit Event occurring after the Early Termination Date or in relation to a Failure to Pay Credit Event occurring after the related Grace Period Extension Date."

and (B) (1) deleting the words "if Market Quotation applies" from the first sentence of Section 6(e)(iv); (2) replacing the words "an amount recoverable under this Section 6(e) is" in such sentence with the words "the amounts recoverable under this Section 6(e), taken together, are"; and (3) replacing the words "Such amount is" in the second sentence thereof with the words "Such amounts, taken together, are".

For the purposes of any Transaction under the Agreement, capitalized terms in Section 6(e) (as modified in this Schedule) that are not otherwise defined in the

21

Agreement have the meanings given to them in the Confirmation evidencing such Transaction.

(ix) *Contemporaneous occurrence of certain Events of Default and Termination Events.* In the event that an Early Termination Date is designated by Party B as a result of an Event of Default with respect to Party A as the Defaulting Party and either a Tax Event or a Tax Event Upon Merger has occurred and is continuing on the date of designation, then (and without limiting Section 5(c)), each of the payment obligations of each Party shall be determined as if the event giving rise to the designation of such Early Termination Date was a Tax Event or a Tax Event Upon Merger, as applicable.

(x) *Survival.* Except as otherwise provided in this Part 1(d), the provisions of each Confirmation and the rights and obligations of the parties thereunder and under this Agreement in connection therewith shall survive the designation or purported designation of an Early Termination Date.

The foregoing provisions supersede any contrary provisions contained in Section 6.

(e) "***Termination Currency***" means Euro.

(f) "***Additional Termination Event***" will apply.  The following shall constitute an Additional Termination Event:

(i) **Indenture Event of Default**.  An "Event of Default" (as defined in the Indenture), other than pursuant to Section 5.1(g) of the Indenture (as such term is defined in Part 5(a) of this Schedule), and an acceleration pursuant to Section 5.2(a) of the Indenture of the principal of, and accrued and unpaid interest on, the Notes.  For all purposes of this Agreement, Party B shall be the sole Affected Party with respect to the occurrence of a Termination Event described in this Part 1(f)(i).

(g) **Application of Events of Default.**  Notwithstanding anything in this Agreement to the contrary, the following Events of Default shall apply to the specified party and such party shall be the Defaulting Party:

|   |   | **Party A** | **Party B** |
|---|---|---|---|
| (1) | Section 5(a)(i), "Failure to Pay or Deliver" | Applicable | Applicable |
| (2) | Section 5(a)(ii), "Breach of Agreement" | Applicable (as modified by Part 5(e) of this Schedule) | Not Applicable |
| (3) | Section 5(a)(iii), "Credit Support Default" | Applicable (solely pursuant to Part 5(k) of this Schedule) | Not Applicable |
| (4) | Section 5(a)(iv), "Misrepresentation" | Applicable | Not Applicable |
| (5) | Section 5(a)(v), "Default under Specified Transaction" | Not Applicable | Not Applicable |
| (6) | Section 5(a)(vi), "Cross Default" | Not Applicable | Not Applicable |
| (7) | Section 5(a)(vii), "Bankruptcy" | Applicable | Applicable (as modified by Part 5(e) of this Schedule) |
| (8) | Section 5(a)(viii), "Merger Without Assumption" | Applicable | Not Applicable |

(h)    **Application of Termination Events.**  Notwithstanding anything in this Agreement to the contrary, the following Termination Events shall apply to the specified party and such party shall be (except as otherwise provided in this Part 1) the Affected Party:

|   |   | **Party A** | **Party B** |
|---|---|---|---|
| (1) | Section 5(b)(i), "Illegality" | Applicable | Applicable |
| (2) | Section 5(b)(ii), "Tax Event" | Applicable (as modified by Part 5(e) of this Schedule) | Applicable (as modified by Part 5(e) of this Schedule) |
| (3) | Section 5(b)(iii), "Tax Event Upon Merger" | Applicable (as modified by Part 5(e) of this Schedule) | Applicable (as modified by Part 5(e) of this Schedule) |
| (4) | Section 5(b)(iv), "Credit Event Upon Merger" | Not Applicable | Not Applicable |
| (5) | Section 5(b)(v), "Additional Termination Event" | Not Applicable | Applicable (as specified in Part 1(f)(i) of this Schedule) |

23

**Part 2. Tax Representations.**

(a)     ***Payer Tax Representations***.  For the purposes of Section 3(e) of this Agreement, Party A and Party B will each make the following representations to the other:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, each party may rely on:

  (i)     the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement;

  (ii)    the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and

  (iii)   the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement,

provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)     ***Payee Tax Representations***.  For the purpose of Section 3(f) of this Agreement:

Party A makes the following representations:

  (A) it is an Aktiengesellschaft organized under the laws of Germany, it is liable to taxation in Germany by reason of its domicile, residence, place of management, place of incorporation, or any other criterion of a similar nature and there is substantial and regular trading in its principal class of shares on a recognized stock exchange located in the United States or Germany; and

  (B) no payment received or to be received by it in connection with this Agreement is attributable to a trade or business carried on by it through a permanent establishment in the United States.


Party B makes the following representation:

It is an exempt company registered in the Cayman Islands.

24

**Part 3.  Documents to be delivered.**

(a)      For the purposes of Section 4(a)(i):

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Any form or document that may be required or reasonably requested in order to allow such other party to make a payment under this Agreement without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate. | Upon the reasonable request of such other party. |

(b)      For the purposes of Section 4(a)(ii), the other documents to be delivered are as follows:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Section 3(d) representation: |
|---|---|---|---|
| Party A and Party B | Evidence of the authority, incumbency and specimen signature of each person executing this Agreement or any Confirmation, Credit Support Document or other document entered into in connection with this Agreement on its behalf or on behalf of a Credit Support Provider. | Upon or prior to the execution and delivery of this Agreement and, with respect to any Confirmation, upon request by the other party. | Applicable |

25

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Section 3(d) representation: |
| --- | --- | --- | --- |
| Party B | A copy of the resolution of Party B's Board of Directors approving the entering into of this Agreement and each Transaction hereunder and a board resolution delegating the powers to named individuals to enter into any Transactions under this Agreement. | As of execution of this Agreement | Applicable |
| Party B | Memorandum and Articles of Association of Party B | As of execution of this Agreement | Not Applicable |
| Party A and Party B | Legal opinions in a form satisfactory to the other party | The Closing Date | Not Applicable |

NY1 6180218v.5

**Part 4.  Miscellaneous.**

(a)  *Addresses for Notices.*  For the purpose of Section 12(a), the addresses for notices and communications to Party A and Party B shall be as follows:

>  **TO PARTY A:**
>
>  All notices to Party A under Sections 5 or 6 (other than notices under Section 5(a)(i)) shall·be sent to:
>
>  Deutsche Bank AG Frankfurt
>  Taunusanlage 12
>  60325 Frankfurt am Main
>  Germany
>
>  | | |
>  |---|---|
>  | Attn: | Loan Exposure Management Group |
>  | | Christian Kuenzle, Karin Lehnert |
>  | Telephone: | +49(69) 910-34819/-42298 |
>  | Telefax: | +49(69) 910-34796 |
>
>  with a mandatory copy to each of:
>
>  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.,
>  20 Canada Square
>  Canary Wharf
>  London E14 5LH
>  United Kingdom
>
>  Attn:  Amit Sohal
>  Telephone: +44 20 7176 3845
>  Telefax: +44 20 7176 3098
>  E-Mail:europeansurveillance@standardandpoors.com
>
>  and
>
>  Fitch Ratings Ltd.
>  101 Finsbury Pavement
>  London EC2A 1RS
>  United Kingdom
>
>  Attn: CDO Performance Analytics
>  Tel:  +44 20 7417 4222
>  Fax: +44 20 7417 4224
>  Email:  london.cdosurveillance@fitchratings.com

NYI 6180218v.5

**TO PARTY B:**

All notices to Party B shall be sent to:

CART 1 Ltd.
c/o Maples Finance Limited
P.O. Box 1093 GT
Queensgate House
South Church Street
George Town,
Grand Cayman
Cayman Islands

Attn:   The Directors
Telephone:     +1 (345) 945-7099
Telefax:        +1 (345) 945-7100

with a mandatory copy to each of:

The Bank of New York, London Branch
One Canada Square,
London, E14 5AL
United Kingdom

Attn: Corporate Trust Administration
Telephone:     +44-207-964-7073
Telefax:        +44-207-964-6399

and

Maples and Calder
P.O. Box 309GT, Ugland House
South Church Street,
George Town, Grand Cayman
Cayman Islands

Attn:  Alasdair Robertson – CART 1 Ltd.
Telephone:     +1 (345) 949-8066
Telefax:        +1 (345) 949-8080

and

**Standard & Poor's Ratings Services,** a division of The McGraw-Hill Companies,
Inc.,

28

20 Canada Square
Canary Wharf
London E14 5LH
United Kingdom

Attn:  Amit Sohal
Telephone: +44 20 7176 3845
Telefax: +44 20 7176 3098
E-Mail:europeansurveillance@standardandpoors.com

and

Fitch Ratings Ltd.
101 Finsbury Pavement
London EC2A 1RS
United Kingdom

Attn: CDO Performance Analytics
Tel:  020 7417 4222
Fax:  020 7417 4224
Email:  london.cdosurveillance@fitchratings.com

(b)      *Process Agent*.  For the purposes of Section 13(c):

Party A appoints as its Process Agent:  CT Corporation System, 111 Eighth Avenue, New York, New York 10011, U.S.A.

Party B appoints as its Process Agent:  CT Corporation System, 111 Eighth Avenue, New York, New York 10011, U.S.A.

(c)      *Offices*.  The provisions of Section 10(a) will apply to this Agreement.

(d)      *Multibranch Party*.  For purposes of Section 10(c):

(i)      Party A is not a Multibranch Party.

(ii)     Party B is not a Multibranch Party.

(e)      The *Calculation Agent* shall be Party A.

(f)      *Credit Support Documents*.  Details of any Credit Support Document:-

(i)      With respect to Party A, except as otherwise provided in Part 5(k), Not Applicable.

29

(ii) With respect to Party B, the Indenture (as such term is defined in Part 5(a) of this Schedule) and the Bank Account Mortgage (as such term is defined in Annex A to the Indenture).

(g) ***Credit Support Provider***.  Credit Support Provider means in relation to Party A, except as otherwise provided in Part 5(k), Not Applicable, and in relation to Party B, Not Applicable.

(h) ***Governing Law.***  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without reference to its choice of law doctrine).

(i) ***Netting of Payments:***  Section 2(c) is hereby modified to read in full as follows:

"(c) ***Netting.***  If on any date amounts would otherwise be payable:—

(i) in the same currency; and

(ii) in respect of the Transactions evidenced by the Credit Default Swap Confirmations,

by either of Party A and Party B to the other in respect of Adjustment Payments or by Party B to Party A in respect of Floating Payments, in each case as defined in and as set forth in the related Credit Default Swap Confirmation, then, on such date, each such party's obligation to make payment of any such amount to the other will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one such party exceeds the aggregate amount that would otherwise have been payable by the other such party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount."

(j) "***Affiliate***" will have, in relation to Party A, the meaning specified in Section 14 and, in relation to Party B, no meaning.

N Y 1 6180218v.5

**Part 5.  Other Provisions.**

(a)    **Definitions.**  Terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Indenture, dated as of April 30, 2007 (as amended, modified or supplemented from time to time, the "**Indenture**"), among Party B, as Issuer, The Bank of New York, London Branch, as Trustee, The Bank of New York (Luxembourg) S.A., as Note Registrar and BNY Fund Services (Ireland) Limited, as Irish Paying Agent.  In the event of any inconsistency between the provisions of the Indenture and this Agreement, the Indenture will prevail.

(b)    **Set-off.**  Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without setoff or counterclaim.

(c)    **Representations.**

(i)    *Non-Reliance, Etc.*  Each party will be deemed to represent to the other party on the date that it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(A)    *Non-Reliance*.  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered to be investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(B)    *Assessment and Understanding.*  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of, that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(C)    *Status of Parties*.  The other party is not acting as a fiduciary for or adviser to it in respect of that Transaction.

(ii)    *Commodity Exchange Act.*  It is an "eligible contract participant" as that term is defined in Section 1a(12) of the Commodity Exchange Act, as amended.

31

(iii)      ***Securities Law Representation.*** Party A represents to Party B on and as of the date hereof and on each date on which a Transaction is entered into between them that it is not a "United States resident" within the meaning of the U.S. Investment Company Act of 1940, as amended, and the rules and regulations thereunder (the "**Investment Company Act**").

(iv)      ***Additional Representations of Party B.*** Party B represents to Party A on and as of the date hereof and at all times until the termination of this Agreement that:

         (A)      with respect to each source of funds to be used by it to enter into such Transactions (each such source being referred to herein as a "**Source**"), the Source is not the assets of (i) any "plan" (as defined in and subject to Section 4975 of the Code) or (ii) any "employee benefit plan" (as defined in and subject to Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), or (iii) a governmental plan, church plan or non-U.S. plan that is subject to any U.S. federal, state, local or non-U.S. law that is substantially similar to Section 406 of ERISA, Section 4975 of the Code or the provisions of ERISA under which the assets of an issuer may be deemed to include plan assets, or (iv) any entity whose underlying assets include assets of any such employee benefit plan or plan by reason of U.S. Department of Labor regulation Section 2510.3-101, as modified by Section 3(42) of ERISA; and

         (B)      each Transaction is intended to be exempt from, or otherwise not subject to regulation under, the Investment Company Act and Party B is exempt from regulation under such Act.

(d)      **Consent to Recording.** Each party (i) consents to the recording of the telephone conversations of trading and marketing and/or other personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction (ii) agrees to obtain any necessary consent of and give notice of such recording to such personnel of it and its Affiliates; and (iii) agrees that recordings may be submitted in evidence in any Proceedings relating to this Agreement.

(e)      **Modifications to the Agreement.**

(i)      **Breach of Agreement.** Section 5(a)(ii) is hereby modified by adding the following at the end thereof: "Without limiting the generality of the foregoing, it shall constitute an Event of Default in relation to Party A as the Defaulting Party if Party A fails, at its sole expense and within the applicable time period set forth in Part 5(k) of the Schedule after the occurrence of a Party A Rating Downgrade Event (as defined in Part 5(k) of the Schedule) to (1) take any of the steps for which provision is made in Part 5(k) of the Schedule and (2) cause the Rating Agency Condition to be satisfied."

32

(ii)   **Bankruptcy.** Notwithstanding anything in the Agreement to the contrary, the definition of "Bankruptcy", for the purposes of application to Party B of Section 5(a)(vii), is hereby modified by the insertion of the following paragraph at the end of Section 5(a)(vii):

"For the avoidance of doubt:

(A)   Section 5(a)(vii)(2) and 5(a)(vii)(9) shall not be applicable to Party B;

(B)   the appointment of a trustee or other secured party by Party B or the Secured Parties for the purpose of holding all or a substantial portion of the Trust Estate for the benefit of the Secured Parties does not qualify as the appointment of a trustee, custodian or similar official under Section 5(a)(vii)(6) or as a secured party taking possession of the assets of Party B under Section 5(a)(vii)(7);

(C)   Section 5(a)(vii)(6) is amended by deleting the words "seeks or" at the beginning of such section."

(iii)   **Tax Event; Tax Event Upon Merger.** The definitions in Section 5(b)(ii) and – (iii) of the terms "Tax Event" and "Tax Event Upon Merger" are hereby modified to read as follows:

"***Tax Event***. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) (1) would, or there is a substantial likelihood that it would, in each case but for the first sentence of Part 5(e)(iv) of the Schedule, on the next succeeding Scheduled Payment Date be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e)) or (2) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date, receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e)); provided, however, that for purposes of clarification, the parties acknowledge that the proposal of legislation shall not, in and of itself, give rise to a presumption that a Tax Event has occurred;

***Tax Event Upon Merger***. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date either (1) would, but for the first sentence of Part 5(e)(iv) of the Schedule, be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) will receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax, in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity

33

(which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);"

(iv)   **No Gross-up; Indemnifiable Tax; Tax.**  Neither party shall be required to pay the other any additional amount pursuant to Section 2(d)(i)(4) of the Agreement.

The definition in Section 14 of the term "Indemnifiable Tax" is hereby modified by adding the following sentence at the end thereof:

Notwithstanding the foregoing, "Indemnifiable Tax" also means any Tax imposed in respect of a payment under this Agreement by reason of a Change in Tax Law by a government or taxing authority of a Relevant Jurisdiction of the party making or having made such payment, unless the other party is incorporated, organized, managed and controlled or considered to have its seat in such jurisdiction, or is acting for purposes of this Agreement through a branch or office located in such jurisdiction."

The term "Tax" shall include any tax that the United States Internal Revenue Service may require a party to this Agreement to pay under Section 4371 of the Code, calculated based on the payments received by Party B from Party A.

(v)   **Transfer**.  Section 7 is hereby deleted in its entirety and replaced by the following:

Subject to Section 6(b)(ii) and the terms of the Credit Default Swap Confirmations, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred by either party hereto without the prior written consent of the other party; provided, however, that Party A, operating through one of its Offices or Affiliates outside of the United States, may upon at least 30 days and not more than 60 days prior notice to Party B, substitute another such Office or Affiliate, agency or affiliate of Party A, provided that (i) the obligations of Party A shall be expressly assumed by such Office or Affiliate of Party A, which assumption shall be evidenced by an instrument satisfactory in form and substance to Party B, (ii) such assumption by such Office or Affiliate of Party A shall be made in compliance with all applicable legal and regulatory requirements and (iii) (A) such Office or Affiliate is not a United States person (as defined in the Code) or otherwise subject to tax under the Code on its income in the United States on a net basis or to any withholding or deduction for or on account of any Tax in respect of payments under this Agreement and (B) Party B shall have received written confirmation that, in relation to such substitution, the Rating Agency Condition has been satisfied.

(f)   **Additional Acknowledgments and Agreements of the Parties.**

(i)   *No Bankruptcy Petition.*  Party A agrees not to cause the filing of a petition in bankruptcy or similar proceeding against Party B for the nonpayment of any

34

amounts payable hereunder until the payment in full of all amounts due in respect of the Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands. Nothing in this Part 5(f)(i) shall preclude, or be deemed to estop, Party A from taking any action prior to the expiration of the aforementioned period in (A) any case or Proceeding voluntarily filed or commenced by Party B or (B) any involuntary insolvency proceeding filed or commenced by a person other than Party A. The provisions of this Part 5(f)(i) shall survive any termination of this Agreement.

(ii)    ***Bankruptcy Code.*** Without limiting the applicability of any other provision of Title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq., as amended (the "**Bankruptcy Code**") (including, without limitation, Sections 362, 546, 553, 556, 560, 561 and 562 thereof and the applicable definitions in Section 101 thereof), the parties acknowledge and agree that all Transactions entered into hereunder will constitute "swap agreements" as defined in Section 101 (53B) of the Bankruptcy Code, that the rights of the parties under Section 6 will constitute contractual rights to terminate, accelerate and liquidate Transactions, that any margin or collateral provided under any margin, collateral, security, pledge, or similar agreement related hereto will constitute a "margin payment" as defined in Section 101 of the Bankruptcy Code, and that the parties are entities entitled to the rights under, and protections afforded by, Sections 362, 546, 553, 556, 560, 561 and 562 of the Bankruptcy Code, subject to the terms of the Indenture.

(iii)   ***Waiver of Right to Trial by Jury.*** Each of the parties hereby irrevocably waives any and all right to a trial by jury with respect to any legal proceeding arising out of or relating to this Agreement or any Transaction.

(g)    **Limited Recourse.** Notwithstanding anything in this Agreement or any Confirmation hereunder to the contrary, all amounts, payable or expressed to be payable by Party B on, under or in respect of its obligations and liabilities under this Agreement and any Confirmation hereunder shall be recoverable only from and to the extent of sums in respect of, or calculated by reference to, the Trust Estate that are received by Party B pursuant to the terms and conditions thereof and the proceeds of any realization or enforcement of the Trust Estate, subject in any case to the Priority of Payments set out in the Indenture. Upon final realization of such sums and proceeds, neither Party A nor any person acting on its behalf shall be entitled to take any further steps against Party B to recover any sums due but still unpaid and all claims in respect of such sums due but still unpaid shall be extinguished and shall not thereafter revive. No recourse shall be had for the payment of any amounts owing in respect of this Agreement against any officer, director, employee, administrator, shareholder or incorporator of Party B. The provisions of this Part 5(g) shall survive any termination of this Agreement.

(h)    **Limitation of Claims.** Any amount that Party B does not pay pursuant to the operation of Part 5(g) of this Schedule shall not constitute a claim (as defined in §101 of the United States Bankruptcy Reform Act of 1978 (11 U.S.C. §101, et seq.), as amended from time

35

to time) against, or a corporate obligation of, Party B for any such insufficiency, unless and until Party B has additional funds available to it to pay such amount. The provisions of this Part 5(h) shall survive any termination of this Agreement.

(i)    **Assignment Under the Indenture and Direction to Pay Trustee.** Party A hereby acknowledges that Party B has granted a first priority security interest in its rights under this Agreement, has directed that payments owed to it be made to the Trustee pursuant to this Agreement and the Confirmations hereunder and has assigned this Agreement to the Trustee pursuant to the Indenture, and consents thereto, and Party A hereby consents to any further transfer of such rights pursuant to the Indenture. Except as provided in Part 5(e)(iii) of this Schedule, neither party shall otherwise pledge, encumber or assign any interest (whether outright or by way of security) in this Agreement without the prior written consent of the other party, and any attempted assignment in violation of this provision shall be null and void.

(j)    **Payment in Advance by Party A.** In order to facilitate the distribution by the Trustee of amounts payable by Party B in respect of the Notes in accordance with the Priority of Payments, Party A agrees, for so long as the Trustee may so require, to pay in accordance with the Credit Default Swap Confirmations, any amount stated to be due under this Agreement on a Payment Date, not later than one Business Day in advance of such Payment Date; *provided* that, with respect to the calculation of any such amount, such agreement of Party A to pay in advance shall be disregarded; and *provided, further*, that, for all purposes of this Agreement (other than this provision), any amount so paid shall be construed to have been paid on the relevant Payment Date.

(k)    **Party A Rating Downgrade Event. "Party A Rating Downgrade Event"** means either: (i) the short term debt rating of Party A is reduced below "A-1+" by S&P or "F1" by Fitch or (ii) the unsecured unsubordinated long term debt rating of Party A is reduced below "A" by Fitch.

Party A agrees that, if a Party A Rating Downgrade Event has occurred and is continuing, it shall cause either of the following conditions to be satisfied:

(A) on the Business Day immediately preceding each Payment Date, Party A will pay to Party B (1) for the first relevant Payment Date, the Issuer Spread Amount for the following two Payment Dates in advance or, for any succeeding Payment Date, the Issuer Spread Amount for the second following Payment Date in advance, in each case as estimated by Party A in good faith, plus (2) the product of €100,000 and the applicable Day Count Fraction, plus (3) a fixed amount sufficient to provide Party B with an amount of €100,000 of funds available, in respect of Administrative Expenses, Trustee Administrative Expenses and Indemnification Amounts (each of such capitalized terms having the meaning ascribed to it in the applicable Credit Default Swap Confirmation); or

(B) as an alternative to (A) above, either within 15 days after the occurrence of a Party A Rating Downgrade Event or at any time thereafter while satisfying the requirements of (A) above, Party A: (i) delivers to the Trustee, at Party A's sole

expense, an absolute and unconditional guaranty from a third party having a short-term credit rating not lower than "A-1+" by S&P and "F1" by Fitch and having a long-term credit rating not lower than "A" by Fitch of all of the obligations of Party A hereunder so as to enable Party A to cause the Rating Agency Condition to be satisfied or (ii) enters, at Party A's sole expense, into arrangements for the posting of collateral for its obligations to Party B under the Agreement pursuant to the terms of a Credit Support Annex to this Schedule, in such form and in such amount as shall enable Party A to cause the Rating Agency Condition to be satisfied; *provided* that once the written confirmation of each Rating Agency is obtained in connection with the satisfaction of the Rating Agency Condition, Party A need no longer satisfy the requirements of (A) above in respect of such Party A Rating Downgrade Event.

If as a result of the prepayments described above, Party B has surplus funds (beyond its need to pay current Administrative Expenses, Trustee Administrative Expenses and Indemnification Amounts) on the final Payment Date, then the surplus shall be paid to Party A in accordance with the Priority of Payments.

(l)    **Regarding Floating Payments and Adjustment Amounts.**  Notwithstanding any provision of either of the Credit Default Swap Confirmations to the contrary, after the Closing Date, and provided that the Terms of both of the Credit Default Swaps are continuing:

(i)    if the amount payable by Party B to Party A on any Payment Date in accordance with the First Loss Credit Default Swap Confirmation as a result of either (x) the determination of a Loss Determination Amount, (y) any increase in the Periodic Interest Loss Limitation Amount (resulting in a portion of the Cumulative Deferred Interest Loss Limitation Amount no longer being in excess thereof) or (z) the determination of an Adjustment Amount is limited as a result of the Cumulative Loss Amount equaling or exceeding the Initial Credit Default Swap Notional Amount set forth in the First Loss Credit Default Swap Confirmation, then, to the extent of the excess of the Cumulative Loss Amount over such Initial Credit Default Swap Notional Amount, Party B shall pay such amount to Party A pursuant to the Mezzanine Credit Default Swap Confirmation (and the Credit Default Swap Notional Amount as determined pursuant to the Mezzanine Credit Default Swap Confirmation shall be reduced by the amount so paid); *provided* that the aggregate liability of Party B to Party A under the Credit Default Swaps to make payment in respect of amounts comprising the Cumulative Loss Amount shall not exceed the Senior Threshold Amount; and

(ii)    if the amount payable by Party A to Party B on any Payment Date in accordance with the Mezzanine Credit Default Swap Confirmation as a result of the determination of an Adjustment Amount is limited as a result of the Cumulative Loss Amount becoming equal to or less than the Mezzanine Threshold Amount set forth in the Mezzanine Credit Default Swap Confirmation, then, to the extent of the excess of the Mezzanine Threshold Amount over the Cumulative Loss Amount, Party A shall pay such amount to Party B pursuant to the First Loss

37

Credit Default Swap Confirmation (and the Credit Default Swap Notional Amount as determined pursuant to the First Loss Credit Default Swap Confirmation shall be increased by the amount so paid); *provided* that the aggregate amount payable by Party A to Party B under the Credit Default Swaps in respect of Adjustment Amounts shall not on any date exceed the aggregate of the Floating Payments and Adjustment Payments received by Party A from Party B on or prior to such date.

38

DEUTSCHE BANK AG
FRANKFURT

By:_____
Name:
Title:

Date:

By:_____
Name:
Title:

Date:

CART 1 LTD.

By:_____
Name:    **Chris Marett**
Title:    Director

Date:

*ISDA Schedule to Master Agreement -- CART 1 Ltd.*

DEUTSCHE BANK AG
FRANKFURT

By:_____
Name:  **Christian Künzle**
Title:  **Director**

Date:_____

By:_____
Name:  Karin Lehnert
Title:  Vice President

Date:_____

CART 1 LTD.

By:_____
Name:
Title:

Date: