Exhibit 5

**EXECUTION COPY**

**SCHEDULE**
**to the**
**ISDA Master Agreement**

**dated as of April 30, 2007**
**between**
**Deutsche Bank AG Frankfurt (“Party A”)**
**and**
**CART 1 Ltd. (“Party B”)**

## Part 1.  Termination Provisions.

(a)  “*Specified Entity*” means in relation to Party A and Party B: Not Applicable.

(b)  “*Specified Transaction*” is not applicable to Party A or Party B and accordingly Section 5(a)(v) will not apply to Party A or Party B for any purpose.

(c)  The “*Automatic Early Termination*” provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(d)  *Early Termination*.

(i)  Section 6(a) is hereby modified to read as follows:

“(a)  *Right to Terminate Following Event of Default.*  If at any time an Event of Default with respect to a party (the “Defaulting Party”) has occurred and is then continuing, the other party (the “Non-defaulting Party”) or, if Party B is the Non-defaulting Party and the Notes are then subject to acceleration upon the occurrence of an “Event of Default” (as defined in the Indenture), the Trustee (acting pursuant to the Indenture) may, by not less than 10 Business Days notice to the Defaulting Party specifying the relevant Event of Default, and provided that the relevant Event of Default is then continuing, designate the Payment Date next succeeding the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.”

(ii)  Section 6(b)(ii) is hereby modified to read as follows:

“(ii)  *Transfer to Avoid Termination Event.*  If either an Illegality or a Tax Event occurs and Party A is the sole Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is Party A, Party A will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its

Offices or Affiliates that is not a United States person (as defined in the U.S. Internal Revenue Code of 1986, as amended (the "**Code**")) or otherwise subject to tax under the Code on its income in the United States or to the application of any withholding or deduction for or on account of any Tax in respect of payments under this Agreement so that such Termination Event ceases to exist.

If Party A is not able to make such a transfer it will give notice to Party B and the Trustee to that effect within such 20 day period.

Any such transfer by Party A under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the Trustee (acting at the direction of Party B) and a Majority of the Controlling Class, which consent may not be unreasonably withheld."

(iii)     Section 6(b)(iii) is hereby modified to read as follows:

"(iii)     *Two Affected Parties.*  If either an Illegality or a Tax Event occurs and there are two Affected Parties, Party A and the Trustee (acting at the direction of Party B) will use all reasonable efforts to reach agreement within 30 days after notice thereof is given on action to avoid the effect of such Termination Event."

(iv)     Section 6(b)(iv) is hereby modified by (A) replacing the words "by not more than 20 days" therein with the words "by not less than 10 Business Days" and (B) replacing the words "a day not earlier than the day" therein with the words "the Payment Date next succeeding the day".

(v)     Section 6(c)(ii) is hereby modified by replacing the words "The amount, if any, payable in respect of an Early Termination Date" in the second sentence thereof with the words "The amounts, if any, payable on or after an Early Termination Date".

(vi)     Section 6(d)(i) is hereby modified by (A) replacing the word "occurrence" in the first sentence thereof with the word "designation"; (B) replacing the words "each party will make the calculations on its part, if any," in such sentence with the words "the Calculation Agent (or, if an Event of Default shall have occurred in relation to Party A as the Defaulting Party, the Trustee) will from time to time make the calculations of the amounts for payment"; (C) replacing the words "to the other party" in such sentence with the words "to each of Party A, the Calculation Agent (if such calculations were made by the Trustee), Party B and the Trustee (if such calculations were made by the Calculation Agent)"; (D) deleting the number "(1)" and the words "and (2) giving details of the relevant account to which any amount payable to it is to be paid" from such sentence; and (E) deleting the second sentence thereof and adding the words "To the extent that the Trustee shall be responsible for making any calculation hereunder, Party B

20

agrees to deliver to the Trustee a statement in writing making any such calculation." as a new sentence thereafter.

(vii)     Section 6(d)(ii) is hereby modified by (A) replacing the words "on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event)" in the first sentence thereof with the words "on the date or dates set forth therefor in Section 6(e)"; and (B) deleting the second and third sentences thereof; and (C) adding the words "Such amount will be paid in the Termination Currency." as a new sentence thereafter.

(viii)    Section 6(e) is hereby modified by (A) replacing all of the words therein after the words "the following provisions shall apply", through Section 6(e)(iii) with the words:

> "(i)     ***Payments in respect of Base Spread Amount to Cease.***  After the Early Termination Date, no amount shall be payable by Party A in respect of any Base Spread Amount (except, for the avoidance of doubt, any unpaid amount in respect of any Base Spread Amount accrued through the related Final Redemption Date).
>
> (ii)    ***Certain Other Payments to Continue.***  The occurrence of the Early Termination Date shall have no effect on the rights and obligations of the parties in respect of any Eligible Investment Spread Shortfall Amount, any Additional Payment, any Floating Payment or any Adjustment Payment, and each relevant amount shall be payable under the Agreement on each applicable Payment Date thereafter until the final Extension Maturity Date; it being understood, however, that Party A will not have the right to deliver any Credit Event Notice in relation to a Bankruptcy Credit Event occurring after the Early Termination Date or in relation to a Failure to Pay Credit Event occurring after the related Grace Period Extension Date."

and (B) (1) deleting the words "if Market Quotation applies" from the first sentence of Section 6(e)(iv); (2) replacing the words "an amount recoverable under this Section 6(e) is" in such sentence with the words "the amounts recoverable under this Section 6(e), taken together, are"; and (3) replacing the words "Such amount is" in the second sentence thereof with the words "Such amounts, taken together, are".

For the purposes of any Transaction under the Agreement, capitalized terms in Section 6(e) (as modified in this Schedule) that are not otherwise defined in the

21

Agreement have the meanings given to them in the Confirmation evidencing such Transaction.

(ix) *Contemporaneous occurrence of certain Events of Default and Termination Events*.  In the event that an Early Termination Date is designated by Party B as a result of an Event of Default with respect to Party A as the Defaulting Party and either a Tax Event or a Tax Event Upon Merger has occurred and is continuing on the date of designation, then (and without limiting Section 5(c)), each of the payment obligations of each Party shall be determined as if the event giving rise to the designation of such Early Termination Date was a Tax Event or a Tax Event Upon Merger, as applicable.

(x) *Survival*. Except as otherwise provided in this Part 1(d), the provisions of each Confirmation and the rights and obligations of the parties thereunder and under this Agreement in connection therewith shall survive the designation or purported designation of an Early Termination Date.

The foregoing provisions supersede any contrary provisions contained in Section 6.

(e) "***Termination Currency***" means Euro.

(f) "***Additional Termination Event***" will apply.  The following shall constitute an Additional Termination Event:

(i) **Indenture Event of Default**.  An "Event of Default" (as defined in the Indenture), other than pursuant to Section 5.1(g) of the Indenture (as such term is defined in Part 5(a) of this Schedule), and an acceleration pursuant to Section 5.2(a) of the Indenture of the principal of, and accrued and unpaid interest on, the Notes.  For all purposes of this Agreement, Party B shall be the sole Affected Party with respect to the occurrence of a Termination Event described in this Part 1(f)(i).

(g) **Application of Events of Default.**  Notwithstanding anything in this Agreement to the contrary, the following Events of Default shall apply to the specified party and such party shall be the Defaulting Party:

|  | **Party A** | **Party B** |
|---|---|---|
| (1)  Section 5(a)(i), "Failure to Pay or Deliver" | Applicable | Applicable |
| (2)  Section 5(a)(ii), "Breach of Agreement" | Applicable (as modified by Part 5(e) of this Schedule) | Not Applicable |
| (3)  Section 5(a)(iii), "Credit Support Default" | Applicable (solely pursuant to Part 5(k) of this Schedule) | Not Applicable |

| | | Party A | Party B |
|---|---|---|---|
| (4) | Section 5(a)(iv), "Misrepresentation" | Applicable | Not Applicable |
| (5) | Section 5(a)(v), "Default under Specified Transaction" | Not Applicable | Not Applicable |
| (6) | Section 5(a)(vi), "Cross Default" | Not Applicable | Not Applicable |
| (7) | Section 5(a)(vii), "Bankruptcy" | Applicable | Applicable (as modified by Part 5(e) of this Schedule) |
| (8) | Section 5(a)(viii), "Merger Without Assumption" | Applicable | Not Applicable |

(h)   **Application of Termination Events.**  Notwithstanding anything in this Agreement to the contrary, the following Termination Events shall apply to the specified party and such party shall be (except as otherwise provided in this Part 1) the Affected Party:

| | | <u>Party A</u> | <u>Party B</u> |
|---|---|---|---|
| (1) | Section 5(b)(i), "Illegality" | Applicable | Applicable |
| (2) | Section 5(b)(ii), "Tax Event" | Applicable (as modified by Part 5(e) of this Schedule) | Applicable (as modified by Part 5(e) of this Schedule) |
| (3) | Section 5(b)(iii), "Tax Event Upon Merger" | Applicable (as modified by Part 5(e) of this Schedule) | Applicable (as modified by Part 5(e) of this Schedule) |
| (4) | Section 5(b)(iv), "Credit Event Upon Merger" | Not Applicable | Not Applicable |
| (5) | Section 5(b)(v), "Additional Termination Event" | Not Applicable | Applicable (as specified in Part 1(f)(i) of this Schedule) |

NY1 6180218v.5

**Part 2.  Tax Representations.**

(a)    ***Payer Tax Representations***.  For the purposes of Section 3(e) of this Agreement, Party A and Party B will each make the following representations to the other:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, each party may rely on:

(i)    the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement;

(ii)    the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and

(iii)    the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement,

provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    ***Payee Tax Representations***.  For the purpose of Section 3(f) of this Agreement:

Party A makes the following representations:

(A) it is an Aktiengesellschaft organized under the laws of Germany, it is liable to taxation in Germany by reason of its domicile, residence, place of management, place of incorporation, or any other criterion of a similar nature and there is substantial and regular trading in its principal class of shares on a recognized stock exchange located in the United States or Germany; and

(B) no payment received or to be received by it in connection with this Agreement is attributable to a trade or business carried on by it through a permanent establishment in the United States.

Party B makes the following representation:

It is an exempt company registered in the Cayman Islands.

24

**Part 3.  Documents to be delivered.**

(a)      For the purposes of Section 4(a)(i):

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Any form or document that may be required or reasonably requested in order to allow such other party to make a payment under this Agreement without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate. | Upon the reasonable request of such other party. |

(b)      For the purposes of Section 4(a)(ii), the other documents to be delivered are as follows:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Section 3(d) representation: |
|---|---|---|---|
| Party A and Party B | Evidence of the authority, incumbency and specimen signature of each person executing this Agreement or any Confirmation, Credit Support Document or other document entered into in connection with this Agreement on its behalf or on behalf of a Credit Support Provider. | Upon or prior to the execution and delivery of this Agreement and, with respect to any Confirmation, upon request by the other party. | Applicable |

25

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Section 3(d) representation: |
|---|---|---|---|
| Party B | A copy of the resolution of Party B's Board of Directors approving the entering into of this Agreement and each Transaction hereunder and a board resolution delegating the powers to named individuals to enter into any Transactions under this Agreement. | As of execution of this Agreement | Applicable |
| Party B | Memorandum and Articles of Association of Party B | As of execution of this Agreement | Not Applicable |
| Party A and Party B | Legal opinions in a form satisfactory to the other party | The Closing Date | Not Applicable |

26

**Part 4.  Miscellaneous.**

(a)       ***Addresses for Notices.***  For the purpose of Section 12(a), the addresses for notices and communications to Party A and Party B shall be as follows:

> **TO PARTY A:**
>
> All notices to Party A under Sections 5 or 6 (other than notices under Section 5(a)(i)) shall be sent to:
>
> Deutsche Bank AG Frankfurt
> Taunusanlage 12
> 60325 Frankfurt am Main
> Germany
>
> Attn:            Loan Exposure Management Group
>                     Christian Kuenzle, Karin Lehnert
> Telephone:    +49(69) 910-34819/-42298
> Telefax:        +49(69) 910-34796
>
> with a mandatory copy to each of:
>
> Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.,
> 20 Canada Square
> Canary Wharf
> London E14 5LH
> United Kingdom
>
> Attn:  Amit Sohal
> Telephone: +44 20 7176 3845
> Telefax: +44 20 7176 3098
> E-Mail:europeansurveillance@standardandpoors.com
>
> and
>
> Fitch Ratings Ltd.
> 101 Finsbury Pavement
> London EC2A 1RS
> United Kingdom
>
> Attn: CDO Performance Analytics
> Tel:  +44 20 7417 4222
> Fax:  +44 20 7417 4224
> Email:  london.cdosurveillance@fitchratings.com

27

**TO PARTY B:**

All notices to Party B shall be sent to:

CART 1 Ltd.
c/o Maples Finance Limited
P.O. Box 1093 GT
Queensgate House
South Church Street
George Town,
Grand Cayman
Cayman Islands

Attn:   The Directors
Telephone:      +1 (345) 945-7099
Telefax:         +1 (345) 945-7100

with a mandatory copy to each of:

The Bank of New York, London Branch
One Canada Square,
London, E14 5AL
United Kingdom

Attn: Corporate Trust Administration
Telephone:      +44-207-964-7073
Telefax:         +44-207-964-6399

and

Maples and Calder
P.O. Box 309GT, Ugland House
South Church Street,
George Town, Grand Cayman
Cayman Islands

Attn:  Alasdair Robertson – CART 1 Ltd.
Telephone:      +1 (345) 949-8066
Telefax:         +1 (345) 949-8080

and

**Standard & Poor's Ratings Services,** a division of The McGraw-Hill Companies,
Inc.,
20 Canada Square

Canary Wharf
London E14 5LH
United Kingdom

Attn:  Amit Sohal
Telephone: +44 20 7176 3845
Telefax: +44 20 7176 3098
E-Mail:europeansurveillance@standardandpoors.com

and

Fitch Ratings Ltd.
101 Finsbury Pavement
London EC2A 1RS
United Kingdom

Attn: CDO Performance Analytics
Tel:  020 7417 4222
Fax:  020 7417 4224
Email:  london.cdosurveillance@fitchratings.com

(b)     ***Process Agent.***  For the purposes of Section 13(c):

Party A appoints as its Process Agent:  CT Corporation System, 111 Eighth Avenue, New York, New York 10011, U.S.A.

Party B appoints as its Process Agent:  CT Corporation System, 111 Eighth Avenue, New York, New York 10011, U.S.A.

(c)     ***Offices***.  The provisions of Section 10(a) will apply to this Agreement.

(d)     ***Multibranch Party***.  For purposes of Section 10(c):

(i)      Party A is not a Multibranch Party.

(ii)     Party B is not a Multibranch Party.

(e)     The ***Calculation Agent*** shall be Party A.

(f)     ***Credit Support Documents***.  Details of any Credit Support Document:-

(i)      With respect to Party A, except as otherwise provided in Part 5(k), Not Applicable.

(ii)     With respect to Party B, the Indenture (as such term is defined in Part 5(a) of this Schedule) and the Bank Account Mortgage (as such term is defined in Annex A to the Indenture).

29

(g)     ***Credit Support Provider***.  Credit Support Provider means in relation to Party A, except as otherwise provided in Part 5(k), Not Applicable, and in relation to Party B, Not Applicable.

(h)     ***Governing Law.***  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without reference to its choice of law doctrine).

(i)     ***Netting of Payments:***  Section 2(c) is hereby modified to read in full as follows:

"(c)     ***Netting.***  If on any date amounts would otherwise be payable:—

(i)     in the same currency; and

(ii)     in respect of the Transactions evidenced by the Credit Default Swap Confirmations,

by either of Party A and Party B to the other in respect of Adjustment Payments or by Party B to Party A in respect of Floating Payments, in each case as defined in and as set forth in the related Credit Default Swap Confirmation, then, on such date, each such party's obligation to make payment of any such amount to the other will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one such party exceeds the aggregate amount that would otherwise have been payable by the other such party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount."

(j)     "***Affiliate***" will have, in relation to Party A, the meaning specified in Section 14 and, in relation to Party B, no meaning.

NY1 6180218v.5

**Part 5.  Other Provisions.**

(a)      **Definitions.**  Terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Indenture, dated as of April 30, 2007 (as amended, modified or supplemented from time to time, the "**Indenture**"), among Party B, as Issuer, The Bank of New York, London Branch, as Trustee, The Bank of New York (Luxembourg) S.A., as Note Registrar and BNY Fund Services (Ireland) Limited, as Irish Paying Agent.  In the event of any inconsistency between the provisions of the Indenture and this Agreement, the Indenture will prevail.

(b)      **Set-off.**  Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without setoff or counterclaim.

(c)      **Representations.**

     (i)      ***Non-Reliance, Etc.***  Each party will be deemed to represent to the other party on the date that it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

          (A)      ***Non-Reliance***.  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered to be investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

          (B)      ***Assessment and Understanding.***  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of, that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

          (C)      ***Status of Parties***.  The other party is not acting as a fiduciary for or adviser to it in respect of that Transaction.

     (ii)      ***Commodity Exchange Act.***  It is an "eligible contract participant" as that term is defined in Section 1a(12) of the Commodity Exchange Act, as amended.

31

(iii) **Securities Law Representation.**  Party A represents to Party B on and as of the date hereof and on each date on which a Transaction is entered into between them that it is not a "United States resident" within the meaning of the U.S. Investment Company Act of 1940, as amended, and the rules and regulations thereunder (the "**Investment Company Act**").

(iv) **Additional Representations of Party B.**  Party B represents to Party A on and as of the date hereof and at all times until the termination of this Agreement that:

(A) with respect to each source of funds to be used by it to enter into such Transactions (each such source being referred to herein as a "**Source**"), the Source is not the assets of (i) any "plan" (as defined in and subject to Section 4975 of the Code) or (ii) any "employee benefit plan" (as defined in and subject to Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), or (iii) a governmental plan, church plan or non-U.S. plan that is subject to any U.S. federal, state, local or non-U.S. law that is substantially similar to Section 406 of ERISA, Section 4975 of the Code or the provisions of ERISA under which the assets of an issuer may be deemed to include plan assets, or (iv) any entity whose underlying assets include assets of any such employee benefit plan or plan by reason of U.S. Department of Labor regulation Section 2510.3-101, as modified by Section 3(42) of ERISA; and

(B) each Transaction is intended to be exempt from, or otherwise not subject to regulation under, the Investment Company Act and Party B is exempt from regulation under such Act.

(d) **Consent to Recording.**  Each party (i) consents to the recording of the telephone conversations of trading and marketing and/or other personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction (ii) agrees to obtain any necessary consent of and give notice of such recording to such personnel of it and its Affiliates; and (iii) agrees that recordings may be submitted in evidence in any Proceedings relating to this Agreement.

(e) **Modifications to the Agreement.**

(i) **Breach of Agreement.**  Section 5(a)(ii) is hereby modified by adding the following at the end thereof: "Without limiting the generality of the foregoing, it shall constitute an Event of Default in relation to Party A as the Defaulting Party if Party A fails, at its sole expense and within the applicable time period set forth in Part 5(k) of the Schedule after the occurrence of a Party A Rating Downgrade Event (as defined in Part 5(k) of the Schedule) to (1) take any of the steps for which provision is made in Part 5(k) of the Schedule and (2) cause the Rating Agency Condition to be satisfied."

(ii) **Bankruptcy.**  Notwithstanding anything in the Agreement to the contrary, the definition of "Bankruptcy", for the purposes of application to Party B of Section

5(a)(vii), is hereby modified by the insertion of the following paragraph at the end of Section 5(a)(vii):

"For the avoidance of doubt:

(A)     Section 5(a)(vii)(2) and 5(a)(vii)(9) shall not be applicable to Party B;

(B)     the appointment of a trustee or other secured party by Party B or the Secured Parties for the purpose of holding all or a substantial portion of the Trust Estate for the benefit of the Secured Parties does not qualify as the appointment of a trustee, custodian or similar official under Section 5(a)(vii)(6) or as a secured party taking possession of the assets of Party B under Section 5(a)(vii)(7);

(C)     Section 5(a)(vii)(6) is amended by deleting the words "seeks or" at the beginning of such section."

(iii)     **Tax Event; Tax Event Upon Merger.**  The definitions in Section 5(b)(ii) and – (iii) of the terms "Tax Event" and "Tax Event Upon Merger" are hereby modified to read as follows:

"***Tax Event.***  Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) (1) would, or there is a substantial likelihood that it would, in each case but for the first sentence of Part 5(e)(iv) of the Schedule, on the next succeeding Scheduled Payment Date be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e)) or (2) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date, receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e)); provided, however, that for purposes of clarification, the parties acknowledge that the proposal of legislation shall not, in and of itself, give rise to a presumption that a Tax Event has occurred;

***Tax Event Upon Merger***.  The party (the "Burdened Party") on the next succeeding Scheduled Payment Date either (1) would, but for the first sentence of Part 5(e)(iv) of the Schedule, be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) will receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax, in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);"

33

(iv)     **No Gross-up; Indemnifiable Tax; Tax.**  Neither party shall be required to pay the other any additional amount pursuant to Section 2(d)(i)(4) of the Agreement.

The definition in Section 14 of the term "Indemnifiable Tax" is hereby modified by adding the following sentence at the end thereof:

Notwithstanding the foregoing, "Indemnifiable Tax" also means any Tax imposed in respect of a payment under this Agreement by reason of a Change in Tax Law by a government or taxing authority of a Relevant Jurisdiction of the party making or having made such payment, unless the other party is incorporated, organized, managed and controlled or considered to have its seat in such jurisdiction, or is acting for purposes of this Agreement through a branch or office located in such jurisdiction."

The term "Tax" shall include any tax that the United States Internal Revenue Service may require a party to this Agreement to pay under Section 4371 of the Code, calculated based on the payments received by Party B from Party A.

(v)      **Transfer**.  Section 7 is hereby deleted in its entirety and replaced by the following:

Subject to Section 6(b)(ii) and the terms of the Credit Default Swap Confirmations, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred by either party hereto without the prior written consent of the other party; provided, however, that Party A, operating through one of its Offices or Affiliates outside of the United States, may upon at least 30 days and not more than 60 days prior notice to Party B, substitute another such Office or Affiliate, agency or affiliate of Party A, provided that (i) the obligations of Party A shall be expressly assumed by such Office or Affiliate of Party A, which assumption shall be evidenced by an instrument satisfactory in form and substance to Party B, (ii) such assumption by such Office or Affiliate of Party A shall be made in compliance with all applicable legal and regulatory requirements and (iii) (A) such Office or Affiliate is not a United States person (as defined in the Code) or otherwise subject to tax under the Code on its income in the United States on a net basis or to any withholding or deduction for or on account of any Tax in respect of payments under this Agreement and (B) Party B shall have received written confirmation that, in relation to such substitution, the Rating Agency Condition has been satisfied.

(f)     **Additional Acknowledgments and Agreements of the Parties.**

(i)     ***No Bankruptcy Petition.***  Party A agrees not to cause the filing of a petition in bankruptcy or similar proceeding against Party B for the nonpayment of any amounts payable hereunder until the payment in full of all amounts due in respect of the Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.  Nothing in

34

this Part 5(f)(i) shall preclude, or be deemed to estop, Party A from taking any action prior to the expiration of the aforementioned period in (A) any case or Proceeding voluntarily filed or commenced by Party B or (B) any involuntary insolvency proceeding filed or commenced by a person other than Party A.  The provisions of this Part 5(f)(i) shall survive any termination of this Agreement.

(ii)     ***Bankruptcy Code.***  Without limiting the applicability of any other provision of Title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq., as amended (the "**Bankruptcy Code**") (including, without limitation, Sections 362, 546, 553, 556, 560, 561 and 562 thereof and the applicable definitions in Section 101 thereof), the parties acknowledge and agree that all Transactions entered into hereunder will constitute "swap agreements" as defined in Section 101 (53B) of the Bankruptcy Code, that the rights of the parties under Section 6 will constitute contractual rights to terminate, accelerate and liquidate Transactions, that any margin or collateral provided under any margin, collateral, security, pledge, or similar agreement related hereto will constitute a "margin payment" as defined in Section 101 of the Bankruptcy Code, and that the parties are entities entitled to the rights under, and protections afforded by, Sections 362, 546, 553, 556, 560, 561 and 562 of the Bankruptcy Code, subject to the terms of the Indenture.

(iii)    ***Waiver of Right to Trial by Jury.***  Each of the parties hereby irrevocably waives any and all right to a trial by jury with respect to any legal proceeding arising out of or relating to this Agreement or any Transaction.

(g)     **Limited Recourse.**  Notwithstanding anything in this Agreement or any Confirmation hereunder to the contrary, all amounts, payable or expressed to be payable by Party B on, under or in respect of its obligations and liabilities under this Agreement and any Confirmation hereunder shall be recoverable only from and to the extent of sums in respect of, or calculated by reference to, the Trust Estate that are received by Party B pursuant to the terms and conditions thereof and the proceeds of any realization or enforcement of the Trust Estate, subject in any case to the Priority of Payments set out in the Indenture.  Upon final realization of such sums and proceeds, neither Party A nor any person acting on its behalf shall be entitled to take any further steps against Party B to recover any sums due but still unpaid and all claims in respect of such sums due but still unpaid shall be extinguished and shall not thereafter revive.  No recourse shall be had for the payment of any amounts owing in respect of this Agreement against any officer, director, employee, administrator, shareholder or incorporator of Party B.  The provisions of this Part 5(g) shall survive any termination of this Agreement.

(h)     **Limitation of Claims.**  Any amount that Party B does not pay pursuant to the operation of Part 5(g) of this Schedule shall not constitute a claim (as defined in §101 of the United States Bankruptcy Reform Act of 1978 (11 U.S.C. §101, et seq.), as amended from time to time) against, or a corporate obligation of, Party B for any such insufficiency, unless and until Party B has additional funds available to it to pay such amount.  The provisions of this Part 5(h) shall survive any termination of this Agreement.

35

(i)  **Assignment Under the Indenture and Direction to Pay Trustee.**  Party A hereby acknowledges that Party B has granted a first priority security interest in its rights under this Agreement, has directed that payments owed to it be made to the Trustee pursuant to this Agreement and the Confirmations hereunder and has assigned this Agreement to the Trustee pursuant to the Indenture, and consents thereto, and Party A hereby consents to any further transfer of such rights pursuant to the Indenture.  Except as provided in Part 5(e)(iii) of this Schedule, neither party shall otherwise pledge, encumber or assign any interest (whether outright or by way of security) in this Agreement without the prior written consent of the other party, and any attempted assignment in violation of this provision shall be null and void.

(j)  **Payment in Advance by Party A.**  In order to facilitate the distribution by the Trustee of amounts payable by Party B in respect of the Notes in accordance with the Priority of Payments, Party A agrees, for so long as the Trustee may so require, to pay in accordance with the Credit Default Swap Confirmations, any amount stated to be due under this Agreement on a Payment Date, not later than one Business Day in advance of such Payment Date; *provided* that, with respect to the calculation of any such amount, such agreement of Party A to pay in advance shall be disregarded; and *provided, further*, that, for all purposes of this Agreement (other than this provision), any amount so paid shall be construed to have been paid on the relevant Payment Date.

(k)  **Party A Rating Downgrade Event.** "**Party A Rating Downgrade Event**" means either: (i) the short term debt rating of Party A is reduced below "A-1+" by S&P or "F1" by Fitch or (ii) the unsecured unsubordinated long term debt rating of Party A is reduced below "A" by Fitch.

Party A agrees that, if a Party A Rating Downgrade Event has occurred and is continuing, it shall cause either of the following conditions to be satisfied:

(A) on the Business Day immediately preceding each Payment Date, Party A will pay to Party B (1) for the first relevant Payment Date, the Issuer Spread Amount for the following two Payment Dates in advance or, for any succeeding Payment Date, the Issuer Spread Amount for the second following Payment Date in advance, in each case as estimated by Party A in good faith, plus (2) the product of €100,000 and the applicable Day Count Fraction, plus (3) a fixed amount sufficient to provide Party B with an amount of €100,000 of funds available, in respect of Administrative Expenses, Trustee Administrative Expenses and Indemnification Amounts (each of such capitalized terms having the meaning ascribed to it in the applicable Credit Default Swap Confirmation); or

(B) as an alternative to (A) above, either within 15 days after the occurrence of a Party A Rating Downgrade Event or at any time thereafter while satisfying the requirements of (A) above, Party A:  (i) delivers to the Trustee, at Party A's sole expense, an absolute and unconditional guaranty from a third party having a short-term credit rating not lower than "A-1+" by S&P and "F1" by Fitch and having a long-term credit rating not lower than "A" by Fitch of all of the obligations of Party A hereunder so as to enable Party A to cause the Rating

36

Agency Condition to be satisfied or (ii) enters, at Party A's sole expense, into arrangements for the posting of collateral for its obligations to Party B under the Agreement pursuant to the terms of a Credit Support Annex to this Schedule, in such form and in such amount as shall enable Party A to cause the Rating Agency Condition to be satisfied; *provided* that once the written confirmation of each Rating Agency is obtained in connection with the satisfaction of the Rating Agency Condition, Party A need no longer satisfy the requirements of (A) above in respect of such Party A Rating Downgrade Event.

If as a result of the prepayments described above, Party B has surplus funds (beyond its need to pay current Administrative Expenses, Trustee Administrative Expenses and Indemnification Amounts) on the final Payment Date, then the surplus shall be paid to Party A in accordance with the Priority of Payments.

(l)     **Regarding Floating Payments and Adjustment Amounts.**  Notwithstanding any provision of either of the Credit Default Swap Confirmations to the contrary, after the Closing Date, and provided that the Terms of both of the Credit Default Swaps are continuing:

  (i)     if the amount payable by Party B to Party A on any Payment Date in accordance with the First Loss Credit Default Swap Confirmation as a result of either (x) the determination of a Loss Determination Amount, (y) any increase in the Periodic Interest Loss Limitation Amount (resulting in a portion of the Cumulative Deferred Interest Loss Limitation Amount no longer being in excess thereof) or (z) the determination of an Adjustment Amount is limited as a result of the Cumulative Loss Amount equaling or exceeding the Initial Credit Default Swap Notional Amount set forth in the First Loss Credit Default Swap Confirmation, then, to the extent of the excess of the Cumulative Loss Amount over such Initial Credit Default Swap Notional Amount, Party B shall pay such amount to Party A pursuant to the Mezzanine Credit Default Swap Confirmation (and the Credit Default Swap Notional Amount as determined pursuant to the Mezzanine Credit Default Swap Confirmation shall be reduced by the amount so paid); *provided* that the aggregate liability of Party B to Party A under the Credit Default Swaps to make payment in respect of amounts comprising the Cumulative Loss Amount shall not exceed the Senior Threshold Amount; and

  (ii)    if the amount payable by Party A to Party B on any Payment Date in accordance with the Mezzanine Credit Default Swap Confirmation as a result of the determination of an Adjustment Amount is limited as a result of the Cumulative Loss Amount becoming equal to or less than the Mezzanine Threshold Amount set forth in the Mezzanine Credit Default Swap Confirmation, then, to the extent of the excess of the Mezzanine Threshold Amount over the Cumulative Loss Amount, Party A shall pay such amount to Party B pursuant to the First Loss Credit Default Swap Confirmation (and the Credit Default Swap Notional Amount as determined pursuant to the First Loss Credit Default Swap Confirmation shall be increased by the amount so paid); *provided* that the aggregate amount payable by Party A to Party B under the Credit Default Swaps

37

in respect of Adjustment Amounts shall not on any date exceed the aggregate of the Floating Payments and Adjustment Payments received by Party A from Party B on or prior to such date.

NY1 6180218v.5

DEUTSCHE BANK AG
FRANKFURT

CART 1 LTD.

By:_____

By:_____

Name:

Name:

Title:

Title:

Date:

Date:

By:_____

Name:

Title:

Date:

DEUTSCHE BANK AG
FRANKFURT

By:_____

Name: **Christian Künzle**

Title: **Director**

Date:

By:_____

Name: Karin Lehnert

Title: Vice President

Date:

CART 1 LTD.

By:_____

Name:

Title:

Date:

*ISDA Schedule to Master Agreement – CART 1 Ltd.*

DEUTSCHE BANK AG
FRANKFURT

By:_____
Name:
Title:

Date:

By:_____
Name:
Title:

Date:

CART 1 LTD.

By:_____
Name:   **Chris Marett**
Title:   Director

Date: