**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE BANK OF NEW YORK MELLON
LONDON BRANCH, as Indenture Trustee
under the Indenture dated as of April 30,
2007,

               Interpleader Plaintiff,

    - against -

CART 1, LTD., as Issuer; DEUTSCHE BANK
AG FRANKFURT, as Swap Counterparty; and
CRC CREDIT FUND, LTD.,

               Interpleader Defendants.

18-cv-06093 (JPO)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEUTSCHE BANK AG's MOTION TO DISMISS CRC CREDIT FUND, LTD's CROSSCLAIMS

CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Interpleader and*
*Crossclaim Defendant Deutsche*
*Bank AG*

Of Counsel:

David G. Januszewski
Sheila C. Ramesh
Stephen C. Behymer

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARDS ....................................................................................................... 8

ARGUMENT....................................................................................................................... 9

I.    CRC FAILS TO ALLEGE A BREACH OF CONTRACT FOR DEUTSCHE BANK'S 2011 SUBSTITUTION OF NEWLY ISSUED CONERGY LOANS IN CART 1 ................................................................................10

    A.    The 2011 Allegations Are Time-Barred ...............................................10

    B.    Deutsche Bank's 2011 Substitution of Conergy Debt Complied With The Terms Of The Confirmation ........................................................11

        1.    The July 2011 Conergy Debt Was A Substitution..........................11

        2.    Substitutions Are Not Subject To Reference Obligation Eligibility Criteria (a)....................................................................12

        3.    CRC Proposes An Absurd Interpretation Of The Confirmation...................13

II.    CRC DOES NOT, AND CANNOT, PLAUSIBLY ALLEGE BREACH BASED ON THE DEBT-FOR-EQUITY EXCHANGE .................................................14

    A.    The 2010 Allegations Are Time-Barred ...............................................14

    B.    Deutsche Bank Did Not Place Its Own Interests Ahead of CRC's Interests ..............................................................................................15

III.    CRC DOES NOT PLAUSIBLY ALLEGE THAT DEUTSCHE BANK IMPERMISSIBLY ACCELERATED ITS WORKOUT OF CONERGY DEBT ........................................................................................................................18

IV.    CRC FAILS TO STATE A CLAIM FOR DECLARATORY JUDGMENT.......................................................................................................20

CONCLUSION................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABB Industries System, Inc.* v. *Prime Technology, Inc.*,
  120 F.3d 351 (2d Cir. 1997).................................................................................11

*Alexander & Alexander Services, Inc.* v. *These Certain Underwriters at Lloyd's*,
  136 F.3d 82 (2d Cir. 1998)...................................................................................9

*Amaranth LLC* v. *J.P. Morgan Chase & Co.*,
  71 A.D.3d 40 (1st Dep't 2009) ..........................................................................13n

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)..............................................................................................8

*Barbara* v. *MarineMax, Inc.*,
  2013 WL 4507068 (E.D.N.Y. Aug. 22, 2013).............................................14, 17

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007)......................................................................................8-9, 18

*Childs* v. *Levitt*,
  151 A.D.2d 318 (1st Dept.1989).........................................................................17

*DynCorp.* v. *GTE Corp.*,
  215 F. Supp. 2d 308 (S.D.N.Y. 2002)..................................................................9

*Fleet Capital Corp.* v. *Yamaha Motor Corp.*,
  2002 WL 31174470 (S.D.N.Y. Sept. 26, 2002)....................................................9

*Joester Loria Group* v. *Licensing Co. Ltd.*,
  2011 WL 1642736 (S.D.N.Y. Apr. 29, 2011).....................................................19

*Klauber Bros.* v. *Russell-Newman, Inc.*, 2013 WL 1245456.................................17

*Krys* v. *Pigott*,
  749 F.3d 117 (2d Cir. 2014)............................................................................9, 18

*LaSalle Bank N.A.* v. *Nomura Asset Capital Corp.*,
  424 F.3d 195 (2d Cir. 2005)...............................................................................13

*In re Lipper Holdings, LLC*,
  1 A.D.3d 170 (1st Dep't 2003) ..........................................................................14

*LiveIntent, Inc.* v. *Naples*,
 293 F. Supp. 3d 433 (S.D.N.Y. 2018)...................................................................11

*Lockheed Martin Corp.* v. *Retail Holdings, N.V.*,
 639 F.3d 63 (2d Cir. 2011)............................................................................9, 12

*Poindexter* v. *EMI Record Group Inc.*,
 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) ...............................................9

*Rex Medical L.P.* v. *Angiotech Pharmaceuticals (US), Inc.*,
 754 F. Supp. 2d 616 (S.D.N.Y. 2010)...........................................................13n

*Sabilia* v. *Richmond*,
 2012 WL 213656 (S.D.N.Y. Jan. 24, 2012) ....................................................8

*T&N PCL* v. *Fred S. James & Co.*,
 29 F.3d 57 (2d Cir. 1994).................................................................................11

*Tucker* v. *MTA*,
 2013 WL 55831 (S.D.N.Y. Jan. 4, 2013) .........................................................8

*TufAmerica, Inc.* v. *Diamond*,
 968 F.Supp. 2d 588 (S.D.N.Y. 2013)................................................................9

*Twersky* v. *Yeshiva University*,
 993 F. Supp. 2d 429 (S.D.N.Y. 2014)..............................................................10

*Wilson* v. *Hochberg*,
 245 A.D.2d 116 (1st Dep't 1997) ......................................................................9

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .......................................................1

C.P.L.R. § 213(2)......................................................................................10, 14

Interpleader and Crossclaim Defendant Deutsche Bank AG ("Deutsche Bank"), herein named Deutsche Bank AG Frankfurt, respectfully submits this Memorandum of Law in support of its Motion to Dismiss the Crossclaims of CRC Credit Fund, Ltd. ("CRC") ("Crossclaims" or "CRC Compl.") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

## PRELIMINARY STATEMENT

This action arises from a sophisticated hedge fund's transparent effort to avoid the terms of its unambiguous contractual agreement with Deutsche Bank.  In April 2007, CRC purchased notes issued pursuant to an Indenture backed by a credit default swap (collectively the "Swap"). The Swap provided CRC substantial coupon payments over more than a decade in exchange for credit protection, much like insurance, to Deutsche Bank.  With no more coupon payments forthcoming, CRC now attempts to escape paying Deutsche Bank the final credit protection payment that it is owed.

In a May 29, 2018 letter to the Trustee, CRC surfaced groundless allegations accusing Deutsche Bank of breaching the Transaction Documents and demanding that the Trustee withhold the protection payment to Deutsche Bank.  Claiming concerns of conflicting allegations, the Trustee gave in to CRC's demands and interpleaded the credit protection funds, naming Deutsche Bank and CRC as Interpleader Defendants.  Now CRC's Crossclaims to the Interpleader assert the same untenable allegations as its May 29, 2018 letter.  But the written terms of the agreement between the parties are unambiguous.  Even read in the light most favorable to CRC, its Crossclaims fail to allege any facts plausibly asserting any wrongdoing by Deutsche Bank.  Indeed, the actions that CRC complains of were expressly authorized by the Transaction Documents.  For these reasons, and those discussed below, CRC's Crossclaims

should be dismissed and, as a result, the Trustee should be ordered to distribute the interpleaded funds to Deutsche Bank.

## BACKGROUND[1]

### The Transaction

On April 30, 2007, CART 1, as Issuer, and The Bank of New York Mellon ("BONY"), as Trustee, among others, entered into an Indenture pursuant to which the special purpose vehicle CART 1 LTD. ("CART 1") issued notes to purchasers ("Noteholders").  (CRC Compl. ¶¶ 1, 10, 11, 13.)  CRC alleges that CART 1 issued six classes of notes:  Classes A through F, with Class A as the most senior and Class F as the most junior.  (*Id.* ¶ 13.)  CRC purports to hold 82.56% of the Class E notes and 100% of the Class F notes.  (Interpleader Compl. ¶ 7.)  The total face value of the notes was €238 million.  (CRC Compl. ¶ 13.)  Each quarter, the Noteholders received regular coupon payments from CART 1.  (*Id.* ¶ 1.)

Also on April 30, 2007, CART 1 and Deutsche Bank entered into the Swap, which is governed by an ISDA Master Agreement, Schedule, and integrated Confirmation.[2]  (*Id.* ¶¶ 1, 10, 16.)  Under the terms of the Swap, the funds paid into CART 1 by the Noteholders were used to protect Deutsche Bank against losses on a portfolio of loans (individually, "Reference Obligations," and collectively "Reference Portfolio") that Deutsche Bank made to third parties ("Reference Entities").  (*Id.* ¶ 1.)  In other words, CART 1 provided credit protection to Deutsche Bank to cover losses on the Reference Portfolio.  For instance, if a Reference Obligation defaulted and was liquidated or written off, CART 1 would make payments ("Floating

---

[1] The non-conclusory facts alleged in the Crossclaim Complaint are taken as true for purposes of this motion only.

[2] As CRC's Crossclaim Complaint explains, there were actually two Confirmations for different classes of notes.  (CRC Compl. ¶ 16 n.5.)  The two Confirmations are substantially similar.  (*Id.*)  CRC attached the First Loss Credit Default Swap.  (*Id.*)

Payments") to Deutsche Bank to cover the loss.  (*Id.* ¶¶ 1, 18, 27.)  In exchange for the credit

protection, Deutsche Bank agreed to make, and did make, certain periodic payments ("Fixed

Payments") to the Issuer.  (*Id.* ¶ 18.)  The Fixed Payments were ultimately passed on to the

Noteholders, including CRC, through the coupon payments.

Upon final maturity of the Swap, on June 15, 2018, any remaining amounts not used to

cover Deutsche Bank's losses would be paid back to Noteholders.  (*Id.* ¶¶ 1, 14.)  As the

Crossclaim Complaint states, "[t]he fewer eligible loans that defaulted, or were liquidated or

written off, the better the investors would do."  (*Id.* ¶ 1.)

**Reference Obligations**

The initial notional amount of the Reference Portfolio was €1.7 billion.  (CRC Compl. ¶

17.)  To be eligible for entry into the Reference Portfolio, the Confirmation required Reference

Obligations and the related Reference Entity to meet certain criteria ("Reference Obligation

Eligibility Criteria").  (*Id.* ¶ 19.)  Included among those criteria was Reference Obligation

Eligibility Criteria (a), which required that the relevant Reference Entity have a "DBAG Internal

Rating of 'iB-' or better."  (*Id.* ¶ 19.)[3]

The Confirmation also contemplated that, over time, Reference Obligations could be

added to the Reference Portfolio provided that certain conditions were met.  First, because the

notional amount of the Reference Portfolio would likely decline over time as Reference

Obligations were repaid, Deutsche Bank could add new Reference Obligations to the Reference

Portfolio or increase the notional amount of any Reference Obligation already in the Reference

Portfolio up to a certain maximum notional amount.  (*Id.* ¶ 20; *see* Confirmation § 6.)  This was

done through a process known as Replenishment.  (Confirmation § 6.)  To be added through

---

[3] The other Reference Obligation Eligibility Criteria are set forth in Schedule C of the
Confirmation.  They are not at issue in this action.

Replenishment, "each Reference Obligation so added (or whose Reference Obligation Notional

Amount was so increased)" must "meet[] the Reference Obligation Eligibility Criteria."

(Confirmation § 6.)  Also, following the addition of the replenished Reference Obligation, the

Reference Portfolio must meet certain additional criteria known as the Replenishment

Conditions.  (CRC Compl. ¶¶ 20, 22; Confirmation § 6 & Schedule D).  The Replenishment

Conditions are set forth in Schedule D of the Confirmation.

Replenishment, as contemplated under the Confirmation, was not the only mechanism for

adding Reference Obligations to the Reference Portfolio.  As set forth in Schedule D, Reference

Obligations could also be added through processes known as "Substitution" and "Replacement".

(Confirmation, Sch. D §§ (x)(1)-(2).)  A Substitution occurs where an existing Reference

Obligation is "partially or fully prepaid or cancelled."  (*Id.*)  In such a circumstance, Deutsche

Bank may "substitute another obligation of the applicable Reference Entity that satisfies the

Reference Obligation Eligibility Criteria other than *clauses (a)* and (c) thereof for the prepaid or

cancelled portion of such Reference Obligation" up to a certain notional amount.  (Confirmation,

Sch. D § (x)(1) (emphasis added).)  In other words, the substituted obligation did not have to

satisfy the requirement that the Reference Entity have a "DBAG Internal Rating of 'iB-' or

better."   This made sense because the substituted obligation replaced debt from an entity already

in the Reference Portfolio.  It allowed Deutsche Bank to work with a Reference Entity whose

DBAG Internal Rating dropped below iB- while their debt was in the Reference Portfolio to

restructure their existing Reference Obligation, as needed.  Absent this provision, Deutsche Bank

would be prohibited from restructuring the debt in such a way as to increase its recovery

prospects and the Reference Portfolio could be left holding unnecessarily risky debt.  Similarly, a

Replacement occurs where an existing obligation is "partially or fully paid . . . from the proceeds

of one or more other loan or credit facilities that satisfy the Reference Obligation Eligibility Criteria other than *clauses (a)* or (c) thereof." (Confirmation, Sch. D § (x)(2) (emphasis added).) In such a circumstance, Deutsche Bank "may elect to include any such Replacement Reference Obligation(s) in the Reference Portfolio" up to a certain notional amount. (*Id.*) For both Substitutions and Replacements, the Replenishment Criteria need not be met either. (Confirmation, Sch. D §§ (x)(1)-(2).)

The Confirmation contemplated Deutsche Bank and/or its affiliates acting as both lenders and servicers of the Reference Obligations.  Schedule F of the Confirmation sets forth the relevant Reference Portfolio servicing standards, including:

> In administering, collecting and enforcing the Reference Obligations or foreclosing on any Reference Collateral (collectively the "servicing" and to "service") each DB Servicer shall at all times act (in the case of a syndicated loan, to the extent permissible under the relevant loan agreement) as a reasonable creditor in the protection of its own interests acting reasonably and in good faith in accordance with its general business practices taking into account the interests of [CART 1]. In the case of a conflict of interest between the interests of [CART 1] and the interests of any DBAG Group party or a third party with regard to servicing of the Reference Obligations, the DB Servicers shall not place the interests of [CART 1] in a less favorable position than the interests of any such DBAG Group Entity or third party. In the case of a conflict between the interests of [Deutsche Bank] and the interests of the Noteholders, the DB Servicers shall give priority to the interests of Buyer and then, among the Noteholders, to the interests of the Holders of the Class or Classes of Notes which then rank most senior pursuant to the Priority of Payments.

(CRC Comp. ¶ 25; Confirmation, Sch. F at 1.)

In the case of a Credit Event of a Reference Obligation, such as a Reference Entity's bankruptcy, the Confirmations provided that Deutsche Bank, as servicer of the defaulting Reference Obligation ("Defaulted Reference Obligation"), would conduct any "work-out processes . . . in accordance with its servicing practices prevailing from time to time and this Confirmation." (CRC Compl. ¶ 27; Confirmation § 5.)  CRC alleges that, in a June 11, 2018

letter, Deutsche Bank "informed CRC that [Deutsche Bank's] normal servicing procedures allowed it to write off a Reference Obligation only if it determined that it was 'probable' no further recovery could be had." (CRC Compl. ¶ 41.)  This is not exactly correct.  In its June 11 letter, Deutsche Bank informed CRC that Deutsche Bank's internal policies provided that it could write-off a Reference Obligation *or a portion thereof* after its uncollectability was determined to be probable.  (Ramesh Aff. Ex. 1 at 4.)

Under the terms of the Confirmation, Deutsche Bank was entitled to protection payments to cover any losses on Defaulted Reference Obligations once the Reference Obligations were either sold or "determined in accordance with such servicing practices and [the] Confirmation either that such Reference Obligation shall be written-off (as reflected in the relevant DBAG Entity's books and records) or . . . the formal work-out process shall have been terminated." (Confirmation § 5.)  If, by the final maturity date of June 15, 2018, the Reference Obligation had not been sold, written-off, or the formal work-out process terminated, then Deutsche Bank would not receive any credit protection payments for that Reference Obligation.  (CRC Compl. ¶ 27; Confirmation § 5.)  If, after a Floating Payment (*i.e.*, credit protection payment) is made to Deutsche Bank, "additional amounts are recovered" then, under the terms of the Confirmation, Deutsche Bank will make an adjustment payment to CART 1 to account for the additional recovery.  (Confirmation § 8(g).)

Apart from its role as lender and servicer, the Confirmation explicitly recognized that Swap parties "and [their] Affiliates may, where permitted[:]"

> [G]enerally engage in any kind of commercial or investment banking or other business with, a Reference Entity, any Affiliate of Reference Entity, any other person or entity having obligations relating to Reference Entity, and may act with respect to such business in the same manner as each of them would if the relevant Transaction did not exist, regardless of whether any such action might have an adverse effect on Reference Entity, or the

position of any other party or otherwise (including, without limitation, any action which might constitute or give rise to a Credit Event.").

(Confirmation § 8(b)(ii).)

**The Conergy Reference Obligations**

In 2007, Reference Obligations tied to Conergy AG ("Conergy"), a solar energy company, were added to the Reference Portfolio.  (CRC Compl. ¶ 29.)  At this time, the Conergy debt satisfied the Reference Obligation Eligibility Criteria, including criteria (a) as it had an alleged Deutsche Bank internal rating of iBBB.  (*Id.* ¶ 30.)  In 2010, as alleged, "Conergy was facing further challenges" and "an independent business review determined it likely would not receive continued financing unless it strengthened its capital base." (*Id.* ¶ 32.)  On December 17, 2010, Conergy reached an agreement with its creditors to restructure its debt.  (*Id.* ¶ 33.)  As part of its restructuring, certain of Conergy's lenders agreed to refinance its remaining debt under the syndicated loan agreement while others agreed to exchange Conergy debt for equity in the company, thereby reducing the amount of Conergy's outstanding debt.  (*Id.* ¶¶ 6, 7, 33, 36, 56.)  With respect to the Conergy Reference Obligation, Deutsche Bank's affiliate, Deutsche Bank Luxembourg, S.A., as originator and servicer of the Conergy Reference Obligation in the Reference Portfolio, decided to refinance the debt.  (Ramesh Aff. Ex. 1 at 5.)  Separate and apart from this, at some point after 2007, Deutsche Bank's London Branch purchased Conergy debt in the secondary market.  (*See id.* 5 n.10.)  The London Branch decided not to refinance but, rather, to participate in the debt-for-equity swap.  (*Id.* 5 n.10.)  Because the London Branch's Conergy debt was not in the Reference Portfolio, the Conergy Reference Obligation in the Reference Portfolio was not replaced with Conergy equity.

On July 5, 2013, Conergy filed for insolvency.  (CRC Compl. ¶ 38.)  As alleged, in December 2017, after over four years of insolvency proceedings, Deutsche Bank received a

payment of €21,000 on the Conergy Reference Obligations.  (CRC Compl. ¶ 39.)  Thereafter,

Deutsche Bank wrote off the remaining, uncollected portion of the Conergy Reference

Obligations on March 23, 2018, months before CART 1's June 15, 2018 final maturity date and

after nearly a five-year long work-out process.  (*Id.* ¶¶ 39, 43.)  Deutsche Bank thereafter sought

credit protection in connection with the now written-off Conergy Reference Obligations.  (*Id.* ¶

9.)

On May 29, 2018, CRC wrote a letter to BONY, as Trustee, alleging that Deutsche Bank

breached the Confirmation.  (*Id.* ¶ 43.)  On June 11, 2018, Deutsche Bank responded, denying

the allegations.  On July 5, 2018, BONY filed its Interpleader Complaint.  (*Id.* ¶ 44.)  On August

9, 2018, CRC answered the Interpleader Complaint and added the instant Crossclaims.

## LEGAL STANDARDS

To survive a motion to dismiss, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

While for purposes of a motion to dismiss the Court "must accept as true all well-pleaded factual

allegations in the complaint" the Court is "not bound to accept as true a legal conclusion couched

as a factual allegation."  *Tucker* v. *MTA*, 2013 WL 55831, at *2 (S.D.N.Y. Jan. 4, 2013) (Oetken,

J.), *aff'd sub nom. Tucker* v. *MTA Long Island Rail Road.*, 538 F. App'x 100 (2d Cir. 2013)

(citation and internal quotation marks omitted).  The Court may consider "any documents

attached to the complaint or incorporated in it by reference, any documents that are 'integral' to

the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the

Court may take judicial notice."  *Sabilia* v. *Richmond*, 2012 WL 213656, at *4 (S.D.N.Y. Jan.

24, 2012) (Oetken, J.) (citation omitted).  "'If a document relied on in the complaint contradicts

allegations in the complaint, the document, not the allegations, control, and the court need not

accept the allegations in the complaint as true.'" *TufAmerica, Inc.* v. *Diamond*, 968 F.Supp. 2d 588, 592 (S.D.N.Y. 2013) (quoting *Poindexter* v. *EMI Record Group Inc.,* 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012). A plaintiff's "'[f]actual allegations must be enough to raise a right to relief above the speculative level,' *i.e.*, the complaint 'must contain something . . . more . . . than a statement of facts that merely creates a suspicion of a legally cognizable right of action.'" *Krys* v. *Pigott*, 749 F.3d 117, 129 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

## ARGUMENT

As set forth below, the unambiguous terms of the Confirmation confirm that, even accepting CRC's non-conclusory allegations as true, CRC is not entitled to relief on any of the three theories underlying its Crossclaims. Under New York law, which governs here,[4] "the initial interpretation of a contract is a matter of law for the court to decide." *Fleet Capital Corp.* v. *Yamaha Motor Corp.*, 2002 WL 31174470, at *19 (S.D.N.Y. Sept. 26, 2002) (quoting *Alexander & Alexander Services, Inc.* v. *These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998)). "It is axiomatic under New York law... that '[t]he fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties,'" and in "a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp.* v. *Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citation omitted). A claim thus should be dismissed where the terms of the relevant contract, incorporated by reference in the pleadings, unambiguously show that the claimant is not entitled to relief. *DynCorp.* v. *GTE Corp.*, 215 F. Supp. 2d 308, 315 (S.D.N.Y. 2002); *see also Wilson* v. *Hochberg*, 245 A.D.2d 116, 116-17 (1st Dep't 1997) (claim should be dismissed where express terms of relevant contract flatly contradict claim). Here, CRC alleges that Deutsche Bank

---

[4] *See* Indenture §14.8; Ramesh Aff. Ex. 2 at 13, 30; Ex. 3 at 30.

breached the Confirmation in three ways: (i) by purportedly placing its interests above those of CART 1 and the Noteholders when it participated in the debt-for-equity swap for the uncovered Conergy loans; (ii) by purportedly placing new Conergy debt in CART 1's Reference Portfolio even though that debt did not satisfy all Reference Obligation Eligibility Criteria; and (iii) by purportedly accelerating its workout of the Conergy loans in violation of its servicing provisions. The unambiguous terms of the Confirmation show, however, that CRC is not entitled to relief on its claims and, accordingly, this Court should dismiss CRC's Crossclaims and instruct the Trustee to distribute the interpleaded funds to Deutsche Bank. In addition, the first two theories are barred by the applicable six-year statute of limitations. *See* C.P.L.R. § 213(2).

## I.   CRC FAILS TO ALLEGE A BREACH OF CONTRACT FOR DEUTSCHE BANK'S 2011 SUBSTITUTION OF NEWLY ISSUED CONERGY LOANS IN CART 1

CRC fails for two reasons to state a claim for relief by alleging that, in 2011, Deutsche Bank placed Conergy debt into the Reference Portfolio that did not have a Deutsche Bank internal rating of "iB-" or better. First, because the alleged breach occurred in 2011, the claim is time-barred. *See* C.P.L.R. § 213(2). Second, because the inclusion of the Conergy debt was a "Substitution," the terms of the Confirmation explicitly provide that it was not subject to the requirement that it have an internal rating of "iB-" or better. (Confirmation, Sch. D § (x)(1).)

### A.   The 2011 Allegations Are Time-Barred

CRC's claim that Deutsche Bank breached the Confirmation by placing ineligible loans in the Reference Portfolio in 2011 is barred by New York's six-year statute of limitations. *See* C.P.L.R. § 213(2); *Twersky* v. *Yeshiva University*, 993 F. Supp. 2d 429, 434 (S.D.N.Y. 2014) (providing that the Court may adjudicate a statute-of-limitations defense in a "pre-answer motion to dismiss" provided that "the dates in [the] complaint show that an action is barred by a statute of limitations"). Because CRC claims that Deutsche Bank's breach occurred in 2011, and it filed

-10-

its breach of contract claim more than six years later in 2018, its claim is time-barred.  (*See* CRC Compl. ¶ 36); *ABB Industries System, Inc.* v. *Prime Technology, Inc.*, 120 F.3d 351, 360 (2d Cir. 1997) ("[I]n New York it is well settled that the statute of limitation for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered.").  Indeed, "even where the breach and alleged damages are not simultaneous," the claim still accrues upon the breach.  *T&N PCL* v. *Fred S. James & Co.*, 29 F.3d 57, 59 (2d Cir. 1994); *see also LiveIntent, Inc.* v. *Naples*, 293 F. Supp. 3d 433, 442 (S.D.N.Y. 2018) ("The plaintiff need not be aware of the breach or wrong to start the period running.") (citation and internal quotation marks omitted).

  **B.**  <u>Deutsche Bank's 2011 Substitution of Conergy Debt Complied With The Terms Of The Confirmation</u>

    1.  *The July 2011 Conergy Debt Was A Substitution*

As set forth in CRC's Crossclaims, a Substitution occurs when debt is placed into the Reference Portfolio after debt from the same Reference Entity is partially or fully prepaid or cancelled.  (CRC Compl. ¶ 23 n.11; Confirmations, Sch. D §(x)(1).)  CRC's own allegations leave no doubt that the Conergy debt included in the Reference Portfolio in July 2011 was a Substitution.[5]  Specifically, CRC alleges that:

> On July 28, 2011, Conergy entered a new syndicated loan agreement for €261.5 million that replaced the 2007 agreement.  The outstanding 2007 loans were *repaid* with the proceeds of the 2011 loans.  Thus DBAG voluntarily *cancelled* the prior loan agreement that was a CART 1 Reference Obligation and made new loans for Conergy in its place.

---

[5] The only plausible alternate interpretation would be to characterize the Conergy debt placed into the Reference Portfolio in July 2011 as a Replacement Reference Obligation.  Replacement Reference Obligations, as explained *supra* pp. 4-5, are also not subject to Reference Obligation Eligibility Criteria (a).  (Confirmation, Sch. D § (x)(2).)

(CRC Compl. ¶ 36 (emphasis added); *see also id.* ¶ 7.)  Thus, CRC alleges that debt from

Conergy (1) existed in the Reference Portfolio; (2) was cancelled; and (3) was replaced with

newly-issued Conergy debt.  In other words, it was a Substitution.  (Confirmation, Sch. D §

(x)(1).)

> 2.     *Substitutions Are Not Subject To Reference Obligation Eligibility Criteria (a)*

The plain language of clause (x) of the Confirmation's Schedule D permits Deutsche

Bank to "substitute another obligation of the applicable Reference Entity that satisfies the

Reference Obligation Eligibility Criteria *other than clauses (a) and (c) thereof*."  (CRC Compl.

¶ 23 n.11; Confirmation, Sch. D § (x)(1) (emphasis added).)  Thus, at the time of a Substitution,

the relevant Reference Entity need not satisfy clause (a)'s requirement that the relevant

Reference Entity have an internal Deutsche Bank rating of iB- or better.[6]  (*See* Confirmation,

Sch. C (setting for the Reference Obligation Eligibility Criteria).)  The Substitution mechanism

enables Deutsche Bank to work with struggling Reference Entities to restructure their debt, as

needed, to avoid or decrease the risk of a default (and subsequent credit protection payments due

under the Swap), and reflects the parties' clear intention to avoid Reference Entity defaults.  *See*

*Lockheed Martin Corp.*, 639 F.3d at 69 ("the fundamental objective of contract interpretation is

to give effect to the expressed intentions of the parties.") (citation and internal quotation marks

omitted).  The terms of the Confirmation are unambiguous and require dismissal of this claim; a

Substitution is not subject to clause (a) and, therefore, allegations that clause (a) was not met fail

to state a claim upon which relief can be granted.

---

[6] Beyond Reference Obligation Eligibility Criteria (a) and (c), Substitutions and Replacements are also not subject to the Replenishment Conditions set forth in Schedule D to the Confirmation. (Confirmation, Sch. D §§ (x)(1)-(2).)

3.     *CRC Proposes An Absurd Interpretation Of The Confirmation*

CRC does not, because it cannot, dispute that the July 2011 restructuring consisted of a Substitution.  Rather, it alleges that a Substitution is a type of Replenishment and, therefore, is subject to all Reference Obligation Eligibility Criteria, including criteria (a).  (CRC Compl. ¶ 24 ("Nothing in Schedule D… provided that… Substitute or Replacement Reference Obligations… were excused from complying with *all* the Reference Obligation Eligibility Criteria….") (emphasis in original).)  Under CRC's interpretation, clause (x)(1) of the Confirmation's Schedule D merely sets forth the circumstances under which a Substitution need not comply with the Replenishment Conditions (*i.e.* the Replenishment Conditions do not apply to a Substitution as long as Reference Obligation Eligibility Criteria (b), (d) and (e) are met).  (CRC Compl. ¶ 23.) This interpretation should not be credited, however, because it would render clause (x)(1) entirely meaningless.  *See LaSalle Bank N.A.* v. *Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("[T]he contract should be construed so as to give full meaning and effect to all of its provisions…. An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.") (citations and internal quotation marks omitted).[7]  Under CRC's interpretation, there would be no need to clarify that the Replenishment Criteria do not apply if Reference Obligation Eligibility Criteria (b), (d), and (e)—but not (a) and (c)—are met because all criteria would have to be met for all Substitutions.  New York law does not permit claims predicated on such absurd contractual

---

[7] *See also Rex Medical L.P.* v. *Angiotech Pharmaceuticals (US), Inc.*, 754 F. Supp. 2d 616, 624 (S.D.N.Y. 2010) ("Under New York (and every other state's) law, parties are not free to interpret a contract in a way that frustrates the purpose of that contract or that makes any provision of the contract meaningless."); *Amaranth LLC* v. *J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 46 (1st Dep't 2009) ("It is well settled that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect.") (citation and internal quotation marks omitted).

interpretations.  *See In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171 (1st Dep't 2003) ("A

contract should not be interpreted to produce a result that is absurd, commercially unreasonable

or contrary to the reasonable expectations of the parties.") (citations omitted).

## II.   CRC DOES NOT, AND CANNOT, PLAUSIBLY ALLEGE BREACH BASED ON THE DEBT-FOR-EQUITY EXCHANGE

CRC's claim that Deutsche Bank breached the Confirmation in December 2010 by

restructuring Conergy's debt fails for two reasons.  (CRC Compl. ¶ 6; *see also id.* ¶ 32 (alleging

that the restructuring was done in order to "maximize DBAG's interests and to prejudice the

noteholders.").)  First, because the alleged breach occurred in December 2010, the claim is

barred by the applicable six-year statute of limitations.  *See* C.P.L.R. § 213(2).  Second, CRC's

argument amounts to nothing more than a complaint that, in hindsight, it would have preferred

that Deutsche Bank chose a different restructuring strategy for the CART 1 Conergy Reference

Obligation, which is inadequate to sustain a claim for breach of contract.  *See Barbara* v.

*MarineMax, Inc.*, 2013 WL 4507068, at *21 (E.D.N.Y. Aug. 22, 2013), *aff'd*, 577 F. App'x 49

(2d Cir. 2014) (dismissing breach of contract claim where "defendant, like plaintiffs, could not

know in advance whether these decisions would result in financial benefit or harm to

plaintiffs.").

### A.   The 2010 Allegations Are Time-Barred

CRC's claim that Deutsche Bank breached the Confirmation by placing its interests

ahead of the Noteholders in December 2010 is barred by New York's six-year statute of

limitations.  *See* C.P.L.R. § 213(2); *supra*, Section I.A.  CRC filed its claim in 2018, more than

six years after the alleged 2010 breach.  Therefore, the claim is time-barred.

B.     Deutsche Bank Did Not Place Its Own Interests Ahead of CRC's Interests

CRC's theory that there is some nefarious implication to be made from two independent business lines at Deutsche Bank making two independent business decisions relating to their independent Conergy investments fails to sustain its breach of contract claim.  (CRC Compl. ¶ 32-35.)  Indeed, the Confirmation expressly condones that very behavior.  (Confirmations § 8(b)(ii), discussed *infra*).  And the fact that Conergy, years later, would file for insolvency, thus dramatically reducing the value of both its debt and equity, does not transform these acts into breaches.

Deutsche Bank does not dispute that it maintained Conergy debt outside CART 1. Specifically, as Deutsche Bank explained to CRC in its June 11, 2018 letter, Deutsche Bank's London Branch purchased Conergy debt separate and apart from Deutsche Bank Luxembourg, S.A., the originator of the CART 1 Conergy debt.  (*See* Ramesh Aff. Ex. 1 at 5.)  In December 2010, the London Branch participated in the debt-for-equity swap.  (*Id.*)  This was permitted under the terms of the Confirmation and, therefore, was not a breach.  Specifically, under the terms of the Confirmation:

> each party and its Affiliates may, where permitted, accept deposits from, make loans or otherwise extend credit to, and ***generally engage in any kind of commercial or investment banking or other business with, a Reference Entity*** . . . ***and may act with respect to such business in the same manner as each of them would if the relevant Transaction did not exist***, regardless of whether any such action might have an adverse effect on a Reference Entity, or the position of any other party or otherwise (including, without limitation, any action which might constitute or give rise to a Credit Event).

(Confirmations § 8(b)(ii) (emphasis added).)  By choosing to purchase debt on the secondary market and participate in the debt-for-equity exchange option without regard to debt included in CART 1, Deutsche Bank did not breach the terms of the Confirmation.

Nor did Deutsche Bank breach the Confirmation by choosing to participate in the debt-refinancing option for the CART 1 Conergy debt.  The Confirmation afforded Deutsche Bank significant discretion in servicing Reference Obligations, providing that Deutsche Bank "shall at all times act . . . as a reasonable creditor in the protection of its own interests acting reasonably and in good faith in accordance with its general business practices taking into account the interests of Seller."  (Confirmation, Sch. F at 1.)  In addition, it empowered Deutsche Bank to "take all measures it deems necessary or appropriate in its professional judgment (which judgment shall, for the avoidance of doubt, be reasonable) to service the relevant part of the Reference Portfolio."  (*Id.*)  If Deutsche Bank were to participate in a debt restructuring, the Confirmation provided that:

> In all cases of a payment rescheduling or debt restructuring, each of the DB Servicers shall adequately safeguard the interests of Seller ***in the fullest performance of the Reference Obligations*** at all times and shall not place such interests in a less favorable position than its own interests or the interests of any other DBAG Group Entity ***in relation to their respective other claims against the same Reference Obligor.***[8]

(Confirmation, Sch. F. at 2. (emphasis added).)  The Confirmation did not require Deutsche Bank to participate in the debt-for-equity exchange with respect to debt in CART 1.  Indeed, that would be an absurd requirement as it would, in essence, require Deutsche Bank to seek to exchange any debt from a financially-troubled company for equity so that it could remove the debt from the Reference Portfolio and avoid any and all credit protection payments.  This would defeat the purpose of the Swap:  to provide credit protection to Deutsche Bank.  Instead, under

---

[8] Numerous times throughout its Complaint, CRC alleges that Deutsche Bank placed its own interests ahead of the Noteholders. (*See* CRC Compl. ¶¶ 6, 32, 37, 56.)  The Confirmation, however, unambiguously states that "[i]n the case of a conflict between the interests of [Deutsche Bank] and the interests of the Noteholders, [Deutsche Bank] shall give priority to the interests of [Deutsche Bank] and then, among the Noteholders, to the interests of the Holders of the Class or Classes of Notes which then rank most senior pursuant to the Priority of Payments." (Confirmation, Sch. F at 1.)

the terms of the Confirmation, Deutsche Bank was required to safeguard the interests of CART 1 "in the fullest performance of the Reference Obligations." By participating in a debt restructuring that "reduced Conergy's debts by approximately 40 percent," Deutsche Bank did just that: it increased the likelihood of performance by reducing Conergy's overall debt.[9]  (CRC Compl. ¶ 33.)  Moreover, the London Branch's decision to participate in the debt-for-equity exchange did not place Deutsche Bank's interests ahead of Conergy's "in relation to their respective other claims against the same Reference Obligor."  Instead, as a holder of debt, CART 1 held a more senior claim in the event of default than lenders that exchanged debt for equity, including Deutsche Bank's London Branch.

Ultimately, CRC's allegations reflect its frustration that Conergy eventually defaulted, and that CRC has to make higher credit protection payments than anticipated.  However, a bad bargain in hindsight does not amount to a breach of contract.  *See Barbara*, 2013 WL 4507068, at *21; *Klauber Bros.* v. *Russell-Newman*, Inc., 2013 WL 1245456, at *3 (S.D.N.Y. Mar. 26, 2013), *aff'd sub nom. Klauber Bros.* v. *Bon-Ton Stores, Inc.*, 557 F. App'x 77 (2d Cir. 2014) (dismissing breach of contract claim where plaintiff's allegations amounted to "in effect, that it struck a bad bargain," which did "not allow the Court to alter the plain meaning of the" relevant contract); *see also Childs* v. *Levitt*, 151 A.D.2d 318, 320 (1st Dept.1989) ("Equity will not relieve a party of its obligations under a contract merely because subsequently, with the benefit of hindsight, it appears to have been a bad bargain.").

---

[9] At the time of the restructuring, Conergy was not insolvent and would not file for insolvency for another 3 years.  (*See* CRC Compl. ¶ 38.)

III.    **CRC DOES NOT PLAUSIBLY ALLEGE THAT DEUTSCHE BANK
        IMPERMISSIBLY ACCELERATED ITS WORKOUT OF CONERGY DEBT**

CRC's Crossclaims cannot survive based on razor thin allegations that because the write-off occurred a relatively short time before CART 1's Legal Maturity, the workout must have been improperly "accelerated."  (*See* CRC Compl. ¶¶ 38-42, 56); *Krys* v. *Pigott*, 749 F.3d 117, 129 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555) ("'[f]actual allegations must be enough to raise a right to relief above the speculative level,' *i.e.*, the complaint 'must contain something . . . more . . . than a statement of facts that merely creates a suspicion of a legally cognizable right of action.'").  The Confirmation provided that in the case of a Credit Event, Deutsche Bank would conduct work-out processes, which would conclude upon a write-off, "in accordance with its servicing practices prevailing from time to time and this Confirmation."  (CRC Compl. ¶ 27; Confirmations § 5.)  As Deutsche Bank communicated to CRC in a letter dated June 11, 2018—which CRC incorporated in its Crossclaims—Deutsche Bank's internal policies provided that it could write off a Reference Obligation or a portion thereof after its uncollectability was determined to be probable (*i.e.*, greater than 50% chance).  (*Id.* ¶ 41; Ramesh Aff. Ex. 1 at 4.)  CRC alleges that, because Deutsche Bank wrote-off the Reference Obligation in March 2018, three months prior to CART 1's final maturity date, it must have improperly accelerated its work out.  Such allegations are impermissibly speculative.

As alleged, Conergy filed for insolvency on July 5, 2013, nearly five years before Deutsche Bank wrote off the Conergy loans on March 23, 2018.  (CRC Compl. ¶ 38.) Suggesting that a five-year long workout process during the course of an eleven-year long Swap was "improperly accelerated" defeats the purpose of the Swap; if five years is too accelerated, then Deutsche Bank's bargained-for credit protection is near worthless.  CRC's only support for its theory is that (1) it placed calls to Deutsche Bank on and before March 23, 2018 inquiring on

the status of the Conergy debt, and (2) Deutsche Bank received a €21,000 payment in December 2017 on the Conergy debt.  Neither allegation supports CRC's theory.  First, that CRC had, "for several months," called Deutsche Bank about the Conergy debt does not provide any insight into Deutsche Bank's workout process.  If anything, it suggests that Deutsche Bank would have been careful to adhere to its policies because an interested party was paying close attention.  Second, CRC's suggestion that a €21,000 payment means that Deutsche Bank could not have determined that €23,774,772 of the CART 1 Conergy debt was probably uncollectable is illogical.  After a five-year bankruptcy process, Deutsche Bank received a €21,000 payment on its alleged €24 million debt, after which it wrote-off the uncollected portion of the debt; this small payment suggests that the remaining debt was likely to be uncollectable.[10]  Notably, CRC has not included any allegations that the bankruptcy process is likely to result in additional payments to creditors; it has only suggested that "further payments *could* be coming."  (CRC Compl. ¶ 8) (emphasis added).)  CRC's allegations are nothing more than impermissible speculation and fail to state a claim entitled to relief.  *See Joester Loria Group* v. *Licensing Co. Ltd.*, 2011 WL 1642736, at *3 (S.D.N.Y. Apr. 29, 2011) (dismissing, inter alia, breach of contract claim because "Complaint lacks sufficient factual matter to support its claims" and "allegations amount to mere speculation.").  CRC has entirely failed to challenge Deutsche Bank's determination that the written-off portion of the Conergy debt was likely uncollectable.  Because Deutsche Bank properly made this determination, Deutsche Bank policies and the Confirmation permitted the write off, which concluded an almost five-year workout process.  There is nothing in the

---

[10] Deutsche Bank was not required to determine that no further collection on the Conergy debt, or a portion thereof, was certain, only that it was probable.  In fact, the Confirmation provides a mechanism for Deutsche Bank to make "adjustment payments" to CART 1 if additional amounts are recovered after a credit protection payment.  (Confirmation § 8(g).)

Confirmation or Deutsche Bank policies (and certainly nothing in the Crossclaims) to support the notion that a workout that spanned the course of almost five years was inadequate or rushed.

## IV.   CRC FAILS TO STATE A CLAIM FOR DECLARATORY JUDGMENT

Because CRC fails to sufficiently allege that Deutsche Bank breached the Confirmation, its Declaratory Judgment claim also fails.  (CRC Compl. ¶¶ 48-49 (seeking declaration that Deutsche Bank (i) "materially breached the Confirmation," and (ii) "is not entitled to any protection payments because of its material breaches of the Confirmation").)  And because BONY's Interpleader Complaint is predicated on CRC's breach of contract claim (Interpleader Complaint ¶¶ 7, 24, 35), it, too, lacks any basis.  As a result, this Court should instruct BONY to transfer the interpleaded funds to Deutsche Bank.

### CONCLUSION

For the foregoing reasons, CRC's Crossclaims should be dismissed for failure to state a claim and, as a result, Interpleader Plaintiff BONY should be ordered to distribute the interpleaded funds to Deutsche Bank.


Dated:    September 13, 2018
            New York, New York

                                          CAHILL GORDON & REINDEL LLP

                                          By:  _____
                                                David G. Januszewski
                                                Sheila C. Ramesh
                                                Stephen C. Behymer
                                                80 Pine Street
                                                New York, New York 10005
                                                (212) 701-3000

                                          *Attorneys for Interpleader and Crossclaim Defendant Deutsche Bank AG*