IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BANK OF NEW YORK MELLON, LONDON BRANCH, as Indenture Trustee under the Indenture dated as of April 30, 2007,<br><br>  Interpleader Plaintiff,<br><br>              -against-<br><br>CART 1 LTD., as Issuer; DEUTSCHE BANK AG FRANKFURT, as Swap Counterparty; and CRC CREDIT FUND, LTD.,<br><br>  Interpleader Defendants. | Case No. 1:18-cv-06093 (JPO) |

**SUR-REPLY MEMORADUM OF LAW IN SUPPORT OF CRC CREDIT FUND LTD.'S MOTION TO DISMISS DEUTSCHE BANK AG'S CROSSCLAIMS AND IN OPPOSITION TO DEUTSCHE BANK AG'S MOTION TO DISMISS CRC CREDIT FUND LTD.'S AMENDED CROSSCLAIMS**

Date: December 21, 2018

Maria Ginzburg
Andrew R. Dunlap
Nicholas Klenow
SELENDY & GAY, PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000
E-mail: mginzburg@selendygay.com
       adunlap@selendygay.com
       nklenow@selendygay.com

*Attorneys for CRC Credit Fund, Ltd.*

**TABLE OF CONTENTS**

**Pages**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 2

I.     CRC's Claims Accrued In 2018, When DBAG Demanded An Insurance Payment From CART 1 ........................................................................................ 2

II.    DBAG Added Ineligible Loans To The Reference Portfolio ............................. 5

        1.    The Loans Expired After The Contractual Cut-Off Date ............ 5

        2.    The Borrower Did Not Have The Required Credit Rating .......... 7

        3.    Some Of The Loans Were To Ineligible Borrowers ...................... 9

    B.   DBAG Denied CART 1 The Benefit Of A Favorable Debt-For-Cash-And-Equity Swap ........................................................................... 9

    C.   DBAG Improperly Accelerated Its Workout Of The Loans ................... 11

    D.   DBAG Improperly Refused to Remove The Ineligible Loans From the Reference Portfolio ............................................................... 12

III.   DBAG's Tortious Interference Claims Should Be Dismissed Because CRC Had A Strong Economic Interest In The Contracts At Issue ................. 12

CONCLUSION ............................................................................................................................ 14

# **TABLE OF AUTHORITIES**

**Pages**

**Cases**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 16 (2d Cir. 2015) ............................................................................................... 9

*CRAFT EM CLO 2006-1, Ltd. v. Deutsche Bank AG*
    2018 WL 5084811 (N.Y. Sup.Ct. Oct. 15, 2018) ............................................................ 3, 4

*Deutsche Bank AG v. Ambac Credit Prods., LLC*,
    2006 WL 1867497 (S.D.N.Y. July 6, 2006) ..................................................................... 1, 6

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008) ................................................................................ 12

*Felsen v Sol Cafe Mfg. Corp.*,
    24 NY2d 682 (1969) .......................................................................................................... 13

*God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assoc., LLP*,
    6 N.Y.3d 371 (2006) .......................................................................................................... 10

*Hildene Capital Management, LLC v. The Bank of New York Mellon*,
    2015 WL 67544 (Sup. Ct. N.Y. Co. Jan. 5, 2015) ............................................................. 13

*John J. Kassner & Co., Inc. v. City of New York*,
    46 N.Y.2d 544 (1979) ......................................................................................................... 2

*Kassover v. Prism Venture Partners, LLC*,
    53 A.D.3d 444 (1st Dep't 2008) ....................................................................................... 14

*Lasalle Bank N.A. v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005) ............................................................................................... 8

*Merryman v. J.P. Morgan Chase Bank, N.A.*,
    2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016) .................................................................... 9

*Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co.*,
    17 F. Supp.3d 323 (S.D.N.Y. 2014) ................................................................................... 7

*Platek v. Town of Hamburg*,
    24 N.Y.3d 688 (2015) ..................................................................................................... 5, 6

*T&N PLC v. Fred S. James & Co. of New York, Inc.*,
    29 F.3d 57 (2d Cir. 1994) .................................................................................................. 4

*Telesco v. Neuman*,
    2015 WL 2330166 (S.D.N.Y. Mar. 11, 2014) ..................................................... 4

*UMG Recordings v. Escape Media Group*,
    37 Misc.3d 208 (N.Y. Sup. Ct. 2012), *rev'd on other grounds* 964
    N.Y.S.2d 106 (1st Dep't 2013) ........................................................................ 13

*Wells Fargo Bank N.A. v. ADF Operating Corp.*,
    50 A.D.3d 280 (1st Dep't 2008) ....................................................................... 13

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015) ................................................................ 9

*Zappone v. Home Ins. Co.*,
    55 N.Y.2d 131 (1982) ......................................................................................... 7

## **Other Authorities**

S. Davydenko and J. Franks, *Do Bankruptcy Codes Matter?* A Study of
    Defaults in France, Germany, and the U.K. (2008), The Journal of
    Finance (LXIII: 2), 565-608 .............................................................................. 11

## PRELIMINARY STATEMENT

In a credit default swap, "the protection seller agrees to take on a precisely defined level of risk[.]" *Deutsche Bank AG v. Ambac Credit Prods., LLC*, No. 04-5594 (DLC), 2006 WL 1867497, at *8 (S.D.N.Y. July 6, 2006). In the swap contract at issue, CART 1 and investors like CRC, as the insurers, assumed the risks that eligible, properly serviced loans might default and be written off, according to express servicing standards and within a specified time frame. DBAG, as the insured, assumed all risks for loans that were ineligible or improperly serviced.

In its reply papers, DBAG has no coherent response to the plain contract language showing it bore risks for ineligible, improperly serviced loans. It argues CRC's claims are untimely because DBAG placed ineligible Conergy debt into the swap's Reference Portfolio in 2011—but the contract shows, and New York law confirms, that CRC's claims could not accrue until DBAG wrongly demanded an insurance payment in 2018. DBAG asserts the ineligible debt would have defaulted even if it had not exceeded the contractual cut-off date—but the contract provides that because the debt violated the cut-off, it was not covered by the swap; the reason for its default is irrelevant. DBAG argues the contract did not require Conergy to have a minimum credit rating when DBAG restructured its debts—but the contract's Section 6 and Schedule C required that rating for *all* insured debts, and the language DBAG cites (an exception to the separate Schedule D) does not say otherwise. DBAG argues it could take Conergy's debt-for-cash-and-equity swap for itself, while denying the benefit of that swap to loans covered by CART 1, because the CART 1-insured debt was senior to the uninsured debt—but the contract protects CART 1's interests, not the loans' seniority, and CART 1's exposure to Conergy's debt would have been 40 percent lower if DBAG gave it the benefit of the swap. Finally, DBAG asserts CRC has not sufficiently alleged that DBAG improperly wrote off the Conergy debt early to claim

a protection payment—but CRC's allegations are completely plausible: DBAG could not write off the loan if it was probable more funds could be recovered, yet DBAG wrote off the loan shortly after recovering €21,000 on it, while Conergy's bankruptcy was ongoing, and shortly after CRC raised questions about the debt.

DBAG also spins a false tale that it acted in the best interests of the noteholders by restructuring Conergy's debt in 2011 to prevent a bankruptcy at that time which it says would have resulted in an immediate protection payment by CART 1. In truth, it is often better for creditors that a debtor goes bankrupt soon after it becomes distressed, when it has more cash and assets for the creditors to recover, rather than later when it may have burnt through many of those assets. Had Conergy gone bankrupt in 2011, DBAG might well have recovered more than the €2.3 million it has collected so far on the restructured Conergy debt. But DBAG was indifferent to how much it recovered on Conergy debt in the Reference Portfolio, as it intended to stick CART 1 and the swap's investors with any losses on that debt, contracts be damned.

CRC's claim should be sustained and DBAG's retaliatory claim should be dismissed. As there is no genuine dispute over DBAG's conduct, the Court's rulings on the meaning of the contract's key terms should, as a practical matter, end this case.

## ARGUMENT

### I. CRC's Claims Accrued In 2018 When DBAG Demanded An Insurance Payment From CART 1

In its brief, CRC showed that its claims accrued in 2018, when DBAG obtained a (false) Accountant Certification that gave it the right to demand payment from CART 1. CRC Opp. 13-14. Under New York law, a breach-of-contract action accrues only when all conditions precedent to performance have been met, *John J. Kassner & Co., Inc. v. City of New York*, 46 N.Y.2d 544, 550 (1979), and DBAG concedes that obtaining the Certification was a substantive condition precedent to its right to

2

demand an insurance payment on a defaulted, eligible Reference Obligation. DB Br. at 23, 23 n.13.

In reply, DBAG acknowledges that "[a] claim for monies owed accrues when a party is entitled to demand payment and the breaching party fails to pay," but asserts DBAG's own demand for an insurance payment is "irrelevant" to CRC's claims. DB Reply at 2-3. In fact, it is highly relevant: In a blind credit default swap, an independent certification that a claim for swap insurance is valid is the noteholders' main protection against paying false claims. Accordingly, CRC's primary claim is for a declaratory judgment that DBAG is not entitled to the payment it demanded based on the improper Accountant Certification, *see* Am. Cross-Cl. ¶¶ 70-74; that claim could not arise until DBAG sought the certification in 2018.[1] Similarly, CRC brings a claim that DBAG breached the Confirmation by making an improper payment demand, *Id.* ¶¶ 63-67; that claim too could not arise until DBAG made its 2018 demand.

DBAG argues New York's accrual rules do not apply to claims brought by insurers against insureds for improper payment demands in circumstances like this. DB Reply at 3. In fact, in *CRAFT EM CLO 2006-1, Ltd. v. Deutsche Bank AG*, a credit-default-swap insurer, CRAFT, brought suit against an insured, DBAG, for an improper payment demand based on false Accountant Certifications. No. 656152/16, 2018 WL 5084811, at *1 (N.Y. Sup.Ct. Oct. 15, 2018). The court held such claims were timely if brought within six years after the Certifications were issued. *Id.*

DBAG tries to distinguish *CRAFT* by noting it dismissed breach-of-contract claims based on violations of eligibility criteria that occurred more than six years before suit was filed. DB Reply at 3-4. This is irrelevant: *CRAFT* sustained breach claims based on Accountant Certifications issued less than six years before suit that

---

[1] DBAG also failed to provide the independent accountant with all information necessary to determine eligibility, including CRC's letters. Am. Cross-Cl. ¶ 66.

3

falsely certified the same criteria were met more than six years earlier. *See* Complaint ¶¶ 94-99, *CRAFT EM CLO 2006-1, Ltd.*, 2018 WL 5084811. Here, as in *CRAFT*, CRC squarely alleges that DBAG obtained an ingenuine Accountant Certification that falsely stated the Reference Obligations at issue complied with the Reference Obligation Eligibility Criteria. Am. Cross-Cl. ¶¶ 63-67.[2]

Finally, DBAG wrongly argues that CRC's claims would not qualify for equitable tolling. DB Br. 4-5. It asserts CRC did not allege that DBAG concealed its misconduct in 2011, after the transaction was entered into, *id.* at 4, but, in fact, CRC alleges that "DBAG's conduct after the deal closed shows that it used the 'blind' nature of the transaction to administer the swap very differently than it had told investors it would." Am. Cross-Cl. ¶ 45. DBAG also asserts CRC should have learned of DBAG's misconduct in 2013, DB Reply at 4-5, but even if true (and it is not), CRC would have had six years—until 2019—to assert its breach-of-contract claims, and it brought them in 2018. *See Telesco v. Neuman*, 2015 WL 2330166, at *5 (S.D.N.Y. Mar. 11, 2014) (holding that where defendants concealed breaches until 2011, the statute of limitations for plaintiff's claims, which otherwise would have accrued in 1997, was equitably tolled until 2011, such that claims filed in 2014 were timely).

---

[2] DBAG cites *T&N PLC v. Fred S. James & Co. of New York, Inc.*, 29 F.3d 57 (2d Cir. 1994) for the proposition that a breach-of-contract claim accrues when the contract is breached. In that case, the Second Circuit rejected defendant's argument that its claim accrued when the defendant was first injured, seven years after the contract was breached. *Id.* at 59. Here, in contrast, CRC argues that DBAG breached the contract, and CRC was injured, in 2018 when DBAG first procured an improper Accountant Certification that DBAG concedes is a substantive condition precedent to CART 1's performance. There was no condition precedent at issue in *T&N PLC*. Moreover, CRC's proffered application of the accrual rules would create a perverse incentive for credit default sponsors like DBAG: They could fill reference portfolios with ineligible debts, conceal the problem as the portfolios are blind, then wait six years to demand insurance payments for the ineligible loans. That is exactly why the swap contract requires an independent Accountant Certification to ensure eligibility when payment is demanded.

4

## II. DBAG Added Ineligible Loans To The Reference Portfolio

### 1. The Loans Expired After The Contractual Cut-Off Date

CRC showed that DBAG improperly added new Conergy loans to the Reference Portfolio that matured after the June 15, 2015 contractual cut-off date set in the Confirmation's Schedule F. CRC Opp. 14-17.

DBAG argues this violation did not make the loans ineligible for insurance payments, because Schedule F's cut-off date did not appear on Schedule C's list of Reference Obligation Eligibility Criteria. DB Reply at 9. In fact, Schedule C's criterion (e) required that each Reference Obligation "shall be a loan … whose repayment is primarily dependent upon the creditworthiness of a small or medium-sized enterprise, as determined by the relevant DBAG Group Entity in accordance with the Credit and Collection Policies." Sch. C at 1. The Credit and Collection policies were "the standard credit and collection policies of Deutsche Bank AG as amended or supplemented from time to time in accordance with the Servicing Standards[.]" Confirm. at 6. The Servicing Standards, in turn, were "the servicing principles set forth in Schedule F[.]" *Id.* Thus, the servicing requirements of Schedule F were incorporated into the eligibility criteria of Schedule C. If DBAG restructured a Reference Obligation in a way that violated Schedule F, as it did here, it necessarily violated Schedule C, rendering the loan ineligible. DBAG has no response to this point, which CRC laid out in its Opposition. CRC Opp. at 21 n.12.

Even if the cut-off-date were not incorporated into Schedule C (and it is), restructured loans maturing after that date still would not be eligible for credit protection. Under New York law, courts interpret insurance contracts to give meaning to coverage exclusions where "permitting coverage … would force [the insurer] to insure a loss it did not contemplate and, indeed, affirmatively excluded." *Platek v. Town of Hamburg*, 24 N.Y.3d 688, 697 (2015). Here, in Schedule F, DBAG agreed its servicers "shall ***only*** agree to … debt restructuring" of a Reference Obligation if the

5

restructured loan was due to be repaid in full before the cut-off date. Sch. F at 6 (emphasis added). This language excludes from the swap's coverage any Reference Obligation that was restructured to expire after that date. *Platek*, 24 N.Y.3d at 697 (2015).[3]

DBAG also repeats its argument that its inclusion of a loan expiring after the cut-off date did not cause CRC any damages. DB Reply at 10. As CRC explained, however, it has been damaged by DBAG's demand for an €23 million insurance payment for loans that did not comply with the contractual cut-off. CRC Opp. at 15-17. DBAG does not refute this point. Instead, DBAG asserts that CRC does not explain "how it might have made out better" if the loans had complied with the cut-off date, DB Reply at 10, but CRC does not need to. CRC simply needs to show that the loans did not qualify for insurance coverage—which they did not, because they matured after the cut-off. Whether Conergy might have defaulted on the loans even if the loans did qualify for insurance coverage is irrelevant.

Finally, DBAG argues that CRC does not allege that DBAG materially breached the contract by adding loans that exceeded the cut-off date. DB Reply at 11. Notably, DBAG does not contest CRC's showing that it does not have to plead a material breach unless it is trying to excuse its own performance or rescind the contract. CRC Opp. at 15. Rather, DBAG now asserts that CRC is purportedly trying to prevent CART 1 from performing its obligations under the Confirmation. DB Reply at 10-11.

---

[3] DBAG does not meaningfully respond to *Platek* or to *Deutsche Bank AG v. Ambac Credits Prods., LLC*, which held DBAG's failure to comply with a required time frame made a loan ineligible for credit protection. 2006 WL 1867497, at *3 (S.D.N.Y. July 6, 2006). In a footnote, DBAG says the cases are distinguishable because they provided no insurance payments were due if certain contractual provisions were not met. DB Reply at 9 n.8. But the Confirmation does the same thing here regarding the cut-off date, by incorporating that date into Schedule C's eligibility criteria and by providing Reference Obligations can be restructured "only" if they comply with that date. Thus, the cut-off date was part of the "precisely defined level of risk" that CART 1 and CRC agreed to take on through the swap, *Ambac*, 2006 WL 1867497, at *8, and the risks of loans not complying with that date are borne solely by DBAG.

6

In reality, CRC is not asking CART 1 to stop performing under the contracts (for example, by withholding payment on *other* defaulted Reference Obligations that are not in dispute), nor is it seeking to rescind the contracts. CRC is simply disputing DBAG's claim to coverage on the specific loans at issue, which insurers do routinely without having to prove the insured's material breach. *See generally Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co.*, 17 F. Supp.3d 323, 331 (S.D.N.Y. 2014); *Zappone v. Home Ins. Co.*, 55 N.Y.2d 131, 136 (1982).

### 2. The Borrower Did Not Have The Required Credit Rating

CRC showed that Section 6 and Schedule C of the Confirmation both require all loans to comply with Schedule C's Reference Obligation Eligibility Criteria. CRC Opp. at 17-20. Yet DBAG added new Conergy loans to the Reference Portfolio in 2011, when Conergy lacked the minimum credit rating required by Schedule C's criterion (a). CRC also showed that, contrary to DBAG's assertions, clause (x)(1) of Schedule D does not excuse Substitute Reference Obligations from complying with all of Schedule C's criteria. *Id.* at 20.

DBAG's primary response is that Schedule D's clause (x)(1) must excuse failing borrowers from having the minimum credit rating because the sole purpose of that clause is to help DBAG restructure the debt of distressed companies to stave off default and bankruptcy. DB Reply at 6. This is demonstrably false. Clause (x)(1), which deals with Substitute Reference Obligations, applies when a borrower's loan "is partially or fully prepaid or canceled." Sch. D at 2. That is, it applies when a robust company with strong finances **prepays** its loans well before scheduled maturity, not simply when a distressed borrower's debt is canceled and replaced by restructured debt. DBAG cannot rewrite clause (x)(1) as applying only in cases of restructuring.

DBAG also argues, again, that requiring Substitute Reference Obligations to comply with all of Schedule C's Reference Obligation Eligibility Criteria would render

7

Schedule D's clause (x)(1) "meaningless." DB Reply at 6-8. In fact, as CRC showed, a natural reading of the contract requires all loans to comply with all of Schedule C's criteria, while excusing some replenished loans from complying with Schedule D's replenishment conditions if (among other things) those loans are of the type laid out in three of those criteria. This reading gives full force to the plain command in Section 6 and Schedule C that "each" loan comply with all criteria, while not interfering with the operation of Schedule D's clause (x)(1) in allowing substitutions. DBAG's reading, in contrast, would excuse large numbers of loans from complying with the most critical requirements of Schedule C, in stark violation of Section 6 and Schedule C, which DBAG does not address.[4]

Finally, DBAG asserts that Substitute Reference Obligations do not need to comply with the minimum credit rating because the borrowers' debt "must already be in the CART 1 Reference Portfolio such that it is already covered by the protection purchased by Deutsche Bank." DB Reply at 8. DBAG mischaracterizes the contracts' allocation of risks. If an eligible, properly serviced loan is in the Reference Portfolio, then CART 1 and its investors bear the risk of that loan defaulting and being written off. But if DBAG cancels that loan and replaces it with a restructured loan, CART 1 does not bear the new loan's risk of default unless the new loan meets all the contract's eligibility criteria. DBAG seems to believe that as long as it includes one of a borrower's eligible loans in the Reference Portfolio, then it can include whatever other loans to that borrower it likes (up to the amount of the original balance), no matter how distressed the borrower has become in the interim. That is not what the contract

---

[4] DBAG tries to distinguish *Lasalle Bank N.A. v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir. 2005) by arguing the Second Circuit simply found two overlapping warranties were not duplicative. DB Reply at 8 n.6. In fact, the appellate court rejected exactly the same argument DBAG makes here: that a straightforward reading of two overlapping provisions would render one "superfluous." *Id.* at 207. Here, as in *LaSalle*, enforcing the contract as it is written "accords each warranty independent weight, thereby giving full effect to all of its provisions." *Id.* (quotation omitted).

says. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015) (rejecting interpleader-defendant's interpretation of an indenture that would subvert provisions designed to protect the noteholders).

### 3. Some Of The Loans Were To Ineligible Borrowers

CRC showed that Schedule D's clause (x) requires Substitute Reference Obligations to be made to the same borrower that took out the canceled or prepaid loan, but DBAG placed a new loan into the Reference Portfolio that was not made to the original Conergy borrower. CRC Opp. at 21. DBAG argues CRC's pleadings are inadequate because they do not preclude the possibility that the loan came from the original borrower. DB Reply at 8-9. In fact, CRC alleged a new loan was made to a Reference Entity with a different identifier than the canceled loan. *See* Am. Cross-Cl. ¶ 56. DBAG's assertion that the two numbers refer to the same entity is a fact-specific question, and "[f]act specific questions cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 16, 185 (2d Cir. 2015); *see also Merryman v. J.P. Morgan Chase Bank, N.A.*, 2016 WL 5477776, at *9-10 (S.D.N.Y. Sept. 29, 2016) (denying motion to dismiss where defendant's version of events "is plausible [because] the Court cannot pick between equally plausible scenarios when deciding a motion to dismiss").

## B. DBAG Denied CART 1 The Benefit Of A Favorable Debt-For-Cash-And-Equity Swap

CRC showed that Schedule F prohibited DBAG from putting its interests ahead of CART 1's, yet DBAG denied CART 1 the benefit of a debt-for-cash-and-equity swap that DB London took for itself. CRC Opp. at 21-23. DBAG even admitted that DB London made an "independent decision[]," not considering whether it would wind up in a better position than CART 1. DB Br. at 15.

9

DBAG argues Schedule F restricts it from favoring its interests over CART 1's only "in relation to their respective other claims against the same Reference Obligor[.]" DB Reply at 11-12. That language appears in only one of Schedule F's two most-favored-nation provisions. The first has no such restriction; it provides:

> In the case of a conflict of interest between the interest of Seller and the interests of any DBAG Group party or a third party with regard to servicing of the Reference Obligations, the DB Servicers shall not place the interests of Seller in a less favorable position than the interests of any such DBA Group Entity or third party.

Sch. F at 1. DBAG cannot read this provision out the contract, and impermissibly "pick and choose which provisions suit its purposes[.]" *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assoc., LLP*, 6 N.Y.3d 371, 374 (2006).

DBAG also misinterprets the second provision, which states:

> In all cases of a payment rescheduling or debt restructuring, each of the DB Servicers shall adequately safeguard the interests of Seller in the fullest performance of the Reference Obligations at all times and shall not place such interests in a less favorable position than its own interests or the interests of any other DBAG Group Entity in relation to their respective other claims against the same Reference Obligor.

Sch. F at 2. DBAG misleadingly asserts that it complied with this provision because "CART 1 held a more senior claim than DB London as a holder of equity." DB Br. at 18. But the clause does not speak of debts' "seniority," it speaks of DBAG's and CART 1's "interests" in relation to claims against the same borrower. Because CART 1 does not insure equity, if DBAG had taken the swap for the debt protected by CART 1, about 40 percent of that protected debt would have been replaced with a partial equity stake *not* subject to the swap. As a result, CART 1's total exposure to Conergy debt would have been reduced by about 40 percent. Because DBAG took the swap for itself but not CART 1, however, DBAG reduced its own, unprotected Conergy

10

debt while CART 1's exposure stayed the same. Thus, DBAG put its interests in Conergy ahead of CART 1's.

Finally, DBAG asserts its conduct was allowed by Section 8(b)(ii) of the Confirmation, which allows it to "generally engage" in banking with Reference Entities like Conergy. DB Br. at 16. But CRC showed this provision allows DBAG to bank with such borrowers only "*where permitted*" by the Confirmation, CRC Opp. at 22 (original emphasis), a point that DBAG does not bother to dispute.

### C. DBAG Improperly Accelerated Its Workout Of The Loans

CRC showed the Confirmation required DBAG to write off the Conergy loans using its normal servicing procedures, that those procedures allowed a write-off only if it was "probable" no further recovery could be had, and that DBAG violated those provisions by writing off the loans when more recoveries could be forthcoming. CRC Opp. at 23. DBAG argues that allegations it received a €21,000 recovery in December 2017 do not make it plausible that more recoveries were forthcoming, but it does not explain why.[5] DBAG notes the size of the December recovery was small compared to that of the original debt, but the procedures do not distinguish based on the size of recovery—if ***any*** further recovery of any amount was probable, then the debt was not to be written off. DBAG also fails to address CRC's allegation that its write-off of the Conergy loans came directly after CRC asked it about those loans, but before Conergy's bankruptcy process was completed.[6] DB Br. at 21-23. CRC is entitled to the

---

[5] DBAG also misleadingly argues the Confirmation provided a mechanism for it to "make 'adjustment payments' if and when additional amounts are recovered." DB Br. at 13 (citing Confirmation § 8(g)). DBAG fails to mention, however, that this provision only applies "*during the Term of this Transaction*," (Confirm. at § 8(g) (emphasis added)). That is, after the final maturity date, CART 1 and the noteholder would not receive any adjustment payments, because the notes would be legally extinguished.

[6] DBAG cannot make CRC's allegations less plausible by identifying the length of Conergy's bankruptcy proceedings. DB Br. at 21-22. The *median* length of reorganization proceedings in Germany is nearly four (3.82) years, making Conergy's five-year proceeding unexceptional. S. Davydenko and J. Franks, *Do Bankruptcy Codes Matter?* A Study of Defaults in France, Germany, and the U.K. (2008), The Journal of Finance (LXIII: 2), 565-608.

benefit of all inferences that more recoveries were likely but DBAG wrote off the obligations simply to take advantage of the swap. *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) ("[I]f there are two equally plausible inferences that may be drawn from [a] set of facts, one favoring the plaintiff and one favoring the defendant, a motion to dismiss must be denied.").

### D. DBAG Improperly Refused to Remove The Ineligible Loans From the Reference Portfolio

CRC showed the Confirmation required DBAG to remove ineligible loans from the Reference Portfolio, but DBAG refused to do so. CRC Opp. at 24. DBAG argues it was required to remove only loans that violated Schedule C and that none of the new Conergy loans did so. DB Reply at 13-14. In fact, as shown, the loans violated Schedule C because they did not meet the minimum credit rating, *see* Section I.A.2, *supra*, and because they violated Section F's maturity cut-off date for restructured loans, which is incorporated into Schedule C. Section I.A.1, *supra*.

## III. DBAG's Tortious Interference Claims Should Be Dismissed Because CRC Had A Strong Economic Interest In The Contracts At Issue

CRC showed DBAG's tortious interference claims must be dismissed because DBAG alleges CRC had an economic interest in the swap. CRC Opp. at 24-25.

DBAG argues the facts necessary to establish this defense are "not evident on the face of Deutsche Bank's crossclaim." DB Reply at 14. In reality, DBAG explicitly pleads all the necessary facts, alleging (1) "it was in the noteholders' financial interests for Deutsche Bank to draw upon as little of the credit protection fund as possible," DB Compl. ¶ 52; (2) "CRC … has a direct financial incentive to prevent Deutsche Bank from drawing upon the credit protection," *id.* ¶ 59; and (3) "Deutsche Bank's entitlement to credit protection cuts against [CRC's] financial interests," *id.* ¶ 60.

DBAG also argues CRC must allege an interest in the business of CART 1's Indenture Trustee, the Bank of New York Mellon ("BNYM"), for the defense to apply.

12

DB Reply at 14-15. Not so. CRC did not prevent BNYM from paying its own funds to DBAG: It prevented BNYM from distributing CART 1's funds to DBAG. CRC prevented BNYM from acting solely as CART 1's representative, as Indenture Trustee: It did not prevent BNYM from acting in the course of its own business. Thus, the relevant question is not whether CRC has an economic interest in BNYM, but whether it has an economic interest in **CART 1**, and it plainly does, holding 100% of CART 1's Class F notes and 82.56% of its Class E notes. Just as the economic interest defense applies where a defendant is a significant stockholder in the breaching party's business, *Felsen v Sol Cafe Mfg. Corp.*, 24 NY2d 682, 687 (1969), it applies here, where CRC has an enormous stake in CART 1's business.

DBAG's contrary argument is not helped by *Hildene Capital Management, LLC v. The Bank of New York Mellon*, 2015 WL 67544 (Sup. Ct. N.Y. Co. Jan. 5, 2015). In *Hildene*, investors in a collateralized debt obligation sued BYNM for selling the CDO's assets to a third party, Bimini, in breach of the CDO's indenture. *Id.* at *4. They also sued Bimini for tortiously interfering with the indenture by inducing BNYM to make the sale. *Id*. The court rejected Bimini's argument that an economic interest in its own business was sufficient to defeat the tortious interference claim, as Bimini (which was not an investor) had no interest in BNYM's business *or the CDO*. *Id*. at *8. Far different from *Hildene*, CRC is not a stranger to the CART 1 trust but is its largest investor.[7]

---

[7] DBAG cites *UMG Recordings v. Escape Media Group*, 37 Misc.3d 208 (N.Y. Sup. Ct. 2012), *rev'd on other grounds* 964 N.Y.S.2d 106 (1st Dep't 2013), and *Wells Fargo Bank N.A. v. ADF Operating Corp.*, 50 A.D.3d 280, (1st Dep't 2008) for the proposition that a party asserting an economic interest defense must have an interest in the business of the breaching party. DB Reply at 15. In fact, those cases provide: "a party acting in its own direct interest, rather than to protect its stake in the breaching party, may not raise the economic interest defense." *UMG*, 37 Misc.3d at 224 (citing *Wells Fargo*, 50 A.D.3d at 281). *UMG* makes clear that a "stake in the breaching party" can be, for example, the investment of a fund in a company. *Id.* (*citing Foster v Churchill*, 87 N.Y.2d 744, 749-751 (1996) (holding that, when venture capital funds acted to remove executives of company in which the funds had invested, they were acting in the company's economic interests, hence "their actions were economically

13

Moreover, contrary to DBAG's claim that it has no legal interest in BNYM's trusteeship of CART 1, CRC is an express third-party beneficiary to the Indenture Agreement. *See* Indenture § 14.8 ("Noteholders . . . each of which shall be an express third party beneficiary of this Indenture . . ."). Under New York Law, a third-party beneficiary to a contract cannot tortiously interfere with that contract. *See Kassover v. Prism Venture Partners, LLC,* 53 A.D.3d 444 (1st Dep't 2008) (holding court properly dismissed the tortious interference claim because defendants, as third-party beneficiaries, "were not strangers" to the contract).

## CONCLUSION

For the reasons stated above and in CRC's Opposition, the Court should dismiss DBAG's claims and deny DBAG's motion to dismiss CRC's claims.

Dated: December 21, 2018
New York, NY

Respectfully submitted,

SELENDY & GAY PLLC

By: /s/ Maria Ginzburg
Maria Ginzburg
Andrew R. Dunlap
Nicholas Klenow
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
E-mail: mginzburg@selendygay.com
adunlap@selendygay.com
nklenow@selendygay.com

*Attorneys for CRC Credit Fund, Ltd.*

---

justified"). Here, CRC plainly has a qualifying economic stake in the CART 1 trust, as the trust's primary investor. *UMG* and *Wells Fargo* do not hold—and DBAG cites no caselaw for the proposition—that CRC must ***also*** show an economic interest in the business of CART 1's trustee, which acts for the trust solely in a representative capacity.