UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

――――――――――――――――――――――――
THE BANK OF NEW YORK MELLON,
LONDON BRANCH,
                    Interpleader Plaintiff,            18-CV-6093 (JPO)

          -v-                                          OPINION AND ORDER

CART 1, LTD., DEUTSCHE BANK AG
FRANKFURT, and CRC CREDIT
FUND, LTD.,
                    Interpleader Defendants.
――――――――――――――――――――――――

J. PAUL OETKEN, District Judge:

      This interpleader action concerns whether Interpleader Defendant Deutsche Bank AG Frankfurt (together with its affiliates, "DB") is entitled to receive any payment under a credit default swap transaction it entered into with CART 1 Ltd. ("CART 1").  Interpleader Plaintiff, the Bank of New York Mellon, London Branch ("BNYM"), as the trustee for this transaction, now holds approximately €28.7 million in disputed funds related to this transaction.  (Dkt. No. 54.)  DB claims that it is entitled to €24,400,601.41 from BNYM of these disputed funds.  (Dkt. No. 28 ("DB Compl.") ¶ 96.)  On the other hand, CRC Credit Fund, Ltd. ("CRC"), which has invested in CART 1, claims that DB is not entitled to any default protection payment in light of DB's breach of contract.  (Dkt. No. 43 ("CRC Compl.") at 27.)  DB also asserts a tortious interference with contract claim against CRC.  (DB Compl. ¶¶ 88–95.)

      DB and CRC have filed cross-motions to dismiss.  (Dkt. Nos. 37, 44, 47.)  For the reasons that follow, CRC's motion is granted and DB's motions are denied.[1]

―――――――――――

[1] DB's first motion to dismiss CRC's cross-claims is mooted in light of CRC's filing of the amended cross-claims.  (*See* Dkt. Nos. 37, 43, 44.)

**I.      Background**

    **A.      Factual Background**

The following factual allegations are drawn from the parties' pleadings and are not subject to dispute unless otherwise noted.[2]

        **1.      The Swap Transaction**

The transaction at issue concerns a structured note backed by a credit default swap, under which investors agreed to cover certain losses DB incurred on eligible loans it made to third parties. (CRC Compl. ¶ 1.) In brief, this transaction was structured as follows.

In 2007, DB created a special-purpose vehicle, CART 1, to issue notes with a total face value of €263.5 million to investors ("Noteholders"). (CRC Compl. ¶¶ 1, 19–20.) The notes were issued under an indenture (the "Indenture"), with BNYM as the trustee (the "Indenture Trustee"). (CRC Compl. ¶18.) Pursuant to the Indenture, CART 1 issued seven classes of notes—Classes A+ through F—with Class A+ as the most senior and Class F as the most junior. (CRC Compl. ¶ 20.) The Noteholders were to receive quarterly payments from DB through CART 1, until the notes matured. (CRC Compl. ¶ 21.) But the Noteholders' investment was not without risk, because under a credit default swap agreement between DB and CART 1, the funds that Noteholders paid to CART 1 would be used to cover certain losses that DB might incur on a portfolio of loans (individually, "Reference Obligation," and collectively "Reference Portfolio") that it made to third parties ("Reference Entities").[3] (CRC Compl. ¶¶ 1, 24.) Upon the maturity date of the notes—June 15, 2018—any remaining amounts with CART 1 that had not been used

---

[2] For ease of reference, the Court cites CRC's amended cross-claims for undisputed factual allegations.

[3] The names of the Reference Entities were not disclosed to the Noteholders. (CRC Compl. ¶ 2.)

to cover DB's losses would be paid back to Noteholders. (CRC Compl. ¶¶ 1, 21.) In other words, "[t]he fewer eligible loans that defaulted and were liquidated or written off, the better the investors would do." (CRC Compl. ¶ 1.)

As of June 2018, the only outstanding notes were Classes E and F, and CRC holds 82.56% of the Class E notes and 100% of the Class F notes. (Dkt. No. 1 ("Interpleader Compl.") ¶¶ 5, 7.)

### 2. Relevant Provisions

This transaction is governed by the Indenture, an International Swaps and Derivatives Association Master Agreement, and an integrated Confirmation (the "Confirmation").[4] (CRC Compl. ¶¶ 17, 23.) Because this action primarily presents a question of contract interpretation, the Court sets out several relevant provisions from the Confirmation below.

#### a. Reference Obligation

For any Reference Obligation to be eligible for entry into the Reference Portfolio, it and its related Reference Entity must satisfy Reference Obligation Eligibility Criteria as set out in Schedule C to the Confirmation ("Schedule C"). (CRC Compl. ¶ 26; Dkt. No. 49-1 ("Confirmation") at 45.[5]) Schedule C contains five Reference Obligation Eligibility Criteria, including that

> (a) [the] Reference Entity [shall have] a DB Internal Rating of iB- or better;
>
> . . .

---

[4] There are actually two confirmations involved in the transaction here, each one for different classes of notes. One confirmation is the First Loss Credit Default Swap Confirmation, and the other is the Mezzanine Swap Confirmation. (CRC Compl. at 7 n.8.) Because they have substantially similar terms, they are collectively referred to herein as the "Confirmation." (*Id.*)

[5] When citing the Confirmation, the Court uses the pagination assigned by the Electronic Court Filing system.

> (e) [and that the] Reference Obligation . . . shall be a loan . . . whose repayment is primarily dependent upon the creditworthiness of a small or medium-sized enterprise, as determined by the relevant DB Group Entity in accordance with the Credit and Collection Policies.

(Confirmation at 45.)

DB could add new Reference Obligations to the Reference Portfolio through a process known as Replenishment, if the new Reference Obligation "meets the Reference Obligation Eligibility Criteria [listed in Schedule C] and, following such addition, the Reference Portfolio . . . meet[s] [certain] Replenishment Conditions [listed in Schedule D]." (CRC Compl. ¶ 27 (formatting omitted); Confirmation at 25.)

Schedule D sets out ten Replenishment Conditions, nine of which are applicable to the Reference Portfolio as a whole, and one of which is applicable to the new Reference Obligation alone. (CRC Compl. ¶ 29; Confirmation at 46–47.) In addition, Schedule D also provides that

> During the Replenishment Period, the [Replenishment Conditions] will not be applicable as follows:
>
> (x)(1) If a Reference Obligation (the "**Original Reference Obligation**") is partially or fully prepaid or cancelled (as such terms are commonly used), then [DB] may elect to maintain the unpaid or uncancelled portion of such Reference Obligation in the Reference Portfolio and substitute another obligation of the applicable Reference Entity that satisfies the Reference Obligation Eligibility Criteria other than clauses (a) and (c) thereof (the "**Substitute Reference Obligation**") for the prepaid or cancelled portion of such Reference Obligation . . . .

(Confirmation at 47.)

Moreover, Schedule D also requires DB to remove from the Reference Portfolio any Reference Obligation that, after inclusion, would violate the Reference Obligation Eligibility Criteria or the Replenishment Conditions. (CRC Compl. ¶ 33; Confirmation at 48.)

4

### b. Loan Servicing Standards

The Confirmation contains Reference Portfolio Servicing Standards, set forth in Schedule F. As a general principle, Schedule F provides that:

> In administering, collecting and enforcing the Reference Obligations or foreclosing on any Reference Collateral (collectively the "servicing" and to "service") each [DB] Servicer shall at all times act . . . as a reasonable creditor in the protection of its own interests acting reasonably and in good faith in accordance with its general business practices taking into account the interests of [CART 1]. In the case of a conflict of interest between the interests of [CART 1] and the interests of any DB Group party or a third party with regard to servicing of the Reference Obligations, the [DB] Servicers shall not place the interests of [CART 1] in a less favorable position than the interests of any such DB Group Entity or third party. In the case of a conflict between the interests of [DB] and the interests of the Noteholders, the [DB] Servicers shall give priority to the interests of [DB] and then, among the Noteholders, to the interests of the Holders of the Class or Classes of Notes which then rank most senior pursuant to the Priority of Payments.

(Confirmation at 61.)

In the event that a Reference Obligation's payment is in arrears, Schedule F provides that

> In all cases of a payment rescheduling or debt restructuring, each of the [DB] Servicers shall adequately safeguard the interests of [CART 1] in the fullest performance of the Reference Obligations at all times and shall not place such interests in a less favorable position than its own interests or the interests of any other DB Group Entity in relation to their respective other claims against the same Reference Obligor.

(Confirmation at 62.)

Moreover, with respect to the due date of any restructured Reference Obligation, Schedule F provides that

> Each [DB] Servicer shall only agree to payment rescheduling or debt restructuring of a Reference Obligation . . . if the Reference Obligation, under the altered repayment schedule or as restructured, is due to be repaid in full before the Scheduled Termination Date.

(*Id.*)

5

The Scheduled Termination Date is the "'Payment Date' (as defined in the Indenture) falling in June 2015." (Confirmation at 4.) The Indenture identifies the "Payment Date[]," as relevant, as June 15, 2015. (Dkt. No. 49-3 at 100.)

### c.    Conditions to Settlement

To claim a protection payment for a defaulted loan, DB has to satisfy two "Conditions to Settlement." (Confirmation at 13, 15.) First, DB must send CART 1 a Credit Event Notice informing CART 1 that a credit event—bankruptcy or failure to pay—has occurred with one of the Reference Entities. (CRC Compl. ¶ 38; Confirmation at 13–14, 16–17.) The Credit Event Notice has to "contain a description in reasonable detail of the facts relevant to the determination that a Credit Event has occurred." (Confirmation at 14.)

Following the delivery of the Credit Event Notice, the Confirmation provides that DB, as the servicer of the defaulting Reference Obligation, will conduct any "work-out process[] . . . in accordance with its servicing practices prevailing from time to time and this Confirmation." (Confirmation at 23.) DB may then conclude the work-out process and determine the loss incurred if it has "determined in accordance with such servicing practices and this Confirmation . . . that such Reference Obligation shall be written-off." (*Id.*)

After DB writes off the defaulting Reference Obligation and determines the loss, it needs to satisfy an additional condition to settlement before obtaining a default protection payment from CART 1. This additional condition requires DB to seek a Notice of Accountant Certification from KPMG or any other independent accountant certifying the following:

> (a) that such Defaulted Reference Obligation satisfied the Reference Obligation Eligibility Criteria to the extent applicable thereto and, if added to the Reference Portfolio pursuant to a Replenishment, did not (taken together with any other Reference Obligation added to the Reference Portfolio on the same

> Replenishment Date) contravene the Replenishment Conditions, in each case on the related Relevant Date,
>
> (b) verifying that the Credit Event identified in the Credit Event Notice occurred and
>
> (c) verifying the computation of the relevant Loss Determination Amount.

(Confirmation at 15.)

### 3. The Conergy Loans

At its inception of April 30, 2007, the Reference Portfolio of CART 1 contained a Reference Obligation of €14.247 million for Reference Entity 6622834, Conergy AG ("Conergy").[6] (CRC Compl. ¶ 46; *see also* DB Compl. ¶ 31.) That Reference Obligation was removed from the Reference Portfolio on June 27, 2007. (DB Compl. ¶ 31.)

Later in 2007, DB added to the Reference Portfolio two loans that were made to Conergy by DB's subsidiary, Deutsche Bank Luxembourg, S.A. ("DB Luxembourg"), totaling €24.3 million. (DB Compl. ¶¶ 32–34.) Additionally, DB's distressed-debt desk in London ("DB London") also held portions of these loans to Conergy, separate from the portions that had been brought within the Reference Portfolio. (DB Compl. ¶ 36.)

Conergy soon had to re-negotiate the terms of its loans with its creditors in light of its mounting financial difficulties. It offered its creditors two restructuring options. (DB Compl. ¶ 40.) First, creditors could exchange their debt holdings for equity shares in Conergy and cash (the "Debt-for-Equity Swap"). (*Id.*; *see* CRC Compl. ¶ 50.) Alternatively, creditors could choose debt refinancing, under which they would have to accept a haircut. (DB Compl. ¶ 40.) DB London agreed to take the Debt-for-Equity Swap and exchanged its debt. (DB Compl. ¶ 41;

---

[6] DB alleges that the initial amount of the Reference Obligation tied to Conergy was €14.3 million. (DB Compl. ¶ 31.)

7

CRC Compl. ¶ 50.) DB Luxembourg, holding Conergy loans then in the Reference Portfolio, did not participate in the debt-for-equity swap. (CRC Compl. ¶ 51.) Instead, DB Luxembourg opted for debt refinancing, accepting a haircut and establishing the maturity date of the resultant new loans as July 21, 2015. (CRC Compl. ¶¶ 53–54; DB Compl. ¶ 41.) DB added these new loans to the Reference Portfolio. (CRC Compl. ¶ 54.)

On July 5, 2013, Conergy filed for insolvency. (DB Compl. ¶ 44.) On July 23, 2013, DB issued a Credit Event Notice in connection with the defaulted Conergy loans. (DB Compl. ¶ 46.) In March 2018, DB concluded its work-out process, writing off €25.2 million of its Conergy debt after determining that the debt was expected to be unrecoverable. (DB Compl. ¶¶ 48, 50.) On June 6, 2018, DB procured a Notice of Accountant Certification. (DB Compl. ¶ 54.)

### 4. The Parties' Dispute

The swap transaction was scheduled to terminate on June 15, 2018. (DB Compl. ¶ 52.) At that time, any undrawn credit protection funds that CART 1 held were to be distributed to the Noteholders. (*Id.*)

On May 29, 2018, CRC wrote to BNYM, the Indenture Trustee, requesting that BNYM withhold default protection payment to DB due to DB's alleged breaches of the Confirmation. (CRC Compl. ¶ 68.) DB denied CRC's allegations. (*Id.*) To address the parties' disputes, DB agreed to extend the termination date from June 15 to June 29, 2018. (*Id.*) It is DB's position that, as of June 29, 2018, it was entitled to credit payment of €24,400,601.41 from BNYM. (DB Compl. ¶ 55.)

### B. Procedural History

On July 5, 2018, BNYM filed this interpleader action against CART 1, DB, and CRC, in order to resolve the conflicting claims to the disputed funds. (Dkt. No. 1.) DB answered and filed counter-claims and cross-claims against all parties, seeking a declaratory judgment that it

was entitled to the payment of €24,400,601.41.  (DB Compl. ¶¶ 78–87.)  DB asserted an additional cross-claim against CRC for tortious interference with contract.  (DB Compl. ¶¶ 88–95.)  CRC answered and filed cross-claims against DB, asserting a breach of contract claim and seeking a declaratory judgment that DB was not entitled to any protection payments because it had breached the Confirmation.  (CRC Compl. ¶¶ 70–78.)

DB and CRC filed cross-motions to dismiss.  (Dkt. Nos. 37, 44, 47.)  The briefing of the motions is complete, and the Court is ready to rule.  (Dkt. Nos. 39, 45, 48, 50, 52, 53.)

## II.     Legal Standard

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads facts that would allow "the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (quoting *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 214 (2d Cir. 2003)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

## III.    Discussion

Whether DB is entitled to the default protection payment under the swap depends on whether it has breached the Confirmation.  CRC advances several theories of breach.  First, CRC alleges that DB has violated the Confirmation by restructuring the Conergy loans in 2010 and 2011.  (CRC Compl. ¶¶ 49–56.)  Second, CRC alleges that DB improperly accelerated its work-

out process for Conergy loans in 2018.  (CRC Compl. ¶¶ 57–61.)  Third, CRC alleges that DB breached the Confirmation by failing to remove the allegedly ineligible Conergy loans from the Reference Portfolio.  (CRC Compl. ¶ 62.)  Finally, CRC alleges that DB breached the Confirmation by making an improper payment demand pursuant to an inadequate Accountant Certification.  (CRC Compl. ¶¶ 63–67.)

In response, DB argues that CRC's claims premised on DB's conduct with regard to the Conergy restructuring in 2010 and 2011 are time-barred.  (Dkt. No. 45 at 10–11, 15.)  DB also contends that its conduct in restructuring the Conergy loans were in full compliance with the Confirmation, which in turn, renders the Conergy loans eligible for default protection.  (Dkt. No. 45 at 11–21.)  As a result, DB maintains, it is not obliged to remove the Conergy loans from the Reference Portfolio and its Accountant Certification was proper.  (Dkt. No. 45 at 23.)  In addition, DB also contends that it properly carried out the work-out process of the Conergy loans.  (Dkt. No. 45 at 21–23.)

Because the Court concludes that the Accountant Certification that DB procured is erroneous in that it wrongly certified ineligible Reference Obligations, DB is not entitled to any default protection payment for the Conergy loans.  The Court therefore need not examine the other grounds for breach.

### A.     Statute of Limitations

In New York, the statute of limitations for a breach-of-contract claim runs for six years from the time of accrual—which is generally the time of the breach.  *John J. Kassner & Co. v. City of N.Y.*, 46 N.Y.2d 544, 548 (1979); *see also* N.Y. C.P.L.R. § 213(2).  A claim accrues "when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court."  *Aetna Life & Cas. Co. v. Nelson*, 67 N.Y.2d 169, 175 (1986).

DB argues that CRC's breach-of-contract claims are time-barred because they are predicated on DB's conduct in connection with Conergy's restructuring in 2010 and 2011. (Dkt. No. 45 at 10–11, 15.) DB contends CRC's claims accrued when the alleged breach occurred—more than six years before the filing of this lawsuit. (*Id.*) As a result, DB argues, these claims are time-barred. (*Id.*)

DB might be correct if CRC's breach-of-contract claims were solely based on DB's conduct in 2010 and 2011, because "all of the facts necessary to" raise such a claim would have already occurred by then. *Aetna Life & Cas. Co.*, 67 N.Y.2d at 175. It would be disingenuous for CRC to argue that it had to wait until DB demanded payment in 2018 before it could sue DB for breaches that occurred in 2010 or 2011. *See T & N PLC v. Fred S. James & Co. of N.Y., Inc.*, 29 F.3d 57, 59 (2d Cir. 1994) ("[T]he [New York] Court of Appeals . . . has declined to adopt an accrual-at-injury rule, even where breach and damages are not simultaneous.").

However, CRC's improper certification claim presents a different question. In its pleadings, CRC asserts that DB is not entitled to any payment because it has failed to satisfy the conditions precedent to receiving payments. (*See generally* CRC Compl. ¶¶ 63–67.) More specifically, CRC alleges that DB "provid[ed] CART 1 with a Credit Event notice that falsely indicated the relevant Reference Obligations were entitled to protection under the swap." (CRC Compl. ¶ 64.) CRC also alleges that DB "obtained a bogus Accountant Certification" because "DB did not provide the Accountant with CRC's letters," which would have revealed the ineligibility of the Conergy loans, and as a result, the Accountant only "rubber-stamp[ed]" a certification based on DB's false assertions. (CRC Compl. ¶¶ 65–66.) And because the improper certification claim accrued only after DB had procured the allegedly invalid

certification in early 2018, CRC argues that its claim based on improper certification is timely. (Dkt. No. 48 at 14.)

The New York state court cases, *Craft EM CLO 2006-1, Ltd. v. Deutsche Bank AG*, No. 656152/16, 2017 WL 3527488 (N.Y. Sup. Ct. Aug. 14, 2017) ("*Craft I*"), and *Craft EM CLO 2006-1, Ltd. v. Deutsche Bank AG*, No. 656152/16, 2018 WL 5084811 (N.Y. Sup. Ct. Oct. 15, 2018) ("*Craft II*") (collectively, "*Craft*"), support CRC's argument. The *Craft* court encountered a similar situation, in which Deutsche Bank was alleged to have breached a credit default swap agreement. *Craft I*, 2017 WL 3527488, at *1–2. The *Craft* plaintiff asserted breach-of-contract claims on the theory that Deutsche Bank had included ineligible loans in the swap's underlying portfolio and obtained improper accountant certifications. *Id.* at *2. The *Craft I* court decided that the claim for violating the loan eligibility criteria occurred at the time when the ineligible loans were added to the portfolio. *Id.* at *4. Because the loans were added more than six years prior to the commencement of the *Craft* action, the court held that those claims were time-barred. *Id.* at *5. But it reserved judgment on the improper certification claims because the issuance dates of the certifications were unclear. *Id.* Following limited discovery as to the issuance dates of the certifications, the court held in *Craft II* that improper certification claims are timely if they are based on certifications issued no more than six years prior to the initiation of the action. *Craft II*, 2018 WL 5084811, at *1. In other words, an improper certification claim accrues when such a certification is issued.

DB fails to address the timeliness of CRC's improper certification claim. Instead, DB attempts to distinguish *Craft II* by stating that "CRC does not adequately allege a violation of any contract based on Deutsche Bank's 2018 accountant verification. *See, infra, section II*." (Dkt. No. 52 at 4 n.2.) The "*section II*" that DB refers to, in turn, argues that DB's conduct in

12

restructuring the Conergy loans complied with the Confirmation. (*See* Dkt. No. 52 at 5–11.) But this argument has no bearing on whether CRC's improper certification claim is timely. Because dismissing a claim as time-barred at the pleading stage is "appropriate only if a complaint clearly shows the claim is out of time," and DB has failed to demonstrate that this condition has been satisfied, the Court declines to dismiss CRC's improper certification claim as untimely. *Harris v. City of N.Y.*, 186 F.3d 243, 250 (2d Cir. 1999).

### B. Breach of Contract

The viability of CRC's improper certification claim turns on whether DB's Accountant Certification complies with the Confirmation. The Confirmation mandates, among other things, that the Certification must certify that any defaulted Reference Obligation satisfies the Reference Obligation Eligibility Criteria. (Confirmation at 15.) CRC argues that because the Conergy loans fail to satisfy the Reference Obligation Eligibility Criteria, the Accountant Certification was improperly issued. In support of its claim that the Conergy loans were ineligible, CRC advances several theories. (*See* Dkt. No. 48 at 14–23.) The Court is persuaded by CRC's argument that the Conergy loans were ineligible because their maturity date was later than the contractual cut-off date. As such, the Court need not reach CRC's other arguments.

CRC argues that the Conergy loans were ineligible to serve as Reference Obligations because they were due after June 15, 2015—a contractual cut-off date set forth in Schedule F. (Dkt. No. 48 at 14.) In essence, Schedule F contains a servicing principle that prohibits DB from altering the maturity dates of any Reference Obligations to dates later than the contractual cut-off date—June 15, 2015.[7] (Confirmation at 62; DB Compl. ¶ 52; CRC Compl. ¶ 54.) CRC

---

[7] Schedule F provides that DB "shall only agree to payment rescheduling or debt restructuring of a Reference Obligation . . . if the Reference Obligation, under the altered

contends that the Conergy loans breached this servicing principle because they did not come due until July 21, 2015, more than one month after the contractual cut-off date. (CRC Compl. ¶ 54.)

DB never disputes the fact that the Conergy loans breached the servicing principle set out in Schedule F. (*See* Dkt. No. 45 at 18–21; Dkt. No. 52 at 9–11.) Instead, it argues that missing the "cut-off date does not implicate [the Reference Obligation Eligibility Criteria] and, therefore, does not affect the eligibility of the debt." (Dkt. No. 52 at 9.)

The disputed question, then, is solely whether the Reference Obligation Eligibility Criterion (e) has incorporated the servicing principles in Schedule F, such that DB's violation of one servicing principle in Schedule F would render the Conergy loans ineligible. The Court starts its inquiry with the language of the contract.

Reference Obligation Eligibility Criterion (e), provides, in relevant part, that

> [each] Reference Obligation . . . shall be a loan . . . whose repayment is primarily dependent upon the creditworthiness of a small or medium-sized enterprise, as determined by the relevant DB Group Entity in accordance with the Credit and Collection Policies.

(Confirmation at 45.)

The Credit and Collection Policies referenced above are, in turn, defined in the "General Terms" section of the Confirmation. In relevant part, the Confirmation provides

> "**Credit and Collection Policies**" means the standard credit and collection policies of Deutsche Bank AG as amended or supplemented from time to time in accordance with the Servicing Standards.

(Confirmation at 7.)

---

repayment schedule or as restructured, is due to be repaid in full before the Scheduled Termination Date." (Confirmation at 62.)

The Scheduled Termination Date is the "Payment Date (as defined in the Indenture) falling in June 2015." (Confirmation at 3.) The Indenture identifies the "Payment Date[]," as relevant, as June 15, 2015. (Dkt. No. 49-3 at 100.)

In the same section of the Confirmation, the "Servicing Standards" referenced above are defined as follows:

> "**Servicing Standards**" means the servicing principles set forth in Schedule F hereto, as amended, modified or supplemented from time to time by Deutsche Bank AG or any other relevant DB Group Entity.

(*Id.*)

It is plain that the Servicing Standards set out in Schedule F are properly incorporated into Reference Obligation Eligibility Criterion (e), through the definitions of "Credit and Collection Policies" and "Servicing Standards." *See Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms[.]"). Indeed, DB fails to dispute this chain of cross-references. (*See* Dkt. No. 52 at 9–10.)

Because the Conergy loans were not made in compliance with the Credit and Collection Policies, they do not satisfy Reference Obligation Eligibility Criterion (e). In light of the ineligibility of the Conergy loans, the Accountant Certification that DB procured is clearly erroneous, thus breaching a substantive condition precedent to DB's right to payment. As a result, the Court concludes that DB is not entitled to the disputed credit payment from CART 1.

### C. Tortious Interference with Contract

Finally, DB asserts a tortious interference with contract claim against CRC, alleging that CRC has unjustifiably induced BNYM, the Indenture Trustee, to breach its contractual obligation by withholding payment. (DB Compl. ¶¶ 88–95.)

To prove a claim for tortious interference with contract, a plaintiff must show: (1) the existence of a valid contract; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of a third-party's breach without justification; (4) actual breach of the

15

contract; and (5) damages caused by breach of the contract. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996).

As discussed earlier, DB is not entitled to any payment in relation to the default of Conergy loans because of its own breach. Accordingly, BNYM's withholding of payment does not constitute an "actual breach of the contract." *Id.* Because DB has failed to allege a necessary component of its tortious interference claim, DB's claim must be dismissed.

**IV.    Conclusion**

For the foregoing reasons, CRC's motion to dismiss is GRANTED, and DB's motions to dismiss are DENIED.

The parties are directed to meet and confer regarding any further proceedings and to submit a joint letter within 21 days after the date of this opinion and order.

The Clerk of Court is directed to close the motions at Docket Numbers 37, 44, and 47.

SO ORDERED.

Dated: September 9, 2019
       New York, New York

_____
J. PAUL OETKEN
United States District Judge