UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF NEW YORK MELLON, LONDON BRANCH, as Indenture Trustee under the Indenture dated as of April 30, 2007,

        Interpleader Plaintiff,

-v-

CART 1, LTD., as Issuer, DEUTSCHE BANK AG FRANKFURT, as Swap Counterparty, and CRC CREDIT FUND, LTD.,

        Interpleader Defendants.

18-CV-6093 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

    On November 30, 2020, the Court issued an Opinion and Order granting a motion for reconsideration that had been filed by Deutsche Bank AG Frankfurt (together with its affiliates, "DB"). (Dkt. No. 70.) In doing so, the Court reversed its earlier interpretation of the Confirmation, a contract that governs a credit default swap entered into by DB and CART 1, Ltd., a special-purpose vehicle created by DB. On December 4, 2020, CRC Credit Fund, Ltd. ("CRC"), a holder of notes issued by CART 1, moved for clarification of the November 30, 2020 Opinion and Order, inquiring about the status of its breach-of-contract theories that were not predicated on the earlier interpretation. (Dkt. No. 71.) Ten days later, on December 14, 2020, CRC moved for reconsideration of the November 30, 2020 Opinion and Order. The motion for clarification is granted, and the motion for reconsideration is denied.

    Additionally, in response to CRC's motion for clarification, the Court resolves the yet-unaddressed arguments raised in DB's October 30, 2018 motion to dismiss and CRC's November 20, 2018 motion to dismiss. For the reasons that follow, DB's motion to dismiss is

1

granted in part and denied in part, and CRC's motion is granted. Familiarity with the background of this case, as set forth in the Court's previous opinions and orders, is assumed.

## I. Motion for Clarification

In its motion for clarification, CRC "asks the Court to clarify whether any further decision on [DB's motion to dismiss] is forthcoming or whether CRC may now proceed to discovery." (Dkt. No. 71 at 3.) It argues that "the Cout did not rule on CRC's other bases for relief," beyond its theory that DB submitted an accountant certification that wrongly certified loans that were due after June 15, 2015. DB, in response, argues that several of CRC's other bases for relief have already been rejected and that the November 30, 2020 Opinion and Order actually "compels reinstatement of [its] cross-claim for tortious interference." (Dkt. No. 72 at 2.)

CRC and DB are correct that the November 30, 2020 Opinion and Order is unclear as to the status of their claims against one another. *See Metcalf v. Yale Univ.*, No. 15-cv-1696, 2019 WL 1767411, at *2 (D. Conn. Jan. 4, 2019) ("[A] motion for clarification is not intended to alter or change a cout's order, but merely to resolve alleged ambiguities in that order."). Like the parties' briefing of the motion for reconsideration, the November 30, 2020 Opinion and Order limited itself to discussing the appropriate interpretation of the Confirmation, not the full slate of arguments advanced in the parties' respective motions to dismiss. It was not the final word on the dismissal or reinstatement of CRC's or DB's claims. As CRC suggests, a further decision on the parties' motions to dismiss is due. That decision is contained below.

## II. Motion for Reconsideration

In the November 30, 2020 Opinion and Order, the Court concluded that Criterion (e) of the Confirmation's Reference Obligation Eligibility Criteria does not incorporate the servicing principles set forth in Schedule F of the agreement. In reaching this conclusion, the Court rejected CRC's argument that Criterion (e)'s reference to the agreement's "Credit and Collection

2

Policies" incorporates those policies in full and that those policies, in turn, incorporate Schedule F in full. CRC now asserts, for the third time, that the Court should read into the Confirmation this tenuous chain of incorporation.

CRC's arguments are unavailing. In general, CRC rehashes its interpretation of language that the November 30, 2020 Opinion and Order cited and expressly considered. Motions for reconsideration, however, are not an opportunity for "relitigating old issues" or taking a second — or third, as it may be — bite at the apple. *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). The only relevant language that CRC mentions and that the November 30, 2020 Opinion and Order did not cite is a sentence at the start of Schedule F: "Except as otherwise described herein, each DB Servicer shall [service loans] in compliance with the Credit and Collection Policies." (Dkt. No. 49-1 at 61.) Instead of supporting CRC's effort to shoehorn Schedule F into the Credit and Collection Policies, this sentence contemplates that Schedule F may conflict with the Credit and Collection Policies. Contrary to CRC's suggestion, this confirms that CRC's chain of incorporation is broken. CRC falls short of showing any error in the November 30, 2020 Opinion and Order, let alone the kind of clear error that would warrant reconsideration. *See Virgin Atl. Airways, Ltd. v. Nat'l Mediation Md.*, 956 F.2d 1245, 1255 (2d Cir. 1992).

### III. DB's Motion to Dismiss

Having resolved the pending motions for clarification and reconsideration, the Court turns to CRC's remaining breach-of-contract theories: (1) that DB improperly accelerated its write-off of the disputed Conergy loans; (2) that DB failed to remove the disputed Conergy loans when CRC challenged the eligibility of those loans; and (3) that DB's accountant certification certified loans that were ineligible based on qualities aside from their maturity date. (Dkt. No. 71.) Notably, the Court previously rejected CRC's theory that DB breached the Confirmation at

3

the time it added the disputed Conergy loans to its loan portofio; the September 9, 2019 Opinion and Order determined that claims based on this theory would be time-barred. (Dkt. No. 57 at 11.)

Taking the remaining theories in turn, CRC's argument that DB prematurely wrote off the disputed Conergy loans does not pass muster. Conergy filed for bankruptcy on July 5, 2013, roughly two years before the loans were due. (Dkt. No. 43 ¶¶ 9, 57.) The deadline for repaying the loans, July 21, 2015, came and went. (Dkt. No. 43 ¶ 9.) DB recouped nothing until December 2017, when Conergy made a payment of €21,000, representing less than one-tenth of one percent of the outstanding €23,774,772 owed. (Dkt. No. 43 ¶¶ 16, 58.) In March 2018, three months before its deadline for doing so, DB informed CRC that it would not be able to recover the outstanding debt, that it was writing off the debt, and that it was invoking CART 1's credit protection. (Dkt. No. 43 ¶¶ 25, 58.) Notwithstanding CRC's contention that the timing of DB's write-off suggests impropriety, CRC's own allegations suggest that DB acted within its rights. According to CRC, DB was entitled to "write off a Reference Obligation [] if it determined that it was 'probable' no further recovery could be had." (Dkt. No. 43 ¶ 60.) At the time DB wrote off the loans, Conergy had been in default for years. Nothing indicated that non-trivial payments would be forthcoming. CRC has not plausibly pleaded that DB departed from its standard servicing procedures in writing off the loans in March 2018.

CRC's second and third breach-of-contract theories are somewhat more successful. The theories are both predicated on the ineligibility of the disputed Conergy loans, and CRC offers two ways in which the loans may have run afoul of the Confirmation's Reference Obligation Eligibility Criteria and Replenishment Conditions. Specifically, CRC argues that the loans were ineligible because they had a DB internal rating below iB- and also because DB substituted loans

4

from one Conergy entity with loans from a different Conergy entity. (Dkt. No. 43 ¶¶ 26–31.) Although the former theory of ineligibility runs counter to the text of the Confirmation, the latter finds support in the Confirmation's demands and CRC's factual allegations.

To explain: CRC is correct that Criterion (a) of the Reference Obligation Eligibility Criteria requires eligible loans to have an "Internal Rating of 'iB-' or better." (Dkt. No. 49-1 at 45.) But CRC is incorrect that Criterion (a) is applicable in all circumstances. The Confirmation's Replenishment Conditions in Schedule D expressly create an exception to the application of Criterion (a):

> If a Reference Obligation . . . is partially or fully . . . cancelled . . . , then [DB] may elect to . . . substitute another obligation of the applicable Reference Entity that satisfies the Reference Obligation Eligibility Criteria other than clauses (a) and (c) thereof (the "**Substitute Reference Obligation**") for the . . . cancelled portion of such Reference Obligation…

(Dkt. No. 49-1 at 47.) In restructuring the original Conergy loans and substituting them with lower-rated Conergy loans, DB operated within the exception. This conclusion accords not only with the plain meaning of the exception but also with common sense. *See Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010) ("The [contract] must be read . . . in a manner that accords the words their fair and reasonable meaning, and achieves a practical interpretation of the expressions of the parties" (internal quotationmarks and citation omitted)). CRC stood to benefit from the restructuring and substitution, as Conergy's default on the original loans was all but guaranteed. Even if the substituted loans had a sub-iB- rating, they at least presented the possibility of repayment. That this possibility never manifested does not permit CRC to erase the exception in the Replenishment Conditions and place itself in a better position than it would have been in, had DB allowed Conergy to default in the first instance.

CRC's other challenge to the substituted loans' eligibility revolves around the same provision in the Replenishment Conditions. This provision envisions DB substituting canceled loans with other loans from "the applicable Reference Entity." It does not permit DB to substitute loans from one entity with loans from a wholly separate entity. In its pleadings, CRC asserts that DB "replaced a loan to one Conergy entity but then included a €2.922 million loan to a *different* Conergy entity in the reference portfolio." (Dkt. No. 43 ¶ 11 (emphasis in original).) DB construes this assertion as "nothing more than rank speculation" and argues that CRC "does not plead facts supporting an inference that €2.922 million came from [a different] Reference Entity." (Dkt. No. 52 at 9.) The Court disagrees. CRC's assertion is supported by its allegations that DB "reported four Reference Obligations for Reference Entity 6622834 in the amounts of €2,922,816, €636,161, €5,802,952, and €13,810,886" (Dkt. No. 43 ¶ 53) and that DB added, as a substitution, "a €2.922 million loan from . . . Reference Entity No. 6993794." (Dkt. No. 43 ¶ 56.) It can be reasonably inferred that the reported €2.922 million loan for Reference Entity 6622834 was substituted with the €2.922 million loan for Reference Entity 6993794.

If DB did in fact substitute a €2.922 million loan from one Conergy entity with a €2.922 million loan from another, the substituted loan would be ineligible. And when CRC flagged the €2.922 million loan's noncompliance with the Replenishment Conditions, DB would have been bound to remove it. Similarly, the accountant certification that DB procured would have been erroneous. CRC can proceed to discovery on its breach-of-contract claim, insofar as it relates to the €2.922 million loan and Conergy's supposedly improper substitution. CRC's breach-of-contract claim is dismissed to the extent it addresses loans other than the €2.922 million loan.

## IV.  CRC's Motion to Dismiss

The Court's November 9, 2019 Opinion and Order dismissed DB's tortious-interference claim against CRC based on its now-vacated interpretation of Criterion (e).  (Dkt. No. 57 at 16.)  In dismissing DB's claim, the Court declined to address CRC's economic interest defense.  The Court now considers this defense and concludes that it warrants the dismissal of DB's claim.

A tortious-interference claim must satisfy five elements: "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 424 (1996).  The economic interest defense goes to the third of these elements.  *See Felsen v. Sol Café Mfg. Corp.*, 24 N.Y.2d 682, 687 (1969).  A party can be "economically justified in procuring [a] breach of contract" when it does so "to protect its own legal or financial stake in the breaching party's business." *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007).

CRC argues that, in inducing the Bank of New York Mellon ("BNYM") to withhold credit protection payments from DB, it safeguarded its financial stake in CART 1, for which BNYM served as trustee.  This is sufficient to invoke the economic interest defense.  To be sure, and as DB argues, not all economic interests give rise to a colorable economic interest defense.  A "generalized economic interest" in growing profits, as may be at stake when a "defendant who is simply plaintiff's competitor [] knowingly solicits its contract customers," does not justify an interference. *Id*. at 425–26.  Nevertheless, the economic interest defense is available in a broad range of contexts in which a party procures a breach supposedly "in the exercise of an equal or superior right." *Felsen*, 24 N.Y.2d at 687 (citation omitted).  The New York Court of Appeals has endorsed the application of the defense "where defendants were significant stockholders in

7

the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff." *White Plains Coat & Apron Co.*, 8 N.Y.3d at 426 (footnotes omitted). Here, CRC was an "express third party beneficiary of [the CART 1] Indenture . . . with the power to exercise any right so granted as if a party [t]hereto." (Dkt. No. 28-3 at 76.) Furthermore, under the Indenture, BNYM's disbursement of credit protection payments to DB would reduce CRC's own payouts. (Dkt. No. 28 ¶ 59.) It follows that CRC had a legal and a financial interest in BNYM's proper management of the CART 1 funds. Even if CRC procured BNYM's breach of the Indenture, it was justified in any good-faith attempt to enforce its rights. *See Don King Prods., Inc v. Smith*, 47 F. App'x 12, 16 (2d Cir. 2002). DB's tortious-interference claim is dismissed accordingly.

V.     **Conclusion**

For the foregoing reasons, CRC's motion for clarification is GRANTED, and its motion for reconsideration is DENIED. DB's motion to dismiss is GRANTED in part and DENIED in part, and CRC's motion to dismiss is GRANTED.

The parties are directed to confer and propose a discovery schedule within 14 days following the date of this Opinion and Order.

The Clerk of Court is directed to close the motions at Docket Numbers 71 and 74.

SO ORDERED.

Dated: June 9, 2021
       New York, New York

_____
                                    J. PAUL OETKEN
                                    United States District Judge